**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,<br><br>Plaintiff,<br><br>v.<br><br>KEITH E. SONDERLING and ELISABETH MESSENGER,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:26-cv-02061 (JEB)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES.................................................................................................II

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 4

    I.    Legal Background.............................................................................................. 4

    II.   Factual Background ........................................................................................... 7

          A.    DOL Proposes, Withdraws, and Suddenly Finalizes Substantial Changes to Labor Organizations' Form LM-2 Reporting Obligations. ................................................. 7

          B.    The AFL-CIO and Hundreds of Other Labor Organizations Scramble To Bring Their Accounting Systems into Compliance with the New Rule. .......................... 10

LEGAL STANDARD ..................................................................................................... 15

ARGUMENT................................................................................................................. 15

    I.    This Court Should Issue a Preliminary Injunction Postponing the Rule's Effective Date Until At Least January 1, 2027. ......................................................................... 15

          A.    The AFL-CIO and Its Member Unions Will Suffer Irreparable Injury Absent a Preliminary Injunction. ............................................................................. 16

          B.    The AFL-CIO Is Likely To Succeed on the Merits of Its Claim That the Rule's July 1 Effective Date Is Arbitrary and Capricious. ................................................. 20

          C.    The Balance of Equities Favors a Preliminary Injunction. ..................................... 27

CONCLUSION.............................................................................................................. 30

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.B.-B. v. Morgan*,
548 F. Supp. 3d 209 (D.D.C. 2020) ........................................................................21

\**AFL-CIO v. Chao* ("*Chao I*"),
297 F. Supp. 2d 155 (D.D.C. 2003) ...............................4, 6, 16, 19, 20, 21, 22, 25, 26, 27, 28

\**AFL-CIO v. Chao* ("*Chao II*"),
298 F. Supp. 2d 104 (D.D.C. 2004) .................................6, 16, 20, 21, 22, 23, 25, 27

*AFL-CIO v. Chao* ("*Chao III*"),
409 F.3d 377 (D.C. Cir. 2005) ..........................................................................4, 6

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) .........................................................................21, 26

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ....................................................................................2, 29

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Donovan*,
543 F. Supp. 1282 (D.D.C. 1982) ..........................................................................28

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020) ........................................................................28

*District of Columbia v. USDA*,
444 F. Supp. 3d 1 (D.D.C. 2020) .......................................................................16, 19

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......................................................................................21

*Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) .............................................................................27

*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022) .............................................................................15

*Jenner & Block LLP v. DOJ*,
784 F. Supp. 3d 76 (D.D.C. 2025) .........................................................................16

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ...............................................................................28

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......................................................................................21

*Nat. Res. Def. Council, Inc. v. EPA*,
  683 F.2d 752 (3d Cir. 1982)................................................................................................21

*Nat'l Ass'n of Indep. Television Producers & Distribs. v. FCC* ("*Television Producers*"),
  502 F.2d 249 (2d Cir. 1974)..........................................................................................15, 21

*Perkins Coie LLP v. DOJ*,
  783 F. Supp. 3d 105 (D.D.C. 2025)....................................................................................29

*Sierra Club v. Jackson*,
  833 F. Supp. 2d 11 (D.D.C. 2012)......................................................................................15

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) (per curiam).......................................................................16

**Statutes**

5 U.S.C. § 705...................................................................................................................15

29 U.S.C. § 431....................................................................................................................4

29 U.S.C. § 438....................................................................................................................4

**Proposed and Final Rules**

25 Fed. Reg. 433 (Jan. 20, 1960)..........................................................................................5

Filing Thresholds for Forms LM-2, LM-3, and LM-4 Labor Organization Annual
  Reports, 90 Fed. Reg. 28251 (proposed July 1, 2025)..........................................................8

Labor Organization Annual Financial Reports,
  57 Fed. Reg. 14244 (proposed Apr. 17, 1992).....................................................................5

Labor Organization Annual Financial Reports,
  57 Fed. Reg. 49282 (Oct. 30, 1992)..............................................................................5, 26

Labor Organization Annual Financial Reports,
  58 Fed. Reg. 67594 (Dec. 21, 1993).....................................................................................6

Labor Organization Annual Financial Reports,
  68 Fed. Reg. 58374 (Oct. 9, 2003).......................................................................................6

Labor Organization Annual Financial Reports,
  74 Fed. Reg. 3678 (Jan. 21, 2009)..................................................................................7, 26

Labor Organization Annual Financial Reports,
  74 Fed. Reg. 52401 (Oct. 13, 2009)......................................................................................7

Labor Organization Annual Financial Reports,
91 Fed. Reg. 32556 (June 1, 2026) ...................................................1, 7, 8, 9, 10, 11, 12, 17, 24

Labor Organization Annual Financial Reports and Abbreviated Annual Financial
Reports for Small Labor Organizations,
58 Fed. Reg. 28304 (May 12, 1993) ................................................................................5, 6, 26

Labor Organization Annual Financial Reports: LM Form Revisions,
85 Fed. Reg. 64726 (proposed Oct. 13, 2020) .......................................................................7, 8

**Other Authorities**

29 C.F.R. § 403.3 ...........................................................................................................................4

29 C.F.R. § 403.4 ...........................................................................................................................4

Air Line Pilots Ass'n, Comment Letter on Proposed Rule Labor Organization
Annual Financial Reports: Form Revisions (Dec. 7, 2020),
https://www.regulations.gov/comment/LMSO-2020-0002-0042 ...........................................23

Am. Postal Workers Union, Comment Letter on Proposed Rule Labor
Organization Annual Financial Reports: Form Revisions (Dec. 14, 2020),
https://www.regulations.gov/comment/LMSO-2020-0002-0080 ...............................13, 18, 23

Ass'n of Flight Attendants, Comment Letter on Proposed Rule Labor
Organization Annual Financial Reports: Form Revisions (Dec. 14, 2020),
https://www.regulations.gov/comment/LMSO-2020-0002-0069 ...........................................23

DOL, Off. of Lab.-Mgmt. Standards, Form LM-2 Labor Organization Annual
Report (2013),
https://www.dol.gov/sites/dolgov/files/OLMS/regs/compliance/GPEA_Forms/
forms/lm2_form_facsimile_2022.pdf .......................................................................................5

DOL, Off. of Lab.-Mgmt. Standards, Instructions for Form LM-2 Labor
Organization Annual Report (2022),
https://www.dol.gov/sites/dolgov/files/OLMS/regs/compliance/GPEA_Forms/
2020/efile/LM-2_instructions.pdf ..............................................................................................5

*Labor Organization Annual Financial Reports Rule Actions*, OIRA,
https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=
1245-AA10 (last visited June 11, 2026) ....................................................................................8

Legacy Pros. LLP, Comment Letter on Proposed Rule Labor Organization Annual
Financial Reports: Form Revisions (Dec. 14, 2020),
https://www.regulations.gov/comment/LMSO-2020-0002-0074 ...........................................23

WithumSmith+Brown, Comment Letter on Proposed Rule Labor Organization
   Annual Financial Reports: Form Revisions (Dec. 11, 2020),
   https://www.regulations.gov/comment/LMSO-2020-0002-0097 ............................................23

**INTRODUCTION**

Under the Labor-Management Reporting and Disclosure Act ("LMRDA"), covered labor organizations must report their financial activities in annual forms prescribed by the Department of Labor ("DOL" or "Department"). These forms require filing organizations to fill out hundreds of pages of detailed financial information, which are then publicly posted and searchable on the Department's website. The LMRDA's reporting requirements apply to thousands of labor organizations across the country, including Plaintiff American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO"), its member unions, and its member unions' affiliates.

