**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,<br><br>    **Plaintiff,**<br><br>      **v.**<br><br>**KEITH E. SONDERLING & ELISABETH MESSENGER,**<br><br>    **Defendants.** | Civil Action No. 26-2061 (JEB) |

## MEMORANDUM OPINION

The American Federation of Labor and Congress of Industrial Organizations brought this suit attacking a recent Department of Labor rule requiring unions to include more detail in their annual financial disclosures and to implement those changes as soon as July 1, 2026 — a mere 30 days after the rule's publication.  Plaintiff's Complaint lists a slew of challenges to the rule and announces that the union will, eventually, seek its vacatur.  For now, though, Plaintiff submits a Motion for Preliminary Relief based only on its claim that the rule goes into effect too soon.  As the union concedes, it must therefore show that it would be irreparably harmed by the rule's effective date — as opposed to its substantive provisions.  Because any harms that the union would suffer from that date alone are not irreparable, the Court will deny its Motion.

## I.    Background

### A.    Legal Background

The Labor-Management Reporting and Disclosure Act of 1959 responded to growing alarm about racketeering, corruption, and mismanagement at some of America's biggest unions

1

in the 1950s (the era when Jimmy Hoffa was calling the shots at the International Brotherhood of Teamsters).  The Act aimed to clean up "financial abuse, mismanagement of labor organization funds, and unethical conduct" by requiring unions to publicly disclose how they make their money and how they spend it.  See Labor Organization Annual Financial Reports, 91 Fed. Reg. 32556, 32556–57 (June 1, 2026).  Specifically, it requires unions to "file annually with the Secretary [of Labor] a financial report" detailing information like the union's assets and liabilities at the start and end of the fiscal year, its revenues and their sources, and the salaries that it paid its employees, "all in such categories as the Secretary may prescribe."  29 U.S.C. § 431(b).

The filings' complexity increases with a union's resources.  Those with gross annual receipts under $10,000 may file the simple Form LM-4.  See 29 C.F.R. § 403.4(a)(2).  Ones whose receipts lie between $10,000 and $250,000 file the moderately detailed Form LM-3.  Id., § 403.4(a)(1).  And America's biggest unions — those whose receipts top $250,000 a year — must file the complex Form LM-2.  Id., § 403.3.  Plaintiff here, the AFL-CIO, is a sprawling union with many affiliates, so it has long filed that last form.  See ECF No. 1 (Compl.), ¶¶ 8–9; AFL-CIO v. Chao, 297 F. Supp. 2d 155, 159 (D.D.C. 2003).

B.    Regulatory and Procedural History

In 2020, the Department issued a notice of proposed rulemaking that floated several changes to unions' financial disclosures.  See generally Labor Organization Annual Financial Reports: LM Form Revisions, 85 Fed. Reg. 64726 (Oct. 13, 2020).  Two are relevant here.  First, the rule proposed creating a new tier of especially big unions — those whose gross annual receipts exceed $8 million — and requiring them to file a new form, the Form LM-2 Long Form, with even more information.  Id. at 64734–45.  Second, the rule would go into effect 30 days

2

after publication.  See Labor Organization Annual Financial Reports: LM Form Revisions, 85

Fed. Reg. at 64747.  That date never arrived, however.  In the spring of 2021, the Department

announced that the proposed rule had been withdrawn.  See Compl., ¶ 18; View Rule, Off. of

Info. & Regul. Affs., https://perma.cc/BU5L-96TM.

Over the next few years, those shelved proposals faded from memory.  Then came 2025,

when DOL issued a narrow notice of proposed rulemaking on a mostly unrelated issue: raising

the revenue thresholds at which unions would have to file a Form LM-3 or LM-2.  See Filing

Thresholds for Forms LM-2, LM-3, and LM-4 Labor Organization Annual Reports, 90 Fed. Reg.

28251, 28251 (July 1, 2025).  After receiving comments on that proposal, the Department

announced on June 1, 2026, that it would finalize it — and also finalize the rule proposed in the

2020 NPRM.  See Labor Organization Annual Financial Reports, 91 Fed. Reg. 32556, 32557

(June 1, 2026).  DOL explained that the 2020 and 2025 proposals "operate in the same reporting

framework" and "will function in coordination once effective," so it would finalize both "for

efficiency."  Id. at 32556–57.  Although interested parties had not commented on the 2020

proposals in more than five years, the Department asserted that none of the core considerations

had changed, so the record from 2020 remained adequate.  Id. at 32562.  What is more, the

finalized rule ordered that the new requirements would take effect July 1 — i.e., 30 days after the

rule's publication.  Id. at 32606.  The only relevant difference between the rule proposed in 2020

and the one finalized in 2026 is that the latter raised the threshold at which a union would need to

file the new Form LM-2 Long Form to $40 million in annual receipts.  Id. at 32574.  That tweak

is little comfort to the AFL-CIO and several of its affiliates, however, who each take in more

than that.  See Compl., ¶ 9; ECF Nos. 15-1 (Declaration of Sibyl Ketcham), ¶ 11; 15-2

(Declaration of Salma Yousefi), ¶ 5.

