**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,<br>Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:26-cv-02061 (JEB) |
| KEITH E. SONDERLING and ELISABETH MESSENGER,<br>Defendants. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION AND SUMMARY ........................................................................ 1

BACKGROUND ........................................................................................................ 3

I. Legal Background ............................................................................................. 3

II. Factual Background .......................................................................................... 7

STANDARD OF REVIEW ....................................................................................... 13

ARGUMENT ............................................................................................................ 14

I. DOL violated the APA's notice-and-comment requirements.............................. 14

II. The Final Rule exceeds DOL's statutory authority.............................................. 25

III. Multiple provisions in the Final Rule are arbitrary and capricious. .................... 33

A. The Rule's revisions to labor organizations' "functional reporting" obligations are arbitrary and capricious.................................................................. 33

B. The Rule unreasonably compels certain labor organizations to list the names of members who pay at least $5,000 in dues................................................. 38

C. The Rule's July 1 effective date is arbitrary and capricious. ............................ 40

CONCLUSION .......................................................................................................... 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action on Smoking & Health v. Civ. Aeronautics Bd.*,
713 F.2d 795 (D.C. Cir. 1983) (per curiam) ........................................14, 15, 17, 21, 23

*AFL-CIO v. Chao ("Chao I")*,
297 F. Supp. 2d 155 (D.D.C. 2003) ........................................5, 40, 43

*AFL-CIO v. Chao ("Chao II")*,
298 F. Supp. 2d 104 (D.D.C. 2004) ........................................6, 42, 44

*AFL-CIO v. Chao ("Chao III")*,
409 F.3d 377 (D.C. Cir. 2005) ........................................4, 5, 6, 25, 32, 34

*Am. Bus Ass'n v. Slater*,
231 F.3d 1 (D.C. Cir. 2000) ........................................15

*Am. Hosp. Ass'n v. Bowen*,
834 F.2d 1037 (D.C. Cir. 1987) ........................................16

*Am. Optometric Ass'n v. FTC*,
626 F.2d 896 (D.C. Cir. 1980) ........................................21, 22

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) ........................................33, 44

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ........................................2, 22, 30, 31, 32, 38

*In re Bandi*,
683 F.3d 671 (5th Cir. 2012) ........................................27

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........................................30

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ........................................7, 32

*City of Billings v. TSA*,
153 F.4th 46 (D.C. Cir. 2025) ........................................16

*Consumer Energy Council of Am. v. FERC*,
673 F.2d 425 (D.C. Cir. 1982) ........................................17

*Council of S. Mountains, Inc. v. Donovan*,
653 F.2d 573 (D.C. Cir. 1981) ....................24

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
710 F.2d 842 (D.C. Cir. 1983) (per curiam) ....................17

*Custis v. United States*,
511 U.S. 485 (1994) ....................29

*Dep't of Educ. v. Brown*,
600 U.S. 551 (2023) ....................14

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ....................31

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ....................33

*Goetz v. Palluconi*,
775 F. Supp. 3d 189 (D.D.C. 2025) ....................13, 14

*Heartland Reg'l Med. Ctr. v. Sebelius*,
566 F.3d 193 (D.C. Cir. 2009) ....................19

*Hosp. Menonita de Guayama, Inc. v. NLRB*,
No. 22-1163, 2026 WL 2093902 (D.C. Cir. July 21, 2026) ....................33

*Humane Soc'y of the U.S. v. USDA*,
41 F.4th 564 (D.C. Cir. 2022) ....................15

*Int'l Bhd. of Elec. Workers Loc. Union No. 5 v. HUD*,
852 F.2d 87 (3d Cir. 1988) ....................38

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ....................30, 32, 33

*Louisiana Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ....................28

*Mack Trucks, Inc. v. EPA*,
682 F.3d 87 (D.C. Cir. 2012) ....................24

*Matal v. Tam*,
582 U.S. 218 (2017) ....................31

*Mine Workers v. Mine Safety & Health Admin.*,
626 F.3d 84 (D.C. Cir. 2010) ....................23

*Mobil Oil Corp. v. EPA*,
35 F.3d 579 (D.C. Cir. 1994) ....................................................................15, 16, 17

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).....................................................................................................33

*Nat. Res. Def. Council, Inc. v. EPA*,
683 F.2d 752 (3d Cir. 1982)........................................................................................40

*Nat'l Ass'n of Indep. Television Producers & Distribs. v. FCC*,
502 F.2d 249 (2d Cir. 1974)........................................................................................39

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021)...........................................................................................15, 19

*Paul v. FAA*,
168 F.4th 672 (D.C. Cir. 2026).....................................................................................31

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023) .........................................................................................21

*SecurityPoint Holdings, Inc. v. TSA*,
769 F.3d 1184 (D.C. Cir. 2014)....................................................................................36

*Sorenson Commc'ns Inc. v. FCC*,
755 F.3d 702 (D.C. Cir. 2014)......................................................................................24

*Sprint Corp. v. FCC*,
315 F.3d 369 (D.C. Cir. 2003)......................................................................................25

*Tenn. Gas Pipeline Co. v. FERC*,
969 F.2d 1141 (D.C. Cir. 1992)....................................................................................23

*Tennessee v. Becerra*,
131 F.4th 350 (6th Cir. 2025) .......................................................................................32

*Teva Pharms. USA v. FDA*,
514 F. Supp. 3d 66 (D.D.C. 2020)................................................................................16

*United States v. Alford*,
89 F.4th 943 (D.C. Cir. 2024).......................................................................................28

*Van Buren v. United States*,
593 U.S. 374 (2021).....................................................................................................29

*World Shipping Council v. Fed. Mar. Comm'n*,
152 F.4th 215 (D.C. Cir. 2025).....................................................................................36

**Statutes**

5 U.S.C. § 551 ....................15

5 U.S.C. § 553 ....................14, 15, 23, 24

29 U.S.C. § 431 ....................4, 6, 25, 29

29 U.S.C. § 438 ....................4

**Proposed and Final Rules**

25 Fed. Reg. 433 (Jan. 20, 1960) ....................29

57 Fed. Reg. 49282 (Oct. 30, 1992) ....................43

58 Fed. Reg. 28304 (May 12, 1993) ....................43

68 Fed. Reg. 58374 (Oct. 9, 2003) ....................5, 6, 33, 34, 35, 37, 42, 44

74 Fed. Reg. 3678 (Jan. 21, 2009) ....................44

85 Fed. Reg. 64726 (proposed Oct. 13, 2020) ....................8, 9, 10, 39

85 Fed. Reg. 80632 (Dec. 14, 2020) ....................21

86 Fed. Reg. 41166 (July 30, 2021) ....................18

90 Fed. Reg. 28251 (proposed July 1, 2025) ....................11

91 Fed. Reg. 32556 (June 1, 2026) .....1, 5, 7, 11, 12, 18, 19, 20, 21, 23, 24, 31, 32, 34, 36, 37, 38, 39, 40, 41

**Other Authorities**

29 C.F.R. § 403.3 ....................4

29 C.F.R. § 403.4 ....................4

C. Rufus Rorem, *Accounting Method* (1928) ....................28

Certified Pub. Accounts., *Accounting Trends & Techniques in Published Corporate Annual Reports* (11th ed. 1957) ....................26

DOL, Off. of Lab.-Mgmt. Standards, Online Public Disclosure Room (Mar. 17, 2026), https://www.dol.gov/agencies/olms/public-disclosure-room ....................7

Earl A. Saliers, *Modern Practical Accounting: Elementary* (1947) ....................27, 28

Harry George Guthmann, *The Analysis of Financial Statements* (1925) ....................................26

John A. White & Marcus H. Bean, *Elementary Accounting* (George H. Newlove ed., 4th ed. 1955)..........................................................................................................26

*Labor Organization Annual Financial Reports Rule Actions*, OIRA, https://www.reginfo.gov/public/do/ eAgendaViewRule?pubId=202104&RIN=1245-AA10 (last visited July 27, 2026) ..........................................................................................................10, 11

Nat'l Ass'n of Letter Carriers, Comment Letter (Dec. 10, 2020), https://www.regulations.gov/comment/LMSO-2020-0002-0096.............................................8

Ronald H. Robnett, Thomas M. Hill & John A. Beckett, *Accounting: A Management Approach* (1951) ...........................................................................27, 28

Roy B. Kester, *Accounting Theory and Practice: Advanced Accounting* (3d rev. ed. 1933) ..................................................................................................26, 27, 28

*Unified Agenda*, OIRA, https://www.reginfo.gov/public/jsp/eAgenda/UA_About.myjsp (last visited July 27, 2026)..........................................................................................................18

Walter J. Goggin & James V. Toner, *Accounting: Principles and Procedure* (1930)..........................................................................................................26, 27

William F. Willoughby, *Financial Condition and Operations of the National Government, 1921–1930* (1931) ...........................................................................28

WithumSmith+Brown, Comment Letter (Dec. 11, 2020), https://www.regulations.gov/comment/LMSO-2020-0002-0097.............................................9

## INTRODUCTION AND SUMMARY

On June 1, 2026, the Department of Labor ("DOL" or "Department") substantially amended a 2003 rule that had governed unions' financial-reporting obligations under the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"). *See* Labor Organization Annual Financial Reports, 91 Fed. Reg. 32556 (June 1, 2026) ("Final Rule" or "Rule"). The Final Rule subjects labor organizations like Plaintiff AFL-CIO and its affiliates to a host of new reporting burdens, greatly expanding the types of financial transactions that many unions must itemize, categorize, and disclose.

The Rule contravenes the Administrative Procedure Act ("APA") in multiple respects. To begin with, the Department violated the APA's notice-and-comment requirements by suddenly reviving and immediately finalizing a 2020 proposed rule that the Department publicly announced it had withdrawn in 2021. Under D.C. Circuit precedent, once an agency's rulemaking process has concluded, the agency cannot finalize a rule without initiating a new rulemaking proceeding and fulfilling its notice-and-comment obligations. The Department flouted that precedent, undermining the APA's fair-notice and informed-decision-making objectives. On this basis alone, this Court should grant summary judgment to the AFL-CIO and vacate the Rule's new financial-disclosure obligations in their entirety.

But the Rule violates the APA on substantive grounds as well—including in ways that DOL likely would have avoided had it provided an opportunity for public comment in 2025 or 2026.

For one, the Department exceeded its statutory authority by imposing a plethora of new itemized-disclosure requirements. Properly interpreted, the LMRDA authorizes DOL to compel only the kinds of summary disclosures that appeared on standard corporate balance sheets and income statements, not itemized disclosures of everyday receipts and disbursements. The Department's contrary view—that it can compel labor organizations to publish detailed lists of

their financial transactions, regardless of their materiality to the union's overall financial condition—misreads the LMRDA's text while raising serious First Amendment concerns under *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 608 (2021). The Rule fails to grapple with any of these concerns—no surprise, since the regulated community had no opportunity to comment on the impact of *Bonta* before the agency finalized the Rule.

