IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,

Plaintiff,

v.

KEITH E. SONDERLING,
Acting United States Secretary of Labor, and
ELISABETH MESSENGER, Director,
Office of Labor-Management Standards,
United States Department of Labor,

Defendants.

Civil Action No. 26-2061 (JEB)

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Table of Contents .......... i

Table of Authorities .......... ii

Introduction .......... 1

Background .......... 1

I. Legal Background .......... 1

II. Factual Background .......... 5

III. Procedural History .......... 12

Legal Standards .......... 13

Argument .......... 15

I. The Secretary complied with the APA when promulgating the 2026 Rule .......... 15

A. The Secretary satisfied the APA's notice and comment rulemaking requirements .......... 15

B. In the alternative, the Secretary validly invoked the APA's good cause exception .......... 22

II. The Final Rule is within DOL's statutory authority. .......... 26

III. The 2026 Rule is not arbitrary and capricious. .......... 31

A. The Department's revisions to the "functional reporting requirements" are reasoned and adequately explained in the record. .......... 32

B. The Department appropriately explained the 2026 Rule's dues payment disclosure requirement based on the evidence before it in the rulemaking record. .......... 34

C. The effective date is reasonable. .......... 35

Conclusion .......... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action on Smoking & Health v. C.A.B.*,
713 F.2d 795 (D.C. Cir. 1983) ........ 15, 20, 22

*Am. Farm Bureau Fed'n v. EPA,*
559 F.3d 512 (D.C. Cir. 2009) ........ 33, 34

*Am. Fedn. of Lab. and Cong. of Indust. Organizations v. Chao*,
297 F. Supp. 2d 155 (D.D.C. 2003) ........ 38

*Am. Min. Cong. v. U.S. E.P.A.*,
907 F.2d 1179 (D.C. Cir. 1990) ........ 15

*Am. Optometric Ass'n v. F.T.C.*,
626 F.2d 896 (D.C. Cir. 1980) ........ 23, 24

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ........ 23, 24

*Bowman Transp., Inc. v. Ark.-Best Freight Sys.*,
419 U.S. 281 (1974) ........ 14, 33, 34

*Burke v. EPA*,
127 F. Supp. 2d 235 (D.D.C. 2001) ........ 35, 36

*Camp v. Pitts*,
411 U.S. 138 (1973) ........ 14

*Center for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
710 F.2d 842 (D.C. Cir. 1983) ........ 16, 17, 18

*Chao III*,
409 F.3d 377 (D.C. Cir. 2005) ........ passim

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ........ 26

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ........ 14, 35

*CSL Plasma Inc. v. Customs & Border Prot.*,
628 F. Supp. 3d 243 (D.D.C. 2022) ........ 33

*Dickson v. Sec'y of Def.*,
68 F.3d 1396 (D.C. Cir. 1995) .......... 14

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999) .......... 39

*Eli Lilly and Co. v. Cochran*,
526 F. Supp. 3d 393 (S.D. Ind. 2021) .......... 19

*FCC v. Prometheus Radio Proj.*,
592 U.S. 414 (2021) .......... 32, 35

*Greater Boston Television Corp. v. FCC*,
463 F.2d 268 (D.C. Cir. 1971) .......... 23

*Ind. Mun. Power Agency v. FERC*,
56 F.3d 247 (D.C. Cir. 1995) .......... 35

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) .......... 19

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .......... 26, 28, 30, 31

*Lopez v. Garland*,
116 F.4th 1032 (9th Cir. 2024) .......... 28

*Mack Trucks, Inc. v. EPA*,
682 F.3d 87 (D.C. Cir. 2012) .......... 22

*Miller v. Lehman*,
801 F.2d 492 (D.C. Cir. 1986) .......... 14

*Mobil Oil Corp. v. U.S. E.P.A.*,
35 F.3d 579 (D.C. Cir. 1994) .......... 22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 14, 35

*Nat'l Treasury Emps. Union v. Horner*,
854 F.2d 490 (D.C. Cir. 1988) .......... 14

*Occidental Eng'g Co. v. INS*,
753 F.2d 766 (9th Cir. 1985) .......... 13

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015) .......... 15

*Pub. Citizen, Inc. v. U.S. Dept. of Health and Human Services*,
332 F.3d 654 (D.C. Cir. 2003) .......... 19

*Richard v. INS*,
554 F.2d 1173, 180 U.S. App. D.C. 314 & (D.C. Cir. 1977) .......... 14

*Sanofi Aventis U.S. LLC v. U.S. Dept. of Health and Human Services*,
58 F.4th 696 (3d Cir. 2023) .......... 16, 17, 19, 21

*Sierra Club v. Mainella*,
459 F. Supp. 2d 76 (D.D.C. 2006) .......... 13

*Sprint Corp. v. F.C.C.*,
331 F.3d 952 (D.C. Cir. 2003) .......... 37

*State of Tex. V. Lyng*,
868 F.2d 795 (5th Cir. 1989) .......... 16, 21

*Virtus Pharmaceuticals, LLC v. Garland*, Civ. A.,
No. 21-2308 (CKK), 2021 WL 4306165 (D.D.C. Sept. 22, 2021) .......... 31

*Xcel Energy Servs. Inc. v. FERC*,
41 F.4th 548 (D.C. Cir. 2022) .......... 33

**Statutes**

5 U.S.C. § 553 .......... 4
5 U.S.C. § 553(b) .......... 4, 17
5 U.S.C. § 553(b)(3) .......... 15
5 U.S.C. § 553(c) .......... 15
5 U.S.C. § 602 .......... 7, 17
5 U.S.C. § 602(d) .......... 7, 17
5 U.S.C. § 706(2)(A) .......... 14
29 U.S.C. § 401 .......... 3
29 U.S.C. § 401(b) .......... 1
29 U.S.C. § 431(b) .......... 2, 27, 30
29 U.S.C. § 435(a) .......... 3
29 U.S.C. § 437(b) .......... 37
29 U.S.C. § 438 .......... 3, 27
29 U.S.C. § 501(c) .......... 2
29 U.S.C. §§ 431-41 .......... 2

**Rules**

Fed. R. Civ. P. 56(a) .......... 13
Federal Rule of Civil Procedure 56 .......... 13

**Regulations**

29 C.F.R. § 403.4(a)(1) .......... 4
29 C.F.R. § 403.4(a)(2) .......... 4
29 C.F.R. §§ 403.3 .......... 4
46 Fed. Reg. 22243-02 .......... 17
68 Fed. Reg. 58374 (Oct. 9, 2003) .......... 3, 4
75 Fed. Reg. 74936 (Dec. 1, 2010) .......... 3
85 Fed. Reg. 64726 .......... passim
90 Fed. Reg. 28251 (July 1, 2025) .......... 8, 9, 10, 11
*Labor Org. Annual Fin.,*
*Reps*. 91 Fed. Reg. 32556 .......... passim

**Other Authorities**

80 Fed. Reg. 29096 (May 20, 2015) .......... 3
105 Cong. Rec. 8566-8568 .......... 1, 24
1959 U.S.C.C.A.N. 2318 .......... 2
1959 WL 3884 (Apr. 14, 1959) .......... 29
1959 WL 3885 (July 30, 1959) .......... 2
Executive Orders 12866 .......... 7

## INTRODUCTION

Plaintiff asserts four Administrative Procedure Act ("APA") challenges against a 2026 Final Rule (the "Final Rule" or "2026 Rule") promulgated by the Department of Labor ("Department" or "DOL") relating to labor organization financial reporting requirements. Plaintiff's summary judgment briefing consolidates those four claims into three groups to argue that the 2026 Rule: (1) did not properly undergo notice-and-comment; (2) exceeds DOL's statutory authority by, among other things, requiring labor organizations to publish detailed financial transaction lists apparently in violation of the First Amendment; and (3) contains an arbitrary and capricious effective date as well as new, arbitrary and capricious substantive reporting obligations. But Plaintiff's dissatisfaction with the new reporting requirements under the Final Rule, and its July 1, 2026 effective date, does not render the Final Rule arbitrary and capricious or otherwise in violation of the APA. To the contrary, the Department's 2026 Rule is well within the Secretary of Labor's statutory authority to require financial disclosure reports under the Landrum-Griffin Act. Further, the Department properly followed the APA's procedures and adequately explained the rationale for its decision-making process. Because the Department's promulgation of the 2026 Rule was patently reasonable and such reasoned decision making is easily discernable from the record before the Court, the 2026 Rule must stand and DOL's motion for summary judgment should be granted.

## BACKGROUND

### I. <u>Legal Background</u>

In 1959, a bipartisan Congress passed the Landrum-Griffin Act to counteract improper and often criminal practices that had long pervaded the labor-management field, including labor unions whose members were the victims of theft, extortion, embezzlement, and other crimes. *See* 29 U.S.C. § 401(b), (c); 105 Cong. Rec. 8566-8568 (May 20, 1959). In the words of the Act's

sponsors, the statute "is moderate but effective. It is not punitive or extreme." *See* H.R. Rep. No. 86-741 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2318, 2496, 1959 WL 3885 (July 30, 1959). It includes criminal penalties for theft and embezzlement. *See* 29 U.S.C. § 501(c). It also includes tools to detect those crimes. *See* 29 U.S.C. §§ 431-41 (financial disclosure reports required for labor organizations and others in labor-management field).

