**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,<br><br>Plaintiff,<br><br>v.<br><br>KEITH E. SONDERLING and ELISABETH MESSENGER,<br><br>Defendants. | ) | Civil Action No. 1:26-cv-02061 (JEB) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ..... ii

INTRODUCTION AND SUMMARY ..... 1

ARGUMENT ..... 4

I. DOL violated the APA's notice-and-comment requirements. ..... 4

A. The Department cannot use notice-and-comment procedures in one rulemaking proceeding to satisfy its notice-and-comment requirements in another. ..... 4

B. The Department cannot meet its heavy burden to satisfy the APA's good-cause exception. ..... 12

II. The Final Rule exceeds DOL's statutory authority. ..... 16

III. Multiple provisions in the Final Rule are arbitrary and capricious. ..... 28

A. The Final Rule's revisions to labor organizations' "functional reporting" obligations are arbitrary and capricious. ..... 28

B. The Final Rule's requirement that certain labor organizations list the names of members who pay at least $5,000 in annual dues is arbitrary and capricious. ..... 32

C. The Final Rule's July 1, 2026, effective date is arbitrary and capricious. ..... 33

CONCLUSION ..... 37

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action on Smoking & Health v. Civ. Aeronautics Bd.*,
713 F.2d 795 (D.C. Cir. 1983) (per curiam) ........................................1, 11, 13, 14, 15, 16

**AFL-CIO v. Chao* ("*Chao I*"),
297 F. Supp. 2d 155 (D.D.C. 2003) ....................................................................36

**AFL-CIO v. Chao* ("*Chao II*"),
298 F. Supp. 2d 104 (D.D.C. 2004) ....................................................................36

**AFL-CIO v. Chao* ("*Chao III*"),
409 F.3d 377 (D.C. Cir. 2005) ....................................................2, 18, 19, 24, 25, 26, 27

*Am. Optometric Ass'n v. FTC*,
626 F.2d 896 (D.C. Cir. 1980) ....................................................................16

*Ams. for Prosperity Found. v. Albence*,
__ F.4th __, 2026 WL 2563151 (3d Cir. Aug. 31, 2026) ..........................................15

**Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ....................................................................13, 14, 23, 24

*City of Billings v. TSA*,
153 F.4th 46 (D.C. Cir. 2025) ....................................................................16

*Cnty. of Los Angeles v. Shalala*,
192 F.3d 1005 (D.C. Cir. 1999) ....................................................................35

*Coe v. McHugh*,
968 F. Supp. 2d 237 (D.D.C. 2013) ....................................................................35

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
710 F.2d 842 (D.C. Cir. 1983) (per curiam) ....................................................................6

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ....................................................................33

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999) ....................................................................35

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ....................................................................33

*Gaspee Project v. Mederos*,
13 F.4th 79 (1st Cir. 2021)....................14

**Humane Soc'y of the U.S. v. USDA*,
41 F.4th 564 (D.C. Cir. 2022)....................6

*Knight v. Comm'r*,
552 U.S. 181 (2008)....................21

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)....................20

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018)....................21

*Lone Mountain Processing, Inc. v. Sec'y of Lab.*,
709 F.3d 1161 (D.C. Cir. 2013)....................33

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................18, 20

*Marks v. United States*,
430 U.S. 188 (1977)....................14

*In re MCP No. 185*,
124 F.4th 993 (6th Cir. 2025)....................18

*Mobil Oil Corp. v. EPA*,
35 F.3d 579 (D.C. Cir. 1994)....................13

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021)....................7

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*,
494 F.3d 188 (D.C. Cir. 2007)....................32

*PAM Squared at Texarkana, LLC v. Azar*,
436 F. Supp. 3d 52 (D.D.C. 2020)....................35, 36

*Paul v. FAA*,
168 F.4th 672 (D.C. Cir. 2026)....................23

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023)....................9

*Texas v. Lyng*,
868 F.2d 795 (5th Cir. 1989)....................9, 10, 11

*Wyo. Gun Owners v. Gray*,
83 F.4th 1224 (10th Cir. 2023) ....................15

*Yellen v. Confederated Tribes of Chehalis Rsrv.*,
594 U.S. 338 (2021)....................20

**Statutes**

5 U.S.C. § 553....................7

11 U.S.C. § 523....................21

15 U.S.C. § 714k....................21

29 U.S.C. § 431....................17, 22, 24, 31

29 U.S.C. § 438....................25, 26

29 U.S.C. § 1308....................21

42 U.S.C. § 300e-17....................21

**Federal Register Entries**

22 Fed. Reg. 4158 (June 13, 1957) ....................22

53 Fed. Reg. 140 (Jan. 5, 1988) ....................10

53 Fed. Reg. 3999 (Feb. 11, 1988) ....................11

67 Fed. Reg. 79280 (Dec. 27, 2002) ....................28

82 Fed. Reg. 8346 (Jan. 20, 2017) ....................9

85 Fed. Reg. 80632 (Dec. 14, 2020) ....................10

91 Fed. Reg. 32556 (June 1, 2026) ....................24, 26, 29, 31

**Other Authorities**

105 Cong. Rec....................28

C. Rufus Rorem & Harry D. Kerrigan, *Accounting Method* (3d ed. 1942) ....................22

FASB, *Income Statement—Reporting Comprehensive Income—Expense Disaggregation Disclosures (Subtopic 220-40)* (Nov. 2024), https://www.fasb.org/page/ShowPdf?path=ASU%202024-03.pdf (last visited Sep. 10, 2026) ....................34

*Labor Organization Annual Financial Reports Rule Actions*, OIRA, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1245-AA10 (last visited Sep. 10, 2026)....................4

News Release, *US Department of Labor Launches Data Visualization Tool for Union Reporting Forms, Providing Valuable Insight on Union Spending* (Mar. 17, 2026), https://www.dol.gov/newsroom/releases/olms/olms20260317....................30

PwC, *Effective dates of FASB standards for public companies* (Sep. 9, 2026), https://viewpoint.pwc.com/dt/us/en/pwc/effective_dates_of_f/public_companies/public_companies_US/standards_effective__US.html....................34

Ronald H. Robnett, Thomas M. Hill & John A. Beckett, *Accounting: A Management Approach* (1951)....................17

S. Rep. No. 86-187 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2318, 1959 WL 3884 (Apr. 14, 1959)....................21, 22

Walter J. Goggin & James V. Toner, *Accounting: Principles and Procedure* (1930)....................22

## INTRODUCTION AND SUMMARY

This past June, the Department of Labor promulgated a Final Rule through a course of conduct that showed scant regard for the values of order, predictability, fairness, and respect for statutory limits on agency power that the Administrative Procedure Act ("APA") was enacted to promote. The Department announced out of the blue that it had revived a 2020 rulemaking proceeding that was terminated in March of 2021, without allowing for comments on whether legal or factual developments in the intervening half-decade should inform the agency's decisionmaking. The Department made no attempt to square its sweeping expansion of labor organizations' financial reporting obligations with the agency's statutory authority under Title II of the Labor Management Reporting and Disclosure Act ("LMRDA"). And to top it off, it chose to push through the rule with a shorter transition period than it had ever used before, inflicting gratuitous economic injury on the regulated community—a situation made worse by the fact that, because no proposed rule was pending, labor organizations had no reason to be preparing for changes to their financial reporting obligations.

That course of conduct violated the APA in several respects.

*First*, the Department violated the APA's notice-and-comment requirements. DOL claims it provided notice and comment when it originally proposed the rule in 2020. But the 2020 rulemaking ended when DOL publicly announced in March 2021 that the proposal had been "[w]ithdrawn," the rulemaking was "[c]ompleted," and reporting on the rulemaking process was "no longer necessary." Once that rulemaking proceeding "culminated" in a final decision, DOL was "required" to provide "new notice and comment procedures" before it could promulgate a final rule. *Action on Smoking & Health v. Civ. Aeronautics Bd.*, 713 F.2d 795, 800 (D.C. Cir. 1983) (per curiam). By failing to provide such procedures, DOL violated the APA.

In the face of this, the Department is left to contend that the 2020 rulemaking never actually concluded. But the agency's public withdrawal announcement—issued without equivocation or caveat—speaks for itself. And DOL's subsequent behavior confirms that the Department meant what it said: When the Department issued its 2025 notice of proposed rulemaking that covered a significant piece of the 2020 proposed rule (increasing the Form LM-2 threshold), it never even mentioned the 2020 proposal—a curious omission if the Department believed the 2020 proposal was still live.

