IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,<br><br>Plaintiff,<br><br>v.<br><br>KEITH E. SONDERLING, Acting United States Secretary of Labor, and ELISABETH MESSENGER, Director, Office of Labor-Management Standards, United States Department of Labor,<br><br>Defendants. | Civil Action No. 26-2061 (JEB) |

**DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


Table of Contents ........ i

Table of Authorities ........ ii

Introduction ........ 1

Argument ........ 3

I. The Secretary complied with the APA's notice and comment requirements ........ 3

A. The 2020 NPRM remained viable through publication of the 2026 Rule ........ 3

B. The Secretary properly invoked the APA's good cause exception ........ 9

II. The Secretary's statutory authority to promulgate the 2026 Rule is well-settled ........ 11

III. The 2026 Rule is not arbitrary and capricious ........ 15

A. The Final Rule's changes to functional reporting improve financial transparency ........ 15

B. The 2026 Rule considered the privacy interests of union members ........ 19

C. Unions still have more than one year to comply with the Final Rule ........ 19

Conclusion ........ 22

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Action For Children's TV v. Fed. Commc'n. Comm'n.*,
564 F.2d 458 (D.C. Cir. 1977) ... 5
*Action on Smoking and Health v. Civ. Aeronautics Bd.*,
713 F.2d 795 (D.C. Cir. 1983) ... 8, 9
*Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency,*
559 F.3d 512 (D.C. Cir. 2009) ... 18, 19
*Am. Fedn. of Lab. and Cong. of Indust. Organizations v. Chao ("Chao I")*,
297 F. Supp. 2d 155 (D.D.C. 2003) ... 21
*Am. Fedn. of Lab. and Cong. of Indust. Organizations v. Chao ("Chao III")*,
409 F.3d 377 (D.C. Cir. 2005) ... 12, 13
*Am. Mining Cong. v. U.S. Env't Prot. Agency*,
907 F.2d 1179 (D.C. Cir. 1990) ... 8
*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ... 9, 10
*Bowman Transp., Inc. v. Ak.-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ... 20
*Buckley v. Valeo*,
424 U.S. 1 (1976) ... 10, 13, 14
*CBOCS W., Inc. v. Humphries*,
553 U.S. 442 (2008) ... 11
*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ... 19
*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ... 19
*Fed. Commc'n Comm'n v. Prometheus Radio Project*,
592 U.S. 414 (2021) ... 15
*Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*,
41 F.4th 564 (D.C. Cir. 2022) ... 4
*Humphreys, Hutcheson & Moseley v. Donovan*,
755 F.2d 1211 (6th Cir. 1985) ... 10
*Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Lab.*,
358 F.3d 40 (D.C. Cir. 2004) ... 6, 7
*Kimble v. Marvel Ent., LLC*,
576 U.S. 446 (2015) ... 11
*Little Sisters of the Poor v. Pennsylvania*,
591 U.S. 657 (2020) ... 3
*Lone Mountain Processing, Inc. v. Sec'y of Lab.*,
709 F.3d 1161 (D.C. Cir. 2013) ... 19
*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ... 11

*Lopez v. Garland*,
116 F.4th 1032 (9th Cir. 2024) ........................................ 11
*Master Printers of Am. v. Donovan*,
751 F.2d 700 (4th Cir. 1984) ........................................ 10
*Mobil Oil Corp. v. U.S. Env't Prot. Agency*,
35 F.3d 579 (D.C. Cir. 1994) ........................................ 9
*NAACP v. Alabama*,
357 U.S 449 (1958) ........................................ 10
*Nat. Res. Def. Council, Inc. v. Sec. and Exch. Comm'n*,
606 F.2d 1031 (D.C. Cir. 1979) ........................................ 5
*Patterson v. McLean Credit Union*,
491 U.S. 164 (1989) ........................................ 11
*Pro. Drivers Council v. Bureau of Motor Carrier Safety*,
706 F.2d 1216 (D.C. Cir. 1983) ........................................ 5, 6
*Rabbitt v. Rohrman Midwest Motors, Inc.*,
No. 25 C 11312, 2026 WL 851279 (N.D. Ill. Mar. 27, 2026) ........................................ 12
*Sanofi Aventis U.S. LLC v. U.S. Dep't of Health and Hum. Servs.*,
58 F.4th 696 (3d Cir. 2023) ........................................ 4, 5
*Shelton v. Tucker*,
364 U.S. 479 (1960) ........................................ 10
*State of Mont. v. Clark*,
749 F.2d 740 (D.C. Cir. 1984) ........................................ 5
*State of Tex. v. Lyng*,
868 F.2d 795 (5th Cir. 1989) ........................................ 7
*Xcel Energy Servs. Inc. v. FERC*,
41 F.4th 548 (D.C. Cir. 2022) ........................................ 20

**Statutes**

5 U.S.C. § 553(b) ........................................ 3
5 U.S.C. § 602(d) ........................................ 4
29 U.S.C. § 431(b) ........................................ 2, 13
29 U.S.C. § 438 ........................................ 13

**Regulations**

67 Fed. Reg. ........................................ 15
86 Fed. Reg. 41166-01 ........................................ 4
91 Fed. Reg. ........................................ passim

**Other Authorities**

91 Fed. Reg. 32605-6 ........................................ 8
Executive Order 12866 ........................................ 20

## INTRODUCTION

Plaintiff's challenge against the Secretary's June 1, 2026 financial disclosure rule (the "Final Rule" or "2026 Rule") proceeds from a faulty premise—that the Secretary terminated the rulemaking via a simple withdrawal notation in the Unified Agenda. But the Secretary never terminated the rulemaking process under the Administrative Procedure Act ("APA"); he merely removed the proposal from the Department's immediate regulatory priorities. Moreover, the Secretary could not terminate the rulemaking through a perfunctory Unified Agenda entry because such an action would not survive review under the APA's arbitrary and capricious standard of review. Plaintiff wants to hold the Secretary to an action that he did not and could not lawfully take under the APA or D.C. Circuit precedent.