To meet their LMRDA financial-reporting obligations, Plaintiff AFL-CIO and its affiliates have built and implemented complex accounting systems to track, process, and report their financial activities. These systems were developed with the LMRDA's specific financial-reporting requirements in mind, which effectively have remained the same since 2003.

On June 1, 2026, DOL suddenly and substantially amended that reporting regime. It issued a final rule that subjects labor organizations like Plaintiff AFL-CIO to a whole host of new reporting burdens—greatly expanding the types of financial transactions that many unions must itemize, categorize, and disclose. *See* Labor Organization Annual Financial Reports, 91 Fed. Reg. 32556 (June 1, 2026) (the "Rule").

To take just one example: Since the LMRDA was passed in 1959, labor organizations that directly pay for their employees' business travel have not had to allocate and report those expenses on an employee-by-employee basis. The Rule changes that, requiring filing organizations to report all of their business-travel costs *by employee*. Suppose, therefore, that a union sends a group of staff employees to attend collective-bargaining negotiations for several weeks, and the union pays for their lodging by booking a block of rooms at a hotel and for their travel by purchasing a set of seats from an airline. Under the Rule, the union will now need to disaggregate the total hotel and

airplane costs, assign to each specific employee their share of those expenses, and then report each share alongside that employee's salary.

The Rule also creates numerous new categories into which individual expenses must be classified, with the contours of those categories far from clear. Unions, for example, now must classify individual political expenses as either "Political Activities" *or* "Lobbying." On top of that, the Rule also requires certain labor organizations to disclose the membership and dues status of many of the workers they represent.

On their own, these and other changes raise serious questions as to whether DOL has complied with the Administrative Procedure Act ("APA"). Indeed, the revisions—and in particular the revisions requiring disclosure of many individuals' membership and dues status—rest on a DOL interpretation of its statutory authority that is so expansive, and so invasive of associational and free-speech interests, as to raise serious questions as to whether it can survive constitutional scrutiny. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021).

But DOL has turned what would be a serious problem into an immediate crisis by making the Rule effective on July 1, 2026—just thirty days after it was finalized. That thirty-day deadline is the shortest lead time DOL has ever given labor organizations to adjust to new Form LM-2 reporting obligations. It means, starting on July 1, any labor organization beginning a new fiscal year must report new transactions in accordance with the new Rule. And as a practical matter, it means that, starting on July 1, any labor organization beginning its fiscal year must have accounting systems in place tailored to the Rule's new reporting requirements—or else spend considerable resources retroactively recoding and reprocessing countless receipts, disbursements, and transactions.

2

The July 1 effective date has immediate consequences for labor organizations whose fiscal years begin on or soon after July 1—including the AFL-CIO, many of its member unions, and many of their affiliates. These labor organizations will have just a few weeks to try to revamp their accounting systems before the Rule kicks in, their fiscal years start, and new transactions fall within the Rule's new reporting requirements. That is not a realistic schedule. Overhauling an organization's accounting systems takes *several months*, if not longer. As a result, these labor organizations will inevitably be forced to record new transactions on out-of-date systems that were not designed for the Rule's new requirements, and then spend additional time and money correcting those records once their up-to-date systems are finally in place. These expenses will be significant, forcing labor organizations to divert resources from the important services they provide their members—the very workers in whose interests DOL professes to speak. None of these expenditures would be recoverable at the end of the litigation.

DOL provided no justification for this rushed timeline and the considerable burdens it will impose on labor organizations like Plaintiff AFL-CIO and its member unions. Although the APA's prohibition against arbitrary and capricious agency action applies to all important components of a rule—including its effective date—DOL failed to seriously engage with the comments explaining why a thirty-day effective date was unworkable. Still less did the Department attempt to justify that rushed deadline by reference to any exigency. Nor could it. The fact that DOL took almost six years to finalize the Rule nullifies any suggestion of urgency in implementing the new reporting regime. The APA does not permit such an unduly burdensome and unreasoned course of action.

The AFL-CIO's complaint includes four causes of action, the second of which is a claim that, independent of the Rule's other legal defects, the Rule's effective date is itself arbitrary and capricious. This Court can and should grant immediate relief on that claim alone—without needing

3

to delve into Plaintiff AFL-CIO's other three causes of action at this preliminary stage. Indeed, this Court enjoined DOL from attempting to force labor organizations into a near-identical predicament in 2003 when, faced with a multicount complaint challenging a predecessor rule, it accelerated consideration of the count aimed at the rule's effective date. *See AFL-CIO v. Chao*, 297 F. Supp. 2d 155, 164–65 (D.D.C. 2003) ("*Chao I*") (enjoining effective date of rule instituting major changes to Form LM-2). The Court should do the same here and postpone the Rule's July 1 effective date until at least January 1, 2027, such that the Rule would apply prospectively to labor organizations whose fiscal years begin on or after the revised effective date.

## BACKGROUND

### I.    Legal Background

In 1959, Congress passed, and President Eisenhower signed, the Labor-Management Reporting and Disclosure Act. Title II of the LMRDA requires each covered "labor organization" to file an annual financial report with the Secretary of Labor, "in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year." 29 U.S.C. § 431(b). The Act also authorizes the Secretary to issue rules "prescribing the form and publication" of such reports. *Id.* § 438.

Exercising that authority, the Secretary has long required covered labor organizations to submit one of three DOL-prescribed forms, depending on the filer's gross annual receipts. Prior to the Rule, the labor organizations with the largest gross annual receipts filed their reports on a Form LM-2, while labor organizations with smaller receipts filed their reports on simplified Forms LM-3 and LM-4. *AFL-CIO v. Chao*, 409 F.3d 377, 379 (D.C. Cir. 2005) ("*Chao III*"); *see* 29 C.F.R. §§ 403.3, 403.4.

The Form LM-2 contains extensive reporting requirements. Since 2003, it has obligated filers to compile and disclose, in a searchable form posted on the DOL's website, all sorts of

4

detailed financial information—a process that involves filling out hundreds of entries across twenty different schedules. *See* DOL, Off. of Lab.-Mgmt. Standards, Form LM-2 Labor Organization Annual Report (2013), https://www.dol.gov/sites/dolgov/files/OLMS/regs/ compliance/GPEA_Forms/forms/lm2_form_facsimile_2022.pdf (form); DOL, Off. of Lab.- Mgmt. Standards, Instructions for Form LM-2 Labor Organization Annual Report (2022), https://www.dol.gov/sites/dolgov/files/OLMS/regs/compliance/GPEA_Forms/2020/efile/LM- 2_instructions.pdf (instructions). As a result, a single Form LM-2 report often spans hundreds of pages and can take thousands of hours to complete.