The Department emphasized that the rule would apply only to fiscal years that began after its announcement, so that no Form LM-2 Long Form would be due for more than a year. Id.  Still, the new reports would have to be created using all payments starting from the fiscal year's first day.  Unions whose fiscal year starts July 1 — including Plaintiff AFL-CIO, see ECF No. 7-2 (Declaration of Mary Margaret Prange), ¶ 4 — would thus have to start tracking and recording payments in new ways beginning on that date, only 30 days after being told that such a proposal was even being considered.

Nine days after that announcement, the AFL-CIO sued.  Its Complaint contends that the rule was issued without proper notice and comment, contains substantive provisions that are arbitrary and capricious, compels unions to make financial disclosures that violate their First Amendment rights, and imposes an effective date that is itself arbitrary and capricious.  See Compl., ¶¶ 32–54.  For all these reasons, Plaintiff will ask this Court to vacate the rule — later, in a forthcoming motion for summary judgment.  Id. at 16.

For now, Plaintiff has filed a Motion for Preliminary Relief based solely on a claim that the rule's effective date is arbitrarily soon.  See ECF No. 7-1 (Mot.) at 3–4.  The Motion expressly brackets Plaintiff's other merits arguments, assures the Court that it "need not consider" them, and argues only that the union is likely to succeed on the merits of its claim that the effective date is arbitrary.  Id. at 3–4, 20–27.  The AFL-CIO therefore asks the Court to "postpone the Rule's effective date until at least January 1, 2027," id. at 30, either by staying the rule under § 705 of the Administrative Procedure Act, which lets a court "postpone the effective date of an agency action . . . to preserve status or rights pending conclusion of the review proceedings" "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, or by issuing a preliminary injunction.

4

The Court held oral argument on June 29, 2026, and it issued a brief Order denying Plaintiff's Motion the next day — *i.e.*, in advance of the July 1 deadline. See ECF No. 19 (Order). It promised that this Opinion would follow shortly thereafter. Id. at 3.

## II.    Legal Standard

Whether the Court considers Plaintiff's request for a § 705 stay or a PI, the standard is the same. Starting with § 705, "[t]he factors to be considered in determining whether a stay is warranted are: (1) the likelihood that the party seeking the stay will prevail on the merits . . . ; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." Make the Road N.Y. v. Mullin, --- F.4th ---, 2026 WL 1792978, at *5 (D.C. Cir. June 23, 2026) (quotation marks omitted). That inquiry matches the one for whether to grant a PI. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (PI standard); Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev., 2021 WL 3609986, at *2 (D.D.C. Apr. 4, 2021) (one of many decisions in this district holding that standards are identical).

## III.    Analysis

Plaintiff is not entitled to either form of relief unless it shows that it is otherwise likely to suffer irreparable harm. Alpine Sec. Corp. v. Fin. Indus. Regul. Auth., 121 F.4th 1314, 1336 (D.C. Cir. 2024); 5 U.S.C. § 705 (authorizing relief only "to the extent necessary to prevent irreparable injury"). The Court therefore starts with that prong. It first parses which of the union's purported injuries can support its Motion for Preliminary Relief. It then discusses what the AFL-CIO must show to establish that those injuries constitute irreparable harm. Finally, it judges whether Plaintiff has made that showing. As the Court finds that the answer is no, it does not reach the other factors.

A.    Relevant Injuries

A party is not entitled to preliminary relief simply because it would otherwise suffer irreparable harm.  Instead, it must show that it would suffer such harm from an action that it also shows is likely illegal.  Del. & Hudson Ry. Co. v. United Transp. Union, 450 F.2d 603, 619–20 (D.C. Cir. 1971); Munaf v. Geren, 553 U.S. 674, 690–91 (2008).  The Winter test's first two prongs must therefore line up: the movant must show that (1) it is likely succeed to succeed on the merits of its claim that some challenged conduct is against the law, and (2) it must show that that conduct — the same one that it has shown is probably unlawful — will inflict irreparable harm.  Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985) ("[T]he movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin."); Mexichem Specialty Resins, Inc. v. EPA, 787 F.3d 544, 556 (D.C. Cir. 2015) (irreparable harm must be "specific to" action that plaintiff challenges, which must be "source" of that harm).  So if a plaintiff does not challenge some aspect of a defendant's conduct and does not show that such aspect is likely unlawful, then any injuries that this aspect might inflict are irrelevant to the question of irreparable harm.