For another, many of the revisions that the Rule makes to labor organizations' financial-reporting obligations are arbitrary and capricious. One such revision involves the Department's "functional reporting" requirements. When DOL first introduced these requirements in 2003, it transformed how labor organizations needed to categorize their disbursements—forcing them to go beyond standard bookkeeping categories (like legal expenses, professional fees, and so on) and use new "functional" categories (member representation, political advocacy, grants and contributions, and union administration, with the balance treated as general overhead). The Department intended this change to help union members and the general public learn about each union's programmatic priorities—and to compare how different unions allocate their resources.

The Final Rule changes the functional reporting regime in an utterly arbitrary way. Now, when labor organizations disclose how much they spend on each "functional" category, they can no longer include their own salary costs—how much they pay their own staff to carry out various programmatic activities—which make up a substantial portion of a union's total expenses. Suppose, for instance, that Unions A and B spend the same proportion of their total resources on membership representation and overhead. But Union A uses its own staff to provide representation services, while Union B outsources that function to outside counsel. Under the Final Rule, Union A will appear far less devoted than Union B to providing representation services—even though, in truth, they have identical spending priorities. In this way, the Rule drains the "functional reporting"

system of its informational value while keeping many of its burdens in place. That is classic arbitrary-and-capricious decision-making. Compounding the problem, the Rule imposes *new* burdens on regulated parties by subdividing two of the prior functional categories into four.

For these reasons, and because other aspects of the Rule are arbitrary and capricious (including its rushed effective date), the Court should grant this motion for summary judgment.

## BACKGROUND

### I. Legal Background

Congress enacted the LMRDA in 1959. Section 201(b) of the Act—the key provision here—requires covered labor organizations to file annual financial reports with the Secretary of Labor. That provision, which has not been amended, says, in full:

> **Annual financial report; filing; contents**
>
> Every labor organization shall file annually with the Secretary a financial report signed by its president and treasurer or corresponding principal officers containing the following information in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year—
>
> (1) assets and liabilities at the beginning and end of the fiscal year;
>
> (2) receipts of any kind and the sources thereof;
>
> (3) salary, allowances, and other direct or indirect disbursements (including reimbursed expenses) to each officer and also to each employee who, during such fiscal year, received more than $10,000 in the aggregate from such labor organization and any other labor organization affiliated with it or with which it is affiliated, or which is affiliated with the same national or international labor organization;
>
> (4) direct and indirect loans made to any officer, employee, or member, which aggregated more than $250 during the fiscal year, together with a statement of the purpose, security, if any, and arrangements for repayment;
>
> (5) direct and indirect loans to any business enterprise, together with a statement of the purpose, security, if any, and arrangements for repayment; and
>
> (6) other disbursements made by it including the purposes thereof;

all in such categories as the Secretary may prescribe.

29 U.S.C. § 431(b). The Act authorizes the Secretary to issue rules "prescribing the form and publication" of such reports. *Id.* § 438.

Exercising that authority, the Secretary has long required covered labor organizations to submit one of three DOL-prescribed forms, depending on the union's gross annual receipts. Prior to the Rule, the labor organizations with the largest gross annual receipts filed their reports on a Form LM-2, while labor organizations with smaller receipts filed their reports on simplified Forms LM-3 and LM-4. *AFL-CIO v. Chao*, 409 F.3d 377, 379 (D.C. Cir. 2005) ("*Chao III*"); *see* 29 C.F.R. §§ 403.3, 403.4.

DOL first introduced the Form LM-2 shortly after the LMRDA was enacted. *See* Second Taylor Decl. Ex. D (AFL-CIO's first LM-2 filing on Sep. 30, 1960). The original version of the Form LM-2 prompted little controversy. It required filers to provide a "statement of assets and liabilities" and a "statement of receipts and disbursements," corresponding to the broad types of information listed in subparagraphs (1) ("assets and liabilities"), (2) ("receipts"), and (6) ("disbursements") of Section 201(b). Within these statements, the form listed certain subcategories of "assets and liabilities" and "receipts and disbursements" that unions needed to report. Notably, those subcategories corresponded with traditional bookkeeping categories such as legal expenses, professional fees, and purchases of supplies; the form did not require unions to classify their expenses into functional or programmatic categories. Instead, filers disclosed the total sum falling within each bookkeeping category. The only parts of the form that called for more detail were those that tracked the very different and highly specific language of subparagraphs (3), (4), and (5) of Section 201(b), where Congress itself prescribed the details for reporting compensation and loans.

For more than four decades, the original Form LM-2 remained largely unchanged. Then, in October 2003, the Department made major revisions. Labor Organization Annual Financial Reports, 68 Fed. Reg. 58374 (Oct. 9, 2003). The agency's 2003 rule "call[ed] for several significant changes to the financial reporting requirements." *Chao III*, 409 F.3d at 380.

Among other things, the Department for the first time implemented a version of "functional" reporting that attempted to capture the underlying programmatic activities of the reporting organization. *Id.* The 2003 rule required Form LM-2 filers to disclose how much they spent across five specific "functional categories": (1) representational activities; (2) political activities and lobbying; (3) contributions, gifts, and grants; (4) general overhead; and (5) union administration. 68 Fed. Reg. at 58429. Labor organizations needed to disclose the total sum of disbursements spent on each category, while itemizing disbursements within each category if they added up to at least $5,000 to the same recipient. *Id.* at 58430.

This "functional reporting" requirement applied to all disbursements—including the labor organization's costs for the salaries of its officers and employees. Form LM-2 filers apportioned such salaries based on the estimated "time" that their officers and employees spent on each functional category. *Id.* at 58429. For example, if a union officer spent 10% of his time in a given year on "representational activities," then 10% of his salary would be counted toward the union's "representational activities" disbursements for that year. *See id.* at 58405. The Department referred to this practice as "functional time reporting." *E.g.*, 91 Fed. Reg. at 32587.

The 2003 rule gave covered labor organizations 83 days from the issuance date—and "less than two months" (52 days to be exact) from its final-approval date—to "make the enormous changes necessary to their accounting, computer, software and staff training to comply" with the new filing obligations. *AFL-CIO v. Chao*, 297 F. Supp. 2d 155, 164 (D.D.C. 2003) ("*Chao I*").

According to the Department, the effective date gave labor organizations sufficient time to make the necessary "adjustments before the start of their first reporting period under the final rule." 68 Fed. Reg. at 58411, 58422.

The AFL-CIO sued and challenged the 2003 revisions on several grounds, two of which are relevant here.

First, the AFL-CIO argued that the rule's effective date was arbitrary and capricious. This Court agreed. *AFL-CIO v. Chao*, 298 F. Supp. 2d 104, 126–28 (D.D.C. 2004) ("*Chao II*"), *aff'd in part, vacated in part, rev'd in part (all on other grounds)*, 409 F.3d 377 (D.C. Cir. 2005). As a result, this Court postponed the effective date by six months, which effectively gave every covered labor organization at least eight months to transition to the new reporting regime. *Id.* at 128.

Second, the AFL-CIO claimed that the 2003 rule's new itemization requirements exceeded the Department's statutory authority. *See Chao III*, 409 F.3d at 381. Section 201(b) requires each covered labor organization to file an annual financial report "to disclose its financial condition and operations," 29 U.S.C. § 431(b), and—as the D.C. Circuit acknowledged—the Secretary may compel such financial disclosures "only for th[at] purpose," *Chao III*, 409 F.3d at 386. The terms "financial condition" and "operations," the AFL-CIO argued, "have a generally understood meaning in the accounting field": a statement of "financial condition" refers to a "corporate balance sheet," while a statement of "operations" refers to an "income statement." *Id.* at 381. Those sorts of financial statements, the AFL-CIO explained, reported only "aggregated financial information," not itemized transaction data. *Id.* So, in the AFL-CIO's view, Section 201(b) did not authorize DOL's itemized reporting requirements.

The D.C. Circuit, however, determined that the statutory language was "ambiguous" and that DOL's view of its authority was "not 'manifestly contrary to the statute.'" *Id.* at 386 (quoting

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)). As a result, under "Step 2" of the *Chevron* doctrine, the D.C. Circuit concluded that "[t]he Secretary's promulgation of revised Form LM-2 [was] a reasonable application of [her] authority" under Section 201(b), *id.*, without deciding for itself how the terms "financial condition" and "operation" in the statute are best interpreted.

From 2003 until DOL promulgated the Rule at issue in this case, the Form LM-2 remained unchanged. *See* 91 Fed. Reg. at 32561. Still, as its history shows, the modern Form LM-2 contains extensive reporting requirements. Since 2003, Form LM-2 filers have needed to compile and disclose all sorts of detailed financial information—a process that involves filling out hundreds of entries across twenty different schedules. As a result, a single Form LM-2 report often spans hundreds of pages. *See, e.g.*, Second Taylor Decl. Ex. A–C (Forms LM-2 filed by AFL-CIO and two of its national-union affiliates). Every labor organization's Form LM-2 is publicly available on the Department's website. *See* DOL, Off. of Lab.-Mgmt. Standards, Online Public Disclosure Room (Mar. 17, 2026), https://www.dol.gov/agencies/olms/public-disclosure-room.

## II. Factual Background

In 2019, the Department conducted an internal survey of the field staff in its Office of Labor-Management Standards ("OLMS"), asking them to share their experiences with certain Form LM-2 reporting requirements. 91 Fed. Reg. at 32564. As part of that canvassing effort, several investigators raised concerns with the "functional categories" that DOL had created in 2003. *Id.* at 32566. Many noted that the "functional reporting" system was "not useful," since investigators could not "verif[y]" whether labor organizations were accurately categorizing their disbursements. A.R. 584–85. Several emphasized that the categories have made reporting "more complicated for labor unions," A.R. 583, since some categories are "very similar and often confused by the regulatory community," A.R. 582.

With these and other survey responses in hand, in October 2020, DOL proposed several sweeping revisions to the Form LM-2. Labor Organization Annual Financial Reports: LM Form Revisions, 85 Fed. Reg. 64726 (proposed Oct. 13, 2020). First, the Department proposed substantially revising the Form LM-2's reporting requirements. *Id.* at 64745–47. Second, DOL proposed creating an entirely new, expanded form for labor organizations with the largest gross annual receipts. DOL dubbed this the "Form LM-2 Long Form." *Id.* at 64734–45. And third, DOL proposed raising the filing threshold for Form LM-2 filers to keep pace with inflation. *Id.* at 64747. DOL solicited and received comments on these proposals.