The financial reporting requirements set forth in Title II are an integral part of the Landrum-Griffin Act's anticorruption framework and promote ethical union governance through transparency. *See* 29 U.S.C. § 431, *et seq*. In particular, Section 201(b) of the Act requires "[e]very labor organization" ("labor organizations" are also referred to as "unions" in this brief) to file an annual "financial report signed by its president and treasurer" with the Secretary of Labor that contains financial information "in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year[.]" 29 U.S.C. § 431(b). Congress did not prescribe the form of these mandatory financial disclosure reports. The terms "financial condition" and "operations" in section 201(b) are not defined by statute, and it is well-settled that "Congress did not adopt the precise terms of art—'statement of financial condition' and 'statement of operations' that connote the typical corporate income statement and balance sheet . . . nor did it expressly provide, for example, that unions' reports should be made 'in accordance with generally accepted accounting principles'" as it had in other laws. *AFL-CIO v. Chao*, 409 F.3d 377, 381-382 (D.C. Cir. 2005) ("*Chao III*").

Instead, Congress expressly vested the Secretary with broad discretion to create, amend and rescind requisite financial disclosure reports to implement Title II's reporting infrastructure. Section 201(b) lists the "information" unions must report, "all in such categories as the Secretary may prescribe." 29 U.S.C. § 431(b). Section 208 provides "[t]he Secretary shall have authority to

issue, amend, and rescind rules and regulations prescribing the form and publication of reports required to be filed under this subchapter and such other reasonable rules and regulations . . . *as he may find necessary* to prevent the circumvention or evasion of such reporting requirements." 29 U.S.C. § 438 (emphasis added). According to then-Circuit Judge Roberts, this is a statutory delegation "freighted with deference." *Chao III*, 409 F.3d at 393 (Roberts, J. concurring, and dissenting from decision on Form T-1, not at issue here).

The forms and reporting categories that the Secretary creates at the direction of Congress serve the central congressional purposes listed in the statute. *See* 29 U.S.C. § 401. The reports unions file in accordance with Title II are publicly available and allow members to monitor the financial affairs of their labor organizations and ensure a proper accounting of union funds. 29 U.S.C. § 435(a). The Department also uses these reports as an effective early detection tool to uncover and eradicate financial crimes. In a recent five-year period, the Department used information from union financial disclosure reports and other sources to obtain convictions of 255 individuals responsible for fraud, embezzlement, or other criminal activity involving labor union funds. *Labor Org. Annual Fin. Reps*. 91 Fed. Reg. 32556, 32563 (Jun. 1, 2026) (the "2026 Rule"). The Department periodically updates these reports to ensure they remain effective. *See, e.g.,* 68 Fed. Reg. 58374 (Oct. 9, 2003) (the "2003 Rule" requiring the largest labor organizations to itemize and categorize financial transactions); 75 Fed. Reg. 74936 (Dec. 1, 2010) (adding subsidiary organization reporting to the Form LM-2 and clarifying its scope); and 80 Fed. Reg. 29096 (May 20, 2015) (soliciting comments to further refine the Form LM-2/3/4 instructions). Disclosures in union reports are often the first sign of criminal conduct that prompts Department investigation. 91 Fed. Reg. at 32590.

Prior to the 2026 Rule at issue in this case, the Secretary's regulations required unions to file one of three forms. Labor organizations with gross annual receipts of $250,000 or more were required to file Form LM-2 "Labor Organization Annual Report" ("LM-2")—the most detailed of the three forms. *See* 29 C.F.R. §§ 403.3, 403.4(a). Labor organizations with gross annual receipts ranging from $10,000, to $249,999 were permitted to file Form LM-3 "Labor Organization Annual Report" ("LM-3")—a moderately detailed report. 29 C.F.R. § 403.4(a)(1). Labor organizations with gross annual receipts of less than $10,000 were permitted to file the simplest report, the LM-4 "Labor Organization Annual Report" ("LM-4"). 29 C.F.R. § 403.4(a)(2).

In 2003, the Secretary substantially revised Form LM-2 by promulgating a rule that, *inter alia*, required the largest unions to report their general receipts and disbursements into categorized schedules requiring itemization, including "Political Activities and Lobbying." *Labor Org. Annual Fin. Reps*. 68 Fed. Reg. 58374, 58487, 58488, 58503 (Oct. 9, 2003) (the "2003 Rule"); *see also Chao III*, 409 F.3d at 380. The 2003 Rule also required unions to "provide a functional accounting, estimating the portion of work time spent" by union officers and employees in each of the categories listed on the LM-2. *Chao III*, 409 F.3d at 380. Plaintiff AFL-CIO challenged these, and other aspects of the 2003 Rule. However, the D.C. Circuit affirmed the Secretary's authority to compel itemized disclosures by category, and a functional accounting of union officer time. *Id.* at 386.

In this case as in prior rulemakings, the APA governs the steps with which an agency must comply to promulgate a valid rule. *See* 5 U.S.C. § 553. In particular, the APA specifies that rulemaking materials "shall be published in the Federal Register[.]" 5 U.S.C. § 553(b). The APA does not contemplate or sanction the use of any other publications.

## II. <u>Factual Background</u>

In July and September of 2019, the Department sought information from Office of Labor-Management Standards ("OLMS") field investigators on the benefits or drawbacks of the changes made to the Form LM–2 by the 2003 rulemaking. DOL000007; DOL000577-000592. The survey asked investigators for information about the utility of the requirement to "itemize certain categories of receipts and disbursements" at or above a $5,000 threshold, and the "functional reporting" of work time requirement, which the survey defined to mean the estimated "time spent by each union officer and employee on different duties, based on the categories of activities represented by the LM-2 schedules and represented as percentage of work time totaling to 100%." DOL000581. The field investigators viewed the itemization requirements that did not involve reported work time to be "extremely beneficial. They explained that itemization not only aided embezzlement investigations but served as a case targeting tool . . . Notably, no field personnel viewed the itemization requirement as hindering OLMS investigations." DOL001336; *see also* 91 Fed. Reg. 32565. By contrast, the investigators stated functional reporting of union officer and employee work time "added little to no value to their investigations. They explained that the reporting of staff time in functional categories could not be audited, could not be enforced, and did not lead to other enforcement activity." DOL001337; 91 Fed. Reg. 32566.

On October 13, 2020, the Department issued a notice of proposed rulemaking, to *inter alia*, introduce an LM-2 Long Form and modify the standard LM-2 to require more specific information regarding the financial activities of labor organizations. *See generally Labor Organization Annual Financial Reports: LM Form Revisions*, 85 Fed. Reg. 64726, 64726 (Oct. 13, 2020) ("2020 NPRM"). The 2020 NPRM proposed that labor organizations with annual receipts of $8,000,000 or more would have to file the new Long Form. *Id*. at 64734. The Department also sought comment

on increasing the $250,000 threshold for the standard LM-2 to $300,000 to adjust for inflation. *Id*. at 64747.

As proposed in the 2020 NPRM, the LM-2 Long Form would have required the disclosure of more detailed financial information than the standard LM-2, including on strike funds, dues and fees collected, rents, foreign transactions, and sales of supplies. *Id.* at 64734-35, 64744-45. With respect to modifying the standard LM-2, the 2020 NPRM proposed requiring labor organizations to disclose certain categories of spending with more specificity. For example, whereas the prior LM-2 required labor organizations to disclose the aggregate amount spent on "Political Activities and Lobbying," the 2020 NPRM proposed requiring unions to disclose the total amount spent on "Political Activities," and the total amount spent on "Lobbying." *Id.* at 64742-43, 64746. The 2020 NPRM contained similar proposals to separate reporting schedules on "Organizing" and "Contract Negotiation and Administration," as well as "Investments" and "Fixed Assets." *Id.* at 64746. Additionally, the Department proposed eliminating functional reporting of union officer work time, and a reporting exception that allowed unions to forgo itemizing business travel expenses paid directly to the provider or through a credit arrangement. *Id*. at 64740. These items were likewise proposed for the Long Form. *Id.* at 64737, 64739.

The Department provided for a sixty-day comment period that closed on December 14, 2020. The Department received ninety-nine comments, of which ninety-seven were unique and posted. Those submitting comments included labor organizations, public interest groups, employer associations, certified public accountants, and current and former labor organization members and other individuals. 91 Fed. Reg. at 32556. The Department retained the complete administrative record associated with the 2020 NPRM. 91 Fed. Reg. at 32561.

On July 30, 2021, the Regulatory Information Service Center published the *Spring 2021 Unified Agenda of Federal Regulatory and Deregulatory Actions* (the "Unified Agenda"). 86 Fed. Reg. 41166-01. The express purpose of the Unified Agenda is to "help[] agencies fulfill" their obligations under several legal authorities, including Executive Orders 12866 and 13563, and the Unfunded Mandates Reform Act of 1995 – but notably *not* the APA. *Id.* at 41166-68. Of particular relevance to this case, the Unified Agenda is created and required by the Regulatory Flexibility Act ("RFA"), not the APA. *See Id.* (citing 5 U.S.C. § 602). The RFA is clear that "[n]othing in this section precludes an agency from considering or acting on any matter not included in a regulatory flexibility agenda, or requires an agency to consider or act on any matter listed in such agenda." 5 U.S.C. § 602(d). This basic point is repeated in the Unified Agenda itself. 86 Fed. Reg. at 41167 ("The Unified Agenda does not create a legal obligation on agencies . . . to confine their regulatory activities to those regulations that appear within it."). While a portion of the Unified Agenda is published in the Federal Register, "[c]omplete agenda information for those entries appears, in a uniform format, in the online Unified Agenda at http://reginfo.gov." *Id.* at 41167.

In an entry on reginfo.gov, the Department removed the 2020 NPRM from the 'Unified Agenda as of March 17, 2021 and classified the state of rulemaking as completed. The explanation provided on the Unified Agenda appeared in a two-sentence abstract: "The Department will review modernization of the annual financial reports filed by labor organizations. After review, the Department has determined to remove this entry as it is no longer necessary." *Labor Organization Annual Financial Reports*, OIRA, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1245-AA10 (last visited August 27, 2026).