*Second*, the Department exceeded its statutory authority. The Final Rule compels labor organizations to disclose numerous detailed lists of everyday financial transactions, the vast majority of which have no material effect on a filing union's overall financial situation. DOL has no authority to require such sweeping itemized disclosures. Congress used specific, technical accounting terms—"financial condition" and "operations"—to describe labor organizations' financial-reporting obligations under Section 201(b) of the LMRDA. Those terms refer to summaries of financial information and disclosures of material transactions, not a line-by-line reporting of routine expenditures and receipts that can be found in a union's general ledger. DOL's apparent position that it has statutory authority to require unions to disclose any and all finance-related information to the public—including the identity of every dues-paying member—raises serious First Amendment concerns, which can be avoided by interpreting Section 201(b) as the AFL-CIO does.

In response, the Department argues that the statutory-authority question was settled by *AFL-CIO v. Chao* ("*Chao III*"), 409 F.3d 377 (D.C. Cir. 2005). But statutory *stare decisis* cannot save the Final Rule, as *Chao III* only upheld the specific disclosure provisions that DOL implemented in 2003—and did so only after concluding that the Department's grant of statutory

authority under Section 201(b) was ambiguous under the *Chevron* framework. With *Chevron* now overturned, it is this Court's obligation to interpret Section 201(b) of the LMRDA for itself.

*Third*, several provisions in the Final Rule are arbitrary and capricious. Start with the provision that excludes union staff salaries from the formula DOL uses to inform union members about the proportion of union resources devoted to various functional categories, including organizing, collective bargaining, and political expenditures. DOL does not deny that this exclusion will distort how the union's spending priorities are portrayed in the Form LM-2. Instead, DOL argues only that unions can mitigate the distortion by voluntarily reporting their salary allocations as "Additional Information" in a narrative catch-all box at the very end of the form.

But DOL omits that (i) any narrative information volunteered in the catch-all box is excluded from the Form's actual tables that state the percentages spent on organizing, collective bargaining, political expenditures, and the other functional categories; and (ii) DOL's own LM-2 visualization tool—which the agency promotes as the best way for members to understand their union's finances—draws only from those tables. The Department's "Additional Information" suggestion is thus akin to posting a misleading headline and burying the truth—and not even in the same article but in a location where readers will not even know to look for it. That is a recipe for spreading *misinformation* through a publication that is supposed to provide members with *accurate information*.

Another arbitrary provision of the Final Rule requires certain unions to disclose the names and payment amounts of dues-paying members, without so much as considering the substantial privacy interests that are implicated by such disclosures. And the Rule's 30-day effective-date provision departs from DOL's consistent past practice without any explanation. The Department cannot fix that defect by offering a new rationale in this litigation.

The Court should grant the AFL-CIO's motion for summary judgment and deny the Department's cross-motion.

## ARGUMENT

### I. DOL violated the APA's notice-and-comment requirements.

#### A. The Department cannot use notice-and-comment procedures in one rulemaking proceeding to satisfy its notice-and-comment requirements in another.

The AFL-CIO's opening brief showed that the text of the APA, as supported by the precedents of this Circuit, requires notice and comment whenever one rulemaking ends and another begins—unless, of course, the agency can satisfy one of the enumerated statutory exceptions. AFL-CIO Opening Br. 15 (relying on 5 U.S.C. § 553 (b), (c)). In its cross-motion brief, the Department does not attempt to engage with the AFL-CIO's textual argument. Instead, the Department makes several counterintuitive arguments in favor of the proposition that, despite DOL's unequivocal public statements that it had withdrawn the 2020 proposed rule and that the rulemaking process was completed, the 2020 rulemaking proceeding was still ongoing at the time the Final Rule was promulgated in June 2026. Those arguments fare no better on close inspection than they do on intuition.

**1.** DOL begins with the suggestion that the 2020 rulemaking had not concluded because all that happened between 2020 and 2026 was "the mere passage of time." DOL Br. 16. That wishes away reality. In March 2021, DOL formally announced in an official publication—the Unified Agenda—that the status of the 2020 rulemaking proceeding was "Withdrawn"; that the withdrawal was not some mere pause, but was at the "Completed Actions" stage of the rulemaking; and that further reporting on the prior proposal was "no longer necessary." *Labor Organization Annual Financial Reports Rule Actions*, OIRA, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1245-AA10 (last

visited Sep. 10, 2026) ("Withdrawal Notice"). Because the clarity, definitiveness, and finality of that withdrawal is of critical importance here, we reprint the pertinent portion of the Withdrawal Notice below:

**Title:** Labor Organization Annual Financial Reports
**Abstract:**

The Department will review modernization of the annual financial reports filed by labor organizations. After review, the Department has determined to remove this entry as it is no longer necessary.

**Agency:** Department of Labor(DOL)
**RIN Status:** Previously published in the Unified Agenda
**Major:** No
**CFR Citation:** 29 CFR 403
**Legal Authority:** 29 U.S.C. 431 and 438
**Legal Deadline:** None

**Priority:** Other Significant
**Agenda Stage of Rulemaking:** Completed Actions
**Unfunded Mandates:** No

**Timetable:**

| Action | Date | FR Cite |
|---|---|---|
| NPRM | 10/13/2020 | 85 FR 64726 |
| NPRM Comment Period End | 12/14/2020 | |
| Withdrawn | 03/17/2021 | |

DOL did not in any way qualify, hedge, or condition its definitive "Withdrawn" and "Completed" declaration in the Unified Agenda or any other contemporaneous publication. Nor did DOL, in the ensuing period from March 2021 until May 2026, even once suggest that the 2020 rulemaking was still pending. Quite the contrary, in July 2025 when DOL addressed an issue that was among those raised in the 2020 notice of proposed rulemaking (whether to change the Form LM-2 filing threshold), it provided a fresh round of notice and an opportunity for comment on that issue without even referencing the 2020 proposed rule. The Department thus not only informed the public in March 2021 that the rulemaking proceeding was over, its conduct over the next five years made clear that it stood by that decision.

All told, it was the agency's public statements and public conduct—*not* the mere passage of time—that unmistakably concluded the 2020 rulemaking.

DOL also suggests that a withdrawal can never conclude a rulemaking proceeding, since the APA does not explicitly "mention withdrawing proposed rules" or give withdrawals "separate

legal significance." DOL Br. 16 (citation modified). But as the AFL-CIO explained in its opening brief, both the APA's text and D.C. Circuit precedent give the culmination of a rulemaking proceeding legal significance. AFL-CIO Opening Br. 14–16. And it should go without saying that a rulemaking proceeding can culminate in a "no" just as much as it can culminate in a "yes," as either outcome marks the consummation of the agency's decision-making process. *See* AFL-CIO Opening Br. 17. DOL cannot explain why an agency can conclude the rulemaking process by *finalizing* a proposed rule but not by *withdrawing* it—especially when both are final agency actions subject to APA review. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 710 F.2d 842, 846 (D.C. Cir. 1983) (per curiam).

**2.** Taking a different tack, the Department goes on to make a series of arguments that, even if some withdrawals can reset an agency's notice-and-comment obligations, DOL's withdrawal here did not. This line of attack fails, too.

*First*, DOL emphasizes that its withdrawal of the 2020 proposed rule "was not published in the Federal Register." DOL Br. 17. But the D.C. Circuit has held that an agency can conclude the rulemaking process without saying so in the Federal Register. Publication in the Federal Register simply "creates a rebuttable presumption" that a document was "duly issued" and "properly 'made available for public inspection.'" *Humane Soc'y of the U.S. v. USDA*, 41 F.4th 564, 569 (D.C. Cir. 2022) (quoting 44 U.S.C. § 1507). In other words, Federal Register publication for a rule "serves an essentially evidentiary rather than legal function." *Id.* at 570. The touchstone requirement for agency rulemaking is whether the public had "actual notice" that the agency had taken official action—"a proposition incompatible with the . . . view that an agency prescribes law only by Federal Register publication." *Id.* As a result, even a completely fresh rule can become final—such that "an agency must undertake notice and comment to repeal" it—without being

published in the Federal Register. *Id.* at 569–70, 572 (distinguishing "the publication of a document" from "its issuance, prescription, or promulgation").

That leaves the Department to cite Section 553(b) of the APA, which the Department marshals as the sole support for its assertion that the Federal Register "is the presumptive location for publishing rulemaking materials." DOL Br. 16–17. But Section 553(b) does not say that. It says only that an agency's "*notice of proposed rule making* shall be published in the Federal Register" (emphasis added). It thus says nothing about rulemaking materials more broadly, let alone withdrawals.

In short, whether or not an agency's withdrawal announcement appears in the Federal Register is beside the point. So long as the agency has given the public actual notice of the withdrawal of a proposed rule, the withdrawal has full legal effect.