Unsatisfied with answers in the case law, Plaintiff ignores the Secretary's reliance on bedrock APA standards for promulgating regulations, Def. Mot. at 21, supplies its own definition of when rulemaking ends, Pl. Reply at 11,[1] and suggests that an exhaustive rulemaking record stands or falls based on two sentences and two notations in the Unified Agenda that contain no record facts, no analysis of those absent facts, and therefore no reasoning that satisfies standards in this circuit for withdrawing a rulemaking under the APA. Confronted with this defect, Plaintiff says the validity of the "withdrawal" it relies upon is "an issue for another day," Pl. Reply at 14, and accuses the Secretary of "asking for a license to affirmatively mislead the public," *id*. at 13, all while Plaintiff selectively relies on case law excerpts at the margins of APA law—and only when they are convenient.

[1] Citations to Plaintiff's Reply are to the ECF-generated page numbers appearing in blue color at the top, right corner of each page.

Plaintiff's other arguments fare no better. First, Plaintiff alleges additional notice and comment was required to address a Supreme Court decision that reviewed a different financial disclosure statute under exacting scrutiny with a narrow tailoring requirement. While Plaintiff characterizes this decision as an "an important [new] development" in the law, Pl. Reply at 20, courts have been applying exacting scrutiny with a narrow tailoring requirement to review the Secretary's actions under Title II of the Labor-Management Reporting and Disclosure Act ("LMRDA") for over forty years.

Second, Plaintiff repackages arguments of statutory interpretation the D.C. Circuit considered and dismissed over twenty years ago. The best reading of Title II supports the Secretary's broad authority to compel the disclosure of "necessary" financial information, "all in such categories as the Secretary may prescribe." 29 U.S.C. § 431(b). Third, Plaintiff raises a litany of arbitrary and capricious claims that do not pass muster. Plaintiff's disagreement with the Secretary's decision to eliminate an aspect of functional reporting does not entitle Plaintiff to substitute its own judgment for the Secretary's reasoned decision, which is grounded in the administrative record. Finally, Plaintiff alleges the Final Rule's effective date was arbitrary and capricious because it provides too little time to calibrate accounting software. But Plaintiff still has more than one year before it must file its first report under the 2026 Rule.

The Final Rule should be affirmed in its entirety. The Secretary fully complied with Section 553 of the APA when promulgating it, the Secretary's statutory authority to act has been clear since 2005, and the Final Rule exhaustively justifies the reasonableness of each provision.

## ARGUMENT

### I. The Secretary complied with the APA's notice and comment requirements

#### A. The 2020 NPRM remained viable through publication of the 2026 Rule

Section 553 of the APA establishes a clear and definitive process for promulgating regulations: an agency must: 1) provide notice of the proposed rulemaking in the *Federal Register*; 2) give the public an opportunity to comment; and 3) publish a final rule that incorporates a concise general statement of the rule's basis and purpose. 5 U.S.C. § 553(b), (c). While the federal government relies on other laws and processes—including the Regulatory Flexibility Act ("RFA") and the Unified Agenda—to set immediate priorities, the APA itself "provides the maximum procedural requirements that an agency must follow in order to promulgate a rule." *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 685 (2020) (internal citations and quotation marks omitted). Section 553 benefits both agencies and the general public by providing a fixed checklist that, when fully satisfied, signals a rulemaking is complete.

The Secretary met the requirements of Section 553 when promulgating the 2026 Rule, and the rule should be affirmed on that basis. *See* Def. Mot. at 21. But Plaintiff does not like the result returned by a straightforward application of Section 553, so it has constructed a theory that relies on actions and statements that occurred outside the APA's framework to argue the APA process ended. Specifically, Plaintiff exaggerates the importance of a March 17, 2021 entry in the Unified Agenda to argue the Secretary "definitively declared to the regulated community that the regulatory proceeding [began by the 2020 NPRM] is over." Pl. Reply at 13. No such thing happened, and Plaintiff's theory cannot withstand scrutiny.

First, a reasonable observer would not assume the Secretary intended to withdraw the 2020 NPRM via the Unified Agenda because that publication is an inappropriate vehicle to carry out lawful rulemaking activities. The Unified Agenda is created by the RFA, not the APA, and its

express purpose is to "help[] agencies fulfill" their obligations under laws *other than the APA*. *Spring 2021 Unified Agenda of Federal Regulatory and Deregulatory Actions*, 86 Fed. Reg. 41166-01, 41166-68. "It would be odd if agencies could nullify past steps taken to comply with the APA in a publication that has little if anything to do with the APA." *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health and Hum. Servs.*, 58 F.4th 696, 706–07 (3d Cir. 2023), *judgment entered,* No. 21-3167, 2023 WL 1325507 (3d Cir. Jan. 30, 2023). In this context, the March 17, 2021 entry did not withdraw the 2020 NPRM from the rulemaking process itself, but simply removed the 2020 NPRM from the regulatory priorities highlighted in the Unified Agenda.