DOL first introduced the Form LM-2 in 1960, shortly after the LMRDA was enacted. *See* 25 Fed. Reg. 433 (Jan. 20, 1960). Over the decades, the Department has occasionally revised the Form LM-2's reporting requirements. Crucially, each time DOL has done so, covered labor organizations have had at least several months of lead time to adjust to any new disclosure requirements.

DOL first modified the Form LM-2 reporting requirements in 1993, when it required reporting labor organizations to disclose expenses using "functional" categories (such as "organizing" or "political activities") as opposed to traditional bookkeeping categories. Labor Organization Annual Financial Reports, 57 Fed. Reg. 49282, 49285–86 (Oct. 30, 1992); *see* 57 Fed. Reg. 14244, 14245 (proposed Apr. 17, 1992). The final rule gave covered labor organizations two months of lead time "to adapt to the new reporting requirements." 57 Fed. Reg. 49282, 49287. But after receiving comments from unions and accounting firms regarding implementation difficulties, the Department concluded that "a two-month implementation period was insufficient." Labor Organization Annual Financial Reports and Abbreviated Annual Financial Reports for Small Labor Organizations, 58 Fed. Reg. 28304, 28307 (May 12, 1993). DOL acknowledged that the

implementation period "must allow adequate time for labor organizations to revise their internal records and accounting systems in order to properly classify financial transactions *prior to the beginning of the fiscal year for which the revised reporting forms must be used.*" *Id.* (emphasis added). Accordingly, DOL extended the rule's effective date by one year, before eventually rescinding the entire rule altogether. *See* Labor Organization Annual Financial Reports, 58 Fed. Reg. 67594, 67594 (Dec. 21, 1993).

The Department's next set of revisions to the Form LM-2 came in 2003. *See* Labor Organization Annual Financial Reports, 68 Fed. Reg. 58374 (Oct. 9, 2003). DOL issued a final rule "calling for several significant changes to the financial reporting requirements." *Chao III*, 409 F.3d at 380. Among other things, the Department reintroduced a version of "functional" reporting and required Form LM-2 filers to itemize certain categories of transactions above $5,000 and to estimate the portion of work time that union officials spent in the new functional categories. *Id.* The final rule gave covered labor organizations eighty-three days from the issuance date—and "less than two months" from its final-approval date—to "make the enormous changes necessary to their accounting, computer, software and staff training to comply" with the new filing obligations. *Chao I*, 297 F. Supp. 2d at 164.

The AFL-CIO sued and, at the outset of the case, asked this Court to enter a preliminary injunction postponing the rule's effective date. *Id.* at 161. The Court granted that request, finding that the transition period likely violated the APA and would cause the AFL-CIO and its member unions to suffer irreparable harm. *Id.* at 165. The Court later granted the AFL-CIO's request for permanent relief from the effective date while rejecting the other challenges to the rule. *AFL-CIO v. Chao*, 298 F. Supp. 2d 104, 106 (D.D.C. 2004) ("*Chao II*"), *aff'd in part, vacated in part, rev'd in part (all on other grounds)*, 409 F.3d 377 (D.C. Cir. 2005). The Court's ruling on the effective-

6

date issue ultimately postponed the effective date by six months, at which point a labor organization would have to prospectively comply with the new rule at the beginning of its next fiscal year. Thus, every labor organization had at least eight months to transition to the new reporting regime.

The next Form LM-2 rulemaking effort took place in 2009, when DOL again expanded unions' disclosure obligations, requiring them to report additional financial information, such as union-staff benefits, indirect travel reimbursements, and various itemized receipts. Labor Organization Annual Financial Reports, 74 Fed. Reg. 3678, 3680 (Jan. 21, 2009). That rule gave covered labor organizations nearly six months of lead time: The final rule was issued on January 21, 2009, but would apply only to labor organizations whose fiscal years "beg[a]n on or after July 1, 2009." *Id.* at 3678. The Department eventually withdrew the rule a few months later, acknowledging that it "may have underestimated the increased burden that the rule would place" on covered labor organizations. 74 Fed. Reg. 52401, 52401 (Oct. 13, 2009).

Until the events giving rise to this lawsuit, DOL did not initiate any more rulemaking proceedings seeking to revise labor organizations' Form LM-2 reporting obligations. As a result, since 2003, the Form LM-2 has remained virtually unchanged. *See* 91 Fed. Reg. at 32561.

## II.    Factual Background

### A. DOL Proposes, Withdraws, and Suddenly Finalizes Substantial Changes to Labor Organizations' Form LM-2 Reporting Obligations.

In October 2020, DOL proposed several sweeping revisions to the Form LM-2. Labor Organization Annual Financial Reports: LM Form Revisions, 85 Fed. Reg. 64726 (proposed Oct. 13, 2020) ("2020 NPRM"). First, the Department proposed substantially revising the Form LM-2's reporting requirements by expanding the sorts of financial information that filers would be required to report. *Id.* at 64745–47. Second, DOL proposed creating an entirely new, expanded form for

7

labor organizations with the largest gross annual receipts. The DOL dubbed this the "Form LM-2 Long Form," *id.* at 64734–45, a name befitting the proposed form's bureaucratic excesses. And third, DOL proposed raising the filing threshold for Form LM-2 filers from $250,000, to keep pace with inflation. *Id.* at 64747. The Department solicited and received comments on each of these proposals.

But the Department never issued a final rule in response to those comments. Instead, DOL announced on March 17, 2021, that it had "withdrawn" the 2020 NPRM, informing the public that "[a]fter review, the Department has determined to remove this entry as it is no longer necessary." *Labor Organization Annual Financial Reports Rule Actions*, OIRA, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1245-AA10 (last visited June 11, 2026).

DOL revisited the filing-thresholds proposal in July 2025. In a notice of proposed rulemaking ("2025 NPRM"), the Department suggested raising the filing thresholds for Forms LM-2, LM-3, and LM-4, and invited public comment on that specific proposal. Filing Thresholds for Forms LM-2, LM-3, and LM-4 Labor Organization Annual Reports, 90 Fed. Reg. 28251, 28251 (proposed July 1, 2025).

Notably, DOL did not solicit comments on any other proposal. Nor did it ever reference the proposed 2020 changes to Form LM-2 requirements. As the Department has acknowledged, the 2025 NPRM "did not propose revisions to other aspects of the reporting regime addressed in prior rulemakings." 91 Fed. Reg. at 32560. That decision to revisit only the filing-thresholds issue from the 2020 NPRM left the unmistakable impression that DOL had decided not to resurrect any other proposals raised in that prior rulemaking, including substantive revisions to the Form LM-2 or the creation of an entirely new form for the largest LM-2 filers. The comment period for the 2025 NPRM closed on July 31, 2025. *Id.* at 32556.

On June 1, 2026, DOL promulgated a Final Rule entitled "Labor Organization Annual Financial Reports." 91 Fed. Reg. 32556. The Rule finalized the Department's 2025 proposal to increase the filing thresholds, raising the threshold for Form LM-2 filers from $250,000 to $350,000. *Id.* at 32556.

The Rule, however, also finalized DOL's *2020 proposal* to make major revisions to the Form LM-2 and to create the new and expanded "Form LM-2 Long Form" for labor organizations with gross annual receipts of at least $40 million. *Id.* at 32594–601. The Department finalized these changes despite withdrawing them in 2021, never mentioning them since, and failing to provide any further opportunity for public comment.