The Court now applies those principles to Plaintiff's Motion.  The Complaint foreshadows several future challenges to DOL's rule — that it was issued without proper notice, that it is arbitrary and capricious, and that it is contrary to law — but its Motion for Preliminary Relief expressly disclaims those objections here: "[I]n this preliminary posture, this Court need not consider the merits of any of those arguments . . . .  Instead, this Court can promptly grant Plaintiff AFL-CIO's motion to postpone the Rule's July 1 effective date by focusing only on one narrow issue: whether the effective date itself violates the APA's arbitrary-and-capricious standard."  Mot. at 20–21.  True to its word, Plaintiff then argues that it is likely to succeed in

6

showing only that such date is unlawful, not that the rule itself is.  Id. at 20–27.  Because

Plaintiff challenges only the rule's effective date here — and because that is the only argument

whose likelihood of success the Court is in a position to judge — Plaintiff must show that it

would be irreparably harmed by having to comply with the rule starting July 1, as opposed to a

later date.

Turning to the harms alleged in Plaintiff's briefs, they divide into two groups: (1) the

costs of buying and implementing new software, and (2) manually recoding payments that were

entered using outdated systems.  Start with the first bucket.  Plaintiff's current systems, it

explains, are designed to record payments as needed to produce the old Form LM-2.  See Mot. at

17–18; Prange Decl., ¶¶ 16–18; Ketcham Decl., ¶¶ 8–9.  Because the new Form LM-2 Long

Form asks for those payments in new categories and greater detail, the current software cannot

create reports that comply.  See Mot. at 17–18; Prange Decl., ¶ 16; Ketcham Decl., ¶¶ 8–9, 11,

13, 17.  The rule will therefore force the AFL-CIO and its affiliates to buy new accounting tools

and train their staff on how to enter payments in new ways — all of which, Plaintiff says, will

involve no small amount of resources.  See Mot. at 17–18; Prange Decl., ¶¶ 20, 22; Oral Arg. Tr.

at 4:16–23.

Yet whether the rule goes into effect on July 1, 2026 (the date that Plaintiff argues is

arbitrary), or on January 1, 2027 (the date to which Plaintiff asks this Court to postpone the rule,

see Mot. at 30), the AFL-CIO will still have to find and buy new software and still have to train

its staff on how to comply.  See Oral Arg. Tr. at 5:13–6:3.  This first bucket of injuries would

therefore not be caused by the effective date, the only aspect of the rule that the Motion

challenges and seeks to stay or enjoin.  It is therefore irrelevant.  At oral argument, Plaintiff

conceded these points.  It acknowledged that it must show irreparable harm from the rule's

effective date (as opposed to its general existence) and admitted that the harms discussed so far would not be caused by that provision. See Oral Arg. Tr. at 5:13–6:11. The Court therefore sets this first group of injuries aside.

So what injuries will be inflicted because of the effective date itself? Only those in the second bucket: the union's accountants will have to later recode payments that they entered before the new software came online. See Mot. at 18–19; see also Oral Arg. Tr. at 7:15–8:4; Prange Decl., ¶¶ 27–31 (substantiating assertions in brief); Ketcham Decl., ¶ 21 (same); Yousefi Decl., ¶¶ 8, 12–14 (same). For context, a covered union must file its financial disclosures "within ninety days after the end of . . . its fiscal year[]." 29 U.S.C. § 437(b). The AFL-CIO's next fiscal year starts July 1, 2026, and ends June 30, 2027, so Plaintiff's next disclosure — i.e., its first filing that must conform to the new rule — is due in late September 2027. See ECF No. 14 (Opp.) at 12. Yet Plaintiff's accountants must enter payments as they are made, starting this July 1. See Mot. at 18–19; Oral Arg. Tr. at 6:25–7:7. As Plaintiff does not yet have accounting software that uses the categories and detail that the LM-2 Long Form demands, its accountants will be stuck creating entries that differ from the Form LM-2 Long Form's requirements. See Mot. at 18–19; Oral Arg. Tr. at 27:9–29:3. Once they have new software that will let them enter those payments properly, they will have to go back and "manually edit[] [those] transactions" to create the report due in September 2027. See Prange Decl., ¶¶ 29–30; accord Ketcham Decl., ¶ 21; Yousefi Decl., ¶¶ 8, 12–14. "This process of manually editing transactions at the end of the accounting period is time-consuming, inefficient, and potentially error-prone." Prange Decl., ¶ 30; accord Ketcham Decl., ¶ 21.