One of the Department's specific proposals was to eliminate a labor organization's own labor costs from its "functional reporting" disclosures. *Id.* at 64740. Under that proposal, when a labor organization reported the resources it spent on a given "functional category," it could no longer include the time that its own officers and employees spent on those categories—presented as a fraction of their salaries. Because many unions rely on their own staff to provide key representational services, several commenters pointed out that this change would mislead the public about a given labor organization's operations and spending priorities. *See, e.g.*, A.R. 598 (explaining that this change would "exaggerate the portion of expenditures going for overhead, which usually involve payments to third parties for things like rent, utilities and supplies," while "understat[ing] the portion of expenditures going for representation, as negotiations and grievance handling are carried out directly by union officers and employees"); A.R. 606 (the Rule will "misleadingly suggest the union's only representational expenditures were those paid to other entities," even though "[r]epresentation largely comes from the work that the International Union staff performs"); A.R. 612 (similar); Nat'l Ass'n of Letter Carriers, Comment Letter at 7 (Dec. 10, 2020), https://www.regulations.gov/comment/LMSO-2020-0002-0096 ("the majority of union

payroll is spent on representational matters and making this change will strip away dollars currently identified as representational so readers see a different picture”); WithumSmith+Brown, Comment Letter at 4 (Dec. 11, 2020), https://www.regulations.gov/comment/LMSO-2020-0002-0097 (changes to functional reporting “will significantly reduce the amount of money reported for representational activities”).[1]

Another Department proposal considered expanding the number of “functional categories” that labor organizations needed to track and report. DOL proposed splitting the “Political Activities and Lobbying” category into two separate “Political Activities” and “Lobbying” subcategories, 85 Fed. Reg. at 64742, and the “Representational Activities” category into two separate “Contract Negotiation and Administration” and “Organizing” subcategories, *id.* at 64741. As to these changes, commenters noted that labor organizations would be unable to consistently distinguish one subcategory from the other. *See, e.g.*, A.R. 599 (explaining that the proposed subcategories are “directly related”); A.R. 648; A.R. 675; WithumSmith+Brown, Comment Letter at 7 (similar).

Yet another proposal would increase the itemization obligations for Form LM-2 Long Form filers. For certain “categories of receipts,” these filers would need to list every payment received from anyone who paid the filer at least $5,000 in the past year. 85 Fed. Reg. at 64743–44. This proposal, notably, would apply to dues payments that a union received from its members. *Id.* As a result, a covered labor organization would need to “complete a separate itemization schedule” for each union member who paid at least $5,000 in dues in the past year. *Id.* And in that schedule, the organization would need to disclose, among other things, “information about the individual.” *Id.* Several commenters raised privacy concerns with this itemization requirement—especially

[1] The comments submitted by the National Association of Letter Carriers and WithumSmith+Brown were omitted from the certified administrative record that Defendants produced in this litigation.

because, for certain unions, most members' dues exceed the proposed $5,000 threshold. *See, e.g.*, A.R. 609 (comment from Air Line Pilots Association); 707 (comment from Pacific Northwest Regional Council of Carpenters); WithumSmith+Brown, Comment Letter at 2.

The Department proposed that all of these changes, if finalized, would take effect "30 days after publication"—meaning that, 30 days after publication, a labor organization starting a new fiscal year would need to comply with the rule's new reporting obligations for that fiscal year. 85 Fed. Reg. at 64747. Several commenters explained why this proposed 30-day effective date was unworkable. Labor organizations needed substantially more time to "re-tool and make all the necessary changes which must be in place prior to the start of the reporting period [a]ffected by the new reporting rules." Nat'l Ass'n of Letter Carriers, Comment Letter at 8; *see also* WithumSmith+Brown, Comment Letter at 8 (same). For example, labor organizations would need to "reprogram" their accounting systems to comport with the Department's Form LM-2 and Form LM-2 Long Form revisions, a process that would be "extremely burdensome." A.R. 833. In addition, labor organizations would need to "trai[n]" staff on how to use these revamped accounting systems. Nat'l Ass'n of Letter Carriers, Comment Letter at 8. One union added that the proposed Form LM-2 Long Form would "require thousands of additional project codes within [the union]'s accounting system" in addition to numerous other "internal policy, procedure and accounting system changes." A.R. 610, 612; *see also, e.g.*, A.R. 839 (similar). Accounting firms raised the same practical concerns. *See, e.g.*, WithumSmith+Brown, Comment Letter at 8; A.R. 693.

A few months after the comment period closed, the Department publicly announced that the 2020 NPRM had been "[w]ithdrawn" as of March 17, 2021. *Labor Organization Annual Financial Reports Rule Actions*, OIRA, https://www.reginfo.gov/public/do/

eAgendaViewRule?pubId=202104&RIN=1245-AA10 (last visited July 27, 2026) ("Withdrawal Notice"). In its announcement, DOL explained that "[a]fter review, the Department has determined to remove this entry as it is no longer necessary." *Id.*

DOL said nothing further about proposed changes to Form LM-2 until July 2025, when it proposed revisiting the filing-threshold proposal from 2020. In a notice of proposed rulemaking ("2025 NPRM"), the Department again suggested raising the filing threshold for the Form LM-2 and invited public comment on that specific proposal, along with the possibility of raising the filing threshold for the Form LM-3. Filing Thresholds for Forms LM-2, LM-3, and LM-4 Labor Organization Annual Reports, 90 Fed. Reg. 28251 (proposed July 1, 2025).

Notably, DOL did not solicit comments on any other proposal. Nor did its 2025 NPRM reference the proposed 2020 changes to Form LM-2 reporting requirements. As the Department later put it, the 2025 NPRM "did not propose revisions to other aspects of the reporting regime addressed in prior rulemakings." 91 Fed. Reg. at 32560. Several labor organizations submitted comments addressing the proposed changes to the filing thresholds, but none of those comments said anything about the substantive changes DOL had proposed to the Form LM-2 back in 2020. The comment period for the 2025 NPRM closed on July 31, 2025. *Id.* at 32556.

On June 1, 2026, DOL promulgated a Final Rule entitled "Labor Organization Annual Financial Reports"—the agency action challenged in this case. *Id.* The Rule finalized the Department's 2025 proposal to increase the filing thresholds for the Form LM-2 and Form LM-3. *Id.*.

The Rule, however, also finalized many aspects of DOL's *2020 proposal* to make major revisions to the Form LM-2 and to create the new and expanded "Form LM-2 Long Form" for unions with the largest gross annual receipts ($40 million, as set by the Department). *Id.* at 32594–

601. DOL finalized these changes despite the fact it had publicly withdrawn the proposal setting forth these changes more than five years earlier, failed to provide notice that it was considering reviving these changes, and failed to provide any further opportunity for public comment.

These changes to labor organizations' Form LM-2 reporting obligations will subject filers to a whole swath of new reporting obligations. Among them:

- Form LM-2 and Form LM-2 Long Form Filers cannot include their own salary costs when disclosing how they allocated their resources across DOL's "functional" categories. *Id.* at 32586.

- Form LM-2 and Form LM-2 Long Form filers must sort certain expenditures into new "functional" categories. For example, "Political Activities and Lobbying" expenses must now be categorized as *either* "Political Activities" or "Lobbying." *Id.* at 32589. Likewise, "Representational Activities" expenses must now be reclassified as *either* "Contract Negotiation and Administration" or "Organizing." *Id.* at 32588–89.

- Form LM-2 Long Form filers must list the names of union members who pay dues at or above a $5,000 annual threshold, along with the amount of dues each member paid. *Id.* at 32590.

- Form LM-2 Long Form filers also must individually list per capita payments that they receive from affiliates, all rental income, and receipts they receive on behalf of members and affiliates, among other new itemization requirements with a $5,000 annual threshold. *Id.* at 32573 & n.13, 32601.

The Final Rule applies to all "labor organizations whose fiscal years beg[a]n on or after July 1, 2026." *Id.* at 32606. As a result, starting on July 1, any labor organization beginning a new fiscal year must process financial transactions under the Rule's new reporting requirements.

**B.** Plaintiff AFL-CIO is a federation of dozens of national and international labor organizations, which collectively represent 15 million workers. The AFL-CIO and the vast majority of its member unions are covered by Section 201(b) of the LMRDA and are therefore subject to its reporting requirements.

Because the AFL-CIO's gross annual receipts exceed $40 million, it will be required to file a Form LM-2 Long Form under the new Rule. Because some of the AFL-CIO's member unions

also have gross annual receipts of at least $40 million, they too will be required to file Form LM-2 Long Forms. And because many of the AFL-CIO's other member unions (and their affiliates) have total annual receipts of at least $350,000, they will be required to comply with the Rule's new Form LM-2 reporting requirements.

Hundreds of these organizations will need to file the revised Form LM-2 or the new Form LM-2 Long Form for fiscal years that begin in 2026. Many, including the AFL-CIO, started their current fiscal year on July 1, 2026. *See* Dkt. No. 7-3 (Taylor Decl.) ¶ 6. Still others will start their next fiscal year on October 1. *Id.* ¶ 9.

On June 10, 2026, Plaintiff AFL-CIO sued to set aside the Rule under the APA. The complaint raised four causes of action, alleging that (1) DOL failed to comply with its notice-and-comment requirements, (2) DOL set an arbitrary and capricious effective date, (3) several of the Rule's new reporting requirements are arbitrary and capricious, and (4) several of those requirements exceed DOL's statutory authority. Dkt. No. 1.

At the outset, the AFL-CIO sought a preliminary injunction postponing the Rule's July 1 effective date. This Court denied that motion solely on the ground that the AFL-CIO had not established irreparable harm warranting emergency relief. Dkt. No. 21 at 13. "If the Court sides with the AFL-CIO on the merits and vacates the rule," the Court noted, "then the union would likely never have to recode any old entries and so would never suffer any relevant injury." *Id.*

Plaintiff AFL-CIO now moves for summary judgment on all of its claims.

## STANDARD OF REVIEW

When considering a motion for summary judgment in an APA case, a district court "sits as an appellate tribunal" and decides "whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Goetz v. Palluconi*, 775 F. Supp. 3d 189, 198–99 (D.D.C. 2025) (citation modified). Judicial review is

"confined to the administrative record," and the APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *Id.* at 199 (citation modified).

## ARGUMENT

The Final Rule violates the APA several times over and should be vacated.

### I. DOL violated the APA's notice-and-comment requirements.

Under the APA, when an agency engages in a "rule making," it must publish a "notice of proposed rule making" and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b), (c). An agency cannot promulgate a final substantive rule without providing such "notice" and "opportunity for comment." *Dep't of Educ. v. Brown*, 600 U.S. 551, 558 (2023).