While the Department removed this entry from the Unified Agenda, it did not withdraw the NPRM. The Department did not include, on the Unified Agenda or elsewhere, an explanation that interpreted the relevant statute, that described the relevant facts, or that applied specific factors to explain the change to the agenda. The Unified Agenda entry reflected the Department's immediate priorities about which projects to highlight, and that the 2020 NPRM's status on the Unified Agenda was "completed" in light of the Department's priorities.

In early 2025, the Department reassessed the suitability of the filing thresholds for the labor organization annual reports that existed at the time, Forms LM-2, LM-3, and LM-4, in light of inflation. On July 1, 2025, the Department issued a separate and distinct notice of proposed rulemaking from the 2020 NPRM to make inflation adjustments to the filing thresholds for those forms. *See generally* Filing Thresholds for Forms LM–2, LM– 3, and LM–4 Labor Organization Annual Reports, 90 Fed. Reg. 28251 (July 1, 2025) ("2025 NPRM"). Specifically, the 2025 NPRM proposed the following new filing thresholds—LM-2: $450,000 or more in gross annual receipts; LM-3: gross annual receipts between $25,000, and $449,999; and LM-4: gross annual receipts totaling less than $25,000. *Id.* at 28254. The Department did not propose an inflation adjustment to the Long Form because it had not yet been established; consequently, there was no threshold to adjust. The comment period for the 2025 NPRM was open through July 31, 2025, and the Department received a total of 299 comment submissions, of which eleven were unique and substantive. 91 Fed. Reg. at 32556.

In late 2025, the Department reviewed the substantive requirements for the labor organization annual reports that were proposed in the 2020 NPRM, and the public comments received in response to the 2020 NPRM. On April 21, 2026, the Department submitted a draft final rule regarding the 2020 and 2025 NPRMs to the Office of Information and Regulatory Affairs

("OIRA") for intergovernmental review. *EO Review Search Results*, OIRA, https://www.reginfo.gov/public/Forward?SearchTarget=RegReview&textfield=1245-AA10&Image61.x=20&Image61.y=10 (last visited August 27, 2026). One day later, an entry on reginfo.gov marked the 2026 Rule as withdrawn from OIRA review. *Id.* Reginfo.gov "provides information about regulatory actions under OIRA review." *Regulations and the Rulemaking Process*, OIRA, https://www.reginfo.gov/public/jsp/Utilities/faq.myjsp (last visited August 27, 2026). The website also states, "[a]t any time during the OIRA review process, an agency may withdraw its rule from review and choose not to move forward with it or to resubmit it after further consideration." *Regulations and the Rulemaking Process*, OIRA, https://www.reginfo.gov/public/jsp/Utilities/faq.myjsp (last visited August 27, 2026). Therefore, entries on the reginfo.gov website relate to the status of OIRA's review, not the ultimate status of the rules under the APA. On May 11, 2026, the Department resubmitted the 2026 Rule to OIRA for intergovernmental review. *EO Review Search Results*, OIRA, https://www.reginfo.gov/public/Forward?SearchTarget=RegReview&textfield=1245-AA10&Image61.x=20&Image61.y=10 (last visited August 27, 2026).

On June 1, 2026, the Department issued the 2026 Rule, which finalized both the 2020 and the 2025 NPRMs. The "combined final rule" addressed two "distinct regulatory proposals that operate in the same reporting framework." 91 Fed. Reg. at 32556, 32557. First, the 2026 Rule implemented some but not all of the 2020 NPRM's proposals to introduce an LM-2 Long Form, to require more detailed financial information on the standard LM-2, and to eliminate the functional reporting requirement for union officer time. *Id.* at 32557, 32599. In rejecting certain 2020 proposals, the Department determined that the transparency that might be gained from more

detailed reporting on strike funds, confidential organizing information and whistleblower protections did not outweigh the potential burdens on covered organizations. *See id*. 32579-83.

After considering the comments, the Department finalized most of its other 2020 proposals. In light of the LM-2 revision that eliminated the exception allowing unions to forgo itemizing business travel expenses paid directly to the provider or through a credit arrangement, the 2026 Rule made a parallel change to the LM-3 "for consistency with accounting practices[.]" *Id.* at 32557. Second, the 2026 Rule substantially implemented the inflation adjustments proposed in the 2025 NPRM. 91 Fed. Reg at 32576. The 2026 Rule also established the Long Form filing threshold at $40 million, up from the 2020 NPRM's $8 million, in response to public comments and a decision to require only the largest labor organizations to complete the Long Form. 91 Fed. Reg. at 32574-75; 85 Fed. Reg. at 64734.

The Secretary chose to consolidate these "distinct but related" policy changes in a single final rule for the sake of administrative efficiency. *Id.* at 32557. The 2026 Rule made clear findings to support the Department's authority to implement the proposals contemplated in the 2020 NPRM.

First, the Department reviewed the 2020 NPRM's administrative record "in its entirety and [found] no new evidence that would warrant altering the proposed rule." *Id.* at 32561. Second, the Department's review of the "entire administrative record" also led the Department to conclude "that the core circumstances [underlying the need for the rule] have not materially changed." *Id.* In making this finding, the Department determined that the data it relied on to develop the 2020 NPRM "remain[ed] valid and uncontradicted by any subsequent study, audit finding, or enforcement trend;" that "[n]o intervening judicial decisions have altered the statutory basis for" the rulemaking or the Department's authority to act; and that no subsequent "agency regulations

conflicted with or superseded the proposals in the 2020 NPRM." *Id.* Third, the Department found that the 2025 NPRM did not alter the core circumstances underlying the 2020 NPRM. *Id.* at 32561-562. Fourth, the Department determined "that the original record remains sufficiently fresh to support the final rule" because, *inter alia*, "the nature of the financial transactions the proposed schedules are designed to capture, and the enforcement challenges identified in the canvassing study are not circumstances that fluctuate materially over several years." *Id.* at 32562.

Finally, the Department provided an alternate basis for implementing proposals that were originally announced in the 2020 NPRM:

> Alternatively, the Department invokes the Good Cause exception to forego notice and comment. The Department has already provided a full opportunity for notice and comment through the 2020 NPRM, 85 FR 64726, and the 60-day comment period that closed on December 14, 2020. Providing a further period would be unnecessary as the core circumstances, including factual predicates, legal authority, regulatory environment, and evidentiary basis, have not materially changed since the close of the comment period, and the original record remains fresh. OLMS has affirmatively determined, through contemporaneous review supported in the administrative record, that the record continues to serve the APA's purposes.

*Id.* at 32561, n.3.

The 2026 Rule set an effective date of July 1, 2026. *Id*. at 32606-7. While some comments submitted in response to the 2020 NPRM requested one to two years to implement the proposed changes, the Department concluded in the 2026 Rule that such a lengthy implementation period was unnecessary because the rule required prospective, not retroactive, compliance. The Department reasoned that covered organizations "will not actually file anything with the Department for at least one year at minimum, and most labor organizations [will] have at least a year and a half." *Id.* at 32607. The Department noted:

> [M]ost large labor organizations already track many of the new transactions that require itemization, and it is only a matter of altering the amount reported. With the widespread use of adaptable technologies for labor organizations, a labor

> organization is much more adaptable to changes in its annual financial reporting than in the past.

*Id*.

In choosing a thirty-day effective date, the Department recognized that labor organizations require time, before and during their first covered fiscal year, to update accounting systems and procedures. *Id.* at 32607. Considering the factors described at 91 Fed. Reg. 32607, the Department set a thirty-day effective date to allow organizations to prepare prospectively and to balance the need for timely transparency enhancements with the practical realities of compliance and administrative transition. *Id.* Indeed, just days after the publication of the June 1, 2026, final rule, the Department, along with the Department of Justice, secured guilty verdicts of several labor union officials from a high-profile international labor union that would be required to file the LM-2 Long Form by September 28, 2027. These convictions were based in part on payments listed in the union's financial disclosure reports. *See* Press Release, *Office of Public Affairs, Union Leaders Convicted of Racketeering, Fraud, and Embezzlement of Union Dues*, U.S. Dep't of Just. (Jun. 5, 2026) *available at* https://www.justice.gov/opa/pr/union-leaders-convicted-racketeering-fraud-andembezzlement-union-dues (last visited August 27, 2026).

## III. Procedural History

Plaintiff AFL-CIO sued the Department on June 10, 2026, to block the 2026 Rule, asserting four causes of action. *See generally* Compl. (ECF No. 1). The first cause of action alleges Defendants acted in violation of the APA for failure to provide notice and comment as part of its rulemaking process. *Id*. ¶¶ 32-39. The second cause of action alleges Defendants acted in violation of the APA, claiming that the effective date of the Rule is arbitrary and capricious. *Id*. ¶¶ 40-44. The third cause of action alleges Defendants acted in violation of the APA, claiming that substantive aspects of the Rule are arbitrary and capricious. *Id*. at 45-49. The fourth cause of action claims that substantive aspects of the Rule are not in accordance with law. *Id*. ¶¶ 50-54. With the

exception of the new filing thresholds for Forms LM-2, LM-3, and LM-4, Plaintiff asks the Court to declare that the changes to the Form LM-2 and the implementation of the LM-2 Long Form set forth in the Rule are unlawful under the APA and vacate the changes to the Form LM-2 and the implementation of the LM-2 Long Form as set forth in the Rule. *Id*. at 16.