*Second*, the Department argues that entries in the Unified Agenda cannot reset an agency's notice-and-comment obligations, since publication in the Unified Agenda does not force agencies to "confine their regulatory activities to those regulations that appear within it." DOL Br. 17 (quoting 86 Fed. Reg. 41166, 41167 (July 30, 2021)). It is true that an agency need not disclose all of its regulatory activities in the Unified Agenda. But it is one thing for an agency to *omit* mention of a regulatory activity in the Unified Agenda. It is quite another for an agency to *affirmatively tell* the public that it has "[w]ithdrawn" and "[c]ompleted" a regulatory action in the Unified Agenda, as DOL did. When an agency has done that, it has definitively declared to the regulated community that the regulatory proceeding is over. At that point, the public should be able to take the agency at its word. "[I]t cannot be too much to expect the government to turn square corners." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021). And here, DOL is asking to be held to a far lower standard than having to turn square corners; it is asking for a license to affirmatively mislead the public as

to the status of ongoing rulemaking proceedings. Nothing in the APA sanctions such a license. To the contrary, Congress enacted the APA to promote the values of honesty and fair play in dealing with the public and regulated parties. *See* AFL-CIO Opening Br. 16.

*Third*, after suggesting that the Unified Agenda, *writ large*, fails to qualify as a publication on which the public can rely as to an agency's proclamations, DOL tries to dismiss the particular withdrawal announcement here as nothing more than "a stray entry." DOL Br. 18. But the announcement—reproduced in full above (*supra* at 5)—was no glitch. It stated in no uncertain terms that the rule was "Withdrawn" on March 17, 2021. On top of that, the Agenda marked the 2020 rulemaking as a "Completed Action[]." And, for good measure, the Agenda stated: "After review, the Department has determined to remove this entry as it is no longer necessary." When an agency makes a statement and confirms it twice, it is making a deliberate pronouncement, not a "stray" remark.

The next five years, moreover, reinforced that DOL meant what it said. During that time, the Department never once suggested that the 2020 rulemaking was still pending. In fact, when DOL addressed the question of filing thresholds in its July 2025 notice of proposed rulemaking, it not only omitted mention of the 2020 rulemaking (in which the agency had also proposed revising the Form LM-2 threshold) but requested new comments—a sign that, at that time, the agency itself understood the prior rulemaking process to have concluded.

*Fourth*, the Department notes that the 2021 withdrawal announcement was "brief and conclusory." DOL Br. 17. But an agency can terminate a rulemaking proceeding without detailing its legal or policy reasons for doing so. It is the agency's bottom-line decision that ends the rulemaking proceeding. Whether an agency's tersely explained decision to terminate a rulemaking proceeding could withstand APA arbitrary-and-capricious review is an issue for another day—the

dispositive point for present purposes is that it clearly concludes the rulemaking proceeding in question, requiring a new round of notice and comment before the original proposal can take effect.

*Fifth*, the Department relies on two out-of-circuit decisions holding that a single notice-and-comment period sufficed to finalize proposals that underwent a period of inactivity after their initial proposal date. *See Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 702 (3d Cir. 2023); *Texas v. Lyng*, 868 F.2d 795, 796 (5th Cir. 1989). But in neither case did the agency announce any definitive termination of the initial rulemaking proceeding, let alone reach any conclusion that the underlying proposal should be abandoned for lack of necessity or otherwise. Instead, the agencies had merely put the respective proceedings on pause such that the proposals remained alive and viable—both in fact and from the perspective of the public and the regulated community. And precisely because the initial proposed rulemakings remained alive and viable at the time of their withdrawal, new notice-and-comment procedures were not required.

Start with *Sanofi Aventis*, where a divided Third Circuit rejected the petitioner's argument that the Department of Health and Human Services ("HHS") had not satisfied its notice-and-comment obligations. There, HHS withdrew a proposed rule because there had been a government-wide freeze on regulatory activity, *not* because the agency had announced or concluded that the specific proposal at issue was misbegotten or unnecessary. More specifically, a few months after HHS accepted comments on its proposed rule, President Trump took office, and the White House issued a memorandum announcing a "Regulatory Freeze Pending Review." 82 Fed. Reg. 8346 (Jan. 20, 2017). That memorandum ordered agency officials to promulgate "no regulation" until an agency head appointed or designated by the President "review[ed] and approve[d] the regulation." *Id.* After that "freeze" memorandum was issued, HHS listed the proposed rule as "withdrawn" in the Unified Agenda. *Sanofi Aventis*, 58 F.4th at 702.

As HHS later confirmed, the freeze memorandum "had the effect of *pausing* action on the proposed rule." *See* 85 Fed. Reg. 80632, 80633 (Dec. 14, 2020). By its terms, the memorandum required all agencies to "freeze"—not terminate—their regulatory activities, pending approval from the new administration. In keeping with that instruction, HHS did not end the rulemaking process, despite marking it as "withdrawn" in the Unified Agenda. Rather, context shows that the agency was simply re-evaluating the proposal under new leadership and had "left it open as a viable option." *Id.* By contrast, nothing here suggests that DOL intended to just "freeze" or "paus[e]" the 2020 rulemaking. As discussed above, the Department unequivocally ended the 2020 rulemaking proceeding, stating in the withdrawal notice that the proceeding was "completed" and that an entry in the Unified Agenda for the proposed rule was "no longer necessary." And, as we have stressed, any notion that the 2021 withdrawal was merely paused runs headlong into the reality that in 2025 the Department not only proposed, but sought comments on, a change in filing thresholds without so much as mentioning the 2020 rulemaking that had advanced a similar proposal.

*Lyng* is distinguishable for similar reasons. There, the Department of Agriculture placed a hold on a rulemaking proceeding in order to investigate late-breaking factual developments. USDA proposed a new rule to make it easier to ship citrus fruits from parts of Florida affected by a certain plant disease. 868 F.2d at 796. During the comment period, however, authorities discovered new outbreaks of the disease in Florida, prompting commenters to urge USDA to "not implement [its] proposed rule *at this time*." 53 Fed. Reg. 140, 140 (Jan. 5, 1988) (emphasis added). In response to those comments, USDA put the rulemaking proceeding on hold. The agency announced it was "withdrawing" its proposal and "studying alternative protocols" to address commenters' concerns. *Id.* The following week, USDA convened a special task force to review the scientific research and

hold hearings on the matter. *Lyng*, 868 F.2d at 796. The task force soon "recommended implementation" of USDA's original proposal. *Id.* USDA heeded that recommendation and—a month after the withdrawal—finalized that proposal. *Id.*

As this context shows, USDA did not abandon its original proposal. Instead, USDA briefly paused the proceeding—by just a month—to "reassess[]" its proposal in light of new facts. 53 Fed. Reg. 3999, 4000 (Feb. 11, 1988). And once USDA evaluated those facts, it continued apace with the rulemaking process and promptly finalized the rule. By contrast, when DOL withdrew the 2020 proposed rule at issue, it clearly ended the 2020 rulemaking process. The Department has not come forward with any additional context suggesting that its withdrawal was only temporary, nor is the AFL-CIO aware of any. And the fact that DOL followed up its announcement with over five years of silence confirms that the 2020 rulemaking was in fact over.

At bottom, the agencies in *Sanofi Aventis* and *Lyng* did not terminate their respective rulemaking proceedings. As a result, they did not trigger the rule that "[i]f one rulemaking proceeding has culminated and another has begun, then new notice and comment procedures are required." *Action on Smoking & Health*, 713 F.2d at 800.

* * *

The parties have presented two competing positions on a pure question of law. Must an agency that wishes to revive proposals from a rulemaking proceeding that the agency had publicly terminated initiate a new rulemaking proceeding and comply with the APA's notice and comment process for that new proceeding?

As the AFL-CIO has explained, the answer is yes. When one rulemaking ends, another must begin, accompanied by its own notice-and-comment procedures. And a rulemaking ends when an agency publicly announces—without equivocation or caveat—that it is over. That

principle is clear, easy to administer, and makes sense. In this setting, as in many others, what the government tells the public matters.

Perhaps for this reason, the Department begins its brief with an effort to obscure the question by isolating the 2020 rulemaking proceeding from its subsequent termination and by then declaring that DOL met the APA's three statutory requirements (notice, comment, and a statement of basis and purpose) as to that artificially isolated proceeding. DOL Br. 15. But the dispositive question is whether the 2020 rulemaking proceeding remained the operative proceeding to analyze for APA compliance once the Department publicly announced the completion of that proceeding. And the Department's response to that question is rather remarkable: that an agency's official statement that a rulemaking is over does *not* actually end the proceeding—or, as a fallback, that it does so only when the statement appears in the Federal Register. So even when an agency publicly announces that a rulemaking is over, the agency remains free at any point—years or even decades out—to finalize its original proposal, as if it had never made the termination announcement. That words-mean-nothing approach defies the APA's text, the D.C. Circuit's precedents, and common sense. The readily distinguishable out-of-circuit decisions the DOL invokes cannot—and in all events should not—be read to endorse such an anomalous result.