Plaintiff rejects this conclusion by arguing that agencies may use publications other than the *Federal Register* to provide the regulated community with "'actual notice' that the agency had taken official action" in connection with a rulemaking. Pl. Reply at 12 (quoting *Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*, 41 F.4th 564, 570 (D.C. Cir. 2022)). However, the notice at issue in *Humane Society* was "a signed final rule" that was posted to the agency's website before it appeared in the *Federal Register*. 41 F.4th at 567. That kind of notice would clearly apprise the general public of an agency's intent because it was substantively a final rule in all respects that interpreted the relevant statute, described the relevant facts, and applied the facts and law to explain the agency's decision-making.

By contrast, the Unified Agenda is riddled with exceptions and caveats. It clearly notifies the public that "[t]he Unified Agenda does not create a legal obligation on agencies . . . to confine their regulatory activities to those regulations that appear within it." 86 Fed. Reg. at 41167. The RFA also warns the public that "[n]othing in this section precludes an agency from considering or acting on any matter not included in a regulatory flexibility agenda, or requires an agency to consider or act on any matter listed in such agenda." 5 U.S.C. § 602(d). Thus, even if agencies are

not limited to publishing rulemaking materials in the *Federal Register*, the Unified Agenda itself is not an appropriate substitute because its "disclaimer should have put the [regulated community] on notice that the agency was not binding itself simply by listing the rule as withdrawn there." *Sanofi*, 58 F.4th at 707.

Plaintiff argues there is a distinction between "omit[ting] mention of a regulatory activity in the Unified Agenda" and "affirmatively tell[ing] the public" that a rule was withdrawn. Pl. Reply at 13. According to Plaintiff, the March 17, 2021 entry was a "cl[ear], definitive[], and final[]" announcement that the 2020 NPRM was withdrawn. *Id.* at 11. Once again, this grossly overstates the case. Far from being clear, definitive, and final, the March 17, 2021 entry was brief, conclusory, and unsupported by any facts or analysis.

It is not reasonable to conclude the Secretary intended to withdraw the 2020 NPRM via a perfunctory Unified Agenda entry. The D.C. Circuit has held "that an agency['s] decision not to amend long-standing rules after a notice and comment period is reviewable agency action." *State of Mont. v. Clark*, 749 F.2d 740, 744 (D.C. Cir. 1984); *see also Nat. Res. Def. Council, Inc. v. Sec. and Exch. Comm'n*, 606 F.2d 1031, 1047 (D.C. Cir. 1979) (a strong presumption of reviewability exists when "the agency has in fact held a rulemaking proceeding and compiled a record narrowly focused on the particular rules suggested but not adopted."). The D.C. Circuit examines whether "the [agency] has adequately explained the facts and policy concerns it relied on" to terminate the rulemaking and whether "those facts have some basis in the record." *Nat. Res. Def. Council, Inc.*, 606 F.2d at 1053. Phrased differently, the inquiry is whether "the agency's decision 'is blessed with an articulated justification that makes a rational connection between the facts found and the choice made, and follows upon a hard look by the agency at the relevant issues.'" *Pro. Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1221 (D.C. Cir. 1983) (quoting *Action*

*For Children's TV v. Fed. Commc'n. Comm'n.*, 564 F.2d 458, 479 (D.C. Cir. 1977)) (cleaned up). Plaintiff is therefore wrong to claim that "an agency can terminate a rulemaking proceeding without detailing its legal or policy reasons for doing so." Pl. Reply at 14.

In *Professional Drivers Council*, the D.C. Circuit affirmed the sufficiency of an agency's decision to terminate rulemaking proceedings because the agency "clearly articulated the factual and policy bases for its decision" in the *Federal Register* by anchoring the agency's decision in the administrative record. 706 F.2d at 1221. By contrast, when the Department of Labor attempted to terminate a rulemaking by making a conclusory statement in the *Federal Register* "that there was a 'change in agency priorities,' without [further] explanation," the D.C. Circuit concluded the Department violated the APA. *Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Lab.*, 358 F.3d 40, 44 (D.C. Cir. 2004). The March 17, 2021 Unified Agenda entry at issue in the present case was appropriate under the RFA but, measured by APA standards, took none of the steps required by the D.C. Circuit precisely because the Secretary did not intend for it to terminate the 2020 NPRM.

Plaintiff attempts to brush this critical fact to the side. Pl. Reply at 14-15 ("Whether an agency's tersely explained decision to terminate a rulemaking proceeding could withstand APA arbitrary-and-capricious review is an issue for another day—the dispositive point for present purposes is that it clearly concludes the rulemaking proceeding[.]"). But this misses the point. If the Secretary was attempting to actually terminate the 2020 NPRM, he would have done more than make a brief statement in the Unified Agenda that would on its face fail the APA's arbitrary and capricious standard. The Secretary's position is the more logical reading. The March 17, 2021 entry merely removed the 2020 NPRM from the regulatory priorities highlighted in the Unified Agenda. Plaintiff's position would require the Court to not only hold the Secretary to an action he

did not take (withdrawing the 2020 NPRM), but also to hold the Secretary to an action he *could not lawfully take* (withdrawing the 2020 NPRM via a conclusory statement in the Unified Agenda).