These changes to labor organizations' LM-2 reporting obligations will subject filers to a whole swath of new reporting obligations. Among them:

- Form LM-2 and Form LM-2 Long Form filers must now identify the amount of common-carrier and lodging expenses that each union incurs on behalf of each individual union officer and employee for travel on official union business, even when the union pays in bulk for multiple individual travelers by procuring blocks of hotel rooms or airline seats. The union will need to report those expenses, alongside the officer or employee's salary, as if they were disbursements made directly to that officer or employee. *Id.* at 32587.

- Form LM-2 and Form LM-2 Long Form filers must specially categorize various kinds of expenditures into wholly new categories, the definitions of which are far from clear. For example, expenses that had been classified as "Political Activities and Lobbying" must now be categorized as *either* "Political Activities" or "Lobbying." *Id.* at 32589. Likewise, "Representational Activities" must now be reclassified as *either* "Contract Negotiation and Administration" or "Organizing." *Id.* at 32588–89.

- Form LM-2 Long Form filers must list and name individual union members who pay dues above a certain threshold. *Id.* at 32590. For certain unions, this requirement could effectively compel public disclosure of its membership list.

- Form LM-2 Long Form filers also must individually list per capita payments that they receive from individual affiliates; all rental income they receive; and receipts they receive on behalf of members and affiliates, among other new itemization requirements. *Id.* at 32573 & n.13, 32601.

All of these changes are set to go into effect on July 1, 2026. The Rule's new reporting obligations will apply to "labor organizations whose fiscal years begin on or after July 1, 2026." *Id.* at 32606. As a result, starting on July 1, any labor organization beginning a new fiscal year will need to process financial transactions in accordance with the Rule's new reporting requirements.

In response to comments flagging "the extensive system changes" that the Rule will require, the Department claimed that a July 1 effective date was adequate. *Id.* at 32607. In a single paragraph defending the effective date, DOL asserted that labor organizations "will not actually file anything with the Department for at least one year at minimum," that "most large labor organizations already track many of the new transactions that require itemization," and that "the widespread use of adaptable technologies" will facilitate implementation. *Id.*

### B. The AFL-CIO and Hundreds of Other Labor Organizations Scramble To Bring Their Accounting Systems into Compliance with the New Rule.

Plaintiff AFL-CIO is a federation of dozens of national and international labor organizations, which collectively represent 15 million workers.

The AFL-CIO and the vast majority of its member unions are covered by Title II of the LMRDA and are therefore subject to its reporting requirements. Because the AFL-CIO's gross annual receipts exceed $40 million and its fiscal year begins July 1, it will be required to file a Form LM-2 Long Form under the new Rule for that fiscal year. Because some of the AFL-CIO's member unions have gross annual receipts of at least $40 million, they too will be required to file a Form LM-2 Long Form. And because many of its other member unions (and their affiliates) have total annual receipts of at least $350,000, they will be required to comply with the Rule's new Form LM-2 reporting requirements. Approximately 600 labor organizations, a significant majority of which are either member unions of the AFL-CIO or affiliates of those members unions, have a fiscal year that begins on July 1 and will need to file either the Form LM-2 or Form LM-2 Long

Form. *See* Declaration of Ryan Taylor ¶ 6. Still others have a fiscal year that begins on October 1. *Id.* ¶ 9.

To meet their current Form LM-2 obligations, Plaintiff AFL-CIO and its member unions have built and implemented complex accounting systems to track their financial activities. Since there is no "off-the-shelf" accounting system "built to the specifications of Form LM-2," labor organizations like Plaintiff AFL-CIO and their service providers have had to "customize[]" their accounting systems so that they conform to the Form LM-2's reporting obligations. Declaration of Mary Margaret Prange ("Prange Decl.") ¶¶ 16–17. In other words, these systems are designed to process and publish financial-transaction data with the Form LM-2's specific requirements in mind.

As a result, when those reporting requirements change, each labor organization's accounting systems must change, too. Particularly for labor organizations that will need to file the Form LM-2 Long Form, the Rule requires those labor organizations to "rebuild the interfaces" that users interact with, and in some cases, to "build entirely new data fields" through which users can submit information. *Id.* ¶ 18. Moreover, revisions that require labor organizations to itemize new transactions will force them to completely "reconfigure" their accounting systems "to receive and store transaction-level data." *Id.*

For example, one of the many categories of receipts that Form LM-2 Long Form filers will now need to itemize is rental income. 91 Fed. Reg. at 32601. Typically, rental property is managed by an external property manager. Prange Decl. ¶ 19. So, for a labor organization to capture the new details required under the Rule, an external property manager will need to provide the organization with transaction-level data and a way to load that data into the organization's general-ledger accounting system. *Id.* In addition, the Rule will require Form LM-2 Long Form filers to itemize

11

receipts that the labor organization receives on behalf of affiliate unions and individual members. 91 Fed. Reg. at 32601. Such receipts typically are recorded by the organization in a liability account. But because the Form LM-2 Long Form requires filers to report their activities on a cash basis (rather than an accrual basis), unions will now need to rework their general ledgers to ensure that these receipts are recorded with the necessary level of detail. Prange Decl. ¶ 19. These are just two of many examples of how affected labor organizations will need to change their accounting practices and systems to comply with the new Rule. *See also id.* (providing other examples).

In sum, the Rule's new reporting requirements will require labor organizations like Plaintiff AFL-CIO to dramatically retool their accounting systems. That process can take several months—or longer—to complete. *Id.* ¶¶ 25–26. Each labor organization must first fully understand what the new Rule does, identify gaps in its current accounting systems, and assess what changes it needs to make to those systems. *Id.* ¶ 25. Each organization will then need to research, evaluate, and select a qualified vendor to contract with. *Id.* That vendor will then need to completely rebuild, test, and troubleshoot the organization's accounting systems, which alone could take several months of trial-and-error. *Id.* And, at some point, the organization will need to migrate all of its existing financial data onto the new systems, which could also take several months. *Id.*

Beyond revamping the accounting software, this compliance effort will also require labor organizations like Plaintiff AFL-CIO to undertake substantial staff-training efforts, to ensure that the new systems are tracking, coding, and reporting new transaction data reliably. *Id.* ¶¶ 20–24. Service providers will first need to develop training materials to assist their union clients. *Id.* ¶ 24. Each labor organization will then need to train every individual, across every department, who might interact with the new accounting systems on how to use them—from union officers to administrative assistants to travel coordinators and so on. *Id.* ¶¶ 21–22. Consequently, the

12

retraining process will take "an organization-wide effort, not a task confined to the accounting department." *Id.* ¶ 22. These efforts are made even more complicated by the fact that there are numerous ambiguities in the Rule's instructions, such as whether and how to aggregate certain investment purchases and how to account for certain benefit disbursements. *Id.* ¶ 19.

All told, "even under favorable conditions," it typically takes most organizations "at least six months" to deploy new accounting systems—and "substantially longer for some." *Id.* ¶ 26; *see also, e.g.*, Am. Postal Workers Union, Comment Letter on Proposed Rule Labor Organization Annual Financial Reports: Form Revisions at 3–5 (Dec. 14, 2020), https://www.regulations.gov/comment/LMSO-2020-0002-0080.