Thus teed up, the question is whether recoding payments, standing alone, constitutes irreparable harm.

B.      Irreparable Harm in General

The Court starts with the showing that Plaintiff must make.  Three principles are relevant here.  First, monetary loss can be irreparable if it is unrecoverable.  In the usual case, financial losses are not irreparable because the injured party can often be made whole in future litigation — for instance, by receiving damages.  In re NTE Conn., LLC, 26 F.4th 980, 990 (D.C. Cir. 2022).  That rule does not hold, however, if money lost today cannot be recovered tomorrow.  Id. at 990–91; Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs., 594 U.S. 758, 765 (2021); Dep't of Educ. v. California, 604 U.S. 650, 651–52 (2025); NIH v. Am. Pub. Health Ass'n, 145 S. Ct. 2658, 2659 (2025).  Monetary losses inflicted by a challenged agency rule usually fit that exception, as the Federal Government's sovereign immunity almost always bars a party from recovering those costs even if the rule is later invalidated.

Second, the D.C. Circuit has long held that harm is irreparable only if it is "great."  Wis. Gas, 758 F.2d at 674; Clevinger v. Advoc. Holdings, Inc., 134 F.4th 1230, 1234 (D.C. Cir. 2025) (reiterating this rule recently).  That universal rule applies to monetary loss, just as it does to any other kind of harm.  See NTE Conn., 26 F.4th at 990–91 (taking care to note that movant faced financial losses amounting to "millions of dollars" and that defendant "does not dispute that [the sum] is significant") (quotation marks omitted).  Otherwise, "[a]ny movant that could show any damages against an agency with sovereign immunity — even as little as $1 — would satisfy the standard."  Woodstream Corp. v. Jackson, 2011 WL 8883395, at *8 (D.D.C. June 3, 2011).  Such modest injuries could hardly justify the "extraordinary and drastic remedy" of a disruptive stay

9

or injunction halting a government program before a court could judge its merits.  Munaf, 553 U.S. at 689 (quotation marks omitted).

Third, the movant bears a heavy burden of proving that the harm is irreparable. Irreparable harm must be "sufficiently certain, persuasively demonstrated, and so clearly irremediable that it warrants" judicial intervention "before the merits are resolved."  Hanson v. District of Columbia, 120 F.4th 223, 244 (D.C. Cir. 2024).  Indeed, the D.C. Circuit "has said time and again that the degree of proof required for irreparable harm is high."  Olu-Cole v. E.L. Haynes Pub. Charter Sch., 930 F.3d 519, 529 (D.C. Cir. 2019) (quotation marks omitted); see also Winter, 555 U.S. at 22 (plaintiff must make "clear showing" of irreparable harm).

Put it together, and monetary loss inflicted by the challenged effective date could constitute irreparable harm.  Still, the AFL-CIO must show that such loss — or any other injury — would great.  And it must make that showing with a high degree of proof.

C.      Whether Plaintiff's Harms Are Irreparable

Plaintiff clearly checks the first box: the Government enjoys sovereign immunity and has not waived it here, so any financial costs of complying with the rule starting July 1 cannot be recovered later.  Yet Plaintiff does not achieve similar success on the next two criteria.

The primary argument in its brief is that later recoding will cause "significant costs" in the form of "unrecoverable economic losses."  Mot. at 19.  That conclusory assertion is not backed up by its supporting declarations.  Instead, the declarations mostly grumble (understandably) that manual recoding will be "time-consuming, inefficient, and potentially error-prone."  Prange Decl., ¶ 30; see also Ketcham Decl., ¶ 21 ("Such recoding is inefficient and requires employees to spend many hours editing or supplementing journal entries . . . . Moreover, due to its manual nature and the passage of time, such recoding is error-prone and

10

leads to less reliable data collection . . . .”).  They do not even allege that the recoding will cost more money.  Even if it would, Plaintiff does not estimate how much — $10? $1,000? $1 million? — let alone support that estimate with any evidence.  Of course, a movant need not prove the exact amount of money that it would lose to show irreparable injury.  But it must prove — with specific and clear evidence — that the loss would be great.  The AFL-CIO does not really try.  It has thus not met its demanding burden to prove great costs.