DOL violated these basic requirements. In 2020, the Department proposed a raft of changes affecting Form LM-2 filers. It provided notice of that proposal and solicited public comment. After the comment period closed, DOL publicly announced that it had withdrawn its proposal and denoted the rulemaking as "completed." Nevertheless, in 2026, the Department blindsided regulated parties by suddenly finalizing its 2020 proposal without providing further notice or opportunity for comment—even though it had provided fresh notice and an opportunity for comment on one discrete aspect of its 2020 proposal. That contravened the APA. When an agency withdraws a proposed rulemaking but later changes its mind, it must start over and provide a fresh round of notice and comment. Because the Final Rule was issued without notice and opportunity for comment, it must be set aside.

**A.1.** As the D.C. Circuit explained decades ago, "[i]f one rulemaking proceeding has culminated and another has begun, then new notice and comment procedures are required." *Action on Smoking & Health v. Civ. Aeronautics Bd.*, 713 F.2d 795, 800 (D.C. Cir. 1983) (per curiam).

That basic rule emerges from the APA's text. The statute says that an agency must provide "notice" and "an opportunity to participate in *the* rule making" at issue, 5 U.S.C. § 553(b), (c) (emphasis added), which the APA defines as the "agency process for formulating, amending, or repealing a rule," *id.* § 551(5). In using "a definite article with a singular noun" (here, "the rulemaking"), the APA treats each "rule making" as "a discrete thing." *See Niz-Chavez v. Garland*, 593 U.S. 155, 166 (2021); *see also Am. Bus Ass'n v. Slater*, 231 F.3d 1, 5–6 (D.C. Cir. 2000) ("the definite article 'the' particularizes the subject which it precedes" (citation modified)). An agency's notice-and-comment obligations therefore arise in each individual rulemaking proceeding—meaning, an agency must provide notice and opportunity for comment each time it initiates a discrete proceeding for formulating a rule. So, when one rulemaking proceeding ends and another begins, a new round of notice and comment is required. *Action on Smoking*, 713 F.2d at 800. Anything less would deny affected parties the APA's express guarantee of published "notice" and "an opportunity to participate in *the* rule making" under consideration. 5 U.S.C. § 553(b), (c) (emphasis added).

A line of D.C. Circuit decisions illustrates this basic principle. When a rulemaking proceeding culminates in a final rule, a new round of notice and comment is required before the agency can *rescind* that rule. *Humane Soc'y of the U.S. v. USDA*, 41 F.4th 564, 572 (D.C. Cir. 2022). Likewise, when a final rule gets vacated, a new round of notice and comment is required before the agency can *reinstate* that same (vacated) rule, even if the agency believes it can cure the rule's defects without soliciting additional comments. *Action on Smoking*, 713 F.2d at 800; *accord Mobil Oil Corp. v. EPA*, 35 F.3d 579, 597–98 (D.C. Cir. 1994). As this precedent confirms, once an agency's rulemaking process ends in a final decision, the agency cannot begin another rulemaking effort without another round of notice and comment.

Basic administrative-law principles reinforce this interpretation. The APA's notice-and-comment requirements serve two main functions: providing "fairness to affected parties" (*i.e.*, notice) and ensuring that "the agency will have before it the facts and information relevant to a particular administrative problem" (*i.e.*, the opportunity for interested parties to comment). *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987). Requiring new notice-and-comment procedures when one rulemaking proceeding culminates and another begins furthers both aims.

As to fairness: The conclusion of a rulemaking proceeding informs interested parties that the agency has settled on a certain course of action. So, if an agency wishes to take further action (and perhaps even change course), then basic principles of notice require the agency to alert affected parties of its intentions. "The object, in short, is one of fair notice; notice-and-comment processes that result in an unfair surprise being sprung on regulated entities are therefore deficient." *Teva Pharms. USA v. FDA*, 514 F. Supp. 3d 66, 94–95 (D.D.C. 2020) (citation modified).

A fresh round of notice and opportunity for comment also enhances the agency's decision-making. "New information relevant to the agency's decisionmaking might well have come to light after the original notice and comment proceedings." *Mobil Oil*, 35 F.3d at 585. As a result, fresh opportunity for public comment gives affected parties the chance to raise concerns that they could not have raised before—such as new costs imposed by the agency's proposal, new reliance interests that have emerged, or other developments that have occurred in the interim. In this way, the APA ensures that "the agency fully understands the potential impact of a proposed rule before finalizing it." *City of Billings v. TSA*, 153 F.4th 46, 53 (D.C. Cir. 2025).

**2.** These principles apply with full force to the withdrawal of a proposed rule. An agency's decision to *withdraw* a rulemaking—just like an agency's decision to *finalize* a proposed rule—

concludes the rulemaking process. That is the agency's final decision on the matter—its considered determination that the proposed change, for one reason or another, is no longer warranted. That is why an agency's decision to withdraw a proposed rule—and "terminate its rulemaking proceedings"—is a form of "final agency action" subject to judicial review. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 710 F.2d 842, 846 (D.C. Cir. 1983) (per curiam). In other words, the rulemaking process can culminate in a "no" just as much as it can culminate in a "yes." Either way, the agency's final decision resets its notice-and-comment obligations.

Precedent supports this conclusion. Under *Mobil Oil* and *Action on Smoking*, an agency must go through notice and comment before it can "repromulgate" a rule that has been vacated. *Mobil Oil*, 35 F.3d at 584 (citing *Action on Smoking*, 713 F.2d at 797–98). Put another way, new notice-and-comment procedures are required even if the agency intends to take the *same* action that it took in the initial rulemaking process. And if new notice-and-comment procedures are required before an agency can achieve the *same* outcome it reached in a prior rulemaking (by repromulgating the same rule), then new notice-and-comment procedures are surely required before an agency can achieve a *different* outcome (by finalizing a rule that had been withdrawn).

The purposes behind the APA's notice-and-comment requirements—again, fair notice and reasoned decision-making—reinforce the point. A withdrawal alerts the public that the agency has decided to retain the status quo—and that affected parties may stand down and need not brace for regulatory change. If the agency later decides to change course and revive a withdrawn rulemaking proposal, then principles of fair notice require the agency to announce its intention to do so and receive public comments on that change. Beyond ensuring fair notice, new notice-and-comment procedures promote reasoned agency decision-making. They guarantee that an agency will not revert course "without giving all parties an opportunity to comment on the wisdom" of its new

approach, *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982), especially if new information has come to light in the interim.

In sum, the D.C. Circuit's "culmination" rule applies where the initial rulemaking process ends in a withdrawal of a proposed rule and termination of the rulemaking proceedings. So, if an agency later wishes to finalize a withdrawn rule, new notice-and-comment procedures are required.

**3.** Under that approach, the Department needed to provide fresh notice and opportunity for comment before finalizing the Final Rule. It did not do so.

As the Final Rule acknowledges, in March 2021, "the Department withdrew the 2020 NPRM" and "classified the state of rulemaking as completed." 91 Fed. Reg. at 32560. It did so by publicly announcing that the 2020 proposed rule had been "[w]ithdrawn" as of March 17, 2021. *See* Withdrawal Notice. The Department made this announcement in the Spring 2021 edition of the *Unified Agenda*, an official compilation of Executive Branch regulatory activities published semiannually by the Office of Information and Regulatory Affairs. About the Unified Agenda, https://www.reginfo.gov/public/jsp/eAgenda/UA_About.myjsp (last visited July 27, 2026). "Agencies prepare[ ] entries for this publication to give the public notice of their plans to review, propose, and issue or withdraw regulations." 86 Fed. Reg. 41166, 41167 (July 30, 2021); *see also id.* ("Agency agendas also show actions or reviews completed or withdrawn since the last Unified Agenda.").

In addition to announcing that it had "[w]ithdrawn" the 2020 proposed rulemaking, DOL elaborated that, "[a]fter review, the Department has determined to remove this entry as it is no longer necessary." *See* Withdrawal Notice. Reinforcing the point, the announcement also designated the 2020 rulemaking as a "Completed Action[]," *id.*, a term the *Unified Agenda* uses to

describe "actions or reviews the agency has completed or withdrawn since publishing its last agenda," 86 Fed. Reg. at 41168. By marking the 2020 NPRM as "[w]ithdrawn" and "[c]ompleted" in an official Executive Branch publication, DOL unequivocally announced that the 2020 rulemaking process was over.

That is not all. In the time between the March 2021 withdrawal and the June 2026 promulgation, DOL never so much as hinted that the 2020 rulemaking was still on the table. In fact, DOL sent the opposite message when it revisited one aspect of its 2020 NPRM in July 2025—the Form LM-2 filing threshold—by again proposing to increase that threshold and soliciting further comments on that change. The Department did not solicit comments on any of its other 2020 proposals, including its proposed revisions to the Form LM-2 and creation of the Form LM-2 Long Form. As DOL itself later put it, the 2025 NPRM "did not propose revisions to other aspects of the reporting regime addressed in prior rulemakings." 91 Fed. Reg. at 32560. The 2025 NPRM thus left the unmistakable impression that the Department's 2021 withdrawal of its 2020 rulemaking was not being revisited and that the 2020 rulemaking was in fact concluded. And the Department's decision to provide a new round of notice and comment for a potential filing-threshold increase further indicated that, if DOL ever was going to revisit *other* aspects of the 2020 rulemaking, it would provide additional notice and opportunity for comment before doing so.

At bottom, through its 2021 withdrawal announcement and its subsequent conduct, the Department made it clear to affected parties that the 2020 rulemaking proceeding had terminated. When an agency declares that a rulemaking proceeding is over, the public should be able to take the agency at its word. After all, "[i]f men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez*, 593 U.S. at 172. So, when the Department decided to change course and

re-initiate the rulemaking process, it needed to provide fair notice and opportunity for comment. DOL did not, and the Final Rule must be set aside on that basis. *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) ("Failure to provide the required notice and to invite public comment . . . is a fundamental flaw that normally requires vacatur of the rule." (citation modified)).

**B.** Resisting this conclusion in the Final Rule, the Department insists that the Final Rule complied with the APA's notice-and-comment requirements. 91 Fed. Reg. at 32561–62. First, the Department claims that withdrawing a rule has no effect on an agency's notice-and-comment obligations. And second, in the alternative, DOL briefly attempts to invoke the good-cause exception to the APA's notice-and-comment requirements. Neither argument persuades.

**1.** To begin with, DOL does not dispute that, when one rulemaking concludes and another begins, new notice-and-comment procedures are generally required. Instead, the Department suggests that an exception to this rule exists for rulemaking proceedings that culminate in *withdrawals*. 91 Fed. Reg. at 32561 & n.4.