Plaintiff also moved for preliminary relief, *see generally* PI Mot. (ECF No. 7); Mem. of Points and Authorities in Support ("PI Mem.," ECF No. 7-1), challenging only the effective date of the Department's Rule.[1] Plaintiff asked the Court to enjoin the effective date from July 1, 2026, until at least January 1, 2027, such that the Final Rule would apply prospectively to labor organizations whose fiscal years begin on or after the effective date. *See* PI Mot. (ECF No. 7) at 1-2. The Court denied Plaintiff's request for preliminary relief, finding among other things, that Plaintiff's allegations of harm were "conclusory" and "not backed up by its supporting declarations." *See* Memorandum Opinion at 10 (ECF No. 21).

**LEGAL STANDARDS**

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In cases involving review of final agency action under the APA, however, the standard articulated in Rule 56 does not apply. *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006). In the APA context, agencies resolve factual issues and "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir.

---

[1] Citations to Plaintiff's Motion and Memorandum are to the ECF-generated page numbers appearing in blue color at the top, right corner of each page.

1985). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA. *See Richard v. INS*, 554 F.2d 1173, 1177, 180 U.S. App. D.C. 314 & n.28 (D.C. Cir. 1977).

Under the APA, a reviewing may "set aside agency action only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 498 (D.C. Cir. 1988) (quoting 5 U.S.C. § 706(2)(A)). "[T]he scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). An agency's decision need not be "a model of analytic precision to survive a[n] [APA] challenge." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995). A reviewing court will uphold agency action "'if the agency's path may reasonably be discerned.'" *Id*. (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys*., 419 U.S. 281, 286 (1974)). It is sufficient if an agency's explanation of its decision contains "a rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. In addition, "if the necessary articulation of basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, [the Court] will make the reference." *See, e.g.*, *Miller v. Lehman*, 801 F.2d 492, 497 (D.C. Cir. 1986) (internal quotation marks omitted). An agency's decisions are entitled to a "presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one," *id.* at 416. The Court's inquiry is generally confined to the administrative record. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).

## ARGUMENT

### I. The Secretary complied with the APA when promulgating the 2026 Rule

#### A. The Secretary satisfied the APA's notice and comment rulemaking requirements

Section 553 of the APA establishes three basic rulemaking requirements. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015). The Secretary complied with all three when promulgating the 2026 Rule. First, an agency must provide notice of the proposed rulemaking by publishing a notice in the *Federal Register* that includes *inter alia* "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). The Department did just that when it published the 2020 NPRM. *See* 85 Fed. Reg. 64726. Second, the agency must give the public an opportunity to comment on the proposed rule "through submission of written data, views, or arguments," and the agency must consider "the relevant matter presented" in the public comments. 5 U.S.C. § 553(c). Once again, the Secretary satisfied the APA. *See* 91 Fed. Reg. at 32556 ("The Department received 99 comments [in response to the 2020 NPRM], of which 97 were unique and posted."); *id.* at 32561 ("In promulgating this final rule, OLMS has reviewed this record in its entirety."). Third, the agency must "incorporate in the [final rule] a concise general statement of [its] basis and purpose." 5 U.S.C. § 553(c). The 2026 Rule satisfied this requirement and concluded the rulemaking. 91 Fed. Reg. at 32556-605.

"The APA does not establish a 'useful life' for a notice and comment record[.]" *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 800 (D.C. Cir. 1983). Therefore, unless the statute authorizing a rulemaking imposes a deadline, there is no set limit on the length of time that may elapse between closure of the public comment period and publication of the final rule. *See, e.g.*, *Am. Min. Cong. v. U.S. E.P.A.*, 907 F.2d 1179, 1191–92 (D.C. Cir. 1990) (no need for new notice and comment prior to promulgating a rule in 1988 that "relied on the data acquired in the full-

fledged notice and comment process [the agency] conducted" in 1980, as well as comments it solicited in 1985 for the proposed rule). The Secretary concluded that the record associated with the 2020 NPRM "remain[ed] sufficiently fresh to support the" 2026 Rule. 91 Fed. Reg. 32562. Therefore, the mere passage of time does not diminish the fact that the Secretary satisfied each of the APA's requirements for promulgating a lawful rule.

Plaintiff argues the rulemaking terminated when the Department removed the 2020 NPRM from the Unified Agenda on March 17, 2021. Pl. Mot. at 18. But "[t]he APA does not mention withdrawing proposed rules. Nor has the Supreme Court." *Sanofi Aventis U.S. LLC v. U.S. Dept. of Health and Human Services*, 58 F.4th 696, 706 (3d Cir. 2023), judgment entered, No. 21-3167, 2023 WL 1325507 (3d Cir. Jan. 30, 2023). For this reason, some jurisdictions are "reluctant to give withdrawal separate legal significance under the APA. Rather, marking a rule as withdrawn seems to be just a message about an agency's intent." *Id.*; *see also State of Tex. V. Lyng*, 868 F.2d 795, 797 (5th Cir. 1989) (holding under the circumstances of that case that withdrawing an NPRM via the Federal Register did not terminate the APA rulemaking process). Moreover, "[e]ven if an agency had the power to effectively nullify the prior notice and comments, we think it would require something more than" an announcement in the Unified Agenda. *Sanofi*, 58 F.4th at 706. In other words, removal from the Unified Agenda did not wind down, and as a matter of law could not have wound down, the NPRM itself.

Plaintiff relies on *Center for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 710 F.2d 842, 846 (D.C. Cir. 1983) (per curiam) for the proposition that the APA permits withdrawing an NPRM, and that such a withdrawal represents the culmination of the rulemaking process. Pl. Mot. at 17. But *Center for Auto Safety* involved an advance NPRM that was officially withdrawn in the Federal Register, 710 F.2d at 846 (citing 46 Fed. Reg. 22,243 (1981)), which is the presumptive

location for publishing rulemaking materials. *See* 5 U.S.C. § 553(b). Moreover, the withdrawal notice in *Center for Auto Safety* was substantively distinguishable from the 2020 NPRM because it "clearly interpret[ed] the relevant statute" and described the relevant facts by identifying current market pressures, assessing consumer demand for fuel efficient vehicles, and estimating vehicle manufacturers' plans to produce those vehicles in order to justify the agency's policy change. 710 F.2d at 846; *see also* 46 Fed. Reg. 22243-02.

By contrast, the removal of the 2020 NPRM from the Unified Agenda was not published in the Federal Register, and its operative language was brief and conclusory. In full, it said: "The Department will review modernization of the annual financial reports filed by labor organizations. After review, the Department has determined to remove this entry as it is no longer necessary." *Labor Organization Annual Financial Reports*, OIRA, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1245-AA10 (last visited August 27, 2026). Plaintiff claims this sparse statement informed the general public that the Department explicitly terminated the 2020 NPRM in favor of the status quo. Pl. Mot. at 18-19. This argument fails because the Unified Agenda, on its face, advised the regulated community that agency statements in that publication did "not create a legal obligation on agencies . . . to confine their regulatory activities to those regulations that appear within it." 86 Fed. Reg. at 41167. "This disclaimer should have put the [regulated community] on notice that the agency was not binding itself simply by listing the rule as withdrawn there." *Sanofi*, 58 F.4th at 707.

There are good statutory reasons for this conclusion as well. The Unified Agenda is created by the RFA, not the APA. *See* 5 U.S.C. § 602. The RFA is clear that "[n]othing in this section precludes an agency from considering or acting on any matter not included in a regulatory flexibility agenda, or requires an agency to consider or act on any matter listed in such agenda." 5

U.S.C. § 602(d). As previously discussed, the APA establishes certain steps to give the regulated community notice of proposed regulatory actions. Those steps are specific, involved, and require reasoned explanation from the agency. They cannot be undone by a stray entry in the Unified Agenda, particularly when the entry did not interpret the statute, describe any substantive facts the agency considered, or otherwise explain the agency's decision-making under the APA. *See Ctr. for Auto Safety*, 710 F.2d at 846. The entry at issue in this case did no more than withdraw the 2020 NPRM from the Unified Agenda. It therefore reflected the Department's immediate priorities, not the ultimate fate of the 2020 NPRM.

Likewise, the fact that the 2026 Rule was briefly listed as "withdrawn" from intergovernmental review on April 21, 2026, before resubmission on May 11, 2026, is not dispositive. Reginfo.gov exists to provide information about the status of OIRA's review, not the status of an NPRM under the APA. *Regulations and the Rulemaking Process*, OIRA, https://www.reginfo.gov/public/jsp/Utilities/faq.myjsp (last visited August 27, 2026). The mere fact that the Department withdrew the 2026 Rule from OIRA's review process does not mean the Department abandoned the 2026 Rule under the APA. As OIRA makes clear, "[a]t any time during the OIRA review process, an agency may withdraw its rule from review and choose . . . to resubmit it after further consideration." *Id.* The reginfo.gov entry in this case related only to the status of OIRA's review. It did not provide a reasoned explanation for the Department's actions under the APA, and therefore cannot nullify the efforts the Department took under the statutorily prescribed framework to promulgate the 2026 Rule. Moreover, it is not abnormal for the Department or other agencies to remove rules from OIRA review, then resubmit them as part of the finalization process. *See* Maeve P. Carey, Congressional Research Service, Federal Rulemaking: The Role of the Office of Information and Regulatory Affairs (2011).