### B. The Department cannot meet its heavy burden to satisfy the APA's good-cause exception.

Perhaps recognizing how counterintuitive its main defense is, the Department falls back and invokes the APA's good-cause exception. DOL Br. 22–23. But as DOL itself admits, the good-cause exception is "narrowly construed and only reluctantly countenanced." DOL Br. 22 (quoting *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012)).

The exception does not apply here. For starters, the Department does not dispute that the good-cause exception is generally reserved for "emergency situations when delay would do real

harm." AFL-CIO Opening Br. 23 (quoting *Action on Smoking*, 713 F.2d at 800). No such "emergency" existed here, and DOL does not argue otherwise. Likewise, DOL does not dispute that the "unnecessary" prong of the good-cause exception—the only part of the exception that could apply here—is limited to "routine," "insignificant," and "inconsequential" administrative determinations. AFL-CIO Opening Br. 24 (quoting *Mack Trucks*, 682 F.3d at 94). That description does not fit the Final Rule, and DOL does not argue otherwise.

Instead, the Department relies on the D.C. Circuit's observation that "[i]f the original record is still fresh, a new round of notice and comment might be unnecessary." *Mobil Oil Corp. v. EPA*, 35 F.3d 579, 584 (D.C. Cir. 1994). But that exception does not apply if affected parties "*might bring*" new "information" to the agency's attention "in a notice and comment proceeding," including "new evidence relevant to the problem" addressed by the rule. *Action on Smoking*, 713 F.2d at 801 (emphasis added); *see also, e.g.*, *Mobil Oil*, 35 F.3d at 585 (noting that "[n]ew information relevant to the agency's decisionmaking might well have come to light after the original notice and comment proceedings and before the repromulgation of the rule").

This low bar is easily cleared by the three intervening developments that the AFL-CIO and its affiliated unions would have brought to DOL's attention in a new notice-and-comment proceeding. *First*, in 2021, the Supreme Court issued a decision clarifying that all compelled-disclosure requirements must be "narrowly tailored" to the governmental interest they seek to promote. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021). *Second*, in 2024, Microsoft announced it was discontinuing the Great Plains accounting software on which many labor organizations rely—a development that directly affects the ability of regulated labor organizations to comply with the Final Rule on the compressed timeline that DOL has set. AFL-CIO Opening Br. 22–23. And *third*, the Final Rule itself relies on factual developments post-dating

the 2020 comment period. AFL-CIO Opening Br. 23 (citing 91 Fed. Reg. 32556, 32563 & nn.6–8 (June 1, 2026)). By foregoing notice and comment, DOL denied commenters the opportunity to address the Department's reliance on this new evidence. Moreover, the "existence of new evidence supporting the agency's decision strongly suggests the possibility of other new evidence . . . which the notice and comment procedure might well bring to the agency's attention." *Action on Smoking*, 713 F.2d at 801. Whether taken individually or collectively, all of this refutes DOL's claim that additional notice and comment was "unnecessary."

The Department primarily focuses on the AFL-CIO's *Bonta* point, but none of its arguments withstand scrutiny. Contrary to DOL's suggestion (DOL Br. 23–24), *six* Justices in *Bonta* endorsed the core holding that compelled disclosures are subject to a "narrow tailoring" requirement. Three did so under an "exacting scrutiny" standard. 594 U.S. at 607 (plurality opinion of Roberts, C.J., joined by Kavanaugh and Barrett, JJ.). One did so by applying "strict scrutiny." *Id.* at 619–20 (concurring opinion of Thomas, J.). And two stated that they would apply exacting scrutiny in some compelled-disclosure cases and strict scrutiny in others. *Id.* at 622 (concurring opinion of Alito, J., joined by Gorsuch, J.). A majority of the Court thus agreed that "narrow tailoring" applies to all compelled-disclosure requirements under a standard *at least* as demanding as "exacting scrutiny." *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976))). And contrary to DOL's suggestion (DOL Br. 24), the Court's "narrow tailoring" holding was indeed an important development in First Amendment law, as lower courts applying *Bonta* have recognized. *See, e.g.*, *Gaspee Project v. Mederos*, 13 F.4th 79, 85 (1st Cir. 2021) (*Bonta*

"refin[ed] its articulation of exacting scrutiny" and "heightened" the tailoring requirement into a "more muscular test"); *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1243–44 (10th Cir. 2023) (*Bonta* "clarified the contours" and "tightened" judicial "review of disclosure laws"); *Ams. for Prosperity Found. v. Albence*, __ F.4th __, 2026 WL 2563151, at *1 (3d Cir. Aug. 31, 2026) (*Bonta* "clarified how to apply 'exacting scrutiny'" to disclosure laws outside of the "campaign finance" context).

The Department goes on to insist that, in its view, the Final Rule satisfies *Bonta*'s "narrow tailoring" standard anyway. *See* DOL Br. 24–25. But the whole point of notice and comment is to give affected parties the chance to alert the agency to their concerns during the rulemaking process—not for the agency to address them for the first time in litigation. And as further explained in the AFL-CIO's opening brief and below, there are serious reasons to doubt that the Final Rule's disclosure requirements are "narrowly tailored" to legitimate governmental ends. AFL-CIO Opening Br. 30–32; *see infra* at 23–24.

Faced with specific new information that commenters might have brought to its attention in a new notice-and-comment proceeding, DOL tries to move the goal posts. The Department claims it can dispense with notice and comment under the good-cause exception unless the AFL-CIO can establish a "change in 'core' circumstances." DOL Br. 23 (citation modified).

But as the AFL-CIO pointed out in its opening brief (at 21–22), that is not how the good-cause exception works. For one thing, "the onus is on the [*agency*] to establish that notice and comment is *unnecessary*," not on a *challenger* to show that notice and comment is *necessary*. *Action on Smoking*, 713 F.2d at 801 n.6 (emphases added). By assigning the burden to the AFL-CIO, the Department gets things backwards. And the Department cannot satisfy its burden simply by asserting that no "change in core circumstances" has occurred. Rather, the Department must show that there is no "information that [a commenter] might bring to [its] attention in a notice and

comment proceeding." *Id.* at 801. Only then can the agency establish that notice and comment are "unnecessary." *Id.* The "change in core circumstances" line of cases addresses an entirely different question: whether a case already on judicial review should be sent back to the agency because "new evidence" has surfaced before the court has issued a decision. *Am. Optometric Ass'n v. FTC*, 626 F.2d 896, 907 (D.C. Cir. 1980).

Each of the post-2020 developments, then, underscores the importance of the APA's notice-and-comment requirements, which ensure that "the agency fully understands the potential impact of a proposed rule before finalizing it." *City of Billings v. TSA*, 153 F.4th 46, 53 (D.C. Cir. 2025). The Department might "question[] the utility" of those requirements. *Action on Smoking*, 713 F.2d at 800. But that is not DOL's call to make. "Bald assertions that the agency does not believe comments would be useful cannot create good cause to forgo notice and comment procedures. To hold otherwise would permit the exceptions to carve the heart out of the statute." *Id.* (citations omitted).

To sum up: The 2021 Withdrawal Notice marked the termination of the 2020 rulemaking proceeding. That meant that the Department could revive its 2020 proposals only through a fresh rulemaking and compliance with the APA's notice-and-comment requirement for that rulemaking. Because the Department made no attempt at compliance, and because it lacked good cause for its non-compliance, the 2026 Final Rule is invalid and should be vacated.

These points are sufficient to enter judgment in favor of the AFL-CIO, because the remaining deficiencies with the Final Rule can be addressed in the first instance by the Department after it provides an opportunity for comment.

## II. The Final Rule exceeds DOL's statutory authority.

**A.** The Department claims it can compel labor organizations to publicly itemize all sorts of everyday financial transactions, from membership dues to merchandise sales to rent payments. *See*

AFL-CIO Opening Br. 31–32. DOL has gone so far as to require some labor organizations to disclose the names and amount of dues paid by every member. And on the Department's theory, DOL could presumably go further, forcing labor organizations to list every single detail about every single financial transaction they have made in the prior fiscal year.