Plaintiff also unconvincingly attempts to distinguish *Sanofi* and *Lyng* by arguing the rulemakings in those cases were merely "paused" while the 2020 NPRM was terminated. Pl. Reply at 15-17. However, there is nothing in the text of the *Sanofi* Unified Agenda entry that would provide notice to the regulated community that the rulemaking was paused. *See* 340B Drug Pricing Program; Administrative Dispute Resolution Process, RIN 0906-AA90 (Spring 2017), https://perma.cc/ADX3-QUEJ (last visited September 22, 2026). In fact, the *Sanofi* entry, like the entry at issue in this case, characterized the rulemaking as "Withdrawn" and a "Completed Action[]." *Id.* Nevertheless, this language was not fatal to the *Sanofi* rulemaking. Likewise, the *Federal Register* entry that purportedly withdrew the *Lyng* rulemaking did not reasonably apprise the public that the process was paused. *State of Tex. v. Lyng*, 868 F.2d 795, 796 (5th Cir. 1989) (citing *Movement of Citrus Fruit From Florida; Withdrawal of Proposed Rule*, 53 Fed. Reg. 140-01 (Jan. 5, 1988)). Instead, the agency announced it was "withdrawing our proposed rule" and "expect[ed] to publish a new proposal in the near future." *Id.* In other words, the *Lyng* notice suggested the agency would *restart* the notice and comment period. However, even this disclaimer was not enough to force the agency to start from scratch. As was the case in *Sanofi* and *Lyng*, the March 17, 2021 Unified Agenda entry did not "culminate" the rulemaking process such that the Secretary was required to initiate new notice and comment procedures.

In addition, Plaintiff argues the Secretary's conduct "reinforced" that the 2020 NPRM was no longer active because there was "over five years of silence" between the Unified Agenda entry and publication of the Final Rule. Pl. Reply at 14, 17. But as the Secretary previously noted, several years may elapse between an NPRM and a final rule without affecting the rule's validity as long

as the agency satisfies the three requirements of Section 553. *See, e.g.*, *Am. Mining Cong. v. U.S. Env't Prot. Agency*, 907 F.2d 1179, 1191–92 (D.C. Cir. 1990).

Plaintiff also argues the Secretary's narrow 2025 NPRM further signaled to the regulated community that the 2020 NPRM was no longer operative. Pl. Reply at 16. Plaintiff relies on *Action on Smoking* for the proposition that "[i]f one rulemaking proceeding has culminated and another has begun, then new notice and comment procedures are required." *Action on Smoking and Health v. Civ. Aeronautics Bd.*, 713 F.2d 795, 800 (D.C. Cir. 1983). As the Secretary previously argued, the 2025 NPRM did not represent the culmination of the 2020 NPRM, nor did it represent the start of a new rule regarding the LM-2 Long Form or its substantive disclosure requirements. First, the 2025 NPRM never stated it was terminating the 2020 NPRM. In fact, the 2025 NPRM did not reference the substantive proposals made in 2020 because those proposals were covered by the still active 2020 NPRM. Moreover, the public would not have reasonably inferred that the Secretary had concluded and restarted the 2020 NPRM based upon the 2025 NPRM's newly proposed inflation adjustment to the filing thresholds for the already existing LM-2, LM-3, and LM-4 forms. The 2020 NPRM did not consider the filing thresholds for the LM-3 and LM-4. Assuming *arguendo* that it is relevant that both the 2020 and 2025 NPRMs considered the filing threshold for the LM-2, this is not fatal to the Final Rule. The Secretary made clear in a severability analysis that the final enactment of the LM-2 Long Form and the substantive disclosure requirement revisions were distinct policy choices made independently of the filing threshold adjustments. 91 Fed. Reg. 32605-6. To the extent the 2025 NPRM represented a new rulemaking process on the narrow issue of inflation adjustments, it did not represent a new rulemaking process on the LM-2 Long Form or revised disclosure requirements.

**B. The Secretary properly invoked the APA's good cause exception**

In the D.C. Circuit, vacatur of a rule "does not necessarily require the [agency] to 'start from scratch' and initiate new notice and comment proceedings" as long as "the original record is still fresh[.]" *Mobil Oil Corp. v. U.S. Env't Prot. Agency*, 35 F.3d 579, 584 (D.C. Cir. 1994) (quoting *Action on Smoking*, 713 F.2d at 800). It logically follows that notice and comment is similarly unnecessary when an agency decides to rely on a fresh administrative record to complete a rulemaking that it paused or even terminated. Plaintiff argues the Secretary was required to re-start notice and comment proceedings because "affected parties 'might bring' new 'information' to the agency's attention" bearing on the rulemaking. Pl. Reply at 19 (quoting *Action on Smoking*, 713 F.2d at 801) (Plaintiff's emphasis omitted). However, that is a factual determination that "must be made by the agency and supported in the record; it is not self-evident." *Mobil Oil Corp.*, 35 F.3d at 584. The Secretary made an appropriate determination in the 2026 Rule when invoking the good cause exception. 91 Fed. Reg. 32561, n.3.