But because of the Rule's July 1 effective date, labor organizations like Plaintiff AFL-CIO and its members do not have "at least six months" to revamp their accounting systems. The AFL-CIO and many of its members have fiscal years that start on July 1, when the Rule takes effect. Many of its other members have fiscal years that start shortly after. As a result, these labor organizations will have no choice but to begin their fiscal years without up-to-date accounting systems in place. Instead, they will need to process any new financial transactions using outdated accounting systems and make time-consuming manual retroactive changes to their accounting data. Indeed, a declaration from a Certified Public Accountant with decades of experience with labor organizations estimates that "few, if any, LM-2 Long Form filers will have made the necessary system changes and conducted the necessary employee training to comply with the Final Rule's new recordkeeping requirements by July 1." Prange Decl. ¶ 34.

That situation will force labor organizations like Plaintiff AFL-CIO to "incur significant costs associated with reworking and reclassifying financial transactions that were entered into their accounting software using old systems and reporting methodologies." *Id.* ¶ 27. Each labor

13

organization will need to "recode the receipts and disbursements it has already recorded to capture the data that will be required by the Final Rule." *Id.* ¶ 28. According to a current estimate, "most, if not all, LM-2 Long Form filers and revised Form LM-2 filers with a July 1 fiscal-year start" will need to undertake a significant recoding effort. *Id.* ¶ 34.

That recoding process is "time-consuming, inefficient, and potentially error-prone," especially because most commercial accounting software, to deter data manipulation, does not permit users to recode transactions that have already been entered into the software. *Id.* ¶ 30. To complete that process, unions will need to "spend significant staff time reworking transactions that have already been entered on the union's general ledger, effectively diverting the organization's time away from its representational services to its members and toward regulatory compliance." *Id.* ¶ 32. That process will be even more burdensome for large labor organizations like Plaintiff AFL-CIO, which "incur thousands of transactions each month." *See id.* ¶ 31. On top of that, the manual recoding process will likely introduce accounting errors and thus "significantly reduce the reliability and accuracy of LM reports." *Id.* ¶ 32.

In the face of these significant costs, on June 10, 2026, Plaintiff AFL-CIO sued to set aside the Rule. The AFL-CIO's complaint raised four causes of action, alleging that (1) DOL violated the APA by failing to provide notice and comment, (2) DOL violated the APA by setting an arbitrary and capricious effective date, (3) many of the Rule's new reporting requirements are arbitrary and capricious, and (4) many of those requirements also exceed DOL's statutory authority. To avoid incurring more needless expenses while the lawsuit is pending, AFL-CIO now moves for preliminary relief, predicated on the second claim, to postpone the Rule's July 1 effective date until at least January 1, 2027, such that the rule would apply to labor organizations whose fiscal years begin on or after the revised effective date.

14

**LEGAL STANDARD**

The APA authorizes courts to "postpone the effective date of an agency action" to "prevent irreparable injury." 5 U.S.C. § 705. In considering motions to postpone agency action under § 705, courts apply the four factors that govern requests for a preliminary injunction. *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012). The moving party must show that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without preliminary relief, (3) the balance of equities favors preliminary relief, and (4) the public interest favors preliminary relief. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 727 (D.C. Cir. 2022). Where, as here, one of the merits claims is that a rule's effective date is itself arbitrary and capricious—independent of the other aspects of the rule—a court may enter an injunction delaying the effective date and postponing enforcement without considering the merits of the substantive aspects of the rule. *See Nat'l Ass'n of Indep. Television Producers & Distribs. v. FCC*, 502 F.2d 249, 253–55 (2d Cir. 1974) ("*Television Producers*").

**ARGUMENT**

**I.    This Court Should Issue a Preliminary Injunction Postponing the Rule's Effective Date Until At Least January 1, 2027.**

The Rule's July 1 effective date is harmful, violates the APA, and must be postponed. The effective date imposes immediate, unrecoverable costs on Plaintiff AFL-CIO and its member unions whose fiscal years begin on or soon after July 1. These labor organizations have as little as thirty days to try to revamp their accounting systems to comply with the Rule's new reporting obligations. It will be virtually impossible for Plaintiff AFL-CIO and its affiliates to make those organization-wide changes in time, forcing them to process new transactions on out-of-date systems and expend considerable resources correcting them on the back end. The Department failed to offer any reasonable justification for setting such a rushed deadline for the Rule to take

effect; nothing in the record comes close to suggesting that the deadline is either workable or necessary. Indeed, this would not be the first time that this Court has stopped DOL from subjecting labor organizations to new Form LM-2 obligations on an unreasonably compressed timeline. *See Chao I*, 297 F. Supp. 2d at 164–65; *Chao II*, 298 F. Supp. at 106 (postponing by six months rule making substantial changes to Form LM-2 reporting requirements). It should do the same here and postpone the Rule's effective date until at least January 1, 2027, such that the Rule's new requirements would apply prospectively to labor organizations whose fiscal years begin on or after the revised effective date.

## A. The AFL-CIO and Its Member Unions Will Suffer Irreparable Injury Absent a Preliminary Injunction.

Because the merits of the AFL-CIO's claim that the Rule's effective date is arbitrary and capricious are intertwined with the irreparable injuries that the AFL-CIO, its member unions, and their affiliates will suffer if the effective date is not postponed, we start with the irreparable-injury prong of the inquiry before turning to the remaining preliminary-relief factors.

An injury is "irreparable"—and thus warrants a preliminary injunction—if it is certain, is imminent, and cannot be remedied through other forms of relief. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). "'[S]ignificant' economic loss" caused by federal agency action qualifies as an "irreparable" injury. *Jenner & Block LLP v. DOJ*, 784 F. Supp. 3d 76, 114 (D.D.C. 2025). Because the government's sovereign immunity from damages claims makes that loss "unrecoverable," only an injunction can prevent (and thus remedy) that injury. *Id.*; *accord District of Columbia v. USDA*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020) ("[E]conomic injury caused by federal agency action is unrecoverable because the APA's waiver of sovereign immunity does not extend to damages claims.").

16

The Rule's July 1 effective date inflicts such a harm on Plaintiff AFL-CIO and its member unions.

To comply with the Rule, labor organizations like the AFL-CIO will need to undergo extensive and expensive preparation efforts. To start, each labor organization will need to identify what exactly the new rule does. That will require combing through all 231 pages of the Rule—analyzing its preamble, DOL's new forms, and DOL's new filing instructions. Making this task even harder, many of the new requirements imposed by the Rule are far from clear, such as how a union is supposed to systematically differentiate between expenditures incurred for "Political Activities" and those spent on "Lobbying." *See* 91 Fed. Reg. at 32589.

Then, each labor organization will need to dramatically retool its accounting systems to conform to the Rule's new reporting requirements. There is no "off-the-shelf" accounting system tailored to the LMRDA reporting regime. Prange Decl. ¶ 17. Instead, labor organizations and their service providers must build and maintain their own accounting systems and software, calibrating them to DOL's new reporting requirements. That means, here, Plaintiff AFL-CIO and its member unions will need to update their systems to conform them to the Rule's new reporting framework. *See supra* pp. 10–13 (providing specific examples of accounting changes that will need to be made because of the Rule). That process will entail rebuilding the software interfaces and creating new data fields, among other changes. And, at some point, each labor organization will need to migrate its existing data onto the new system.