Plaintiff’s brief vaguely gestures at two other theories of injury: harm to the union’s mission and harm to its members.  As for the mission, the union contends that because its staff would need to spend their time correcting old accounting entries, they could spend less time representing the union’s members.  See Mot. at 19; Prange Decl., ¶ 32.  One wonders how a busier accounting department would prevent a union’s organizers and negotiators from doing their own, separate jobs — let alone do so to such an extent that the AFL-CIO, one of the biggest unions in America, would suffer a great injury to its ability to represent workers.  The declarations do not explain.

Finally, Plaintiff claims that if its year-end reports are less accurate, then its members will be less able to scrutinize how their union is spending their money and so be less able to hold union leadership accountable.  See Mot. at 19.  The Court does not find it obvious that diminishing members’ ability to monitor the union’s spending would injure the union — as opposed to its hypothetically disgruntled members, who are not parties here.  Even so, the declarations offer little detail about the extent of errors that later recoding will cause and do not support a claim that it will be so great that workers will be clueless about where their money is going.  In sum, Plaintiff has not shown that manual recoding — which it concedes is the only

11

injury relevant here — will inflict great harm, and the Court would deny its Motion for that reason alone.

Still, another problem provides independent grounds for denying emergency relief: whether or not Plaintiff's injury would be great, it seems unlikely to arrive before the Court decides the merits.  The point of preliminary relief is to prevent irreparable harm that a movant would suffer before a court can issue final judgment.  Buckingham Corp. v. Karp, 762 F.2d 257, 261 (2d Cir. 1985).  "If a [judgment] on the merits can be [issued] before the injury would occur," there is therefore "no need for" emergency relief.  See 11A Wright & Miller's Federal Practice & Procedure § 2948.1 (3d ed. Apr. 2026 update); see also Matos ex rel. Matos v. Clinton Sch. Dist., 367 F.3d 68, 74 (1st Cir. 2004) ("If a case can be adjudicated on the merits before the harm complained of will occur, there is no sufficient justification for preliminary injunctive relief."); Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 235 (2d Cir. 1999); 5 U.S.C. § 705 (stay must be "necessary to prevent irreparable injury").

Plaintiff's declaration shows that it does not expect to recode any entries until well after the rule goes into effect.  In fact, it strongly implies that no recoding will be needed until after the Court decides the merits.  The union's accountants cannot recode transactions into a new software system until it is up and running.  See Oral Arg. Tr. at 7:21–8:4; Prange Decl., ¶¶ 28–30. Yet Plaintiff does not have the right software now; says that it does not even exist yet, see Oral Arg. Tr. at 27:9–29:3; and filed a declaration asserting that, "even under favorable conditions, reaching the point where the general ledger is ready to reliably capture compliant data takes at least six months for most organizations and substantially longer for some."  Prange Decl., ¶ 26 (and table).  In fact, the declaration talks about "hav[ing] to recode . . . transactions at the end of the fiscal year," id., ¶ 31 — that is, in July 2027.  See also id., ¶ 29 ("At the end of the year, the

12

union's accounting personnel must reconcile the reports that are exported from the accounting system (which have the 'bad' or incorrect entry) with the corrected journal entry.").

The Court expects to decide the merits long before then.  When Plaintiff filed its Motion, it may have been less clear that a merits decision would arrive in time to prevent irreparable harm.  At oral argument, however, the parties agreed to expedited summary-judgment briefing that will be finished by September 10, with the Joint Appendix filed by September 17 — more than a year before Plaintiff's first Form LM-2 Long Form would be due.  See Minute Order of June 30, 2026.  If the Court sides with the AFL-CIO on the merits and vacates the rule, then the union would likely never have to recode any old entries and so would never suffer any relevant injury.  Plaintiff has therefore not shown that it needs emergency relief now.

*     *     *

Because the AFL-CIO has not shown that it likely faces irreparable harm without preliminary relief, the Court will deny its Motion.  It does not reach the merits and expresses no view on them here.  That includes Plaintiff's claim in this Motion: that the rule's effective date is arbitrary and capricious.  That claim remains live, and Plaintiff might still prevail on it — and its other arguments — at summary judgment.  Until then, it is not entitled to emergency relief.

## IV.    Conclusion

For the foregoing reasons, the Court will deny Plaintiff's Motion for Preliminary Relief, as stated in its prior Order.

/s/ <i>James E. Boasberg</i><br>JAMES E. BOASBERG<br>Chief Judge

Date:  July 2, 2026

13