That argument fails. A rulemaking can culminate in the agency adopting *all* of its proposal, *some* of its proposal, or *none* of its proposal—in any of these scenarios, the rulemaking process has come to a head, and any subsequent rulemakings must satisfy the APA's notice-and-comment requirements. The APA draws no distinction between a rulemaking that concludes in a final rule and one that concludes in no rule. The precedents applying the D.C. Circuit's "culmination" rule do not support any such distinction. And DOL's argument would subvert the APA's interests in fairness and reasoned decision-making. On the Department's view, an agency could go through the notice-and-comment process, inform the public that it has decided to maintain the status quo, and then—at any point in the future—reverse course without offering notice or opportunity for

comment. Nothing in the APA or the D.C. Circuit's precedents permits agencies to use the procedures provided in one rulemaking proceeding to satisfy the procedural requirements of another.

To the extent DOL relies on the Third Circuit's split decision in *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023), the facts of that case are distinguishable. There, the NPRM in question was removed from the regulatory agenda as part of a government-wide "'Regulatory Freeze Pending Review,' which had the effect of *pausing* action on the proposed rule." 85 Fed. Reg. 80632, 80633 (Dec. 14, 2020) (emphasis added); *see also Sanofi Aventis*, 58 F.4th at 706 (quoting same). Here, the Government never publicly suggested that the 2020 NPRM might be merely frozen or paused, as opposed to terminated. In all events, to the extent *Sanofi Aventis* could be read for the proposition that an agency can avoid new notice-and-comment procedures whenever it reinstates a withdrawn rule, such a reading cannot be squared with the D.C. Circuit's admonition that "[i]f one rulemaking proceeding has culminated and another has begun, then new notice and comment procedures are required." *Action on Smoking*, 713 F.2d at 800.

Perhaps cognizant of the tension between its interpretation of the APA and the D.C. Circuit's caselaw, DOL fashions an escape hatch. The Department acknowledges that additional notice and opportunity for comment may be required "when circumstances have changed so much since the original proceedings that the agency would wish to write a different rule." 91 Fed. Reg. at 32561 (citation modified). But that changed-circumstances standard lacks any basis in the APA's text. The APA nowhere mentions a notice-and-comment exception when "circumstances" between rulemakings have remained "materially" the same. Instead, DOL's changed-circumstances standard comes from an entirely distinct doctrinal context—it is the standard that the D.C. Circuit uses to decide whether courts should "retur[n] a rule" currently on review "to an agency for further

consideration in light of new evidence." *Am. Optometric Ass'n v. FTC*, 626 F.2d 896, 907 (D.C. Cir. 1980). In other words, the "changed circumstances" standard applies when a rule that has gone through notice-and-comment "relies on evidence which has grown stale while the decision awaits judicial review." *Id.* at 906. It says nothing about whether an agency has met its notice-and-comment obligations in the first instance.

Moreover, the Final Rule cannot satisfy DOL's own changed-circumstances test anyway, as several changes in "core circumstances" have taken place since the original 2020 NPRM.

For one, after the 2020 comment period closed, the Supreme Court issued a decision clarifying that *all* compelled-disclosure requirements—such as the Final Rule's new reporting obligations—are "reviewed under exacting scrutiny," "[r]egardless of the type of association" that is targeted. *Bonta*, 594 U.S. at 608. If unions had an opportunity to provide comments on the proposed rule post-*Bonta*, they would have explained why numerous aspects of the rule did not survive exacting scrutiny, along with why *Bonta* casts grave doubt on DOL's sweeping interpretation of the disclosures that it can require under Section 201(b). *See* Part II.2, *infra*.

In addition, a new round of comments would have informed DOL why recent developments have made it much harder for many labor organizations to revamp their internal accounting systems on the short notice required by the Rule's 30-day effective date. For years, many labor organizations have used a Microsoft software program known as Great Plains for their general ledger, which is the system out of which each union's primary financial reports (including the Form LM-2) must be generated. But in September 2024—nearly four years *after* the 2020 NPRM's comment period closed—Microsoft announced that it would stop supporting Great Plains by the end of 2029. That decision required Great Plains users to identify, procure, and implement alternative general-ledger software, so that they can make the necessary transition well before the

2029 drop-dead date. Now, however, labor organizations have to figure out how to implement new LM-2 financial-reporting requirements in the midst of this general-ledger software transition. This necessarily will slow the implementation of both projects, multiplying the burdens that labor unions will face to immediately comply with the new Rule. *See* Dkt. No. 15-1 (Ketcham Decl.) ¶ 22; Dkt. No. 15-2 (Yousefi Decl.) ¶ 15.

What is more, the Final Rule itself relies on factual developments that post-date the 2020 comment period, including supposed new evidence of union embezzlement uncovered "[i]n the period *since the 2020 NPRM was published*." 91 Fed. Reg. at 32563 & nn.6–8 (emphasis added). In DOL's view, such evidence of "criminal misconduct" bolsters the need for the Rule. *Id.* at 32564. Labor organizations had no opportunity to comment on this new evidence, either.

In sum, by denying commenters "their first occasion to offer new and different criticisms which the agency might find convincing," DOL violated its notice-and-comment obligations. *Mine Workers v. Mine Safety & Health Admin.*, 626 F.3d 84, 95 (D.C. Cir. 2010) (citation modified).

**2.** Falling back, the Rule includes a footnote attempting to invoke the good-cause exception to the APA's notice-and-comment requirements. 91 Fed. Reg. at 32561 n.3. Under that exception, an agency need not provide notice and opportunity for comment when it finds that doing so would be "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B).

"Despite the broad nature of this language," the good-cause exception is "narrowly construed and only reluctantly countenanced." *Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144 (D.C. Cir. 1992) (quoting *State of New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980)). For starters, the exception "should be invoked only in emergency situations when delay would do real harm." *Action on Smoking*, 713 F.2d at 800. Moreover, the "onus" falls on the agency to prove that that good cause exists, and it must do so in the rule itself. *Id.* at 801 n.6; *see* 5 U.S.C.

§ 553(b)(3)(B). And judicial review of the agency's explanation is "meticulous and demanding." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014) (citation modified). All told, it is the "rare" rulemaking that will satisfy the APA's good-cause exception. *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 580 (D.C. Cir. 1981).

This is not the rare situation where an agency can dispense with its notice-and-comment obligations. The Department does not even try to argue that an "emergency" warranted forgoing notice and comment. It also does not suggest that providing notice and an opportunity for comment would have been "impracticable." Nor could it. When DOL solicited comments on its filing-thresholds proposal in 2025, it could have easily informed the public that it was revisiting its other 2020 proposals and invited further comment on those changes. Instead, it remained silent for nearly another year before blindsiding the regulated community with the Final Rule.

DOL instead asserts that further notice and comment was "unnecessary" because, in its view, "the original record remains fresh" and core circumstances "have not materially changed since the close of the comment period." 91 Fed. Reg. at 32561 n.3. The Department's apparent interpretation of the "unnecessary" prong of Section 553(b)(3)(B) of the APA is incorrect. That prong is "confined to those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 94 (D.C. Cir. 2012) (quoting *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 755 (D.C. Cir. 2001)). That does not describe the 232-page Final Rule, which significantly expands the financial-reporting obligations for thousands of labor organizations, including creating an entirely new reporting form for the largest unions.[2]

[2] Regardless, core circumstances *have* materially changed between 2020 and 2026 for the reasons discussed *supra* at 22–23.

* * *

For these reasons, DOL did not comply with its notice-and-comment obligations when it promulgated the financial-reporting changes set forth in the Rule. Because those changes must be set aside on this basis, the Court can stop there without addressing the AFL-CIO's remaining arguments. *See Sprint Corp. v. FCC*, 315 F.3d 369, 377 (D.C. Cir. 2003) (because Court vacated rule on basis of notice-and-comment violation, it did not reach petitioners' contention that rule was also arbitrary and capricious).

## II. The Final Rule exceeds DOL's statutory authority.

Section 201(b) of the LMRDA requires each covered labor organization to annually file "a financial report" disclosing "its financial condition and operations" for the past fiscal year. 29 U.S.C. § 431(b). The Department may compel the disclosure of certain information under Section 201(b) "only for th[at] purpose." *Chao III*, 409 F.3d at 386.

The Final Rule exceeds the Department's statutory authority under Section 201(b). When the LMRDA was enacted, the terms "financial condition" and "operations" were well-established accounting terms. In 1959, accountants regularly used statements of "financial condition" (better known as balance sheets) and statements of "operations" (better known as income statements) to report financial information. It was well understood that these financial statements did *not* itemize financial transactions that are too small to be material to the organization's financial condition and operations. Instead, these statements provided high-level summaries of various categories of aggregated financial data, with non-material individual transactions subsumed within the aggregated data and not separately listed. So, when Congress used the specific terms "financial condition" and "operations" to delimit labor organizations' financial-reporting obligations, it incorporated this technical understanding.

The Final Rule, however, requires far more than just high-level summaries. It obligates covered labor organizations to itemize all sorts of routine financial receipts—from membership dues to merchandise sales to rent payments. At the end of the day, many labor organizations will need to record, process, and report thousands of additional lines of transaction data. That kind of extensive financial reporting would have been completely foreign to accountants tasked in 1959 with drafting the components of an organization's annual financial report that disclosed the entity's "financial condition" and "operations." By requiring this sort of transaction-by-transaction detail, DOL has exceeded its statutory authority.

**1.** When the LMRDA was enacted, organizations primarily relied on two documents to report financial information—a statement of "financial condition" and a statement of "operations." John A. White & Marcus H. Bean, *Elementary Accounting* 55 (George H. Newlove ed., 4th ed. 1955) ("White & Bean"). The statement of "financial condition" reported an organization's assets, liabilities, and equity. *Id.* at 55–56. This was (and is) also known as the "balance sheet." *Id.*; Walter J. Goggin & James V. Toner, *Accounting: Principles and Procedure* 238 (1930) ("Goggin & Toner"); Am. Inst. of Certified Pub. Accounts., *Accounting Trends & Techniques in Published Corporate Annual Reports* 6 (11th ed. 1957) ("AICPA"). Meanwhile, the statement of "operations" reported the organization's revenues, expenses, gains, and losses incurred during a given period. White & Bean 55–56. This document was (and is) also known as the statement of "profit and loss," statement of "earnings," or statement of "revenues and expenditures"—often referred to as the "income statement." *Id.* at 55; 2 Roy B. Kester, *Accounting Theory and Practice: Advanced Accounting* 68–69 (3d rev. ed. 1933) ("Kester"); Harry George Guthmann, *The Analysis of Financial Statements* 39–40 (1925) ("Guthmann"); *accord* AICPA 6.