*Sanofi* is the only appellate authority to squarely address the core issue, and it resoundingly supports the Department's position: brief and conclusory statements in the Unified Agenda do not have legal effect under the APA. *See Sanofi*, 58 F.4th at 702; *cf. Pub. Citizen, Inc. v. U.S. Dept. of Health and Human Services*, 332 F.3d 654, 669 n.24 (D.C. Cir. 2003) (discussing in passing a rule being withdrawn from the Unified Agenda, without substantive analysis or comment on the legal effect of that action); *but see Eli Lilly and Co. v. Cochran*, 526 F. Supp. 3d 393, 407, n.14 (S.D. Ind. 2021) (holding that withdrawing a rule via the Unified Agenda terminated the rulemaking proceedings, but noting the agency did not invoke the good cause exception). *Sanofi* should control because it is identical to the instant case in all material respects. In *Sanofi*, the Department of Health and Human Services published an NPRM in 2016; listed the rulemaking as "withdrawn" in the 2017 Unified Agenda; then published a final rule in 2020 based on the 2016 NPRM and associated comments. *Id.* at 702. The *Sanofi* court upheld strict adherence to the rulemaking procedures established by the APA. It explained that the Unified Agenda "was not created as part of the APA. Instead, its express purpose is to 'help[ ] agencies comply with their obligations' under various other statutes and executive orders. . . It would be odd if agencies could nullify past steps taken to comply with the APA in a publication that has little if anything to do with the APA." *Id.* at 706-707.The Third Circuit affirmed the *Sanofi* rule because:

> Though HHS listed the rule as withdrawn, that did not negate that HHS had taken the required steps [under the APA]: the public knew about the proposed rule and had a chance to comment on it, and the agency considered those comments. The APA prescribes the "maximum procedural requirements that an agency must follow in order to promulgate a rule." . . . No more was needed.

*Id.* at 706 (quoting *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 685 (2020) (internal quotation marks omitted). The 2026 Rule is valid for exactly the same reason—the Secretary satisfied each of the APA's requirements.

Plaintiff argues *Sanofi* "cannot be squared with the D.C. Circuit's admonition that '[i]f one rulemaking proceeding has culminated and another has begun, then new notice and comment procedures are required.'" Pl. Mot. at 21 (quoting *Action on Smoking,* 713 F.2d at 800). Plaintiff's argument is unpersuasive because it presumes the 2021 Unified Agenda withdrawal notice was the culmination of the rulemaking process. The 2020 NPRM did not actually culminate in a particular outcome, nor did the Department begin another rulemaking regarding the fate of the LM-2 Long Form or the substantive information to be disclosed on the LM-2 and LM-2 Long Form. The 2025 NPRM was a "distinct regulatory proposal[]" that was narrowly focused on inflation adjustments to the filing thresholds for all labor organization annual reports in existence at that time. 91 Fed. Reg. at 32556-7. In other words, the 2025 NPRM considered how the LM-2 would be positioned relative to the already existing LM-3 and LM-4 forms, and accordingly proposed new thresholds for those forms. Further, the 2025 NPRM did not state that the Department terminated the 2020 NPRM. By contrast, the 2020 NPRM proposed substantive changes to the LM-2, and the establishment of a new and more detailed LM-2 Long Form. While the 2020 NPRM did solicit comments regarding the filing threshold for the LM-2, this was done to properly situate the LM-2 relative to the new LM-2 Long Form. Therefore, contrary to Plaintiff's assertions, the 2025 NPRM did not begin a new rulemaking regarding the substance of the LM-2, the existence of the LM-2 Long Form, or the relationship between those two forms as dictated by the filing threshold.

Furthermore, *Action on Smoking* did not address the impact, if any, that withdrawing a rule from the Unified Agenda has under the APA because that case involved a rule that was "unequivocally *vacated*" by court order. 713 F.2d at 797 (emphasis in original). *Sanofi* makes clear that the Unified Agenda is not an appropriate vehicle for carrying out the APA's mandates. Therefore, *Sanofi* and *Action on Smoking* are easily reconcilable.

A decision from the Fifth Circuit provides an additional basis for rejecting Plaintiff's interpretation of *Action on Smoking*. In *Lyng*, an agency issued a notice of proposed rulemaking, solicited comments and held hearings, then withdrew the NPRM via a notice in the Federal Register that interpreted the relevant statute, described the agency's factual considerations, and explained the agency's decision-making. 868 F.2d at 796 (citing 53 Fed. Reg. 140). One month later, the agency published a final rule based on the withdrawn proposal. *Id.* The State of Texas challenged the rule, in part, by relying on *Action on Smoking* for "the proposition that the termination of a rule making proceeding prevents the agency from relying on that proceeding in adopting final rules." *Id.* at 797. The Fifth Circuit found this argument unpersuasive:

> [T[he simple withdrawal of proposed regulations, without more, [does not require vacating the final regulation]. The rule advocated by appellants would preclude an agency from ever reconsidering its withdrawal of a published proposal. Indeed, appellants' position would lead to the anomalous result that an agency's withdrawal of proposed regulations would be reviewable in court, at least under the D.C. Circuit case law, but the agency could not settle the lawsuit by adopting the withdrawn proposal. Thus, we hold that failure to offer a new comment period after withdrawing this proposal does not, by itself, require invalidation of [the agency's] final regulations.

*Id.* The Fifth Circuit's reasoning is equally applicable to the facts of this case.

Plaintiff also argues the 2026 Rule "blindside[d] the regulated community" in light of the Unified Agenda withdrawal notice. Pl. Mot. at 24. But the Third Circuit found a similar argument by the *Sanofi* plaintiff to be unpersuasive because, among other things, "the APA already accounts for blindsiding" by requiring "an agency to publish a final rule thirty days before it takes effect." *Sanofi*, 58 F.4th at 706. Furthermore, the Unified Agenda clearly warned the regulated community that the Department's rulemaking activities were not confined to what appeared on the Unified Agenda. 86 Fed. Reg. at 41167.

### B. In the alternative, the Secretary validly invoked the APA's good cause exception

Even if the Department's notice in the 2021 Unified Agenda had the effect of terminating the 2020 NPRM, the 2026 Rule was still validly promulgated under the APA's good cause exception. Section 553(b)(B) provides that notice and comment is not required "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are . . . unnecessary[.]" While this exception "is to be narrowly construed and only reluctantly countenanced," *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (internal quotation marks omitted), the D.C. Circuit has observed it may be applicable when a rule is vacated by court order so long as the agency complies with the requirements of Section 553(b)(B). *See Mobil Oil Corp. v. U.S. E.P.A.*, 35 F.3d 579, 584 (D.C. Cir. 1994) (vacatur of a rule "does not necessarily require the [agency] to 'start from scratch' and initiate new notice and comment proceedings" (quoting *Action on Smoking*, 713 F.2d at 800)).

Specifically, an agency must make a finding that "the original record is still fresh" and that additional notice and comment is therefore unnecessary. *Mobil Oil*, 35 F.3d at 584. It logically follows that a sufficiently fresh administrative record would permit an agency to invoke the good cause exception when a prospective rule was voluntarily removed from the Unified Agenda as opposed to vacated by court order. In both situations, the public has had a full and fair opportunity to weigh in on an agency's proposal, and the agency can rely on that fresh and relevant data. The agencies in *Mobil Oil* and *Action on Smoking* failed to satisfy the APA's requirement to make specific findings and were therefore unable to avail themselves of the good cause exception. The 2026 Rule is distinguishable and easily meets the requirements of Section 553(b)(B). The Department examined the "factual predicates, legal authority, regulatory environment, and evidentiary basis" supporting the 2020 NPRM and found that they had "not materially changed

since the close of the comment period, and the original record remains fresh." 91 Fed. Reg. at 32561, n.3; *see also id.* at 32561-2. The Department therefore fully satisfied Section 553(b)(B) when issuing the 2026 Rule.

Plaintiff alleges several intervening events changed the "core circumstances" of the regulatory environment such that the Department was required to re-start the public comment process. Pl. Mot. at 21-22. Courts have recognized that "there are occasionally times in which the equities of a situation militate in favor of returning a rule to an agency for further consideration in light of new evidence." *Am. Optometric Ass'n v. F.T.C.*, 626 F.2d 896, 907 (D.C. Cir. 1980). In general, this "new evidence" must be "a change in circumstances . . . that is not merely 'material' but rises to the level of a change in 'core' circumstances, the kind of change that goes to the very heart of the case." *Id.* (quoting *Greater Boston Television Corp. v. FCC*, 463 F.2d 268, 283 (D.C. Cir. 1971)). Plaintiff's examples do not meet this high standard.

First, Plaintiff alleges that "after the 2020 comment period closed, "the Supreme Court issued a decision clarifying that *all* compelled-disclosure requirements . . . are 'reviewed under exacting scrutiny,' '[r]egardless of the type of association' that is targeted." Pl. Mot. at 22 (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021). According to Plaintiff, "[i]f unions had an opportunity to provide comments on the proposed rule post-*Bonta*, they would have explained why numerous aspects of the rule [including a requirement that unions required to file the LM-2 and LM-2 Long Form are required to make itemized disclosures of members who pay more than $5,000 in annual dues] did not survive exacting scrutiny. *Id.* But the quotation on which Plaintiff relies comes from Section II-B-1 of *Bonta*, which only had the support of three justices (Chief Justice, Justice Kavanaugh, and Justice Barrett). *Bonta*, 594 U.S. at 598. Justice Thomas observed that "invoking exacting scrutiny is at odds with" the Court's First Amendment

jurisprudence. *Id.* at 619. Justice Alito, joined by Justice Gorsuch opined, "I am not prepared at this time to hold that a single standard applies to all disclosure requirements. And I do not read our cases to have broadly resolved the question in favor of exacting scrutiny." *Id.* at 622. Contrary to Plaintiff's assertion, *Bonta* did not set a specific standard for compelled disclosure requirements and therefore did not change the "basic information on which" the Secretary relied. *Am. Optometric Ass'n*, 626 F.2d at 907. Moreover, even if *Bonta* definitively held that exacting scrutiny applied in all cases, the Chief Justice's opinion makes clear that *Bonta* was not the sea-change Plaintiff makes it out to be. While exacting scrutiny was well-known in the context of election cases, it was derived from "nonelection cases." *Id.* at 608.