The LMRDA does not authorize such an itemized-disclosure regime. Under the LMRDA, the Department may compel a labor organization to submit information disclosing its "financial condition" and "operations." 29 U.S.C. § 431(b). Those specific terms have long had well-established, but technical, meanings in the accounting context. AFL-CIO Opening Br. 26–28. At the time Congress passed the LMRDA in 1959, organizations prepared financial condition and operations statements that provided only high-level summaries describing aggregate financial data sufficient to establish the financial condition of the organization, itemizing only the material financial transactions that underpinned that financial condition. These reports "summarize[d]" an organization's financial activities; their "object" was "the summarization and presentation of the significant data relative to revenue and expense operations for a particular period of time." Ronald H. Robnett, Thomas M. Hill & John A. Beckett, *Accounting: A Management Approach* 25 (1951). They did not "reproduce expense and revenue data in the same detail as is found in the ledger accounts." *Id.* at 193. Congress incorporated this background understanding when it used the terms "financial condition" and "operations" in the statute. The Final Rule's transaction-level itemization requirements flout Congress's careful choice of statutory language.

The Department's theory also raises serious constitutional concerns. AFL-CIO Opening Br. 30–31. The power to compel organizations to publicly itemize their financial transactions is the power to compel organizations to share intimate details about their associations and activities—including, as illustrated here, their sensitive membership lists. Exercises of that power therefore

burden the freedom of association protected by the First Amendment. And such burdens are unconstitutional unless they are "narrowly tailored" to an important governmental interest. AFL-CIO Opening Br. 30. There are serious questions as to whether DOL's interpretation could survive such judicial scrutiny; that constitutional difficulty is reason enough to reject DOL's position.

**B.** DOL challenges this conclusion in three main ways, none availing.

**1.** The Department leads by invoking "statutory stare decisis." DOL Br. 27–28. It claims that the D.C. Circuit already resolved the lawfulness of the *2026* Final Rule in *AFL-CIO v. Chao* ("*Chao III*"), when it upheld DOL's *2003* rulemaking changes to the Form LM-2 as a "reasonable application" of the agency's statutory authority under Step 2 of the *Chevron* doctrine. 409 F.3d 377, 378 (D.C. Cir. 2005).

But statutory *stare decisis* cannot save the Final Rule. AFL-CIO Opening Br. 32–33. For starters, the specific agency action under review in *Chao III*—the 2003 changes to the Form LM-2—is not at issue here. Under statutory *stare decisis*, courts must follow precedential "holdings" that "specific agency actions are lawful" exercises of statutory authority. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). This principle means that courts should generally refuse to revisit the lawfulness of "specific agency actions"—particular agency rules or orders—that have already been upheld under the *Chevron* framework. Statutory *stare decisis* does not, however, mean that agencies can forever insulate themselves from *new* statutory-authority challenges to *new* agency actions. *In re MCP No. 185*, 124 F.4th 993, 1002 (6th Cir. 2025). Otherwise, an agency could double-down on incorrect interpretations of its statutory authority, parlaying one aggrandizement of power into another. That outcome defies the "presumption . . . that Congress expects courts to do their ordinary job of interpreting statutes." *Loper Bright*, 603 U.S. at 403.

Because this lawsuit challenges a new agency action—not the "specific agency action[]" upheld in *Chao III*—statutory *stare decisis* does not resolve this case.

Moreover, even if statutory *stare decisis* applied to the D.C. Circuit's reasoning in *Chao III* (and not just its bottom-line outcome), that still would not rescue the Final Rule. The D.C. Circuit's reasoning in *Chao III* was narrow and specific to the 2003 changes to the Form LM-2. The decision did not hold that the Department had the lawful authority to impose *any* itemization requirements—let alone ones that entailed disclosure of the names of members along with their corresponding dues payments. Such itemization requirements raise a very different question about the scope of DOL's statutory authority than those promulgated in 2003. Instead, *Chao III* said only that the 2003 rule was "a reasonable application" of DOL's statutory authority. 409 F.3d at 386. And the D.C. Circuit reached that conclusion based on the specific factual findings that the Secretary made in 2003 about the necessity of the rule at issue. *See id.* at 385–86 (citing 68 Fed. Reg. 58374, 58377, 58420 (Oct. 9, 2003)). As a result, this Court can and should reject the Final Rule without revisiting any part of *Chao III*.

*Stare decisis* aside, DOL also claims that the D.C. Circuit's reasoning in *Chao III* "exhaustively critiqued" the arguments raised in the AFL-CIO's opening brief here. DOL Br. 28. But as already discussed, *Chao III* was a *Chevron* case. And to the extent *Chao III* addressed the AFL-CIO's statutory-interpretation arguments, it did so only at *Chevron* Step 1, asking whether Congress has "clear[ly]" and "directly spoken" to the statutory question. *Chao III*, 409 F.3d at 381, 383. The D.C. Circuit ultimately concluded that Congress had not, finding "ambiguity in the statutory text and structure" and ultimately proceeding to *Chevron* Step 2. *Id.* at 384. In doing so, however, the D.C. Circuit did not hold that the AFL-CIO had misinterpreted the LMRDA. And it did not hold that the DOL's reading of "financial conditions and operations" to mean itemized

transactions at a universal $5,000 materiality threshold was the "best reading" of what those terms mean in the LMRDA. *Loper Bright*, 603 U.S. at 400. It is not, and *Chao III* does not prevent this Court from saying so.

**2.** Moving away from precedent, the Department insists that Congress authorized it to compel the itemized disclosure of all sorts of everyday financial transactions. But no tool of statutory construction supports that claim.

*First*, the Department does not dispute that "financial condition" and "operations" are technical terms of art in the accounting context. Nor does the Department dispute that financial statements disclosing an organization's "financial condition" and "operations" were reports summarizing aggregated financial data and material financial transactions. AFL-CIO Opening Br. 27–28.

Instead, DOL insists that Congress did not incorporate that technical understanding when it enacted the LMRDA. On DOL's view, then, it was pure coincidence that Congress used terms that correspond exactly to the basic financial reports that organizations used when the LMRDA was enacted. But the more natural reading is that Congress used those specific, technical terms to convey a specific, technical meaning. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 372 (1986) ("terms of art should be interpreted by reference to the trade or industry to which they apply"). Reinforcing the point, the words "financial condition" and "operations" are not everyday ways of describing financial information—another sign that those words take on their technical, specialized meanings. *Cf. Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 353–54 (2021) (assessing whether a statutory term is "too common" to have a "term-of-art meaning").

Had Congress intended to cover a broader universe of financial details, it could have used broader or less technical language, such as "finances" or "financial information." Congress has

used such language in other financial-reporting contexts. *See, e.g.*, 29 U.S.C. § 1308 (requiring the Pension Benefit Guaranty Corporation to report its "finances"); 42 U.S.C. § 300e-17 (requiring a health maintenance organization to report "financial information"). In fact, Congress has sometimes explicitly required "itemized" financial reporting. *See, e.g.*, 15 U.S.C. § 714k (requiring the Commodity Credit Corporation to submit an "itemized report of all expenditures over $10,000"). Likewise, Congress could have added other statutory language with a "broadening effect," such as "relating to" or "respecting." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018). Again, Congress has used such language in other contexts. *See, e.g.*, 11 U.S.C. § 523(a)(2) (referring to statements "respecting the debtor's . . . financial condition"). But Congress did not adopt any of these "readily available and apparent alternative[s]" when it drafted Section 201(b). *Knight v. Comm'r*, 552 U.S. 181, 188 (2008). Instead, Congress used specific, technical terms—"financial condition" and "operations"—with specific, technical meanings. Incorporating that specialized understanding respects Congress's choice of statutory language.

*Second*, the Department resorts to legislative history (DOL Br. 29), keying in on a single sentence in the LMRDA Senate Report, which says: "The information to be reported under the committee bill comprehends all the information required to be reported under present law." S. Rep. No. 86-187, at 36 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2318, 2353, 1959 WL 3884 (Apr. 14, 1959). And part of that "present law," DOL claims, included labor regulations—enacted under the Taft-Hartley Act—requiring covered unions to make certain itemized disclosures. DOL Br. 29 (citing 22 Fed. Reg. 4158, 4158–60 (June 13, 1957)).

But the regulations that the Department cites—and that on its view the LMRDA incorporates—hurt DOL's theory more than they help. The itemization requirements in effect under the Taft-Hartley Act applied only to significant financial transactions. Several schedules

required filers to "identify each individual item representing one or more transactions during the year with an individual or organization if the total amount of such individual item is *in excess of 25 percent* of the schedule total." 22 Fed. Reg. at 4160. And while another schedule required filers to "[i]temize any receipts from sale of assets," that schedule explicitly exempted small-bore assets like "equipment," "furniture," and "fixtures" to ensure that filers would list only material asset sales. *Id.* Nothing in these regulations required filers to detail everyday financial receipts or disbursements—the sort of sweeping disclosure authority that DOL claims today.