Plaintiff claims that intervening events rendered the 2020 administrative record stale and prevented the Secretary from invoking the good cause exception, but these arguments fall flat. The dispute in *Bonta* was whether to review California's disclosure statute under exacting scrutiny or strict scrutiny. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021). As the Secretary noted, the Supreme Court did not resolve this dispute. Def. Mot. at 29-30. Plaintiff argues the true relevance of *Bonta* was that it set a new requirement that disclosure laws be narrowly tailored. Pl. Reply at 19. But this too overstates *Bonta*. As the Chief Justice's plurality opinion makes clear, "[t]he need for narrow tailoring was set forth early in our compelled disclosure cases." *Bonta*, 594 U.S. at 608; *see also id.* at 609 ("But we nevertheless held that the Arkansas statute was invalid because even a 'legitimate and substantial' governmental interest 'cannot be pursued by means

that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'") (quoting *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)).

Even if Plaintiff is correct and *Bonta* clarified that "narrow tailoring" applies to all compelled-disclosure requirements under a standard at least as demanding as "exacting scrutiny," that is not a new development in the LMRDA context because courts have been applying that exact standard to LMRDA Title II disclosure requirements for over forty years. In 1984, the Fourth Circuit applied the "exacting scrutiny" standard established by the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1 (1976) and *NAACP v. Alabama*, 357 U.S 449 (1958), to LMRDA financial disclosure reports, reiterating "the government must show that the [LMRDA Title II] disclosure and reporting requirements are justified by a compelling government interest, and that the legislation is narrowly tailored to serve that interest." *Master Printers of Am. v. Donovan*, 751 F.2d 700, 705 (4th Cir. 1984). One year later, in 1985, the Sixth Circuit applied the same test, also regarding LMRDA Title II compelled disclosure requirements. *Humphreys, Hutcheson & Moseley v. Donovan*, 755 F.2d 1211, 1221 (6th Cir. 1985) (analyzing "whether [LMRDA Title II] disclosure legislation is narrowly tailored to serve a compelling governmental interest"). Thirty-six years after that, Chief Justice Roberts relied upon the same cases—*Buckley v. Valeo* and *NAACP v. Alabama*—to arrive at his conclusion in *Bonta*, 594 U.S at 607-08. Accordingly, *Bonta* did not change the core circumstances of the regulatory environment of the LMRDA or require the Secretary to restart notice and comment procedures.

Plaintiff again raises Microsoft's decision to discontinue Great Plains accounting software, Pl. Reply at 19, but as the Secretary previously argued, the sundown period for Great Plains will take place over five years and not be complete until the end of 2029. DOL Br. at 25. This slow-moving change, which is still several years away, does not render the 2020 administrative record

stale. Finally, Plaintiff once again mischaracterizes the Secretary's description of recent enforcement efforts in the 2026 Rule. According to Plaintiff, the Secretary relied on "new evidence," which the general public was entitled to address. Pl. reply at 20. But Plaintiff should not be allowed to invent a Catch-22. To invoke the good cause exception, the Secretary was required to make findings that the administrative record was still fresh. He did so, in part, by demonstrating that the union corruption that gave rise to the 2020 NPRM was still ongoing at the time the 2026 Rule was published. Under Plaintiff's theory, the Secretary could not make findings about the sufficiency of an existing record without re-opening the entire record.

## II. The Secretary's statutory authority to promulgate the 2026 Rule is well-settled

Plaintiff argues that statutory *stare decisis* protects only the specific changes the Secretary made to union financial disclosures in 2003, and not the overall statutory interpretation that allowed those changes to be affirmed. Pl. Reply at 24. However, statutory *stare decisis* has historically been employed in the context of "statutory construction" and "statutory interpretation," not necessarily specific agency actions. *Patterson v. McLean Credit Union*, 491 U.S. 164, 172-173 (1989); *see also Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 462 (2015) (defining statutory *stare decisis* as a process "in which this Court interprets and Congress decides whether to amend" that "retains . . . strong force" as a principle of statutory construction). In fact, the very case cited in *Loper Bright* affirmed the continued use of a specific statutory interpretation in new cases, even though the Supreme Court's interpretative methods had substantially evolved since the precedent was decided. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 376 (2024) (citing *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008)). Consistent with this understanding of statutory *stare decisis*, courts continue to apply statutory interpretations decided under *Chevron* in new factual situations. *See Lopez v. Garland*, 116 F.4th 1032, 1045 (9th Cir. 2024) (cases decided under *Chevron* "remain[] precedential authority which bind[]" courts, particularly when an agency "has

not promulgated a new interpretation of the statute to prompt us to reconsider our precedent"); *Rabbitt v. Rohrman Midwest Motors, Inc.*, No. 25 C 11312, 2026 WL 851279, at *3 (N.D. Ill. Mar. 27, 2026) (extending statutory *stare decisis* to *Chevron*-era decisions that held a text message was a "call" for the purposes of the Telephone Consumer Privacy Act)". Accordingly, the specific interpretation of the Secretary's authority under Title II of the LMRDA sanctioned in *Chao III*[2] is entitled to statutory *stare decisis.*

Next, Plaintiff once again attempts to revive the arguments it made decades ago in *Chao III*. Pl. Reply at 25-28. According to Plaintiff, the D.C. Circuit's skepticism of Plaintiff's interpretation is not relevant because Plaintiff's arguments were raised and dismissed at the *Chevron* step 1 stage. However, *Chao III* provides a clear roadmap for why Plaintiff does not have the best reading of the LMRDA. Plaintiff insists that Section 201(b)'s reference to financial conditions and operations incorporates only a corporate balance sheet and income statement. But Plaintiff ignores the D.C. Circuit's independent conclusion that "Congress did not adopt the precise terms of art . . . that connote the typical corporate income statement and balance sheet . . . nor did it expressly provide, for example, that unions' reports should be made in accordance with generally accepted accounting principles[.]" *Chao III*, 409 F.3d at 381-382.