Even when all of that is done, each labor organization will need to train its staff on how to use these new systems and make the newly required classifications. That (re)training effort will cover all manner of employees (from officers to administrative assistants to expense coordinators and so on) across every department. *See supra* p. 12. Put another way, any retraining effort will

17

require "an organization-wide effort, not a task confined to the accounting department." Prange Decl. ¶ 22. And these training sessions alone can take several months to develop and conduct. *Id.* ¶ 25.

The transition process does not stop there. Even after a labor organization has deployed its new accounting systems, it must continue to monitor system performance and troubleshoot inevitable errors. *See id.* Each round of trial-and-error will, in turn, demand more time, more resources, and more training.

Given the scale and complexity of these compliance efforts, it will be virtually impossible for labor organizations whose fiscal year begins on or soon after July 1—such as Plaintiff AFL-CIO—to revamp their accounting systems in time. As several unions explained during the 2020 rulemaking process when the Form LM-2 Long Form was initially proposed, these steps typically require well more than a month to implement. *E.g.*, Am. Postal Workers Union, Comment Letter at 3–5. A declaration from a Certified Public Accountant with decades of experience with labor organizations corroborates those projections. That declaration estimates that it will take "at least six months for most organizations" to revamp their accounting systems—and "substantially longer for some." Prange Decl. ¶ 26.

As a result, even after the Rule takes effect, it is virtually certain that labor organizations like Plaintiff AFL-CIO will be forced to record new financial transactions using out-of-date accounting systems that do not conform to the Rule's new reporting obligations. That backlog of improperly processed transactions will continue to grow—by the thousands each month for the large labor organizations that must file the Form LM-2 Long Form—until the new accounting systems are set in place. *See supra* pp. 10–13. And once up-to-date accounting systems are finally

18

in place, each labor organization will need to reprocess these transactions, to ensure that they are properly reported under DOL's new reporting framework. *See supra* p. 13.

That reprocessing effort will saddle labor organizations with significant costs, above and beyond the already-considerable costs of revamping their accounting systems and retraining their staff. They will need to "spend significant staff time reworking transactions that have already been entered on" out-of-date bookkeeping systems, "effectively diverting the organization's time away from its representational services to its members." Prange Decl. ¶ 32. Making matters worse, most accounting software does not allow users to recode already-entered transactions, creating further logistical problems. *Id.* ¶ 29. Accordingly, many labor organizations will need to *manually* recode any transactions that have already been entered—a process that will be even more labor-intensive, time-consuming, and potentially error-prone. *Id.* ¶ 32. That diversion of resources irreparably impairs these labor organizations' efforts to carry out their mission to represent workers. *See USDA*, 444 F. Supp. 3d at 41–42. On top of that, manual recoding "is likely to significantly reduce the reliability and accuracy of LM reports," Prange Decl. ¶ 32, which in turn diminishes the ability of workers to monitor the financial activities of their labor organizations.

In short, so long as the July 1 effective date remains in place, Plaintiff AFL-CIO and its member unions "will lose ground every day," and their unrecoverable economic losses will continue to grow. *Chao I*, 297 F. Supp. 2d at 162. As this Court has made clear once before, when it enjoined a similarly time-pressured implementation deadline, forcing labor organizations into such "an untenable situation" inflicts "irreparable harm." *Id.* at 162–64.

All of that underscores the need for preliminary relief. Postponing the effective date until at least January 1, 2027, would substantially mitigate the transition expenses that the Rule forces Plaintiff AFL-CIO and its affiliates to incur. A six-month extension would give labor organizations

19

more time to retool their accounting systems *before* the Rule's reporting obligations kick in at the start of their next fiscal years—and, as a result, more time to avoid the considerable costs that come with reprocessing transactions on the back end. *Cf. Chao II*, 298 F. Supp. 2d at 106 (delaying the effective date of a similar DOL rule by six months).

Beyond alleviating this logistical chaos, postponing the effective date by at least six months would yield additional cost-saving benefits. With expedited summary-judgment briefing, this Court could resolve all of Plaintiff AFL-CIO's claims in the coming months. Postponing the effective date by six months would therefore ensure that Plaintiff AFL-CIO, its member unions, and their affiliates need not *completely* revamp their accounting systems *before* this Court issues such a final ruling. Put another way, if the Court ultimately invalidates the Rule, then delaying the effective date *now* will prevent many labor organizations from having to undertake significant compliance expenses. By contrast, "if the Court were to deny preliminary injunctive relief and later invalidate the Final Rule, the labor organizations would then have to expend additional unrecoverable money, resources and staff time in transitioning back to comply with the previously existing LM-2 regulations." *Chao I*, 297 F. Supp. 2d at 164. Preliminary relief therefore diminishes the risk of that (again, unrecoverable) deadweight loss.

### B. The AFL-CIO Is Likely To Succeed on the Merits of Its Claim That the Rule's July 1 Effective Date Is Arbitrary and Capricious.

**1.** The Rule violates the APA several times over: It violates the APA's notice-and-comment requirements. Many of its substantive provisions are arbitrary and capricious. And several of those provisions exceed DOL's statutory authority under the LMRDA. But in this preliminary posture, this Court need not consider the merits of any of those arguments, which would require sorting through a detailed administrative record and a technical regulatory regime. Instead, this Court can promptly grant Plaintiff AFL-CIO's motion to postpone the Rule's July 1 effective date by focusing

20

only on one narrow issue: whether the effective date itself violates the APA's arbitrary-and-capricious standard. *Cf. A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 218 (D.D.C. 2020) (establishing a likelihood of success on the merits "of one claim" is enough to obtain injunctive relief).

**2.** The APA requires that agency action be "reasonable and reasonably explained," not "arbitrary" and "capricious." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That standard obligates agencies "to examine all relevant factors and record evidence, and to articulate a reasoned explanation" for their decisions. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). To meet this imperative, an agency must "consider" all "important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency cannot give explanations that "run[] counter to the evidence" before it. *Id.* And when an agency departs from its past practices, it must "acknowledge the change and offer a reasoned explanation for it." *Am. Wild Horse Pres. Campaign*, 873 F.3d at 923.

These bedrock requirements apply to all parts of an agency rule—including, importantly, its effective date. *Television Producers*, 502 F.2d at 253–55. After all, the effective date is "an essential part of any rule," marking the point when the rule's new requirements officially kick in. *Nat. Res. Def. Council, Inc. v. EPA*, 683 F.2d 752, 761–62 (3d Cir. 1982). Indeed, in some cases (as here), a rule's effective date can be nearly as important as its substantive obligations.

As noted earlier, this Court considered a similar arbitrariness challenge to a similar DOL rule in 2003. *See Chao I*, 297 F. Supp. 2d at 164–65; *Chao II*, 298 F. Supp. 2d at 106. There, DOL issued a final rule requiring labor organizations submitting Form LM-2s to "provide an itemized accounting of all receipts, disbursements, and accounts payable and receivable" above $5,000 if those transactions fell into certain designated categories. *Chao I*, 297 F. Supp. 2d at 160. The rule

21

was issued and published in the Federal Register on October 9, 2003, was finally approved on November 10, 2003, and became effective on January 1, 2004. *Id.* at 159, 162. That effective date gave covered labor organizations "less than two months' notice" from the final-approval date (fifty-two days to be exact), and less than three months from the publication date, to "change the reporting mechanisms and protocols" to "meet the detailed requirements of the new Rule." *Id.* at 161–62.