The statement of "financial condition" and the statement of "operations" worked in tandem. The former provided a snapshot of the organization's overall financial status at a given *point* in time, while the latter summarized the transactions that occurred over a given *period* of time. *See* Ronald H. Robnett, Thomas M. Hill & John A. Beckett, *Accounting: A Management Approach* 192 (1951) ("Robnett et al.") (describing the balance sheet as "*the* status report for the enterprise *in toto*" and the income statement as "*the* progress report for the organization as a whole"); Guthmann 39–40 (explaining that the statement of operations describes changes that "occur between the construction of the periodic balance sheets"). Put another way, the statement of "operations" served "as a supplement to the balance sheet by showing how changes in net worth have occurred." Earl A. Saliers, *Modern Practical Accounting: Elementary* 326 (1947) ("Saliers"); *accord* Goggin & Toner 238. Together, both statements formed the "basic" building blocks of an organization's financial-reporting practices. *See* 2 Kester 63 (describing these as the "basic statements" of fiscal reporting); Robnett et al. 192 (describing these as "the common denominators of historical reports"—and thus the "most frequently encountered and most commonly used by the greatest number of persons").

A fundamental feature of both the statement of "financial condition" and the statement of "operations" was their summary nature. These "'master' statements" contained only "summary information," while "other historical reports" provided "more detailed expositions" of the same financial data. Robnett et al. 192. The statement of "financial condition" simply listed "summaries or condensations of several account titles carried in full on the ledger." 2 Kester 36. After all, the phrase "financial condition" has "a readily understood meaning," referring to the "*general overall* financial condition of an entity or individual." *In re Bandi*, 683 F.3d 671, 676 (5th Cir. 2012), *abrogated on other grounds by Lamar v. Appling*, 584 U.S. 709 (2018) (emphasis added).

Likewise, a statement of "operations" reported aggregated financial data in summary form. As one authority from 1951 put it: "It is not to be expected . . . that the report of earnings will reproduce expense and revenue data in the same detail as is found in the ledger accounts. Summarization and condensation as the area encompassed by the report increases are, as previously stated, both proper and necessary to the accomplishment of the objective." Robnett et al. 193. Other authorities likewise emphasized that statements of "operat[ions]" are "usually of a summary character." William F. Willoughby, *Financial Condition and Operations of the National Government, 1921–1930*, at 63 (1931); *see also, e.g.*, Saliers 327 (describing the "income statement" as "a classified summary" of revenues and expenses); C. Rufus Rorem, *Accounting Method* 160 (1928) (likewise describing the statement of operations as a "summary"); 2 Kester 64 ("As in the balance sheet, so in the profit and loss summary it has been found desirable to make use of classifications or sectionization.").

As this background shows, when the LMRDA was enacted, the terms "financial condition" and "operations" were technical terms of art in the accounting context. They referred to two specific, widely used financial statements, both of which provided high-level summaries of an organization's financial situation—not itemized, line-by-line lists of routine financial transactions.

**2.** Section 201(b) of the LMRDA incorporates that technical understanding. When Congress "employs a term of art," it "presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *United States v. Alford*, 89 F.4th 943, 949 (D.C. Cir. 2024) (citation modified).

Congress did just that when it used the terms "financial condition" and "operations" to delimit Section 201(b)'s financial-reporting requirements. After all, those terms appear in a statutory provision that obligates labor organizations to file annual financial reports. It is fair to

read words used in a financial-reporting provision the same way they would be understood in a financial-reporting context. *See Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 372 (1986) ("terms of art should be interpreted by reference to the trade or industry to which they apply"); *cf. Van Buren v. United States*, 593 U.S. 374, 388 (2021) (it is a term's "'computational'" meaning "that matters when interpreting a statute about computers").

Other provisions within Section 201(b) support this understanding. When Congress listed the types of financial "information" subject to disclosure, it expressly required labor organizations to itemize only the following financial transactions: (i) disbursements to "each" union employee who receives over $10,000 a year from the organization and its affiliates, 29 U.S.C. § 431(b)(3); (ii) disbursements to "each" union officer, *id.*; and (iii) certain kinds of loans, which must be accompanied by "a statement of the purpose, security, if any, and arrangements for repayment," *id.* § 431(b)(4), (5). Yet for other aspects of a union's financial reports—"assets and liabilities," "receipts," and "other disbursements"—Section 201(b) does not use any itemization language. *Id.* § 431(b)(1), (2), (6). By using itemizing language in one part of Section 201(b) and "omi[tting]" it from another, Congress signaled that itemization was not required for financial information other than the enumerated categories. *Custis v. United States*, 511 U.S. 485, 492 (1994).

Early agency practice reinforces this interpretation. The original Form LM-2 was promulgated in 1960, as part of the Department's first set of regulations implementing the LMRDA. *See* 25 Fed. Reg. 433 (Jan. 20, 1960). The form comprised two main financial statements: a "statement of assets and liabilities" and a "statement of receipts and disbursements." As already discussed, the former (a "statement of assets and liabilities") was synonymous with a statement of "financial condition" (or "balance sheet"), while the latter (a "statement of receipts and disbursements") corresponded with the standard "statement of operations" (or "income

statement”). And although the original form also specified certain subcategories of “assets and liabilities” or “receipts and disbursements” that labor organizations needed to report, it did not require any sort of line-by-line itemization within those categories—except for the disbursements and loans that Congress expressly singled out in the statute. *See* Second Taylor Decl. Ex. D (AFL-CIO’s 1960 Form LM-2). That initial version of the Form LM-2—issued “contemporaneously with the enactment” of the LMRDA—is “especially useful in determining the statute’s meaning.” *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388, 394 (2024).

On top of that, DOL’s view of Section 201(b) would raise serious constitutional concerns. Requiring labor organizations to publicly itemize their financial transactions—and identify payors or payees by name and location—obligates them to share sensitive details about their associations and the activities of their members who have chosen to associate together. *Cf. Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (“financial transactions can reveal much about a person’s activities, associations, and beliefs” (citation modified)). As the Supreme Court held in *Bonta*, these sorts of “compelled disclosure” requirements burden the freedom of association and are reviewed under “exacting scrutiny,” “[r]egardless of the type of association” targeted. 594 U.S. at 608. Under that standard, a challenged disclosure requirement is constitutional only if it bears a “substantial relation” with “a sufficiently important governmental interest” and is “narrowly tailored” to promoting that interest. *Id.* at 611 (internal quotation marks omitted). Such scrutiny applies “[r]egardless of the type of association” targeted. *Id.* at 608.

There is, at the very least, a serious question whether an interpretation of Section 201(b) that allows itemization requirements of the kind DOL has promulgated could satisfy “exacting scrutiny,” which requires that any compelled disclosure be “narrowly tailored” to promoting an “important government interest.” Congress has never made or even purported to make such a

showing, nor has the Department.[3] Moreover, if DOL is correct that Section 201(b) authorizes these itemization requirements, then it presumably authorizes the Department to go even further—to require every labor organization to itemize *every* financial transaction it makes, or to publicly disclose the name of and amounts paid by *every* dues-paying member—further deepening the tension between DOL's interpretation and the First Amendment.

To "avoid the premature adjudication" of these important "constitutional questions," *Matal v. Tam*, 582 U.S. 218, 230–31 (2017) (citation modified), any ambiguity in Section 201(b) must be "construed to avoid serious constitutional doubts," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). When one reading of the statute will raise such doubts, and "another 'plausible' reading will not," then courts should adopt the latter. *Paul v. FAA*, 168 F.4th 672, 679 (D.C. Cir. 2026). The canon of constitutional avoidance therefore confirms that the AFL-CIO's interpretation of DOL's Section 201(b) authority is the better one.

In sum, Section 201(b)'s text, early agency practice, and constitutional considerations all point the same way: The LMRDA does not permit DOL to compel labor organizations to disclose itemized lists of routine financial information such as those required by the Rule.

**3.** With this proper interpretation of Section 201(b) in mind, several provisions in the Final Rule exceed the Department's statutory authority. The Rule requires Form LM-2 Long Form Filers—labor organizations with annual gross receipts of at least $40 million—to itemize annual receipts of at least $5,000 in the following categories: (1) dues and agency fees; (2) per capita tax; (3) fees, fines, assessments, work permits; (4) sales of supplies; (5) rents; (6) receipts on behalf of

[3] As shown in Part III.B below, DOL's "anti-fraud" justification for requiring unions to publicly disclose the names and dues amounts of certain dues-paying members fails even arbitrary-and-capricious review. *A fortiori*, that justification flunks exacting scrutiny. Indeed, DOL's flimsy justification is strikingly similar to the one proffered by the State of California—and rejected by the Supreme Court—to sustain the compelled disclosures at issue in *Bonta.* 594 U.S. at 614–15.

affiliates for transmittal to them; and (7) receipts from members for disbursement on their behalf. 91 Fed. Reg. at 32601. The Rule also requires Form LM-2 Long Form filers to report any "receipts" or "disbursements" "derived from a foreign entity or individual" if they aggregate to "$5,000 or more during the reporting period." *Id.* And the Rule requires Form LM-2 Long Form filers to "publicly list" the "name" and location of any member who pays over $5,000 in dues in a given year. *Id.* at 32590.

Each of these new itemization requirements goes beyond the scope of DOL's statutory authority. They compel labor organizations to detail everyday financial receipts—such as the names of individual members who tender membership dues, the names of purchasers who buy union merchandise, and the names of tenants who rent space from unions. As a result, the annual reports that these organizations publish will be packed with the names of payors and payees of small-bore receipts and disbursements—the vast majority of which will have no material effect on the filer's overall financial condition and operations. Moreover, the requirement that Form LM-2 Long Form filers list the names of dues-paying members and the amount of annual dues they have paid—thus effectively requiring the disclosure of membership lists for certain unions—raises especially salient freedom-of-association concerns under the First Amendment. *See Bonta*, 594 U.S. at 606 (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–66 (1958)). Section 201(b) does not give the Department such sweeping authority.

These new itemization requirements are unlawful—notwithstanding the D.C. Circuit's decision in *Chao III*. That decision upheld the itemization requirements that DOL introduced in 2003, but it did so under *Chevron* "Step 2," holding that the statute was ambiguous—*not* that DOL's interpretation was the best interpretation. 409 F.3d at 384–86. And while a "specific agency action[]" upheld at the second *Chevron* step may remain "lawful" as a matter of "statutory *stare*

*decisis*," *Loper Bright*, 603 U.S. at 412, considerations of stare decisis do *not* rescue a distinct agency action like the new itemization requirements imposed by the Rule. *See Tennessee v. Becerra*, 131 F.4th 350, 365 (6th Cir. 2025) ("*Loper Bright* opens the door to new challenges based on *new* agency actions interpreting statutes"), *judgment vacated as moot*, 2026 WL 135717 (U.S. Jan. 20, 2026). After *Loper Bright*, "courts have an independent obligation to interpret statutes and not defer to an agency's interpretation of the scope of its statutory authority." *Hosp. Menonita de Guayama, Inc. v. NLRB*, No. 22-1163, 2026 WL 2093902, at *1 (D.C. Cir. July 21, 2026).