*Bonta* is best understood as holding that a specific California statute – wholly distinguishable from the 2026 Rule – did not satisfy exacting scrutiny. The statute at issue in *Bonta* cast a "dragnet for sensitive donor information" by requiring all charities to disclose the names of donors who contributed more than $5,000 in a tax year. *Id.* at 602, 614. Notably, California did not rely on the information "to initiate investigations," nor did the state "rigorously enforce the disclosure obligation." *Id.* at 614. The Court found that "California's interest [in blanket collection of donor information] is less in investigating fraud and more in ease of administration." *Bonta*, 594 U.S. at 614. By contrast, the 2026 Rule made clear that the disclosure requirement regarding individual membership dues was consistent with the exacting scrutiny standard. The Department's requirement was not a dragnet, but instead was substantially related to the important interests of the Landrum-Griffin Act, including specific congressional findings of extensive criminal activities, *see e.g.*, 105 Cong. Rec. 8566-8568 (May 20, 1959), specific OLMS prosecutions leading to convictions, 91 Fed. Reg. 32563, and real-world enforcement activities:

> This [disclosure requirement] ensures honesty by the reporting officers and the labor organization and helps avoid fraudulent conduct such as the conduct

> described in the 2020 NPRM involving a union treasurer converting union dues checks worth $18,720 to personal use. 85 FR 64726, 64774 (Oct. 13, 2020).
>
> Further, requiring this limited disclosure on the labor organization report, rather than relying on the Department's subpoena authority to obtain it after the fact, is essential to the LMRDA's statutory design of union self governance through an informed membership and to the Department's corresponding enforcement responsibilities.

91 Fed. Reg. at 32590. Moreover, the 2026 Rule explained why the requirement was narrowly tailored, unlike the universal requirement at issue in California. Specifically, the requirement to disclose individuals who paid dues of $5,000 or more was only applicable to labor organizations that filed the LM-2 and LM-2 Long Form. As the Department explained, "[t]his will not affect most labor organizations given the level of dues required to meet the itemization threshold, but [will apply] in . . . rare circumstances[.]" *Id.*

Plaintiff is therefore unable to prove that *Bonta* changed the core circumstances surrounding the 2026 Rule such that additional notice and comment opportunities were required. *Bonta* did not decide a specific standard for disclosure requirements; the statute struck down was easily distinguishable from the 2026 Rule; and the Department's requirements were consistent with exacting scrutiny – a standard well-known prior to *Bonta*.

Plaintiff also argues that Microsoft's 2024 decision to stop supporting Great Plains accounting software is another change in core circumstances that requires an additional notice and comment period. Pl. Mot. at 22-23. However, according to Plaintiff, Microsoft's support will not end until the conclusion of 2029. Plaintiff has already had two years to address this issue, and has more than three additional years to fully resolve it. This does not meet the high standard described in *American Optometric Association*.

Finally, Plaintiff argues that unions should be permitted to provide additional evidence because the "Final Rule itself relies on factual developments that post-date the 2020 comment

period, including supposed new evidence of union embezzlement uncovered '[i]n the period since the 2020 NPRM was published.'" Pl. Mot at 23 (quoting 91 Fed. Reg. at 32563 & nn.6–8) (Plaintiff's emphasis omitted). However, it is clear from the surrounding context that the 2026 Rule relied on specific examples of union corruption that occurred after the 2020 NPRM to explain that the factual record developed in 2020 remained fresh. Specifically, "[w]hen the Department proposed revising Form LM–2 in 2020, it had just expended considerable resources on investigating widespread corruption involving high-level officials in the automotive industry." 91 Fed. Reg. at 32563. Examples of post-2020 corruption are best understood as explaining that the core circumstances surrounding the rulemaking have not changed, which militates against additional public comment.

Based on the foregoing, the Secretary fully complied with the APA's requirements when promulgating the 2026 Rule.

## II. **<u>The Final Rule is within DOL's statutory authority.</u>**

*Chao III* settled that requiring unions to disclose itemized financial information according to relevant categories "is a reasonable application" of the Secretary's authority under Section 201(b). 409 F.3d at 386. Since *Chao III* was decided, the Supreme Court overturned the framework established in *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), which guided *Chao III*'s analysis. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). Now agencies and reviewing courts must adopt the "best reading" of statutes with ambiguous terms. *Id.* at 400. To the extent Section 201(b) is ambiguous, the Secretary acted consistently with *Loper Bright* when promulgating the 2026 Rule. *See* 91 Fed. Reg. 32564 (the 2026 Rule "reflect[s] the best reading of the statute[.]").

Moreover, *Chao III* remains controlling and dispositive even under *Loper Bright* for several reasons. First, the interpretation of Section 201(b) affirmed in *Chao III* is entitled to

statutory stare decisis. Second, *Chao III*'s majority opinion systematically dismantled the interpretative arguments Plaintiff attempts to resurrect in this case. The deficiencies identified in *Chao III*'s majority opinion preclude the Court from adopting Plaintiff's interpretation as the best reading of Section 201(b). Third, a partial concurrence and dissent from then-Circuit Judge John Roberts explains that Section 208 provides an express delegation of discretionary authority to the Secretary, which provides an independent legal basis for issuing the 2026 Rule.

The Secretary's interpretation of its statutory authority to promulgate the 2026 Rule is straightforward. Section 201(b) requires unions "to file with the Secretary an annual financial report 'in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year'—'all in such categories as the Secretary may prescribe.'" *Chao III* at 379 (quoting 29 U.S.C. § 431(b)). The 2026 Rule merely "prescribe[d]" additional categories of "detail[s]" for disclosure relevant to the financial conditions and operations of the sophisticated unions required to file the LM-2 and LM-2 Long Form. *See* 91 Fed. Reg. 32573, n.13. Furthermore, Section 208 empowers the Secretary to "amend, and rescind rules and regulations prescribing the form and publication of reports . . . as he may find necessary to prevent the circumvention or evasion of such reporting requirements." 29 U.S.C. § 438. The Secretary made specific findings in the 2026 Rule that the changes were necessary to prevent unions from circumventing and evading Title II. 91 Fed. Reg. at 32556, 32564, 32594.

*Chao III* directly addressed the Secretary's authority to promulgate the 2026 Rule under Section 201(b). In fact, many of the categories at issue in the 2026 Rule are identical to those affirmed in the 2003 Rule.[2] *Loper Bright* made clear that "[t]he holdings of those cases [decided

[2] These include Sale of Investments, Sale of Fixed Assets, Purchase of Investments, Purchase of Fixed Assets, Political Activities, and Lobbying. The only distinction is that the 2003 Rule combined these categories in groups of two, while the 2026 Rule did not.

under *Chevron*] that specific agency actions are lawful . . . are still subject to statutory stare decisis . . . Mere reliance on *Chevron* cannot constitute a special justification for overruling such a holding." 603 U.S. at 376 (internal quotations and citations omitted). Plaintiff argues the 2026 Rule constitutes a new and "distinct agency action" that does not benefit from statutory stare decisis. Pl. Mot. at 32-33. But cases decided under *Chevron* "remain[] precedential authority which bind[]" courts, particularly when an agency "has not promulgated a new interpretation of the statute to prompt us to reconsider our precedent." *Lopez v. Garland*, 116 F.4th 1032, 1045 (9th Cir. 2024). The 2026 Rule does not change the Secretary's interpretation of Section 201(b). The Secretary has merely acted consistently with the existing interpretation affirmed in *Chao III*. Plaintiff's challenge to the rule's substantive provisions should fail for this reason alone.

Even if statutory stare decisis does not apply, *Chao III* exhaustively critiqued Plaintiff's interpretative arguments in 2005. Plaintiff now revives those same arguments despite their rejection by the D.C. Circuit. According to Plaintiff, at the time Congress enacted the Landrum-Griffin Act, "the terms 'financial condition' and 'operations' [as they appear in Section 201(b)] were well-established accounting terms" that corresponded to a balance sheet, and an income statement, respectively. Pl. Mot. at 25. According to Plaintiff, these standard corporate documents do *not* itemize financial transactions that are too small to be material to the organization's financial condition and operations" and instead provide high-level summaries only. *Id.* Plaintiff argues that Congress "incorporated this technical understanding" when passing Title II. *Id.* From this premise, Plaintiff argues the Secretary lacked statutory authority to set new itemization requirements in the LM-2 Long Form because the information subject to disclosure would exceed what appears on a standard corporate balance sheet or income statement. Pl. Mot. at 31-32.

However, in *Chao III*, the D.C. Circuit concluded the underlying factual premise of Plaintiff's argument was wrong:

> While the AFL–CIO may be correct that the terms "financial condition" and "operations" have a generally understood meaning, in enacting section 201(b) Congress did not adopt the precise terms of art—"statement of financial condition" and "statement of operations" that connote the typical corporate income statement and balance sheet . . . nor did it expressly provide, for example, that unions' reports should be made "in accordance with generally accepted accounting principles," [as it did in other statutes,] *cf.* 12 U.S.C. § 1441a(k)(4)(B)(i) (2004). These terms of art do not appear in the statutory text of the LMRDA[.]

*Chao III*, 409 F.3d at 381–82.

Moreover, the D.C. Circuit found good reason to believe that at the time of enactment, Congress understood Section 201(b) to require itemized financial disclosures beyond what appear in a standard balance sheet or income statement. Specifically, legislative history demonstrates that Congress intended to import "present law" from Section 9(f) of Taft Hartley, a pre-existing union reporting regime. *Chao III*, 409 F.3d at 383 (quoting S. Rep. 86-187 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2318, 2353, 1959 WL 3884 (Apr. 14, 1959)). Of particular relevance to this case, the "Taft–Hartley regulations in effect when Congress enacted the LMRDA" required covered unions to report "certain itemized disclosures of receipts and disbursements," including itemizations of "any receipts from sale of assets[.]" *Chao III*, 409 F.3d at 383 (quoting 22 Fed. Reg. 4,158, 4,158–60 (June 13, 1957)).