Other parts of the LMRDA's legislative history further support the AFL-CIO's interpretation of Section 201(b). The Committee Report accompanying the bill explained that Section 201(b), at its core, requires "a statement of assets and liabilities and a statement of receipts and expenditures," supplemented by more detailed information about salary and loan disbursements, two categories that are explicitly called out for disclosure, 29 U.S.C. § 431(b)(3)–(4). S. Rep. No. 86-187, at 8 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2318, 2325, 1959 WL 3884 (Apr. 14, 1959). As discussed, a "[s]tatement of [a]ssets and [l]iabilities" was just another name for a "[s]tatement of [c]ondition" (or "the balance sheet"), Walter J. Goggin & James V. Toner, *Accounting: Principles and Procedure* 238 (1930), while a "statement of cash receipts and expenditures" was an "equivalent" way of describing a statement of "operations," C. Rufus Rorem & Harry D. Kerrigan, *Accounting Method* 480 (3d ed. 1942). That formulation reveals that Congress had these specific accounting documents in mind when it enacted Section 201(b). To the provision's authors, a "financial report" disclosing a filer's "financial condition and operations" was the same thing as a balance sheet and an income statement—financial reports that disclose the organization's financial condition without a laundry list of itemized transactions.

*Third*, the Department denies that its interpretation of the statute violates the First Amendment. DOL Br. 31; *see also* DOL Br. 24–25.

But in applying the constitutional-avoidance canon, this Court need not resolve whether the Final Rule or the Department's position "indeed violates" the First Amendment. *Paul v. FAA*, 168 F.4th 672, 679 (D.C. Cir. 2026). The canon kicks in as long as one interpretation of the statute presents a "constitutional difficulty" while "another 'plausible' reading" does not. *Id.* at 679–80.

And DOL's interpretation raises, at the very least, serious constitutional concerns. Just like the disclosure law in *Bonta*, the Final Rule's itemization requirements burden First Amendment rights by "cast[ing] a dragnet for sensitive" financial information from thousands of labor organizations each year, including the "names" of dues-paying members and the dues "contributions they have made." 594 U.S. at 613. In fact, the Final Rule's itemization requirements are even more burdensome than the disclosure requirements struck down in *Bonta*. While the mandatory disclosures at issue in *Bonta* were statutorily required to be kept "confidential" by state officials, *id.* at 615, DOL makes every labor organization's Form LM-2 publicly available, *see* DOL, Off. of Lab.-Mgmt. Standards, Online Public Disclosure Room (last visited Sep. 10, 2026).

On top of that, there is a potentially "dramatic mismatch" between the Final Rule's itemized-disclosure requirements and the Department's purported antifraud aims. *Bonta*, 594 U.S. at 612. To justify the "amount and sensitivity of . . . information harvested" under the Final Rule, the Department must show that its data-collection efforts will "form an integral part" of its "fraud detection efforts." *Id.* at 613. But DOL has not come close to making that showing. After all, a union member can easily verify whether his dues check made it to the union—the only "real-world" case of fraud that DOL mentions in its brief (at 24–25)—without DOL forcing every union to publicly share the name and location of every union member who paid over $5,000 in dues. *See*

AFL-CIO Opening Br. 39. And despite insisting that itemizing receipts like rent payments and per capita taxes will "identify possible diversion," the Rule does not describe a single instance where such receipts were diverted for fraudulent purposes. 91 Fed. Reg. at 32601. All of that raises, at the very least, serious doubts that DOL's position is "narrowly tailored" to a valid government interest.

In response to these constitutional concerns, DOL half-heartedly asserts that the Final Rule's itemization requirements are "narrowly tailored" since they are not "universal" in scope. DOL Br. 25. But the phrase "narrowly tailored" does not appear at all in the Final Rule. And the fact that the Rule does not apply to *all* labor organizations or *all* financial transactions does not mean it is "narrowly tailored." The question is whether "less intrusive alternatives" exist, *Bonta*, 594 U.S. at 613, not whether more intrusive alternatives do. So there remains, at the very least, a serious question whether the Department's position could survive constitutional scrutiny.

*Fourth*, the Department invokes "discretion" and "deference." DOL Br. 3, 30–31. DOL claims that Congress gave it significant—virtually limitless—leeway in deciding the level of financial detail that labor organizations must disclose. The Department traces this authority to two provisions in the statute. Neither can bear such weight.

To start, the Department points to Section 201(b) itself. DOL Br. 30 (quoting 29 U.S.C. § 431(b)). It is true that Section 201(b) requires filers to submit financial reports containing information "in such detail as may be necessary accurately to disclose its financial condition and operations." 29 U.S.C. § 431(b). But that language does not give the Department a freestanding power to impose any itemized-disclosure requirement. Any "deference to the Secretary is still limited by the particular language" in the statute. *Chao III*, 409 F.3d at 384. And under Section 201(b), the Secretary may set the appropriate level of detail for a single purpose—"only for the

purpose" of accurately disclosing a labor organization's "financial conditions and operations." *Id.* at 386 (quoting 29 U.S.C. § 431(b)). That language imposes "restrictions" on DOL's authority. *Id.* at 384. As already discussed, by using the terms "financial conditions" and "operations," Congress imposed an upper limit on the level of financial detail that the Secretary could compel unions to disclose. The Department may require filers to provide high-level summaries of aggregated financial data, while flagging material financial transactions. But the Department may not require filers to provide itemized, line-by-line lists of routine financial transactions (*i.e.*, the union's general ledger). Doing so would contradict Congress's decision to use the specific terms "financial conditions" and "operations" to delimit labor organizations' reporting obligations.

The Department also invokes Section 208 of the LMRDA, 29 U.S.C. § 438. DOL Br. 31. But that provision does not help DOL either.

Section 208 authorizes the Secretary to issue "rules and regulations . . . as he may find necessary to prevent the circumvention or evasion of [the Department's] reporting requirements." 29 U.S.C. § 438. That grant of authority is limited, too. By its terms, Section 208 contains "restrictions" tying the Secretary's authority to the sole purpose of "prevent[ing] the circumvention or evasion" of the LMRDA's reporting requirements. *Chao III*, 409 F.3d at 384 (quoting 29 U.S.C. § 438). To the extent a Section 208 regulation is "unt[e]thered to that limitation," it "exceeds the Secretary's authority." *Id.* at 391. Moreover, to invoke its Section 208 authority, DOL must do more than rely on its own say-so. The Department must "make . . . findings" that its regulations are "necessary to prevent circumvention or evasion of union reporting requirements." *Id.* at 390.

The D.C. Circuit enforced these restrictions in *Chao III*. The Department had required certain unions to disclose financial information about certain union-related trusts. These trust-reporting requirements, however, applied even if the union had "minimal control over trust fund

spending" and minimal effect on its revenues. *Id.* at 391. DOL claimed it had authority to impose these requirements under Section 208 of the LMRDA. The D.C. Circuit disagreed. When a union lacks "management control" or "financial domination" over a trust, then the trust's transactions have no "direct nexus to the union's reporting obligation under Title II" of the LMRDA. *Id.* at 389, 391. So reporting those transactions is not "required to prevent circumvention or evasion of union Title II reporting requirements." *Id.* at 389. Moreover, the Secretary had made no "findings" that such reporting was "necessary to prevent circumvention or evasion of union reporting requirements." *Id.* at 390. "The Secretary's determination that union members would benefit" from these disclosures was "not the same as the determination required by section 208." *Id.* The D.C. Circuit therefore rejected the Department's reliance on Section 208.

The Court should do the same here. The Final Rule's itemized-disclosure requirements do not fall within Section 208's narrow, ancillary grant of authority. They are not "necessary to prevent" any "circumvention or evasion" of the LMRDA's reporting requirements. 29 U.S.C. § 438. As discussed, the LMRDA does not require unions to itemize everyday financial transactions in the first place, and a union cannot "circumvent[]" or "eva[de]" a statutory requirement that does not exist. So the Final Rule's itemized-reporting requirements lack a "direct nexus" to the union's "reporting obligation under Title II." *Chao III*, 409 F.3d at 389. Moreover, unions already must report (in the aggregate) the financial transactions that the Final Rule now requires them to itemize. *See* 91 Fed. Reg. at 32572. Consequently, the Rule's itemization requirements do not compel the disclosure of transactions that would otherwise go "unreported." *Chao III*, 409 F.3d at 391. In short, there is no regulatory gap for Section 208 to lawfully fill.