Plaintiff cites other statutes to argue that Congress knew how to compel a broad disclosure of financial information, but chose not to when drafting the LMRDA. Pl. Reply at 26-27. This argument fails because Plaintiff ignores the broad grant of authority within the plain text of Section 201(b) itself. Congress did not limit the Secretary to requesting narrow financial disclosures. Instead, it empowered the Secretary to compel the production of a report containing "information in such detail as may be *necessary* accurately to disclose" a union's financial condition and

[2] *AFL-CIO v. Chao*, 409 F.3d 377 (D.C. Cir. 2005).

operations, "all in such categories *as the Secretary may prescribe*." 29 U.S.C. § 431(b) (emphasis added). Section 201(b)'s reference to "necessary" financial information echoes Section 208's reference to regulations "necessary" to prevent the circumvention of Title II. *Compare* 29 U.S.C. § 431(b), *with* 29 U.S.C. § 438. As then-Judge Roberts noted in his *Chao III* partial concurrence, this is a statutory construction "freighted with deference[.]" 409 F.3d at 393. Plaintiff fails to grapple with the fact that its interpretation would nullify critical components of Section 201(b) if adopted.

Plaintiff also attempts to distinguish legislative history by arguing that the itemization requirements in the Taft-Hartley Act at the time of the LMRDA's adoption "applied only to significant financial transactions." Pl. Reply at 27. But Plaintiff ignores the fact that the itemization requirement for specific transactions in the 2026 Rule also only applies to significant financial transactions of $5,000 or more. 91 Fed. Reg. 32585.

Plaintiff attacks the 2026 Rule as potentially violating the First Amendment because it is not narrowly tailored. Pl. Reply at 29-30. In particular, Plaintiff alleges the Secretary failed to consider whether less intrusive alternatives existed for the provision requiring LM-2 and Long Form filers to identify individuals who paid dues of $5,000 or more. *Id.* at 30. However, the Secretary did directly address privacy concerns raised by commenters by 1) modifying the Secretary's original proposal to better protect union member privacy interests; and 2) explaining why other potentially less intrusive alternatives were not feasible. 91 Fed. Reg. 32590. First, the Secretary extended a privacy "exception" to the relevant schedules that would allow labor organizations "to omit the full street address of individuals" whose identities must be reported. *Id.* Second, the Secretary considered whether it could rely on the LMRDA's subpoena authority in lieu of requiring LM-2 and Long Form filers to identify union members who paid dues at or above

the $5,000 threshold. *Id.* The Secretary concluded this less intrusive alternative was not sufficient because "[r]eliance on post hoc subpoenas presupposes that the Department already knows where to look for potential conflicts or embezzlement, but the itemized disclosures often provide the initial basis for suspicion that would justify a subpoena in the first place. Subpoena authority is therefore a complement to, not a substitute for, public disclosure." *Id.* Finally, the Secretary only adopted this requirement for the largest of dues transactions among the most sophisticated labor organizations, finding that it will apply only in "rare circumstances" and "will not affect most labor organizations given the level of dues required to meet the itemization threshold." 91 Fed. Reg. 32590.

Contrary to Plaintiff's assertion, the Secretary does not claim "virtually limitless . . . leeway in deciding the level of financial detail that labor organizations must disclose." Pl. Reply at 30; *see also id.* at 27 (improperly alleging the Secretary believes "there is no limiting principle" to his authority under the LMRDA). The Secretary carefully concluded in the 2026 Rule that the "additional disclosure required by Form LM-2 Long Form is necessary to fulfill [the LMRDA's] statutory mandate, particularly for the largest labor organizations with substantial annual receipts and complex financial structures." 91 Fed. Reg. 32592. In other words, the 2026 Rule's new disclosure requirements are necessary only in the specific context of financially sophisticated labor organizations, not as a general matter. The Secretary is therefore not claiming unlimited authority to compel the disclosure of every financial transaction made by every covered labor organization.

Plaintiff also unpersuasively alleges the Secretary could not rely on Section 208 to promulgate the 2026 Rule. Pl. Reply at 31-32. In addition to repeating its arguments that Title II covers only information similar to a corporate balance sheet and income statement, Plaintiff also argues the Secretary failed to make specific factual findings to justify relying on Section 208. But

this is not the case. The 2026 Rule cites the following: 1) the example of a "union treasurer converting union dues checks worth $18,720 to personal use" (91 Fed. Reg. 32590); 2) the fact that "itemized disclosures often provide the initial basis for suspicion that would justify a subpoena" and further investigation (*id.*); and 3) that the financially sophisticated nature of the largest labor organizations demands more detailed disclosure requirements to prevent circumvention and evasion of Title II (91 Fed. Reg. 32594). These findings amply support the Secretary's ability to promulgate the 2026 Rule under Section 208.

Finally, in the event the Court concludes the Secretary lacked statutory authority to require LM-2 and Long Form filers to identify individuals who paid dues of $5,000 or more, that specific requirement is severable from the rest of the 2026 Rule's provisions. *See* 91 Fed. Reg. 32606.