The AFL-CIO sued and included, as one of its causes of action, a challenge to the rule's effective date as arbitrary and capricious, since it gave most labor organizations "less than two months to make the significant changes to their computer hardware, software programs, accounting systems, and employee training programs necessary to comply" with the new rule. *Id.* at 161.

The Court agreed that the rule's effective date was arbitrary and capricious. It therefore vacated the rule's effective date by six months, even though it concluded that the rule had no substantive defect. *Id.* at 164–65. The Court explained that "seven weeks" of lead time was "inadequate" to complete "all of the tasks necessary to bring a union's systems into compliance with the new Rule." *Id.* at 164. The administrative record provided a "firm factual basis" for the many "practical considerations" raised by the AFL-CIO, and "[n]othing in the record contradicted" those facts. *Id.* at 165. Moreover, DOL "claimed no particular need for extraordinary urgency." *Chao II*, 298 F. Supp. 2d at 127. In sum, because the record confirmed that a two-month transition period was inadequate, and because DOL offered no countervailing reason for imposing such an unworkable deadline, the Court determined that the Department's choice of effective date was arbitrary and capricious. The Court thus enjoined the Department from imposing the final rule for

22

six months, at which point the rule would apply to labor organizations at the start of their next fiscal years. *Id.* at 128.

That analysis applies just as much here. The record confirms that a July 1 effective date is unworkable. During the comment period, union after union reiterated that revamping their accounting systems to conform to the Rule's new reporting requirements would require well more than a month of lead time. *See, e.g.*, Air Line Pilots Ass'n, Comment Letter on Proposed Rule Labor Organization Annual Financial Reports: Form Revisions at 6 (Dec. 7, 2020), https://www.regulations.gov/comment/LMSO-2020-0002-0042 (arguing that a longer implementation period was "necessary" given the "enormous number of internal policy, procedure and accounting system changes" needed); Ass'n of Flight Attendants, Comment Letter at 4 (Dec. 14, 2020), https://www.regulations.gov/comment/LMSO-2020-0002-0069 (similar); Am. Postal Workers Union, Comment Letter at 3–5 (similar). Accounting firms raised the same practical concerns. *See, e.g.*, WithumSmith+Brown, Comment Letter at 8 (Dec. 11, 2020), https://www.regulations.gov/comment/LMSO-2020-0002-0097 (proposing a longer implementation period, given "the massive internal policy, procedures and accounting system changes that will be necessary"); Legacy Pros. LLP, Comment Letter at 5 (Dec. 14, 2020), https://www.regulations.gov/comment/LMSO-2020-0002-0074 (urging DOL to give unions "additional time" to "update their systems accordingly"). By contrast, nothing in the record supports DOL's apparent position that a labor organization could bring its accounting systems into compliance with the Rule in anything short of a year—much less thirty days.

DOL did not seriously grapple with or deny any of these workability concerns. The Department purported to address them in a single paragraph in the Rule, but nothing that DOL said comes close to defending its conclusion that a thirty-day transition period is adequate.

23

To start, DOL asserted that no labor organization will need to "actually file anything with the Department for at least one year at minimum." 91 Fed. Reg. at 32607. Even so, that statement completely ignores the initial compliance measures that labor organizations like Plaintiff AFL-CIO will need to undertake *immediately*. Even if labor organizations have at least a year before they need to *file* anything, the Rule gives them as little as thirty days to adjust their accounting systems to meet their new tracking obligations—a transition process that typically takes months. *See supra* pp. 10–13. The Department also claimed that "most large labor organizations already track many of the new transactions" that now "require itemization." 91 Fed. Reg. at 32607. But DOL cited no evidence for this claim, which is misleading at best and incorrect at worst. Even if some labor organizations already *track* certain transactions, it does not mean that those organizations have accounting systems in place to *process* and *report* those transactions in the way that the Rule now requires. *See supra* pp. 10–13 (describing specific changes that labor organizations will need to make to comply with new reporting requirements). In all events, DOL did not explain why this claim about certain labor organizations' purported tracking practices could justify whittling the implementation process down to a mere thirty days—particularly where covered organizations had no reason to believe that financial reporting changes were even on the horizon, let alone imminent.

Last, DOL claimed that adapting to the Rule's new reporting framework should be easy, given "the widespread use of adaptable technologies for labor organizations." 91 Fed. Reg. at 32607. But, again, there is no "off-the-shelf" Form LM-2 accounting system that labor organizations can simply purchase and implement to meet their new compliance obligations. Prange Decl. ¶ 17. And DOL cited no evidence suggesting otherwise. In fact, the Department did not identify what those "adaptable technologies" were or how they might streamline the transition

process, such that labor organizations like Plaintiff AFL-CIO could somehow update their accounting systems in a matter of weeks. The Department's vague, conclusory responses cannot justify the July 1 effective date. The DOL also failed to take any account of the time needed for labor organizations to train staff as to the new reporting requirements so that they could contemporaneously characterize and classify transactions under the new reporting categories at the point of disbursement or receipt.

Besides failing to show why a thirty-day transition period was *workable*, DOL also failed to explain why that amount of lead time was *beneficial*—let alone *necessary*. At no point did DOL ever claim a "particular need for extraordinary urgency." *Chao II*, 298 F. Supp. 2d at 127. That is because nothing in the record could support such a claim. After all, the current reporting regime has been in place for more than two decades. And it took nearly six years for DOL to eventually finalize the new reporting requirements it is now in a rush to implement. Indeed, the Department withdrew the proposed rule back in 2021 and did not mention it again until it issued the Rule in June 2026—even omitting mention of it in 2025 when it proposed other changes that were a component of the 2020 NPRM. None of that describes the sort of Rule that requires regulated parties to act on such a short fuse.

The fact that this Court already rejected DOL's 2003 attempt to impose an unreasonably truncated implementation period makes DOL's latest repeat effort all the more unreasonable—and its failure to explain that decision all the more inexplicable. *Cf. Chao I*, 297 F. Supp. 2d at 164–65; *Chao II*, 298 F. Supp. at 106. Just as DOL failed to adequately defend its hurried effective date in 2003 (eighty-three days from publication and fifty-two days from final approval), it has failed to justify its even-more-hurried effective date here (just thirty days from publication and final approval).