## III. Multiple provisions in the Final Rule are arbitrary and capricious.

The APA requires that agency action be "reasonable and reasonably explained," not "arbitrary" and "capricious." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That standard obligates agencies "to examine all relevant factors and record evidence, and to articulate a reasoned explanation" for their decisions. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). To meet this imperative, an agency must "consider" all "important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency cannot give explanations that "run[] counter to the evidence" before it. *Id.* And when an agency departs from its past practices, it must "acknowledge the change and offer a reasoned explanation for it." *Am. Wild Horse Pres. Campaign*, 873 F.3d at 923. Several provisions in the Final Rule violate these basic requirements.

### A. The Rule's revisions to labor organizations' "functional reporting" obligations are arbitrary and capricious.

Since 2003, the Department has required Form LM-2 filers to disclose how much they spend across five specific "functional categories," such as "representational activities" and "political activities and lobbying." 68 Fed. Reg. at 58429. This "functional reporting" mandate applied to all disbursements—including the labor organization's own salary costs for its officers

and employees. DOL's justification for requiring this sort of category-by-category breakdown was to "allow union members to readily gauge whether the union is committing its resources in the sums and proportions they consider appropriate." *Id.* at 58393. And by requiring every labor organization to use the same functional categories, DOL hoped that individuals could "compare[]" different labor organizations. *Id.* Workers could then use these disclosures "to make informed choices about whether to join, or retain their membership in," a given union. *Id.* at 58392.

In 2019, the Department solicited input from its field staff about the benefits and drawbacks of the 2003 changes to the Form LM-2, as well as whether further revisions would increase transparency and aid investigations. 91 Fed. Reg. at 32564. While the investigators lauded some of the 2003 changes, *see, e.g.*, A.R. 584, they overwhelmingly saw no benefit to functional reporting. Several observed that category-by-category reporting is "not useful" because it "cannot be verified." A.R. 584–85. Others emphasized that functional reporting has made things "more complicated for labor unions," A.R. 583, especially because certain categories are "very similar and often confused by the regulatory community," A.R. 582; *see also* A.R. 585 (noting that "the categories are confusing to the union and to OLMS field staff"). As one investigator put it: labor organizations should "simply" disclose significant disbursements without "breaking it out in categories." A.R. 583. And while the investigators proposed numerous additions to the Form LM-2, *none* proposed expanding the list of functional categories. A.R. 587–92.

That feedback left DOL with two rational paths: Maintain the "functional reporting" system that the D.C. Circuit upheld in *Chao III*, *see* 409 F.3d at 386, or as several investigators suggested, abolish the "functional reporting" system and return to the traditional bookkeeping categories that DOL had required from 1959 to 2003. Instead, DOL chose a third path: retaining functional reporting only for a labor organization's non-salary expenses. 91 Fed. Reg. at 32587. By doing so,

DOL has subverted the very purpose of its own functional reporting system. Instead of allowing union members to accurately gauge how their union is spending its resources, *see* 68 Fed. Reg. at 58393, removing salary costs from a union's functional reporting will *mislead* members about the union's operations and spending priorities. That is because such a system will "understate the portion of expenditures" spent on activities that are typically "carried out directly by union officers and employees"—most commonly, representational activities. A.R. 598. At the same time, it will "exaggerate the portion of expenditures" paid to third parties, such as political contributions (which inherently consist of payments made to outsiders). *Id.*

Take, for example, the American Federation of State, County and Municipal Employees ("AFSCME"). As AFSCME referenced in its December 2020 comment on DOL's October 2020 proposed rule (A.R. 605–06), AFSCME's 2019 Form LM-2 reported that the organization had spent more of its resources on "representational activities" (around $34 million) than on "political activities and lobbying" (around $26 million). *See* Second Taylor Decl. Ex. C, at 4 (AFSCME's 2019 Form LM-2). But, under the Final Rule, AFSCME would need to report the opposite—since salary costs make up the majority (58%) of AFSCME's "representational activities" disbursements and only a fraction (26%) of its "political activities and lobbying" disbursements. *See id.* at 76; A.R. 605. In this way, the Final Rule will defeat the stated purpose of the functional reporting regime: instead of helping members understand the operations and spending priorities of their unions, it will "obscure" how those organizations spend their resources. A.R. 606; *see also* Nat'l Ass'n of Letter Carriers, Comment Letter at 7 ("the majority of union payroll is spent on representational matters and making this change will strip away dollars currently identified as representational so readers see a different picture").

That distortion also will make it impossible to meaningfully compare different labor organizations. As DOL explained in 2003, a core purpose of functional reporting was enabling members to compare how different unions spend their resources. 68 Fed. Reg. at 58393; *cf., e.g.*, *id.* at 58405 (worrying that "differences in reporting formats from union to union" would "eliminate a baseline of comparison, result in confusion, and decrease the value of information reported to members and the public"). The Final Rule undermines that stated purpose. Under the Rule, a union that relies on in-house staff to negotiate its collective bargaining agreements cannot report those costs as "representational" (since they take the form of salary costs), while a union that relies on outside counsel or consultants to negotiate its collective-bargaining agreements must report those costs as "representational" (since they take the form of third-party disbursements). As a result, even if both unions effectively spend the same portion of their resources negotiating collective-bargaining agreements on behalf of their members, their financial reports will (incorrectly) suggest that one spends a much higher percentage of its resources on negotiations than the other. A rule that cannot fulfill its stated purposes—and, worse, will tend to mislead the very individuals that the rule is intended to benefit—is arbitrary and capricious. *Cf. SecurityPoint Holdings, Inc. v. TSA*, 769 F.3d 1184, 1186 (D.C. Cir. 2014) (requiring agency to reasonably explain why regulatory change was not "unnecessary and self-defeating").

Indeed, DOL arrived at this system of functional reporting only by disregarding the views of its own field staff. The Department heavily relies on survey responses from its investigators to support many of the Rule's financial-reporting changes. *See, e.g.*, 91 Fed. Reg. at 32564–68. Yet DOL entirely ignored those investigators' uncontradicted views that category-by-category functional reporting is "not useful" and, worse, leads to "confusing" results. *See supra* at 34. That

sort of "internally inconsistent" agency decision-making is arbitrary and capricious. *World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 221 (D.C. Cir. 2025) (citation modified).

The incoherence of DOL's changes to the functional-reporting system is compounded by the fact that, while eliminating salary expenses from functional reporting, the agency *expanded* the list of functional reporting categories from five to seven. Before the Final Rule, labor organizations needed to disclose their disbursements across five "functional categories": (1) representational activities; (2) political activities and lobbying; (3) contributions, gifts, and grants; (4) general overhead; and (5) union administration. 68 Fed. Reg. at 58429. The Final Rule separates the "political activities and lobbying" category into two distinct "political activities" and "lobbying" subcategories. 91 Fed. Reg. at 32568. And it separates the "representational activities" category into two new "contract negotiation and administration" and "organizing" subcategories. *Id.*

Even under the 2003 functional reporting system where unions were required to categorize all of their expenses (including salary), creating these new indeterminate categories would have bordered on capricious. Indeed, with respect to the distinction between "political activities" and "lobbying," DOL previously acknowledged that "[d]istinguishing between [them] is not always easy"—hence why the agency combined both into a single functional category in the first place. 68 Fed. Reg. at 58398. And none of the agency's own investigators proposed any new functional categories for union expenditures, let alone did they propose subdividing both of the "representational activities" and "political activities and lobbying" categories. *See* A.R. 582–92.

But requiring unions to undertake the significant burden of adjusting their accounting and tracking systems to implement four new functional categories for their expenditures is especially unjustifiable considering that, because salary costs cannot be incorporated into those functional categories, the end result will be aggregate figures that do not provide reliable information to union

members, investigators, or the public. A rule with zero benefit and substantial burden on regulated parties is quintessential arbitrary decision-making.

**B. The Rule unreasonably compels certain labor organizations to list the names of members who pay at least $5,000 in dues.**

The Department's arbitrariness problems do not end there. The Final Rule imposes several new itemization requirements on Form LM-2 Long Form filers—among them, listing dues payments made by members who paid at least $5,000 in dues in the past year. 91 Fed. Reg. at 32590. Each labor organization "must now complete a separate itemization schedule" listing each of those members. *Id.* at 32601. And for each payment listed on that schedule, the filer must include (among other things) "information about the individual"—including their "name, city, and state"—along with "the amount of the payment." *Id.* at 32590, 32601. All of this information will be available on DOL's website "for the public's review and download." *Id.* at 32558.

As already discussed, this requirement exceeds DOL's statutory authority and raises serious constitutional concerns under the First Amendment. Beyond that, the requirement is arbitrary and capricious, as it needlessly invades the privacy interests of members whose personal information will be publicly disclosed. It will require certain labor organizations to "publicly list" the "name[s]" of certain dues-paying members, *id.* at 32590, and thereby disclose that they are, in fact, dues-paying members in the union—a fact that members have a constitutional right not to publicize, *see Bonta*, 594 U.S. at 606 (noting "the vital relationship between freedom to associate and privacy in one's associations" (citation modified)). It will also compel these organizations to disclose the amount of each member's dues payments. And because dues are often assessed as a fixed percentage of a worker's wages or salaries, someone could easily use a member's dues payments to reverse-engineer their total annual "earnings"—"information that most people justifiably prefer to keep private." A.R. 707; *see also Int'l Bhd. of Elec. Workers Loc. Union No. 5*

*v. HUD*, 852 F.2d 87, 89 (3d Cir. 1988) ("employees have a privacy interest in their salaries"). Moreover, because many union members will meet the $5,000 annual dues threshold, this disclosure requirement would sweep broadly—and, for some unions, effectively require them to disclose their entire membership list. *See, e.g.*, A.R. 707 (comment from Pacific Northwest Regional Council of Carpenters noting that most of its 28,000 members pay at least $5,000 in annual dues); A.R. 609 (comment from Air Line Pilots Association). And this disclosure requirement will only expand over time, given that DOL elected not to index the $5,000 annual threshold to inflation.

Nothing in the Rule justifies this serious invasion of members' privacy and associational rights. The Department offers only one reason for requiring labor organizations to publicly list the names of certain dues-paying members: that it will "help[] avoid fraudulent conduct." 91 Fed. Reg. at 32590. To support the point, the Department mentions an (uncited) indictment where a union officer allegedly collected several dues checks—totaling $18,720—and deposited them into his own personal bank account, instead of the union's bank account. *Id.* (citing 85 Fed. Reg. at 64744). In DOL's view, a member could more easily spot that sort of crime if the union were required to itemize each dues check, because a curious member could review the union's Form LM-2 Long Form and potentially notice that some of their dues payments were not listed. 85 Fed. Reg. at 64744. But any member wondering whether their dues check had in fact been deposited by the union could simply ask the union itself—or, for that matter, review a copy of the cancelled check on their bank-account website portal. DOL's hypothetical "check-writing union member suspecting embezzlement" is plainly not a rational basis for the agency to require *every union* to provide the name and location of *every union member* who has paid over $5,000 in union dues *to the general public*.