Plaintiff argues that the Secretary's early practice undermines his authority to enact the 2026 Rule. Pl. Mot. at 29-30. But that is incorrect. As was the case with the 2003 Rule, Plaintiff "has pointed to nothing . . . to suggest that the aggregate reporting in the Form LM–2 required by the Secretaries, albeit for four decades, represented the full exercise of the Secretary's authority.

*Chao III*, 409 F.3d at 385. In fact, the legislative history supports the opposite conclusion as discussed in the preceding paragraph.

Plaintiff also attempts to resurrect its structural argument that by "contrast[ing] the language in subparts (3), (4), and (5) of section 201(b), in which Congress required specific details, with that in subparts (1), (2), and (6), in which Congress did not, . . . that Congress intended that unions would report assets, liabilities, receipts, and other disbursements only in aggregate categories." *Chao III*, 409 F.3d at 383; *see also* Pl. Mot. at 29. But here too, the D.C. Circuit found reason to be skeptical. *See* 409 F.3d at 383. Before enumerating Section 201(b)'s categories, Title II states the financial reports are to be "in such detail as may be necessary;" after enumerating the categories, Section 201(b) states that the information shall be reported "all in such categories as the Secretary may prescribe." 29 U.S.C. § 431(b). Subsections (1), (2), and (6) are therefore surrounded by two clauses that plainly contemplate the Secretary setting the "detail" and "categories" required to be disclosed.[3] Plaintiff's interpretation would nullify the opening and closing parameters of Section 201(b).

Plaintiff does not address the deficiencies *Chao III* identified with Plaintiff's interpretative methods. These deficiencies are relevant to the question at hand and should preclude the Court from adopting Plaintiff's interpretation as the "best reading" of Title II. *Loper Bright*, 603 U.S. at 400. The Department's interpretation of section 201(b) gives full effect to both Title II's plain language, and its anticorruption purpose.

[3] Legislative history is once again useful. The Senate understood subsections (1), (2), and (6) to incorporate "present law" from Taft-Hartley, which as previously discussed, included itemization requirements under the regulations in effect at the time. Subsections (3), (4), and (5) were understood to be new reporting requirements beyond those set by present law. *See* 1959 U.S.C.C.A.N. at 2353.

A concurrence by then-Circuit Judge John Roberts in *Chao III* provides additional support for the Secretary's position under an independent statutory basis—Section 208. In *Loper Bright*, now-Chief Justice Roberts concluded that *Chevron* deference was untenable because it "presume[ed] that statutory ambiguities are implicit delegations to agencies." 603 U.S. at 399. But *Loper Bright* also recognized that "Congress has often enacted" statutes that authorize agencies "to exercise a degree of discretion." 603 U.S. at 394. In *Chao III*, Circuit Judge Roberts observed that Section 208 explicitly delegates authority to the Secretary to structure Title II's forms and regulations. *Chao III*, 409 F.3d at 393. He focused particularly on the fact that Section 208 permits the Secretary to 1) make findings; 2) about what is necessary; 3) "to prevent a future contingency—circumvention or evasion of required reporting." *Id.* As explained in his 'concurrence, this is a statutory delegation "freighted with deference" and each of these factors individually supports the Secretary's broad discretion under Title II. *Id.*; *see also id.* at 385 (majority opinion clarifying that the Secretary's authority extends to "determin[ing] categories of data and level of detail[.]")

Plaintiff also gestures at a constitutional argument that the LM-2 Long Form's disclosure requirements "burden the freedom of association." Pl. Mot. at 30. But Plaintiff's arguments regarding *Bonta* are unavailing for the reasons discussed *supra* in section I.

## III. <u>The 2026 Rule is not arbitrary and capricious.</u>

Plaintiff alleges that the 2026 Rule is arbitrary and capricious for several reasons. None pass muster under the APA. "The scope of review under the 'arbitrary and capricious' standard of review is narrow and a court is not to substitute its judgment for that of the agency." *Virtus Pharmaceuticals, LLC v. Garland*, Civ. A. No. 21-2308 (CKK), 2021 WL 4306165, at *25 (D.D.C. Sept. 22, 2021) (citations omitted). Further, "courts will uphold an agency's action where the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Id.* In conducting arbitrary and capricious review, all a court must

determine is whether "the agency has acted within a zone of reasonableness," *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021).

**A. The Department's revisions to the "functional reporting requirements" are reasoned and adequately explained in the record.**

Plaintiff takes issue with the 2026 Rule's revisions to the "functional reporting" obligations because they will provide "zero benefit and substantial[ly] burden [] regulated parties." But Plaintiff's arguments are based on a misunderstanding of the factual record. Plaintiff claims incorrectly that, when the Department solicited input from field investigators in 2019, "they overwhelmingly saw no benefit to functional reporting." Pl. Mot. at 34. As explained in the 2019 survey, functional reporting had two components prior to the 2026 Rule: one related to receipts and disbursements, and a second related to the amount of work time union officers spent on certain activities. Under the first component, unions were required to itemize certain receipts and disbursements at or above a $5,000 threshold according to different functional categories. Under the second component, unions were required to estimate the "time spent by each union officer and employee on different duties" corresponding to those same categories. DOL000581. The investigators found the first component to be an "extremely beneficial" tool that "aided embezzlement investigations[.]" DOL001336; *see also* 91 Fed. Reg. 32565. The investigators found the second component to have little utility. DOL001337; 91 Fed. Reg. 32566. The 2026 Rule kept the first component (itemized disclosure of receipts and disbursements according to functional categories) but eliminated the second (disclosure of union officer work time according to functional categories). 91 Fed. Reg. 32586. Therefore, Plaintiff's claims that the Department irrationally ignored the responses of its own investigators has no basis in the factual record. *See* Pl. Mot. at 36.

Plaintiff's disagreement with the Department's rationale for eliminating the work time functional reporting requirement, but retaining the receipt/disbursement functional reporting requirement, is not sufficient to sustain an arbitrary and capricious challenge. Under APA review, the question for this Court is whether the agency adequately explained its decision or if the decision "may be reasonably discerned." *Bowman Transp., Inc. v. Ak.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *see also Xcel Energy Servs. Inc. v. FERC*, 41 F.4th 548, 557 (D.C. Cir. 2022) (agency action will be upheld when "the agency's path may reasonably be discerned."); *see also CSL Plasma Inc. v. Customs & Border Prot.*, 628 F. Supp. 3d 243, 261 (D.D.C. 2022) ("[A] brief explanation is not arbitrary and capricious just because of its brevity."). Here, the Department considered the "record in its entirety," 91 Fed. Reg at 32561, and provided a rational explanation that it was keeping the part of the functional reporting requirement that aided Title II investigations and could be verified through record review, and eliminating the part that had no utility to investigations and could not be easily verified. In other words, the Department "considered all aspects of the problem" and "cataloged its concerns," and thus the Department's decision was neither arbitrary nor capricious. *Am. Farm Bureau Fed'n v. EPA,* 559 F.3d 512, 527 (D.C. Cir. 2009).

Plaintiff alleges that "removing salary costs from a union's functional reporting will mislead members about the union's operations and spending priorities. That is because such a system will 'understate the portion of expenditures' spent on activities that are typically 'carried out directly by union officers and employees'—most commonly, representational activities." Pl. Mot. at 35 (quoting AR 598) (original emphasis omitted). This argument rings hollow. While the 2026 Rule eliminated the *requirement* that unions report a functional accounting of work time, nothing in the rule prohibits a union from continuing to track this information, and reporting it in

Item 75 (Additional Information), which is reserved for additional information a union would like to disclose, or that the union is required to disclose when prompted. To the extent Plaintiff believes that reporting a functional accounting of its officers' work time would provide useful context to its members and the general public, it may continue to do so.

### B. The Department appropriately explained the 2026 Rule's dues payment disclosure requirement based on the evidence before it in the rulemaking record.

Plaintiff argues the 2026 Rule's requirement that LM-2 Long Form filers itemize dues payments at or in excess of $5,000 per year is not only in conflict with the First Amendment and in excess of the Secretary's statutory authority, but also arbitrary and capricious. Pl. Mot. at 38. However, as described, *supra,* in section I, this requirement is well within the Department's statutory authority and does not conflict with *Bonta*. Plaintiff's contention that this requirement is also arbitrary and capricious pursuant to the APA fares no better. Plaintiff agrees that the Department explained its reasoning for including this requirement in the Final Rule: "to help[] avoid fraudulent conduct." 91 Fed. Reg. at 32590; *see also* Pl. Mot. at 46. As also described by Plaintiff, the Department provided an example of conduct that it seeks to prevent with this reporting requirement, in which a union officer collected dues checks in the amount of $18,720 and deposited them into his own personal bank account. *Id.* (citing 85 Fed. Reg. at 64744). Although Plaintiff disagrees with the Department's stated rationale, it points to no conflicting evidence in the record that the Department did not consider, and in fact explicitly acknowledges the Department's consideration of the evidence before it. It is entirely reasonable for the Department to rely on its stated interest in preventing fraudulent theft of dues payments. The Department's decision is therefore "reasonably discern[able]" and sufficient under the APA. *Bowman Transp., Inc. v. Ak.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

### C. The effective date is reasonable.

Plaintiff argues the 2026 Rule's effective date is arbitrary and capricious for reasons that do not survive close scrutiny, and would require the Court to step outside the bounds of well-settled standards. When deciding an APA arbitrary and capricious claim, a reviewing court must uphold the agency's action if it is "rational, based upon consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n, Inc.*., 463 U.S. at 42-43; *see also*, *Ind. Mun. Power Agency v. FERC*, 56 F.3d 247, 254 (D.C. Cir. 1995). Under this standard, "[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained its decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The reviewing court may not "substitute its judgment for that of the agency," *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), or reweigh conclusions supported by substantial evidence, *Burke v. EPA*, 127 F. Supp. 2d 235, 241 (D.D.C. 2001). The Department's decision regarding the effective date falls squarely within this standard.