Even the Final Rule makes no real effort to justify the Department's invocation of Section 208. The Rule fails to identify any "union transactions" that have been "rendered unreportable"

absent the Final Rule's itemization requirements. *Id.* at 388. It provides no "examples" of "unreported union transactions" justifying such requirements. *Id.* at 391. And it makes "no other findings" of potential circumvention or evasion. *Id.* Confirming the point, DOL's brief cites only three instances in the Final Rule where the Secretary purportedly "made specific findings" that the Rule was "necessary to prevent unions from circumventing and evading Title II." DOL Br. 27 (citing 91 Fed. Reg. at 32556, 32564, 32594). But those excerpts consist of only conclusory, one-sentence assertions that the Final Rule generally seeks to prevent circumvention or evasion. Those boilerplate claims are not valid findings. That alone is reason enough to reject the Department's reliance on Section 208.

Without anything in precedent or the Rule to anchor its position, the Department resorts to the *dissent* in *Chao III* as authority for the proposition that Section 208 is "a statutory delegation freighted with deference." DOL Br. 31 (citation modified). But as the *majority* in *Chao III* made clear, whatever discretion Section 208 confers also comes with significant "limits." 409 F.3d at 391. And just like the Department did in 2003, DOL here has exceeded those limits.

Indeed, even more indefensible than the particular dues-itemization requirement at issue here is the breathtakingly broad interpretation of the LMRDA on which it implicitly rests. Given that DOL believes that even one example of stolen dues checks justifies its current requirement, there is no limiting principle that would restrain the agency in the future from compelling every union to disclose its complete membership list together with the dues received from every member. Even aside from the obvious tension between such a compelled-disclosure requirement and the First Amendment, such an interpretation cannot be fairly imputed to a statute that its chief sponsor, Senator John F. Kennedy, described as a bill "designed to strike a balance between the dangers of to[o] much and too little legislation in this field" by "permit[ting] responsible unionism to operate

without being undermined by either racketeering tactics *or bureaucratic controls*." 105 Cong. Rec. at S816 (emphasis added).

## III. Multiple provisions in the Final Rule are arbitrary and capricious.

### A. The Final Rule's revisions to labor organizations' "functional reporting" obligations are arbitrary and capricious.

As the AFL-CIO showed in its opening brief (at 33–38), the Final Rule's changes to the way in which labor organizations must categorize disbursements into certain categories cannot be squared with the Department's raison d'être for "functional reporting" in the first place. The justification for requiring unions to categorize their disbursements into functional categories, the Department explained when it first proposed this system, was to provide "useful and meaningful [information] to the labor organization and its members" by informing them how the union "spend[s]" its money in different functional or programmatic areas. 67 Fed. Reg. 79280, 79288 (Dec. 27, 2002). In other words, the system would allow members to understand whether their union was, for example, spending comparatively little on member representation at the expense of political activity or unnecessary overhead.

Because of the changes made by the Final Rule, however, functional reporting will no longer serve that purpose, as unions will no longer be required—or even permitted—to include the salaries of their own officers and employees when they report the total amount of their disbursements in the data fields reserved on the form for functional categories (such as organizing, collective bargaining, political activities, lobbying, and internal administration). Still worse, the changes made by the Final Rule will affirmatively mislead union members because they will "exaggerate the portion of expenditures" that unions spend on political activities and lobbying,

which disproportionately consist of disbursements to third parties. AFL-CIO Opening Br. 35 (quoting A.R. 598).

The Department's brief does not even try to justify the utility of reporting only a salary-free sum total of disbursements. Instead, the best the Department can do is attempt some damage control by pointing to the "Additional Information" box of the Form LM-2 and Form LM-2 Long Form (Item 75), where, it says, a union has the option of disclosing in narrative form how its salary costs are allocated if it would like to volunteer that information. DOL Br. 33–34. That attempt fails to cure the Final Rule's arbitrariness.

As an initial matter, DOL's own instructions for the Form LM-2 and Form LM-2 Long Form indicate that the "Additional Information" box is to be used to provide additional information *required* by the form's instructions—such as a narrative explanation if the union answers "yes" to certain questions on the form—rather than additional information that the union would like to *volunteer*. *See* 91 Fed. Reg. at 32712 ("Use Item 75 to provide additional information as indicated on Form LM-2-Long Form and in these instructions"), 32784 (same instruction for revised Form LM-2). But more fundamentally, even assuming that the Department would not object to labor organizations using the "Additional Information" box to include information that is not specified anywhere within the Form LM-2 or its instructions, that would not cure the misleading presentation of a union's disbursements in the body of the form itself. That is because the form's tables that summarize the union's disbursements do not pull in the information narrated in the "Additional Information" box at the very end of the form, and—even worse—the bottom-line rows in those tables are captioned as "Total Disbursements" *without disclaimer or explanation* that salary costs are not included. 91 Fed. Reg. at 32657 (summary page of disbursements for Form LM-2 Long Form), 32737 (same for revised Form LM-2).

This problem is illustrated—and indeed exacerbated—by the Department's much-publicized "data visualization tool" for viewing union reports, which the Department has "designed to provide union members with a simple, straightforward way to see how their union dues are spent." News Release, *US Department of Labor Launches Data Visualization Tool for Union Reporting Forms, Providing Valuable Insight on Union Spending* (Mar. 17, 2026), https://www.dol.gov/newsroom/releases/olms/olms20260317. The tool, like the tables that comprise the body of the form, only pulls information from the "Total Disbursements" reported on the form, not from whatever ancillary "Additional Information" a labor organization might choose to include in the catch-all box at the end of the form. Here is how the Department's visualization tool depicts each union's expenditures into the functional categories, using the visualization for the American Federation of Teachers' most recent Form LM-2 as an example[1]:




How would even sophisticated union members know that, instead of relying on this chart that the Department has made easily accessible on its website, they should instead look to "Item

[1] This chart is available at https://olmsapps.dol.gov/olpdr/visualization.jsp?rptId=924116 by clicking on the "Itemized Disbursements" tab.

75" of the union's Form LM-2 and sift through all of the "Additional Information," where they eventually might locate non-misleading totals of the union's disbursements? Of course, they would not. The Form LM-2 therefore will predictably become an active engine of *mis*information, defeating the purpose of the form in the first place, which is to provide an "accurate[]" report of a union's finances to its members and the public. 29 U.S.C. § 431(b).

Finally, although the Department asserts that the AFL-CIO's opening-brief discussion of the OLMS field-investigator survey was "based on a misunderstanding of the factual record" (DOL Br. 32), it is telling that the Department does not even cite the survey results in the argument section of its brief—unlike the AFL-CIO, which cited or quoted the survey results eight times in the argument section alone. *See* AFL-CIO Opening Br. 34, 37. As the survey results themselves make clear, what the agency's field investigators found to be "extremely beneficial" (DOL Br. 32)—a phrase that comes from the Final Rule and not the survey results, *see* 91 Fed. Reg. at 32565—was the requirement that unions itemize disbursements and receipts above a certain monetary threshold. *See, e.g.*, A.R. 582 ("[i]temization of disbursements revealed that payments were being made to a business owned by a union officer"); A.R. 583 ("[i]temization of receipts revealed payments from a law firm to a union's annual golf outing"). In contrast, the field investigators strongly disapproved of the additional requirement that unions must categorize each such disbursement or receipt *into a functional category*, which is the requirement that is relevant here. *See, e.g.*, A.R. 582 ("[c]ategorization (breaking down transactions into Sch. 15–19) may in some instances inhibit full disclosure on LM-2s and hurt OLMS case targeting"); A.R. 583 ("[t]he specified categories have probably hindered our OLMS enforcement areas, and made it more complicated for labor unions, rather than simply using the $5,000 threshold and itemizing any payees that exceed this

threshold"); A.R. 584 ("[d]isbursements reported in specific categories is not useful because it cannot be verified, does not result in reporting violations or recordkeeping violations").

All told, because the Department's revisions to its "functional reporting" system are arbitrary and capricious, the changes to that system made by the Final Rule should be vacated.

### B. The Final Rule's requirement that certain labor organizations list the names of members who pay at least $5,000 in annual dues is arbitrary and capricious.

The Final Rule's provision that certain labor organizations must disclose every individual member who paid $5,000 in dues in the past year—what the Department terms its "dues payment disclosure requirement," DOL Br. 34 (section header)—is also arbitrary and capricious. Where an agency "has entirely failed to consider an important aspect of the problem," its action is arbitrary and capricious and therefore violates the APA. *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 210 (D.C. Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (alteration omitted)). That is the case here, as the Final Rule does not even acknowledge the substantial privacy interests implicated by the public disclosure of the names of dues-paying union members and the amount of dues that each member paid—information that in many instances would allow any interested observer to calculate each listed union member's salary. *See* AFL-CIO Opening Br. 38. Thus, even if the Department's example of a single union officer illegally endorsing dues-payment checks over to himself weighed in favor of requiring *every union* that files a Form LM-2 Long Form to *publicly* disclose a list of its dues-paying members—and, to be clear, it does not, *see* AFL-CIO Opening Br. 39—the Department still needed to take account of the substantial privacy interests on the other side of the ledger. It did not do so.