## III. <u>The 2026 Rule is not arbitrary and capricious</u>

### A. The Final Rule's changes to functional reporting improve financial transparency

Plaintiff insists it was arbitrary and capricious for the Secretary to eliminate an aspect of functional reporting that was unverifiable and had little utility within the overall enforcement structure. Pl. Reply at 34. Plaintiff may disagree with the Secretary's approach, but the changes to functional reporting made by the 2026 Rule plainly fall "within a zone of reasonableness" and therefore are not arbitrary and capricious. *Fed. Commc'n Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Plaintiff continues to blur the distinction between the two kinds of functional reporting that existed prior to the 2026 Rule. First, unions were required to itemize certain receipts and disbursements at or above a $5,000 threshold according to different functional categories. This is the component of functional reporting the Secretary described in 2002 as being "useful and meaningful to the labor organization and to its members." 67 Fed. Reg. 79288. But Plaintiff

incorrectly attributes that statement to the second component of functional reporting, which required labor organizations to estimate the "time spent by each union officer and employee on different duties" corresponding to those same categories. DOL000581; *see also* 91 Fed. Reg. 32558 (identifying "Functional Reporting" and "Functional Reporting of Work Time" as two separate categories in the Department's 2003 rulemaking).

When the Secretary surveyed investigators in 2019, the responses overwhelmingly concluded that accounting for union officer work time was not useful. *See* DOL 000583 ("It provides unverifiable disclosure information to the public."); DOL 000584 ("This information offers no valuable insight for case targeting and has provided no benefit in criminal investigations or compliance audits."); DOL 000585 ("Estimating the percentage of specified categories is not useful because it cannot be verified, does not result in reporting violations or recordkeeping violations."). By contrast, some respondents found it useful to require unions to itemize receipts and disbursements according to functional categories. DOL 000582 (noting investigators have taken investigatory steps "based on unusual categorization patterns and traced categorized transfers between affiliates that indicated reporting or other potential LMRDA violations."); DOL 000584 ("Disbursements in different categories are useful[.]").

The 2026 Rule reasonably kept the useful aspect of functional reporting (itemized disclosure of receipts and disbursements according to functional categories), and eliminated the aspect that was not useful to investigators (reporting officer work time). Plaintiff argues this decision was arbitrary and capricious because it will cause financial reports to "affirmatively mislead union members" about the extent to which unions are active in certain functional categories. Pl. Reply at 34-35. But the Secretary considered this argument and found that retaining work time estimates diminished the reliability of union financial reports. Whereas receipts and

disbursements can be confirmed through a review of records, union officer work time estimates cannot be independently verified. DOL 000585 ("There is no way to verify how union officials spend their time in these categories. It is and will always be a ballpark guess and the categories are confusing to the union and to OLMS field staff."). The Secretary determined that comingling verifiable and unverifiable information provided union members with a poor understanding of their unions' finances:

> The Department determined that time estimates are difficult to ascertain and verify: the estimates cannot be audited easily, if at all, against documentary evidence and therefore fail to serve the LMRDA's core purpose of ensuring reliable financial accountability. If a labor organization publishes information the Department cannot verify, then a member does not necessarily receive more transparency in how the labor organization operates.

91 Fed. Reg. 32587.

Plaintiff also objects that the changes to functional reporting will distort the information provided by the Secretary's data visualization tool, because the resulting "Itemized Disbursement" chart will omit union officer work time. Pl. Reply at 36. But even prior to the 2026 Rule, that chart never included union officer work time and only displayed information related to disbursements to third parties. The data visualization tool clearly identifies from which schedules it pulls information. Had Plaintiff included a more complete screenshot, like the one included below, it would have shown text under the graphics that states, "NOTICE: This page only reports itemized expenditures as reported in Schedules 15-19 of the Form LM-2." Those schedules correspond only to disbursements to third parties, not to officers and employees. *See* 91 Fed. Reg. 32567 (salary disbursements, functional time reporting on Schedules 11 and 12).




Largest Disbursements

| Name | Disbursement Type | Amount |
|---|---|---|
| New York State United Teachers, 8030 | REPRESENTATIONAL ACTIVITIES | $5,609,615 |
| NYSUT Advocacy Fund | POLITICAL ACTIVITIES | $5,607,640 |
| NYSUT Holding Account Solidarity | POLITICAL ACTIVITIES | $4,109,554 |
| Selendy Gay Elsberg PLLC | REPRESENTATIONAL ACTIVITIES | $3,427,981 |
| Public Employees Federation 4053 | REPRESENTATIONAL ACTIVITIES | $3,218,706 |
| **Total** | | **$21,973,496** |

NOTICE: This page only reports itemized expenditures as reported in Schedules 15-19 of the Form LM-2.

Office of Labor-Management Standards – LM Reports and Constitutions and Bylaws, https://olmsapps.dol.gov/olpdr/visualization.jsp?rptId=924116 (last visited September 22, 2026).[3] Furthermore, no disclaimer is necessary regarding the exclusion of officer salary costs from the LM Forms. Those costs are included in Statement B on the new forms and the 2026 Rule explains that they will no longer be reported by functional category. 91 Fed. Reg. at 32599, 32603.

The Secretary has "considered all aspects of the problem" bearing on functional reporting of union officer work time, and arrived at a reasonable decision grounded in the administrative record. *Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency,* 559 F.3d 512, 527 (D.C. Cir. 2009). Plaintiff's arbitrary and capricious challenge on this issue must therefore fail.

[3] This chart is available by clicking the "Itemized Disbursements" tab.