Reinforcing the point, in prior rulemakings, DOL has given labor organizations far more than just thirty days to adjust to any new financial-reporting obligations. In 1993, DOL revised the Form LM-2 by requiring filing organizations to report expenses using newly created "functional" categories. 57 Fed. Reg. 49282, 49282. The final rule initially gave covered labor organizations only two months to implement these changes. *Id.* Soon after, however, DOL acknowledged that even "a two-month implementation period was insufficient," given that filing organizations needed "adequate time" to "revise their internal records and accounting systems" and to "train union officers." 58 Fed. Reg. 28304, 28307; *see also Chao I*, 297 F. Supp. 2d at 164–65. Any implementation period, the Department explained, "must allow adequate time for labor organizations to revise their internal records and accounting systems in order to properly classify financial transactions *prior to the beginning of the fiscal year for which the revised reporting forms must be used*." 58 Fed. Reg. 28304, 28307 (emphasis added). Accordingly, DOL extended the effective date by a year. *Id.* Consistent with that approach, when DOL revised the reporting requirements again in 2009 (further expanding LM-2 filers' disclosure obligations), it gave filing labor organizations at least five months of lead time. *See* 74 Fed. Reg. 3678, 3678 (rule issued on January 21, 2009, would apply only to labor organizations "whose fiscal years beg[a]n on or after July 1, 2009"). Notwithstanding this consistent practice of giving covered labor organizations at least several months of lead time, DOL never acknowledged—let alone explained—why it was departing from that approach in this rulemaking. That unexplained change was itself arbitrary and capricious. *See Am. Wild Horse*, 873 F.3d at 923.

At bottom, the record provides "no reasonable justification" for DOL's decision to set an effective date that, "as a practical matter," requires labor organizations with fiscal years starting July 1 "to make such far-reaching changes" to their accounting systems in thirty days—or else

26

undertake the even-more-significant burdens of retroactively and manually coding countless transactions. *See Chao II*, 298 F. Supp. 2d at 128. Plaintiff AFL-CIO is thus likely to prevail on its claim that the July 1 effective date is arbitrary and capricious.

### C.  The Balance of Equities Favors a Preliminary Injunction.

The final two factors in the preliminary-relief analysis—the balance of equities and the public interest—also clearly favor Plaintiff AFL-CIO. "[W]hen the Government is the opposing party," these factors "merge" into the same inquiry. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). The Court must weigh the harm to the AFL-CIO if there is no injunction against the harm to the government if there is. *Id.* That balance weighs heavily in the AFL-CIO's favor.

As explained, the July 1 effective date imposes significant costs on Plaintiff AFL-CIO and its member unions. A July 1 deadline makes it all but impossible for labor organizations that begin their fiscal year on July 1 to conform their accounting systems to the Rule's reporting requirements, forcing those organizations to spend considerable time and resources recoding financial transactions processed on out-of-date software. Moreover, that recoding process will diminish the reliability and accuracy of any LM-2 reports, to the detriment of the workers who rely on those reports. So, the longer the effective date remains in place, the more and more losses that Plaintiff AFL-CIO, its member unions, and their union members will incur—none of which can be remedied at the end of the lawsuit.

On the other side of the ledger, the risk of harm to the government is insignificant. To repeat, DOL never explained why it needed to proceed on such an expedited timeline. "There is no evidence whatsoever that a temporary stay of the implementation of the Final Rule will cause any significant harm to the Secretary, to union members, or to the public." *Chao I*, 297 F. Supp.

27

2d at 165. Indeed, in choosing a July 1 effective date, DOL "did not claim any particular need for extraordinary urgency." *Id.*

Moreover, the fact that it took DOL nearly six years to finalize the rule undermines any suggestion of urgency. Given that context, "[a]n additional period of delay while the legality of the regulation[] is judicially determined with finality cannot significantly harm . . . the government." *Bldg. & Constr. Trades Dep't, AFL-CIO v. Donovan*, 543 F. Supp. 1282, 1291 (D.D.C. 1982); *accord Chao I*, 297 F. Supp. 2d at 165.

Finally, because the effective date violates the APA, DOL has no legitimate interest in preserving it. "It is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). There is "no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up).

\* \* \*

Everything we have said so far shows that this Court can—and should—grant preliminary relief based solely on the Rule's defective effective date, as it did in 2003 when the Court considered a similar APA challenge to a similar Form LM-2 rule. *See Chao I*, 297 F. Supp. 2d at 164–65. Accordingly, at this stage of the litigation, the Court need not consider Plaintiff AFL-CIO's other claims, which (as noted) can be resolved in the coming months through dispositive motions.

28

At the same time, we would be remiss not to preview those additional grounds for invalidating the Rule. To take one prominent example: The Supreme Court recently clarified that all "compelled disclosure requirements"—like the Rule's new reporting obligations—are "reviewed under exacting scrutiny," "[r]egardless of the type of association" targeted. *Bonta*, 594 U.S. at 608. That standard, the Court then explained, requires the government to show that a challenged disclosure requirement bears a "substantial relation" with "a sufficiently important government interest" and that the requirement is "narrowly tailored" to promoting that interest. *Id.* at 611 (internal quotation marks omitted).

That recent elaboration of the First Amendment's requirements in compelled-disclosure cases calls several aspects of the Rule into doubt. To start, there is a serious question whether DOL has carried its "heavy" burden of proving that the Rule's new reporting obligations are "narrowly tailored" to promoting "a sufficiently important governmental interest." *Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105, 166 (D.D.C. 2025) (internal quotation marks omitted). After all, the Rule never once mentions the compelled-speech doctrine—let alone the Supreme Court's "exacting scrutiny" standard.

Moreover, there is a very serious question whether DOL violated the APA's notice-and-comment requirement. The Department solicited comments on the Rule's new reporting obligations in October 2020, withdrew its proposal in March 2021, and then suddenly finalized the Rule in June 2026—in reliance on the 2020 rulemaking record, without providing further opportunity for public comment. As a result, Plaintiff AFL-CIO and its affiliates had no opportunity to raise whether the numerous additional disclosures proposed by the Department could survive *Bonta*—which was decided months *after* the initial comment period closed—or to

29

raise other intervening factual and legal developments with the Department. The APA does not permit DOL to sidestep its notice-and-comment obligations in this way.

Each of these points merely bolsters the AFL-CIO's case for preliminary relief. As noted above, if the Rule is invalid and ultimately set aside (under an expedited summary-judgment briefing schedule), then postponing the effective date now would mitigate—and, for some labor organizations, virtually eliminate—any expenses that come with transitioning back to the preexisting Form LM-2 reporting regime. All that said, this Court need not delve into these other APA claims to provide immediate relief as to Plaintiff AFL-CIO's narrowest claim, which assumes the validity of the Rule itself and attacks just the Rule's effective date as arbitrary and capricious.

## CONCLUSION

The Court should postpone the Rule's effective date until at least January 1, 2027, such that the Rule's new reporting requirements would apply prospectively to labor organizations whose fiscal years begin on or after the revised effective date.

Dated: June 11, 2026                         Respectfully submitted,

*/s/ Leon Dayan*
Leon Dayan (DC Bar # 444144)
Jacob Karabell (DC Bar # 996066)
Adam Bellotti (DC Bar # 1020169)
Fred Wang (DC Bar # 90031826)*
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street N.W.
Suite 1000
Washington, DC 20005
(202) 842-2600
ldayan@bredhoff.com
jkarabell@bredhoff.com
abellotti@bredhoff.com
fwang@bredhoff.com

30

Matthew Ginsburg (DC Bar # 1001159)
Maneesh Sharma (DC Bar # 1033407)
AFL-CIO
815 Sixteenth Street N.W.
Washington, DC 20006
(202) 637-5336
mginsburg@aflcio.org
msharma@aflcio.org

*Counsel for Plaintiff*

*Admitted pro hac vice

31