**C. The Rule's July 1 effective date is arbitrary and capricious.**

The APA's arbitrary-and-capricious standard applies to all parts of an agency rule—including its effective date. *See Nat'l Ass'n of Indep. Television Producers & Distribs. v. FCC*, 502 F.2d 249, 253–55 (2d Cir. 1974). The effective date, after all, is "an essential part of any rule," marking the point when the rule's new requirements officially kick in. *Nat. Res. Def. Council, Inc. v. EPA*, 683 F.2d 752, 761–62 (3d Cir. 1982). Indeed, in some cases (as here), a rule's effective date can be nearly as important as its substantive obligations.

The Final Rule's July 1 effective date is arbitrary and capricious and should be vacated.

**1.** The administrative record proves that a July 1 effective date is fundamentally unworkable. During the comment period, union after union reiterated that adjusting their accounting systems to conform to the Rule's new reporting requirements would require well more than a month of lead time. *See supra* at 10. And multiple commenters specifically emphasized that labor organizations will need to "re-tool and make all the necessary changes which must be in place *prior to the start of the reporting period [a]ffected by the new reporting rules*." Nat'l Ass'n of Letter Carriers, Comment Letter at 8 (Dec. 10, 2020) (emphasis added); *see also* WithumSmith+Brown, Comment Letter at 8 (Dec. 11, 2020) (same). As this Court observed in *Chao I*, if a labor organization does not have its accounting systems in place to comply with new financial reporting requirements before the start of the first reporting period covered by the new rules, "it will face an untenable situation in which it will lose ground every day," leading to an ever-growing number of transactions that the union will need to manually re-code to comply with the new requirements. 297 F. Supp. 2d at 162.

The Department's defense of the July 1 effective date appears in a single, cursory paragraph. Nothing in that paragraph, however, comes close to defending DOL's conclusion that a 30-day transition period is workable or necessary.

To begin with, DOL emphasized that no labor organization will need to "actually file anything with the Department for at least one year at minimum." 91 Fed. Reg. at 32607. Even so, to meet that one-year filing deadline, labor organizations like Plaintiff AFL-CIO will need to take compliance measures well before the deadline to update their accounting systems—a transition process that will take months, if not longer. For labor organizations like the AFL-CIO whose fiscal years started on or soon after July 1, this will require them to go back and manually recode hundreds if not thousands of transactions once they are able to get their training and accounting systems in place—a burdensome process that is all but certain to lead to errors. The Rule does not even acknowledge that its rushed effective date will lead to manual recoding of transactions, let alone justify why such a burdensome, error-prone process is warranted.

Next, the Department claimed that "most large labor organizations already track many of the new transactions" that now "require itemization." *Id.* But DOL cited no evidence for this claim, which is misleading at best and incorrect at worst. Even if some labor organizations already track certain transactions, they do not have accounting systems to process and report those transactions in the way the Rule requires. *See, e.g.*, Nat'l Ass'n of Letter Carriers, Comment Letter at 4 (pointing out aspects of the new reporting requirements that are not captured in the union's accounting system, which would require "[a]n electronic bridge . . . to be created"). And, in all events, DOL did not explain why this claim about certain labor organizations' purported tracking practices could justify whittling the implementation process down to a mere 30 days—particularly where covered organizations had no reason to believe that financial reporting changes were on the horizon, let alone imminent.

Last, DOL claimed that adapting to the Rule's new reporting framework should be easy, given "the widespread use of adaptable technologies for labor organizations." 91 Fed. Reg. at

32607. But DOL cited no evidence to support this conclusory assertion. The Department did not identify what those "adaptable technologies" were or how they might streamline the transition process. Moreover, DOL failed to explain how these unspecified "adaptable technologies" could mitigate considerable staff-training efforts that labor organizations would need to undertake.

Besides failing to show why a 30-day transition period was workable, DOL also failed to explain why that short amount of lead time was beneficial—let alone necessary. At no point did DOL ever claim a "particular need for extraordinary urgency." *Chao II*, 298 F. Supp. 2d at 127. That is because nothing in the administrative record could support such a claim. After all, the current reporting regime has been in place for more than two decades. And it took nearly six years for DOL to eventually finalize the new reporting requirements it is now in a rush to implement: The Department, recall, withdrew the proposed rule back in *March 2021* and did not mention it again until it issued the Final Rule in *June 2026*. None of that describes the sort of rule that requires regulated parties to act on such a short fuse.

This Court's holding that it was arbitrary for DOL in 2003 to impose an unreasonably truncated implementation period makes DOL's repeat effort all the more unreasonable—and its failure to explain that decision all the more inexplicable. *Cf. Chao II*, 298 F. Supp. at 106. Just as DOL failed to adequately defend its hurried effective date in 2003 (83 days from publication and 52 days from final approval), it has failed to justify its even-more-hurried effective date here (just 30 days from publication and final approval), particularly where—unlike in 2003—the Department did not provide advance notice of its intention to issue the Rule and has to date made *no efforts* to assist unions with compliance other than promulgation of the Rule itself.[4] In adopting an effective

[4] *Cf.* 68 Fed. Reg. 58374, 58410 (Oct. 9, 2003) (describing the Department's extensive efforts to assist labor organizations in complying with the 2003 reporting changes, including "briefings for

date and transition schedule inconsistent with the evidence before it, the Department acted arbitrarily and capriciously.

**2.** DOL's own past practice confirms that the Final Rule's 30-day deadline is unreasonable. In prior rulemakings, the Department gave labor organizations far more than 30 days to adjust to any new financial-reporting obligations. And, in doing so, DOL acknowledged that labor organizations need to be in position to properly classify transactions before the start of the first covered reporting period—an impossibility in this case for labor organizations, like the AFL-CIO, whose fiscal years began on or soon after July 1, 2026. DOL's failure to acknowledge its past practice is arbitrary and capricious and itself a sufficient basis to vacate the Rule's effective date.

For example, in 1992, DOL promulgated a rule (which eventually was withdrawn before it took effect) requiring Form LM-2 filers to report expenses using newly created "functional" categories. 57 Fed. Reg. 49282, 49282 (Oct. 30, 1992). The rule initially gave filers only two months to implement these changes. *Id.* Soon after, however, DOL acknowledged that even "a two-month implementation period was insufficient," given that filing organizations needed "adequate time" to "revise their internal records and accounting systems" and to "train union officers." 58 Fed. Reg. 28304, 28307 (May 12, 1993); *see also Chao I*, 297 F. Supp. 2d at 164–65. Any implementation period, the Department explained, "must allow adequate time for labor organizations to revise their internal records and accounting systems in order to properly classify financial transactions *prior to the beginning of the fiscal year* for which the revised reporting forms must be used." 58 Fed. Reg. at 28307 (emphasis added). Indeed, ensuring that unions have

national/international unions," "[m]aintaining a help desk . . . for handling reporting inquiries," and "[d]eveloping a 'list serve' system to send email messages to unions, accountants, union members, and other interested individuals to provide up-to-the-minute information to assist in meeting the reporting requirements for the revised Form LM-2").

sufficient time to put recordkeeping and accounting systems in place to comply with any new financial disclosure requirements is necessary to further the essential purpose of Section 201(b), which is to provide *accurate* information about a union's finances to members and the public.

In 2003, DOL reiterated its position that labor organizations need "[s]ome interim period . . . to adapt their recordkeeping practices to the new requirements," taking the position that three months of lead time was sufficient for labor organizations to make the necessary "adjustments *before the start of their first reporting period* under the final rule." 68 Fed. Reg. at 58411, 58422 (emphasis added). And it again acted consistently with that approach in 2009 when, in proposing a further expansion of the Form LM-2, it gave every filing labor organization at least five months of lead time. *See* 74 Fed. Reg. 3678, 3678 (rule issued on January 21, 2009, would apply only to labor organizations "whose fiscal years beg[a]n on or after July 1, 2009").

Notwithstanding this consistent practice of giving covered labor organizations at least several months of lead time to ensure they will have the necessary training and systems in place before the start of the first-covered reporting period, DOL never acknowledged—let alone explained—why it was departing from that approach in this rulemaking. That unexplained change was arbitrary and capricious. *See Am. Wild Horse Pres. Campaign*, 873 F.3d at 923 ("A central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it." (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)).

**3.** At bottom, both the record and DOL's past practice confirm that the Final Rule's July 1 effective date is arbitrary and capricious. The record provides "no reasonable justification" for DOL's decision to set an effective date that, "as a practical matter," requires labor organizations

with fiscal years starting July 1 to undertake the burdens of manually recoding hundreds if not thousands of transactions once the new systems are in place. *See Chao II*, 298 F. Supp. 2d at 128.

Although this Court denied the AFL-CIO's motion for a preliminary injunction to postpone the effective date, that decision "d[id] not reach the merits" of any of the AFL-CIO's arbitrariness claims—including its challenge to the effective date—and "express[ed] no view on them." Dkt. No. 21 at 13. Instead, the Court simply concluded that the injury inflicted by the effective date was not so imminent to warrant preliminary relief because an ultimate merits ruling that the July 1 effective date was arbitrary and capricious, even if a few months after the start of the AFL-CIO's fiscal year, would be effective in forestalling the harmful effects of this aspect of the Rule. *Id.*

For these reasons, separate and apart from the Rule's other procedural and substantive defects, the Rule's effective date is arbitrary and capricious and should be set aside.

## CONCLUSION

The Court should grant the AFL-CIO's motion for summary judgment and vacate the Rule.

Dated: July 27, 2026

Respectfully submitted,

_/s/ Leon Dayan_
Leon Dayan (DC Bar # 444144)
Jacob Karabell (DC Bar # 996066)
Adam Bellotti (DC Bar # 1020169)
Fred Wang (DC Bar # 90031826)
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street, N.W.
Suite 1000
Washington, DC 20005
(202) 842-2600
ldayan@bredhoff.com
jkarabell@bredhoff.com
abellotti@bredhoff.com
fwang@bredhoff.com

Matthew Ginsburg (DC Bar # 1001159)
Maneesh Sharma (DC Bar # 1033407)
AFL-CIO
815 Sixteenth Street N.W.
Washington, DC 20006
(202) 637-5336
mginsburg@aflcio.org
msharma@aflcio.org

*Counsel for Plaintiff*