When promulgating the 2026 Rule, the Department made a careful distinction between the rule's effective date and the applicability date by which labor organizations would be required to file their first reports under the new requirements. While the 2026 Rule was effective thirty days after publication, a "labor organization subject to the new [requirements] will not actually file anything with the Department for at least one year at minimum, and most labor organizations would have at least a year and a half." 91 Fed. Reg. at 32607.

Plaintiff alleges the Department's decision to set a thirty-day effective date was insufficiently explained and did not acknowledge important record evidence, Pl. Mot. at 40-41. This is incorrect. The Department fully considered the objections Plaintiff raises in this action but reached a different conclusion after reviewing the available evidence. For example, the

Department considered comments from labor unions and accounting firms that "requested ample lead time before the Department implements the rule." 91 Fed. Reg. at 32606-32607. Most labor organizations (though notably, not Plaintiff) requested at least a year before implementation, with some requesting at least two years "to get accounting procedures and systems set up to comply with the new Form LM-2 Long Form and revised Form LM-2." *Id*. at 32607. Some commenters even requested "an 18-month implementation period given the extensive system changes required." *Id*. The Department also considered that "multiple commenters urged the Department to finalize the rule quickly and make it effective immediately upon publication." *Id*. at 32606. The Department balanced these comments, along with the statutory purpose of Title II, and determined that a thirty-day implementation period was sufficient:

> While the Department does not agree with commenters who recommended an immediate effective date, it has decided to adopt its proposal that labor organizations receive a 30-day implementation period and that the effective date will begin for the first fiscal year following. A labor organization subject to the new Form LM-2 Long Form or revised Form LM-2 will not actually file anything with the Department for at least one year at minimum, and most labor organizations would have at least a year and a half. The Department also notes that most large labor organizations already track many of the new transactions that require itemization, and it is only a matter of altering the amount reported. With the widespread use of adaptable technologies for labor organizations, a labor organization is much more adaptable to changes in its annual financial reporting than in the past. As such, the Department rejects the commenters requesting an extension of the effective date and adopts a 30-day implementation period and an effective date beginning with the first fiscal year afterwards.

*Id*. at 32607. In reaching this conclusion, the Department recognized "that labor organizations may require time to update accounting systems, internal controls, and reporting practices to comply with the revised forms and instructions." *Id*. Ultimately, the Department "conclude[d] that this implementation framework appropriately balances the need for timely transparency enhancements with the practical realities of compliance and administrative transition." *Id*.

Consistent with its obligations under the APA, the Department responded in a reasoned manner to the substantive comments it received. *See Sprint Corp. v. F.C.C.*, 331 F.3d 952, 960 (D.C. Cir. 2003). Specifically, the Department stated after review of all relevant comments that it did not agree with commenters who recommended an immediate date, and had decided to adopt its proposal that labor organizations receive a thirty-day implementation period and that the effective date will begin for the first fiscal year following. 91 Fed. Reg. at 32607. Consequently, the applicability date for each union would be the first day of the fiscal year beginning on or after the July 1, 2026 effective date. *Id.* at 32606-32607; *see also* 29 U.S.C. § 437(b) (financial disclosure reports due ninety days after end of each fiscal year). This means that unions such as plaintiff with fiscal years beginning on July 1 will not have to file a report using the new forms until September 28, 2027. Plaintiff cannot use an APA action to upset this well-considered and reasonable determination.

Nevertheless, Plaintiff argues the 2026 Rule is arbitrary and capricious because it and other unions "whose fiscal years started on or soon after July 1 . . . will [be] require[d] . . . to go back and manually recode hundreds if not thousands of transactions once they are able to get their training and accounting systems in place—a burdensome process that is all but certain to lead to errors. The Rule does not even acknowledge that its rushed effective date will lead to manual recoding of transactions, let alone justify why such a burdensome, error-prone process is warranted." Pl. Mot. at 41. In particular, Plaintiff relies on *Chao I* for the proposition that "if a union . . . does not have its new accounting system in place, if it does not have its employees trained, and if it does not have its new computers purchased and its new software installed before the beginning of its fiscal year, it will face an untenable situation in which it will lose ground every

day because the new systems are not in place." *Am. Fedn. of Lab. and Cong. of Indust. Organizations v. Chao*, 297 F. Supp. 2d 155, 162 (D.D.C. 2003) ("*Chao I*").

However, the facts of *Chao I* are distinguishable, particularly because of the passage of time. In 2003, the Department made two significant revisions to the reporting process. First, as previously discussed, the Department introduced "for the first time, the use of a new functional category approach." *Chao I*, 297 F. Supp. 2d at 163. As Plaintiff itself notes, "[w]hen DOL first introduced these requirements in 2003, it transformed how labor organizations needed to categorize their disbursements—forcing them to go beyond standard bookkeeping categories[.]" Pl. Mot. at 2. Second, the Department mandated for the first time that unions file Form LM-2 electronically, but the Department failed to timely open the electronic filing portal "that it ha[d] promised in order to implement" the e-filing requirement. *Id.* Therefore, *Chao I*'s observation that unions would "lose ground" every day without an accounting system in place is best understood within this specific context. Unions were required to implement a functional accounting requirement for the first time without any insight into the electronic system the Department would be using to receive the information. Under these circumstances, *Chao I* held the 2003 Rule's effective date was likely arbitrary and capricious. *Id.* at 165.

In the present day, unions are well-familiar with the Department's functional accounting requirements. The 2026 Rule does not implement these requirements from scratch, as happened in 2003, but instead builds on a well-settled foundation. Likewise, Plaintiff and other unions do not have to navigate the leap from paper reports to e-filing. Moreover, there have been twenty-three years of technological advances since *Chao I* was decided. As the Department concluded in the 2026 Rule, "[w]ith the widespread use of adaptable technologies for labor organizations, a labor organization is much more adaptable to changes in its annual financial reporting than in the past."

91 Fed. Reg. at 32607. Therefore, Plaintiff's concerns regarding the time and effort necessary to potentially re-code transactions are misplaced.

Furthermore, Plaintiff bears the burden of persuasion with respect to the impact manual recoding will have on its operations. *See DSE, Inc. v. United States*, 169 F.3d 21, 31 (D.C. Cir. 1999) (Under the APA, courts will not set aside agency action unless "the party asserting error [can] demonstrate prejudice from the error[.]" ). Plaintiff has not presented the evidence necessary to carry this burden. As the Court observed upon denying Plaintiff's motion for preliminary relief, AFL-CIO makes "conclusory assertion[s that are] not backed up by its supporting declarations. Instead, the declarations mostly grumble" about unquantified inefficiencies. *See* Memorandum Opinion at 10 (ECF No. 21). Plaintiff has not presented additional evidence to support these arguments on summary judgment.

Plaintiff argues the 2026 Rule's implementation date is inconsistent with the Department's past practice. In particular, Plaintiff relies on a 1992 rulemaking in which the Department concluded a two-month implementation period was insufficient. Pl. Mot. at 43. However, the 1992 rule occurred before the advent of sophisticated electronic accounting systems and electronic filing. The implementation date for a rule involving paper submission of reports is easily distinguishable from the circumstances of the present day. Likewise, as previously discussed, the 2003 Rule involved significant changes to the reporting process. Those equities are not at issue for the 2026 Rule. Plaintiff also relies on a 2009 rule that adopted a five-month implementation period. Pl. Mot. at 44. However, as previously discussed, the Department in 2026 fully considered all available evidence in the record and made a determination regarding what was appropriate in the present day, particularly in light of advances in adaptable technologies. To the extent the Department departed from its past practice, the 2026 Rule offered a reasoned explanation.

Plaintiff ignores the Department's reasoned explanation for the 2026 Rule's effective date and asks this Court to impermissibly substitute its own judgment for the Department's careful determination. But this is not a proper result under the APA. The record fully supports the Department's decision and the effective date should remain undisturbed. The earliest any union is required to report under the 2026 Rule is September 2027, more than one year from today.

* * *

## CONCLUSION

For these reasons, Defendant's Cross-Motion for Summary Judgment should be granted and Plaintiff's Motion for Summary Judgment should be denied.

Dated: August 27, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: *\/s/ Samantha-Josephine Baker*
SAMANTHA-JOSEPHINE BAKER
FL Bar #105714
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
Tel: (202) 252-2435
Samantha-Josephine.Baker@usdoj.gov

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,

Plaintiff,

v.

KEITH E. SONDERLING,
Acting United States Secretary of Labor, and
ELISABETH MESSENGER, Director,
Office of Labor-Management Standards,
United States Department of Labor,

Defendants.

Civil Action No. 26-2061 (JEB)

**[PROPOSED] ORDER**

UPON CONSIDERATION OF Defendants' Combined Opposition To Plaintiff's Motion For Summary Judgment and Cross Motion For Summary Judgment, Plaintiff's Motion For Summary Judgment, any replies thereto, and the entire record herein, it is hereby

ORDERED that Defendants' motion is GRANTED, Plaintiff's motion is DENIED and it is further ORDERED that judgment is entered in favor of Defendants.

SO ORDERED:

__________________
Date

______________________________________
HONORABLE JAMES E. BOASBERG
United States District Judge