**C. The Final Rule's July 1, 2026, effective date is arbitrary and capricious.**

Finally, the Final Rule's July 1, 2026, effective date should be vacated. The most straightforward reason for vacatur is that a 30-day effective date for financial-reporting changes contravenes the agency's longstanding past practice. As the AFL-CIO explained in its opening brief, whenever the agency has changed Form LM-2 financial-reporting requirements, it has given labor organizations sufficient time to make the necessary changes to their recordkeeping and reporting processes *before* the start of the fiscal year in which the new requirements would first apply. AFL-CIO Opening Br. 43–44 (citing examples).

The Department does not dispute that 30 days is an insufficient amount of time for labor organizations to implement the Final Rule's many significant reporting changes, nor does it dispute that it has deviated from its past practice by giving labor organizations insufficient time to make those adjustments before the start of the first covered reporting period. *See* DOL Br. 39–40. Instead, the Department suggests that it decided to change its past practice because of "the advent of sophisticated electronic accounting systems and electronic filing." DOL Br. 39.

But the Department cannot use its brief in this case to acknowledge its past practice and try to explain it away; it was required to do so in the Final Rule itself, and it did not. As the Supreme Court explained in vacating an agency regulation for precisely this reason, "[i]t is not the role of the courts to speculate on reasons that might have supported an agency's decision." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22–23 (2020) ("Requiring a new decision before considering new reasons promotes 'agency accountability,' by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority." (internal quotation omitted)); *Lone Mountain Processing, Inc. v. Sec'y of Lab.*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) (agency determination arbitrary and capricious because the determination failed to "explain why the

[pertinent] line of precedent either does not apply, or why departure from that line is warranted in this case").

In all events, not even the Department's brief identifies the "sophisticated electronic accounting systems" that purportedly can assist unions in implementing the many new Form LM-2 and Form LM-2 Long Form reporting requirements, nor does it identify how such (unspecified) systems can mitigate the substantial amount of training that labor organizations will need to undertake to record and verify all of the additional information that is now required. *Cf.* A.R. 1575 (comment from National Association of Letter Carriers explaining that newly required information about investment and fixed asset transactions would require union to "make arrangements to gather this electronic information from [its] third-party vendors" because this information is "not processed or posted, in detail, within the accounting system; rather, summary information is posted"). That is because no such accounting system exists. *See* Dkt. No. 7-2 (Prange Decl.) ¶¶ 16–19. Indeed, providing ample lead time for business organizations to implement changes to financial reporting requirements is hardly a novel concept, as it is the practice of the Financial Accounting Standards Board ("FASB")—the organization that establishes financial accounting and reporting standards for corporations and non-profit organizations—to allow for *at least* a year of lead time before a significant new reporting change takes effect. *See, e.g.*, FASB, *Income Statement—Reporting Comprehensive Income—Expense Disaggregation Disclosures (Subtopic 220-40)*, at 3 (Nov. 2024), available at https://www.fasb.org/page/ShowPdf?path=ASU%202024-03.pdf (last visited Sep. 10, 2026) (adding new disclosures for specific expense categories but making them "effective for annual reporting periods beginning after December 15, 2026"—*i.e.*, more than two years after the changes were announced); *see also* PwC, *Effective dates of FASB standards for public companies* (Sep. 9, 2026),

https://viewpoint.pwc.com/dt/us/en/pwc/effective_dates_of_f/public_companies/public_companies_US/standards_effective__US.html (chronicling effective dates of recent FASB standards updates).

In tacit recognition that the Final Rule did not acknowledge the Department's past practice, the Department tries to shift the burden onto the AFL-CIO, asserting that this Court cannot vacate the effective date unless the AFL-CIO "present[s] evidence" to justify "the impact manual recoding will have on its operations." DOL Br. 39. But while a plaintiff must show irreparable harm to obtain the extraordinary remedy of a preliminary injunction, *see* Dkt. No. 21 at 5, there is no comparable requirement at the merits stage. At this point in the litigation, "[w]here the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the Court] must undo [the agency] action." *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (citation omitted).

To be sure, a court should not remand an agency determination where the agency made an error that plainly did not affect the agency's conclusion. *See, e.g.*, *DSE, Inc. v. United States*, 169 F.3d 21, 31 (D.C. Cir. 1999) (agency's erroneous use of formula to count temporary employees deemed "harmless" because it was clear that a correct count would not have changed the agency's determination that business at issue was "small" under applicable regulations); *Coe v. McHugh*, 968 F. Supp. 2d 237, 241 n.2 (D.D.C. 2013) (harmless error where agency cited "outdated version of the regulation" but "the language did not change between it and the new version"). But where "a mistake infects the agency's analysis or the outcome of the adjudication, it crosses the line into arbitrary and capricious territory." *PAM Squared at Texarkana, LLC v. Azar*, 436 F. Supp. 3d 52, 59 (D.D.C. 2020) (citing cases). That is the case here, as the Final Rule engaged in a "flawed" analysis because the Department did not "properly engage[] with precedent"—specifically, its past

practice that labor organizations must be given sufficient time to get their recordkeeping and accounting systems in place to comply with new reporting requirements *before* the start of the first covered reporting period. *Id.* It is irrelevant whether the Department might have reached the same decision if it had acknowledged its past practice; that is a question that the agency must answer if it would like to consider re-promulgating a similar rule in the future. *See id.*

The Department's attempt to distinguish this Court's intertwined decisions in *Chao I* and *Chao II* also falls flat. The Department tries to cast those decisions, which held that the 83-day lead time provided in the 2003 Rule was arbitrary and capricious, as turning on the fact that the Department had not yet distributed the software implementing the Rule's new electronic-filing requirement. DOL Br. 38. But the pertinent section of *Chao I* discusses at length the "numerous irreversible steps" that unions had to take to comply with the Rule's new financial-reporting requirements before even mentioning the separate electronic-filing aspect of the Rule. *AFL-CIO v. Chao* ("*Chao I*"), 297 F. Supp. 2d 155, 162 (D.D.C. 2003). As Judge Kessler summarized, "until the transition system a union adopts in order to comply with the Final Rule is completed, that system will be burdened with a continually expanding backlog of improperly processed data." *Id.* at 163. Thus, to account for unions' need to get their revised accounting systems in place before the start of the first reporting period in which the new requirements applied, the Court extended the Rule's effective date by six months, with the caveat that the effective date would be *further extended* if the Department did not make its electronic-filing software available to the regulated community in time. *AFL-CIO v. Chao* ("*Chao II*"), 298 F. Supp. 2d 104, 128 (D.D.C. 2004).

In sum, just as in 2003, the Department has set a rushed effective date for the Final Rule despite claiming "no particular need for extraordinary urgency." *Id.* at 127. Nor could it claim such a need, given that it waited more than a half-decade after issuing the October 2020 Notice of

Proposed Rulemaking before suddenly finalizing that proposal—and doing so at a time when, because the Department had publicly announced that it had withdrawn the NPRM in March 2021, unions had no reason to believe that the Department was even contemplating significant changes to financial-reporting requirements. For this reason, and because the Final Rule gives unions substantially less time to implement the necessary changes to their recordkeeping and accounting systems than the 2003 Rule did, the Final Rule's effective date is even less defensible than the effective date vacated in *Chao I* and *Chao II*. It must be set aside.

**CONCLUSION**

The Court should grant the AFL-CIO's motion for summary judgment and deny the Department's cross-motion for summary judgment.

Dated: September 10, 2026

Respectfully submitted,

/s/ Leon Dayan
Leon Dayan (DC Bar # 444144)
Jacob Karabell (DC Bar # 996066)
Adam Bellotti (DC Bar # 1020169)
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street, N.W.
Suite 1000
Washington, DC 20005
(202) 842-2600
ldayan@bredhoff.com
jkarabell@bredhoff.com
abellotti@bredhoff.com

Matthew Ginsburg (DC Bar # 1001159)
Maneesh Sharma (DC Bar # 1033407)
AFL-CIO
815 Sixteenth Street N.W.
Washington, DC 20006
(202) 637-5336
mginsburg@aflcio.org
msharma@aflcio.org

*Counsel for Plaintiff*