### B. The 2026 Rule considered the privacy interests of union members

Plaintiff alleges the requirement that some labor organizations report the names of members who pay at least $5,000 in annual dues is arbitrary and capricious because "the Final Rule does not even acknowledge the substantial privacy interests" of union members. Pl. Reply at 38. However, as argued *supra* in section II, the 2026 Rule did directly address privacy concerns raised by commenters in a section that contained the heading "*Privacy Concerns*." 91 Fed. Reg. 32590. In fact, the Department implemented an exception to better protect the PII of union members. *Id.* Plaintiff's argument must therefore fail, because the Secretary adequately considered this issue. *See Am. Farm Bureau Fed'n,* 559 F.3d at 527.

### C. Unions still have more than one year to comply with the Final Rule

The Secretary's chosen effective date is reasonable because it gives Plaintiff and other filers adequate opportunity to comply with the 2026 Rule and reduces the overall economic burden on LM-2 Long Form filers like Plaintiff. Plaintiff unpersuasively argues the Secretary was under a heightened obligation when issuing the 2026 Rule to identify previous Title II rulemakings and explain why the effective date of the 2026 Rule broke from a supposed "past practice[.]" Pl. Reply at 39. Plaintiff identifies no legal authority that the Secretary was required to examine and distinguish past practice when setting a rule's effective date. The cases cited by Plaintiff involve substantive agency actions outside the rulemaking process. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22–23 (2020) (involving the rescission of the Deferred Action for Childhood Arrivals program); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 218 (2016) (involving an agency's "decision to abandon its decades-old practice of treating service advisors as exempt under § 213(b)(10)(A)."); *Lone Mountain Processing, Inc. v. Sec'y of Lab.*, 709 F.3d 1161 (D.C. Cir. 2013) (whether to grant a motion to reopen).

Under APA review, the question for this Court is whether the Secretary adequately explained his decision or if the decision "may be reasonably discerned." *Bowman Transp., Inc. v. Ak.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *see also Xcel Energy Servs. Inc. v. FERC*, 41 F.4th 548, 557 (D.C. Cir. 2022). Here, the Secretary reached a reasonable conclusion about the 2026 Rule's effective date by carefully considering the public comments and the overall administrative record compiled during the rulemaking itself. 91 Fed. Reg. at 32606-32607. That is sufficient to affirm the rule. There was no need to comb the archives of past rulemakings when the Secretary had an administrative record from which to make a decision.

Plaintiff also elides that the 2026 Rule set three important dates: a publication date that gave the regulated community notice of the new requirements (June 1, 2026); 2) an effective date for when the 2026 Rule would become operative (July 1, 2026); and 3) a date of applicability by which unions were required to come into compliance (September 28, 2027, at the earliest). 91 Fed. Reg. 32556, 32606. Under this timeline, labor organizations still have more than one year before they must file their first reports under the 2026 Rule. Plaintiff argues the burden associated with bringing its accounting systems into compliance within that timeframe is unacceptable. But the regulatory process itself contemplates that the first year of a new regulation will impose higher burdens than subsequent years. *See* Executive Order 12866, as amended; *see also* 91 Fed. Reg. 32608 ("The Form LM–2 Long Form is estimated to take 680.76 hours during the first year and 495.80 hours per response for each year afterward."). Furthermore, whatever burdens are associated with bringing an accounting system into compliance within the first year are offset in future years because the 2026 Rule eliminates the requirement to estimate and disclose union officer work time according to functional categories. *Id.* (The 2026 Rule "has resulted in an overall reduction in burden hours for the regulated community, namely by omitting the burdensome

functional reporting requirement."). In years past, Long Form filers like Plaintiff filed the prior version of LM-2, expending an estimated 530.20 burden hours to file that form. *Id.* After the first year filing the Long Form, filers will save an estimated 34.4 burden hours per year under the 2026 Rule. *See id*. After six years, filers like Plaintiff will have gained back the additional burden hours imposed in the first year of compliance.

Finally, while there may have been unique problems associated with data-coding twenty-three years ago,[4] the 2026 Final Rule adequately explains that those concerns are no longer dispositive given the "widespread use of adaptable technologies[.]" 91 Fed. Reg. 32607. Unlike the landscape in 2003, the Secretary is not imposing functional reporting or itemization for the first time; he is not requiring labor organizations to abandon paper filings and use a new and untested electronic system; and technology has significantly improved. Under the terms of the 2026 Rule, Plaintiff will have had nearly sixteen months to modify its accounting systems before having to file with the Secretary (*i.e.*, between June 1, 2026 when the Final Rule was first announced, and September 28, 2027). This is more than reasonable, and Plaintiff's arbitrary and capricious challenge should fail.

* * *

[4] *See AFL-CIO v. Chao*, 297 F. Supp. 2d 155, 162 (D.D.C. 2003) ("*Chao I*").

## CONCLUSION

For these reasons, Defendant's Cross-Motion for Summary Judgment should be granted and Plaintiff's Motion for Summary Judgment denied.

Dated: September 22, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: *\/s/ Samantha-Josephine Baker*
SAMANTHA-JOSEPHINE BAKER
FL Bar #105714
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
Tel: (202) 252-2435
Samantha-Josephine.Baker@usdoj.gov

*Attorneys for the United States of America*

OF COUNSEL:

JONATHAN BERRY
Solicitor of Labor

GARRY D. HARTLIEB
Senior Counselor, Office of the Solicitor

EDWARD M. WENGER
Senior Counselor, Office of the Solicitor

*U.S. Department of Labor*