UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**KEITH E. SONDERLING & ELISABETH MESSENGER,**<br><br>**Defendants.** | **Civil Action No. 26-2061 (JEB)** |

# MEMORANDUM OPINION

As any writer, innovator, or composer knows, there is a difference between shelving an idea and junking it entirely. One leaves open the possibility that a creative spark may prompt a later revisit; the other shuts the door on that potential altogether. On what side of that line does an administrative agency fall when it purports to withdraw a notice of proposed rulemaking that went through notice and comment? And does the Administrative Procedure Act have any qualms about an agency doing so and then reviving the proposal later without beginning the notice-and-comment process anew?

In 2020, the Department of Labor proposed making numerous substantive changes to the financial reporting obligations of the country's largest unions under the Labor-Management Reporting and Disclosure Act. A few months after notice and comment closed, however, DOL announced in a regulatory publication called the Unified Agenda that the proposal had been withdrawn. Nearly six years later, the agency reversed course, finalizing the proposal without further notice and comment alongside a more recently proposed change. The AFL-CIO, one of

the country's largest unions, then sued, challenging the propriety of the rule under the APA. The parties have now cross-moved for summary judgment. The union contends that this regulatory *volte-face* violated the APA's notice-and-comment requirements, that various aspects of the rule exceed the Secretary's statutory authority, and that others are arbitrary and capricious. Although Plaintiff's challenge poses interesting questions of first impression, the Court ultimately concludes that it does not succeed on any of its positions. The Court will thus grant the Government's Motion for Summary Judgment.

## I. Background

### A. Legal Background

During the 1950s, at the apex of their power, labor unions fell under public scrutiny for "corrupt and unethical practices," Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock, 783 F.2d 237, 239 (D.C. Cir. 1986), including "financial abuse [and] mismanagement of labor organization funds." See Labor Organization Annual Financial Reports, 91 Fed. Reg. 32556, 32557 (June 1, 2026). That scrutiny culminated in the passage of the Labor-Management Reporting and Disclosure Act of 1959, which aimed to "put an end to [those] shocking abuses," Shelley v. Brock, 793 F.2d 1368, 1371 (D.C. Cir. 1986) (quotation marks and citation omitted), to "create effective democracy within labor unions[,] and to make accountable previously untouchable union leaders." Lamb v. Miller, 660 F.2d 792, 794 (D.C. Cir. 1981); see 29 U.S.C. § 401 (describing Act's purpose); Finnegan v. Leu, 456 U.S. 431, 435 (1982) (noting that LMRDA was "the product of congressional concern with widespread abuses of power by union leadership").

To that end, the Act requires unions to pull back the curtains on their finances. They must "file annually with the Secretary [of Labor] a financial report" containing information such as

their assets and liabilities, revenues and sources of income, and the salaries paid to their employees, "in such detail as may be necessary accurately to disclose [the union's] financial condition and operations for its preceding fiscal year." 29 U.S.C. § 431(b). The statute vests the Secretary with the authority to fill in the details of that scheme. It specifies that the statutorily required information shall be reported in "such categories as the Secretary may prescribe." Id. It also gives him authority to make regulations "prescribing the form and publication" of those reports, as well "as other reasonable rules and regulations . . . as he may find necessary to prevent the circumvention or evasion of such reporting requirements." Id. § 438.

Exercising that regulatory power, the Secretary has long determined that a union's size and resources should dictate how much it must disclose. See Am. Fed'n of Lab. & Cong. of Indust. Organizations v. Chao, 297 F. Supp. 2d 155, 157 (D.D.C. 2003) (Chao I). Unions with gross annual receipts under certain thresholds may file the simpler Forms LM-3 and LM-4. See 29 C.F.R. § 403.4(a)(1)–(2). America's biggest unions, in contrast, have been required to file the complex Form LM-2, which requires a litany of disclosures. Id. § 403.3.

Although the Secretary adjusted the dollar thresholds for each form over time (presumably to account for inflation), the rules governing reporting otherwise persisted "with only minor modifications" for more than forty years. Chao I, 297 F. Supp. 2d at 157. Then, in 2003, the Secretary promulgated a rule that made "several significant changes to the financial reporting requirements." Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Chao, 409 F.3d 377, 380 (D.C. Cir. 2005) (Chao III); see Labor Organization Annual Financial Reports, 68 Fed. Reg. 58374 (Oct. 9, 2003). As relevant here, the 2003 rule required Form LM-2 filers to report the amount of union funds spent on broad "functional categories" like "organizing," "general overhead," "political activities," and "lobbying." 68 Fed. Reg. at 58391–92. The Department

reasoned that doing so would "enhance union democracy" by giving members insights into how their union spends its resources across practical categories that would matter most to them. Id. at 58392–93. Noting that a "union's own labor costs represent a substantial portion of its yearly disbursements," id. at 58405, DOL also imposed the requirement that unions "estimat[e] the portion of work time spent" by union officers in each of those categories, listing such time as a cost akin to rent or supplies. Chao III, 409 F.3d at 380. The Department would refer to this latter requirement as "functional time reporting." 91 Fed. Reg. at 32587. The new rule also required these unions to itemize certain receipts and disbursements exceeding $5,000. See 68 Fed. Reg. at 58388–90. The agency gave unions that fell within Form LM-2's ambit about seven weeks to come into compliance. Id. at 58374 (establishing effective date of January 1, 2004, following publication in Federal Register on October 9, 2003).

The AFL-CIO is one of the largest unions in the country and has long filed Form LM-2. See ECF No. 1 (Compl.), ¶¶ 8–9. When DOL promulgated the 2003 rule, that union sued under the APA, asserting that the effective date was arbitrary and capricious and the rule substantively infirm because it exceeded the Secretary's authority under the LMRDA. See Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Chao, 298 F. Supp. 2d 104, 106 (D.D.C. 2004) (Chao II). The district court agreed with the AFL-CIO's assessment as to the effective date. Judge Gladys Kessler of this district concluded that "a little less than two months to develop the new accounting systems, purchase . . . new computers and software, and train . . . staff to comply" with new requirements was not reasonable. Id. at 126–27. On the substance, however, the union was not successful. Its statutory challenge was rooted in the premise that the terms "financial condition" and "operations" are terms of art in the accounting field. Chao III, 409 F.3d at 381. As a result, it argued that, by requiring unions to report their "financial condition and

operations," 29 U.S.C. § 431(b), the statute "vest[ed] a limited authority in the Secretary" to require a report reflecting only a "corporate balance sheet and income statement" — not the more detailed itemization that the Secretary required instead. Chao III, 409 F.3d at 381.

Judge Kessler disagreed, concluding that the Secretary had acted well within her authority under the LMRDA in requiring unions to itemize receipts and disbursements in categories and at thresholds prescribed by DOL, see Chao II, 298 F. Supp. 2d at 111–16 — a decision that the D.C. Circuit affirmed on appeal. Chao III, 409 F.3d at 380–86. Proceeding under the now-interred two-step framework from Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), the D.C. Circuit concluded that it was not clear from the plain text of the LMRDA or its legislative history what level of detail the statute authorized the Secretary to require for unions' financial reports. See Chao III, 409 F.3d at 384. So the court moved on to step two of Chevron, where it concluded that the Secretary's new requirements reflected a reasonable construction of the statute. Id. at 384–86. The 2003 rule thus remained in effect, and from 2003 to 2026, Form LM-2 stood largely unaltered.

B. Procedural History

That all changed on June 1, 2026, when the Department promulgated a new final rule — the one at issue here — modifying the reporting requirements under the LMRDA. See 91 Fed. Reg. at 32556, 32557. That rule has its roots in a 2020 notice of proposed rulemaking that floated several changes to Form LM-2 in particular. See Labor Organization Annual Financial Reports: LM Form Revisions, 85 Fed. Reg. 64726, 64728 (Oct. 13, 2020). The Department proposed raising the threshold for filing Form LM-2 from $250,000 to $300,000 to account for inflation. Id. at 64747. It also proposed cleaving off some of Form LM-2's filers, creating a fourth tier for unions whose gross annual receipts exceed $8 million. Id. at 64734–45. Those

unions would be required to file a new form, the Form LM-2 Long Form, which would differ in several substantive ways from the old Form LM-2. Id.

First, the Department indicated that Form LM-2 Long would no longer include "functional reporting of union officer time." Id. at 64739. It explained that it had found the unions' own estimations of their employees' time spent on a particular category to be "difficult to audit" and of "little value" in ferreting out criminal conduct. Id. at 64740. Labor also proposed that the form would split certain functional-reporting categories into subcategories, reasoning that a more granular breakdown would provide union members a better glimpse into how their union spent their dues and what it prioritized. Id. at 64742. Finally, the agency floated requiring Form LM-2 Long filers to separately report the name of each individual or entity "from which the labor organization had received $5,000 or more" within a category of receipts, such as taxes, rents, supplies, and even dues — information that Form LM-2 filers previously reported only in their aggregate sums across the categories listed. Id. at 64743–44. The agency reasoned that embezzlement and other wrongdoing is much easier to hide when the union must report only bulk sums, which can total in the millions. Id. at 64744. The NPRM stated that these changes would go into effect 30 days after the final rule's publication. Id. at 64747.

Publication never came, however. In the spring of 2021, three months after the comment period had closed, the Department announced in a regulatory publication called the Unified Agenda that the proposed rule had been "[w]ithdrawn," labeling the action as "[c]ompleted." View Rule, Off. of Info. & Regul. Affs., https://perma.cc/BU5L-96TM; see Compl., ¶ 18. The legal effect of this withdrawal plays a pivotal role here.

In any event, there matters stood — for a time. Then in July 2025, the Department issued a new notice of proposed rulemaking on the financial-reporting requirements. Its sole proposal

was to raise the dollar thresholds at which unions would have to file Forms LM-2, LM-3, and LM-4 to account for inflation. See Filing Thresholds for Forms LM-2, LM-3, and LM-4 Labor Organization Annual Reports, 90 Fed. Reg. 28251, 28251 (July 1, 2025). After the comment period closed, the Department announced on June 1, 2026, that it would finalize the proposed rule — but with a catch. It would also finalize the rule proposed in the 2020 NPRM. See 91 Fed. Reg. at 32556–57. DOL acknowledged that what it dubbed the "combined final rule" addressed two "distinct regulatory proposals." Id. But it explained that the 2020 and 2025 proposals "operate in the same reporting framework" and "will function in coordination once effective," so it concluded that it would finalize both "for efficiency['s]" sake. Id. DOL maintained that the notice-and-comment record from 2020 remained adequate, as "no new evidence . . . warrant[ed] altering the proposed rule," and the "core circumstances" justifying the rule had "not materially changed" since 2020. Id. at 32561. In the alternative, the agency invoked the "good cause" exception to justify its failure to conduct a new notice-and-comment period before finalizing the proposal. Id. at 32561 n.3.

In sum, the 2026 rule implemented the inflation adjustments proposed in 2025 and otherwise adopted many of the substantive aspects of the 2020 proposal. Of significance here, the rule created the LM-2 Long Form category — just with a threshold of $40 million in annual receipts, rather than the $8 million proposed in 2020. Id. at 32574. It also eliminated functional-time reporting— *i.e.*, the requirement that unions report labor costs across the functional categories. Id. at 32586–87. The rule also split a couple of the prior functional-reporting categories in two: "Political Activities and Lobbying" became "Political Activities" and "Lobbying," while "Representational Activities" became "Contract Negotiation and Administration" and "Organizing." Id. at 32588–89. And — true to the 2020 proposal — the

rule required Form LM-2 Long filers to list in a new schedule the names of "each individual or entity from which the labor organization has received $5,000 or more" across a category of receipts, including union dues. Id. at 32601.

The final rule was set to take effect July 1 — in other words, 30 days after its publication. Id. at 32606. The Department emphasized that the rule would apply only to fiscal years that began after its announcement. Id. Under the statute, each union must hand over its disclosures "within ninety days after the end of . . . its fiscal year[ ]." 29 U.S.C. § 437(b). As such, any union affected would not be required to produce a filing under the new requirements until over a year after the effective date. Still, that filing would have to reflect data from that fiscal year, a particular problem for unions with fiscal years starting July 1. The rule forced them to begin tracking their financial data in new ways only 30 days after first learning that such a proposal was even in the offing. See Compl., ¶¶ 21, 25.

One such affected union was Plaintiff AFL-CIO, which takes in more than $40 million a year and has a fiscal year starting July 1. Id., ¶¶ 9, 21; see also ECF Nos. 15-1 (Declaration of Sibyl Ketcham), ¶ 11 (establishing that one of Plaintiff's affiliate unions is subject to new rule); 15-2 (Declaration of Salma Yousefi), ¶ 5 (same for other affiliate union). Nine days after the rule was announced, the AFL-CIO sued, raising four counts under the APA. The Complaint maintains that the rule was issued without proper notice and comment, imposes an effective date that is arbitrary and capricious, contains substantive provisions that are themselves arbitrary and capricious, and is contrary to law because it exceeds the Secretary's rulemaking authority under the LMRDA. See Compl., ¶¶ 32–54.

The AFL-CIO then filed a motion for a preliminary injunction solely on its claim that the rule's effective date was arbitrarily soon. See ECF No. 7-1 (Mot.) at 3–4. It asked the Court to

"postpone the Rule's effective date until at least January 1, 2027," id. at 30, either by issuing a preliminary injunction or by staying the rule under § 705 of the Administrative Procedure Act. See 5 U.S.C. § 705 (authorizing courts to "postpone the effective date of an agency action . . . to preserve status or rights pending conclusion of the review proceedings" "to the extent necessary to prevent irreparable injury"). The Court denied the motion, concluding that "the harms that the union would suffer from that date alone are not irreparable." Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Sonderling, 2026 WL 1906727, at *1 (D.D.C. July 2, 2026). It reasoned that the union had not "met its demanding burden to prove great costs" and, in any case, had not demonstrated that the harm was likely to arrive "before the Court decides the merits." Id. at *5–6. That is because the union admitted that it would not recode any transactions — even those currently piling up — to comply with the new rule until after the Court had ruled on its propriety. Id. at *5–6.

The parties then filed expedited Cross Motions for Summary Judgment, which the Court now considers. See ECF Nos. 26-1 (Pl. MSJ), 30 (Def. MSJ).

## II. Legal Standard

When reviewing agency action under the APA, the court "sits as an appellate tribunal" and the "entire case on review is a question of law." Marshall Cnty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1225–26 (D.C. Cir. 1993). The parties' motions for summary judgment thus serve "as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." Cemex Inc. v. Dep't of the Interior, 560 F. Supp. 3d 268, 277 (D.D.C. 2021); see Ctr. for Biological Diversity v. Zeldin, 171 F.4th 356, 376 (D.C. Cir. 2026) ("The question of whether

agency action is arbitrary and capricious is a legal one generally made on the administrative record and resolved on summary judgment.").

The APA directs courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "In determining whether an agency's interpretation of its governing statute is contrary to law," the court must exercise its "'independent judgment' and 'apply all relevant interpretive tools' to reach 'the best reading of the statute.'" Env't Def. Fund v. EPA, 124 F.4th 1, 11 (D.C. Cir. 2024) (quoting Loper Bright Enters. v. Raimondo, 603 U.S. 369, 394 (2024)) (cleaned up).

In determining whether an agency action is arbitrary and capricious, conversely, the court's review is more "deferential." Loper Bright, 603 U.S. at 392. The court cannot "substitute its judgment for that of the agency"; it may only ensure that the agency acted "within a zone of reasonableness" — in other words, that it "reasonably considered the relevant issues" and reached a "reasonably explained" decision. FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021). That means that "[a] party seeking to have a court declare an agency action to be arbitrary and capricious carries a heavy burden indeed." Wisconsin Valley Improvement v. FERC, 236 F.3d 738, 745 (D.C. Cir. 2001) (quotation marks and citation omitted). If the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made," Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quotation marks and citation omitted), it will satisfy the "minimal standards of rationality" required under the APA. Nat'l Env't. Dev. Ass'n's Clean Air Project v. EPA, 686 F.3d 803, 810 (D.C. Cir. 2012) (citation omitted). Additionally, while the court "may not supply a reasoned basis for the agency's action

that the agency itself has not given, [it] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974) (citation omitted).

Finally, the court must "set aside a rule if the agency failed to provide the requisite notice and comment and the petitioner has shown prejudice." Chamber of Com. of United States v. EPA, 187 F.4th 636, 649 (D.C. Cir. 2026); see 5 U.S.C. § 553(b).

## III. Analysis

In considering the parties' dueling Motions for Summary Judgment, the Court follows their structural lead. It will first address Plaintiff's procedural objection to the final rule before assessing how it fares on its substantive challenges.

### A. Notice and Comment

Under the APA, see 5 U.S.C. § 553, an agency must provide "notice and opportunity for comment," Dep't of Educ. v. Brown, 600 U.S. 551, 558 (2023), "prior to a rule's promulgation, amendment, modification, or repeal." American Hospital Association v. Bowen, 834 F.2d 1037, 1044 (D.C. Cir. 1987). Plaintiff asserts that DOL violated Section 553 when, after stating in the Unified Agenda that the 2020 NPRM had been "withdrawn," it nonetheless revived its proposals in a 2026 final rule without first going through a fresh round of notice and comment. See Pl. MSJ at 14.

To preview its analysis, the Court concludes that Defendant did not violate the plain text of the APA's notice-and-comment procedures, nor did the agency violate its spirit. The "central purpose" of those procedures "is to subject agency decisionmaking to public input and to obligate the agency to consider and respond to the material comments and concerns that are voiced." Make The Rd. New York v. Wolf, 962 F.3d 612, 634 (D.C. Cir. 2020); see also Int'l

Union, United Mine Workers v. Mine Safety & Health Admin., 407 F.3d 1250, 1259 (D.C. Cir. 2005) (explaining that notice-and-comment procedures are "designed" in part to "ensure that agency regulations are tested via exposure to diverse public comment"). Here, the agency undertook a full notice-and-comment period that gave the regulated public, including the AFL-CIO, the opportunity to weigh in on the rule before it took effect, and the agency considered and responded to those comments. Nothing in the APA or D.C. Circuit caselaw suggests that the agency's decision to withdraw the rule in the Unified Agenda wiped the legal effect of that process away, or that the lag between the close of comment and the rule's ultimate promulgation undermined the policy behind notice and comment. That is especially true given that Plaintiff has not pointed to any material intervening events that retroactively rendered its opportunity to comment inadequate. As explained below, therefore, the Court finds no violation of the APA under the circumstances at issue here.

1. *DOL's Compliance with Notice-and-Comment Requirements*

As the AFL-CIO appears to implicitly accept by rooting this argument in the APA itself, that statute prescribes the "maximum procedural requirements that an agency must follow in order to promulgate a rule." Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania, 591 U.S. 657, 685 (2020) (quotation marks and citation omitted). It also "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). As relevant here, Section 553 of the APA makes an agency jump through three notice-and-comment hoops before it can promulgate a final rule. First, an agency must provide notice of the proposal by publishing it in the Federal Register. See 5 U.S.C. § 553(b). That notice must apprise the public of "the terms or substance of the proposed rule or a description of the subjects and issues involved." Id. Second, the

agency must give interested parties the opportunity to weigh in on the proposal "through submission of written data, views, or arguments." Id. § 553(c). Third and finally, it must consider those comments and then, in its final rule, include a "concise general statement" of the rule's "basis and purpose." 5 U.S.C. § 553(c).

DOL plainly jumped through each hoop here. As discussed above, it put out a notice in the Federal Register, communicating to the public that it proposed making substantive revisions to "the Form LM-2 and establish[ing] a Form LM-2 Long Form (LF)." 85 Fed. Reg. at 64726. That notice invited the public to provide comments, see id., and the Department ultimately received 99 of them. See 91 Fed. Reg. at 32556. Finally, it "reviewed [that] record in its entirety," id. at 32561, and then promulgated the 2026 final rule, which explained the legal basis for the rule and the reasons for the ultimate revisions to the reporting requirements. Id. at 32556-605.

To be sure, approximately five years passed between when DOL put out the notice of proposed rulemaking and when it finalized the rule. But the mere passage of time does not violate the notice-and-comment requirement, as the APA sets no "'useful life' for a notice and comment record." Action on Smoking & Health v. C.A.B., 713 F.2d 795, 800 (D.C. Cir. 1983). Indeed, the D.C. Circuit routinely confronts and upholds final rules promulgated years after the agency issued the notice of proposed rulemaking and sought comment. See, e.g., Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R. Admin., 10 F.4th 869, 873 (D.C. Cir. 2021) (five years); Competitive Enter. Inst. v. U.S. Dep't of Transp., 863 F.3d 911, 913–14 (D.C. Cir. 2017) (five years). The agency therefore did all it needed to do under Section 553 in promulgating this rule. This Court is "not free to impose upon [DOL]" any further

"procedural requirements that have no basis in the APA." Pension Ben. Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

2. *Effect of "Withdrawal" in Unified Agenda*

Does it somehow change the calculus that DOL decided to mark the proposed rule "withdrawn" and "completed action" in the Unified Agenda? View Rule, Off. of Info. & Regul. Affs., https://perma.cc/BU5L-96TM. The D.C. Circuit has held that "[i]f one rulemaking proceeding has culminated and another has begun, then new notice and comment procedures are required." Action on Smoking, 713 F.2d at 800; see Pl. MSJ at 17. But it has never held that an agency "culminates" a rulemaking proceeding, triggering new notice-and-comment obligations, by announcing the withdrawal of a proposed rule. Two strands of caselaw in this area, moreover, give reason to doubt that withdrawal of an NPRM has such legal effect.

First, the D.C. Circuit has held that Section 553 does not require agencies to undergo "an additional notice and comment period" if they wish to revive a rule that was "withdraw[n]" years earlier, so long as the rule had previously gone through a "full period of notice and comment." Am. Min. Cong. v. EPA, 907 F.2d 1179, 1191–92 (D.C. Cir. 1990); see Def. MSJ at 15–16 (invoking this case); see also Sprint Corp. v. FCC, 315 F.3d 369, 375 (D.C. Cir. 2003) (reiterating that American Mining Congress held that agency does not violate APA's notice-and-comment requirements where it "simply reinstate[s] a previously withdrawn rule," even after "eight years" had passed since notice and comment); Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv., 698 F. Supp. 3d 39, 61 (D.D.C. 2023) ("[T]he D.C. Circuit has held that an agency need not open a comment period at all when it reinstates a rule that was previously withdrawn.").

Consider American Federation of Government Employees v. Office of Personnel Management, 821 F.2d 761 (D.C. Cir. 1987). There, the agency "suspended a set of final agency

regulations"; two years later, they went back into effect "without a new period of notice and comment." Am. Min. Cong, 907 F.2d at 1192 (discussing American Federation of Government Employees, 821 F.2d at 764). The D.C. Circuit concluded that the "APA required no new notice and comment period." Id. American Mining Congress is similar. There, the agency revived a rule it had withdrawn eight years prior. See 907 F.2d at 1191. During the intervening period, the agency promulgated a proposal to revive the rule, seeking notice and comment, but ultimately reversed course and never acted on the proposal. See id. at 1183, 1191. Three years later, it reversed course again and, without any further notice and comment, revived the rule. Id. at 1191. The D.C. Circuit concluded that the "APA imposed on [the agency] no obligation to hold a new period of notice and comment before promulgating the 1988 Rule." Id. And the Circuit found it perfectly permissible that, in so doing, "the agency relied on the data acquired in the full-fledged notice and comment process" that it initially undertook when promulgating the original rule. Id.

Those cases strongly suggest that an agency does not need to start from scratch if it wishes to promulgate a final rule after initially announcing that the proposed rulemaking was withdrawn — so long as the proposal had gone through a full round of notice and comment. The logic is straightforward: if the act of formally withdrawing a final rule does not wipe away the legal vitality of an original notice-and-comment process — thereby triggering new notice-and-comment requirements if an agency wishes to revive the rule — it is hard to conclude that the act of withdrawing a proposed rule has a different legal effect under Section 553.

Second, and in contrast, the D.C. Circuit has held that an agency ordinarily does need to start the notice-and-comment process anew if it wishes to reinstate a rule that was vacated by a court order for failure to comply with the APA's requirements. See Mobil Oil Corp. v. EPA, 35 F.3d 579, 584–85 (D.C. Cir. 1994); Action on Smoking, 713 F.2d at 797, 800. That is because

vacatur turns the rule — and the process underlying its creation — into one that never existed. Mobil Oil Corp., 35 F.3d at 584 ("[T]o vacate means to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to set aside.") (cleaned up). That, too, strongly suggests that volitional withdrawal of a notice of proposed rulemaking does not, standing alone, trigger new notice-and-comment obligations if an agency wishes to reverse course and finalize the rule. After all, in such circumstances, the agency is simply thawing an NPRM — which, again, had gone through notice and comment — that it had originally put on ice. It is not attempting to revive a rule that was legally wiped away as infirm.

In any case, even if an agency could culminate a rulemaking proceeding by unmistakably and formally communicating that it had abandoned a proposed rule, DOL did not do so here when it marked the proposed rule "withdrawn" and "completed" in the Unified Agenda. The Unified Agenda was created to help agencies fulfill their obligation under the Regulatory Flexibility Act, see 5 U.S.C. § 602, and several Executive Orders, see, e.g., Exec. Order No. 12,866, 3 C.F.R. § 638 (1994), reprinted as amended in 5 U.S.C. § 601, to compile "all regulations under development or review." Exec. Order No. 12,866. It is a vehicle by which agencies convey to the public each proposed rule's potential economic impact and the estimated rulemaking schedule, while helping the Office of Information and Regulatory Affairs evaluate economically significant proposals through its inter-agency review process. See Introduction to the Unified Agenda of Federal Regulatory and Deregulatory Actions, 86 Fed. Reg. 41166, 41167–69 (July 30, 2021); Jennifer Nou & Edward H. Stiglitz, Strategic Rulemaking Disclosure, 89 S. Cal. L. Rev. 733, 749–50 (2016). As such, when an agency reports in the Unified Agenda that a proposal is "withdrawn," at most it has "withdraw[n] [the] rule" from the "OIRA review process," unless and until the agency chooses to "resubmit it after further consideration," and

signals to the public that the rule has been shelved. OIRA, Off. of Info. & Regul. Affs., https://perma.cc/RP57-UK9E. The same goes for marking an action "completed," a label that the Agenda uses to simply capture that the agency has "completed or withdrawn" a proposal "since publishing its last agenda." 86 Fed. Reg. at 41168.

Those labels have no legal significance under the APA — let alone legal significance under the RFA itself, which plainly caveats that an agency is not required to act in a manner consistent with the agenda or its listings. See 5 U.S.C. § 602(d); 86 Fed. Reg. at 41167. "It would be odd if agencies could nullify past steps taken to comply with the APA in a publication that has little if anything to do with the APA," using labels that have no legal import even outside the APA to boot. Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs., 58 F.4th 696, 706–07 (3d Cir. 2023). This Court thus agrees with the Third Circuit that merely classifying a proposal as "withdrawn" in the Unified Agenda does not terminate a rulemaking proceeding, requiring an agency to "start over" if it "later changes its mind." Id. at 706. Accordingly, DOL's "failure to offer a new comment period after withdrawing th[e] [2020] proposal does not, by itself, require invalidation of [its] final regulations." State of Tex. v. Lyng, 868 F.2d 795, 797 (5th Cir. 1989).

3. *Plaintiff's Counterpoints*

Not ready to throw in the towel, Plaintiff raises a bevy of counterpoints. It first insists that logic dictates that "[a]n agency's decision to withdraw a rulemaking concludes the rulemaking process" — "reset[ting] its notice-and-comment obligations" — because an agency's decision to "terminate its rulemaking proceedings" is "final agency action" subject to judicial review. See Pl. MSJ at 16–17 (quoting Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin., 710 F.2d 842, 846 (D.C. Cir. 1983)) (emphasis omitted). That argument has multiple cracks in its foundation. As an initial matter, whether an agency action is final for purposes of

judicial review is distinct from whether it violates the APA's notice-and-comment requirements. Cf. Lyng, 868 F.2d at 797 (failing to find this argument dispositive). Even if the two bore some logical relation, the union wrongly assumes that DOL's withdrawing the proposed rule in the Unified Agenda also terminated it in a manner sufficiently formal to trigger judicial review.

Whether an agency's decision to terminate a rulemaking is ripe for judicial review turns on the following distinction: does it represent a "final, binding decision" not to move forward with a rule, or can the agency be better understood as having made a "preliminary decision" not to do so, leaving open the "chance" to change course "on its own initiative?" Ctr. For Auto Safety, 710 F.2d at 847, 848. For instance, in Professional Drivers Council v. Bureau of Motor Carrier Safety, 706 F.2d 1216 (D.C. Cir. 1983), the Circuit concluded that it was appropriate to review an agency's decision to "close its rulemaking proceedings" without adopting a final rule. Id. at 1221. There, the agency had issued a formal notice in the Federal Register that it was "terminat[ing] . . . rulemaking," Limits on Hours of Service of Commercial Vehicle Drivers; Termination of Rulemaking, 46 Fed. Reg. 44198 (Sept. 3, 1981), and "clearly articulated the factual and policy bases for its decision" not to forge ahead. Pro. Drivers Council, 706 F.2d at 1221; see also Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Lab., 358 F.3d 40, 42 (D.C. Cir. 2004) (reviewing agency decision to withdraw proposed rule in formal Federal Register notice with explanation); see also, e.g., Withdrawal of Proposed Rule "Health Care Programs: Fraud and Abuse; Civil Money Penalties for Hospital Physician Incentive Plans", 84 Fed. Reg. 37821-02, 37821 (Aug. 2, 2019) ("This document informs the public that OIG has determined not to pursue a proposed rule published in the Federal Register and, as a result, is withdrawing it."); Administrative Law Judges; Withdrawal, 91 Fed. Reg. 16584-01 (Apr. 2, 2026) (similar).

The withdrawal notice here is a far cry from that. The Unified Agenda entry offered no explanation or context for the agency's decision to mark the proposal "withdrawn" and "completed." It simply explained that the entry — not even the rule — was "no longer necessary." View Rule, Off. of Info. & Regul. Affs., https://perma.cc/BU5L-96TM. Nor did the entry suggest that the agency had formally determined that the proposed course of action was permanently off the table. See, e.g., Attorney Fees and Personnel Action Coverage Under the Back Pay Act, 90 Fed. Reg. 31594 (July 15, 2025) (withdrawing proposed rule on ground that comments suggested regulatory approach was wrong and explaining that agency planned to issue new proposal and go through fresh round of notice and comment). As such, even if final agency action were relevant to the question of whether rulemaking was terminated, the Court doubts that the entry at issue here represents final agency action.

Having found no traction there, Plaintiff tries another route, invoking the purpose behind notice and comment. It principally makes three different types of purpose arguments. First, it contends that DOL lulled the public into a false sense of security that there would be no regulatory change when it marked the rule withdrawn, violating the fair-notice principles behind Section 553. See Pl. MSJ at 17–19, 23. It may be true that the regulatory community did not expect — based on DOL's conduct — that the rule would ever come to fruition, but that alone is not sufficient for the Court to find the rule procedurally infirm. Recall that agencies may revive withdrawn final rules without notice and comment. Am. Min. Cong., 907 F.2d at 1191–92. Certainly such action would blindside the regulated community just as much as, if not more than, withdrawing a proposed rule. Yet such revivals are permissible under the APA. So too here.

To check the notice box, then, DOL needed only to "expressly ask[] for comments on a particular issue or otherwise ma[k]e clear that the agency was contemplating a particular

change," Brennan v. Dickson, 45 F.4th 48, 69 (D.C. Cir. 2022), and ensure that its final rule was a "logical outgrowth" of the proposal. Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 174 (2007). Those requirements are easily satisfied here. The 2020 NPRM put the public on notice that DOL was considering making substantive changes "to improve the Form LM2 and establish a Form LM-2 Long." 85 Fed. Reg. at 64726. As discussed above, the NPRM listed each of the proposals that the agency ultimately ended up adopting. Cf. Sprint Corp, 315 F.3d at 375 (distinguishing American Mining Congress on ground that new rule at issue went "substantially beyond" first rule promulgated). The only relevant difference between the rule proposed in 2020 and the one finalized in 2026 is that the latter raised the threshold at which a union would need to file the new Form LM-2 Long Form — from $8 million to $40 million in annual receipts. See 91 Fed. Reg. at 32574. Yet the agency explicitly requested comments on that threshold proposal. See 85 Fed. Reg. at 64734. And in the final rule, DOL explained that it had adjusted the threshold upward after considering the public's comments, analyzing the metrics, and determining that $40 million would best capture the "'largest and most prominent' labor organizations, ensuring filing requirements are proportionate to available resources." 91 Fed. Reg. at 32574; see also id. at 32572–74. An agency "need not provide a new round of notice and comment simply because it modifies a proposed rule in response to a commenter's suggestion." Nat'l Ass'n of Broadcasters v. Fed. Commc'ns Comm'n, 147 F.4th 978, 995 (D.C. Cir. 2025) (internal quotation marks and citation omitted).

Second, Plaintiff suggests that the agency shirked fair notice by relying on "new evidence of union embezzlement," which the public had no opportunity to comment on. See Pl. MSJ at 23. But it is not impermissible for agencies to rely on "new supplementary information that expands on and confirms data in the rulemaking record." Competitive Enter. Inst., 863 F.3d at

920 (internal quotation marks and citation omitted). Here, the agency did just that. In the initial NPRM, it cited multiple criminal convictions involving labor unions that had committed fraud or embezzlement, see 85 Fed. Reg. 64726–27, and in the final rule, the Department cited further "criminal activity involving labor union funds." 91 Fed. Reg. at 32563. It therefore did not err in citing those additional criminal convictions in the final rule.

Finally, Plaintiff suggests that DOL's move undermined the principles behind notice and comment, as the agency did not give the public the opportunity to raise meaningful developments that "might well have come to light after the original notice and comment proceedings." Pl. MSJ at 16 (quoting Mobil Oil Corp., 35 F.3d at 585). It is true that the life of a notice-and-comment record is not "infinite." Mobil Oil Corp., 35 F.3d at 585. At the same time, "new information continually comes to light on the subject of many proposed rules." Sierra Club v. Costle, 657 F.2d 298, 400 (D.C. Cir. 1981). So an agency is not obligated to re-open the comment period every time there has been some change in the world. "Finality, after all, has a place in administrative rulemaking, just as it does in judicial decisionmaking." Id. And, again, where a rulemaking has not been formally terminated, as here, nothing in Section 553 requires an agency to undertake a new round of notice and comment.

That said, agencies do have an obligation under Section 706 of the APA to "reexamine their approaches if a significant factual predicate changes" between the comment period and the rule's finalization. Portland Cement Ass'n v. EPA, 665 F.3d 177, 187 (D.C. Cir. 2011) (quotation marks and citation omitted). That is because such a failure to take a "hard look at the salient problems," Panhandle E. Pipe Line Co. v. FERC, 890 F.2d 435, 439 (D.C. Cir. 1989), is a bread-and-butter violation of the APA's prohibition on arbitrary and capricious agency actions. State Farm, 463 U.S. at 43; see, e.g., Am. Petroleum Inst. v. Johnson, 541 F. Supp. 2d 165, 184–85

(D.D.C. 2008) (concluding that agency acted arbitrarily and capriciously when it promulgated final rule that it had originally proposed ten years prior, as it "fail[ed] to consider a directly relevant decision of the Supreme Court decided before the final rule was promulgated"). Notably, Plaintiff here does not contend that the rule is arbitrary and capricious because the agency neglected to consider material intervening developments. See Pl. MSJ at 33–45 (resting arbitrary-and-capricious arguments on different grounds).

In any case, the AFL-CIO has not identified any meaningful factual developments that it could have brought forward in a reopened notice-and-comment proceeding. The union complains that it could have updated the Department that implementing the new financial-disclosure requirements will be especially challenging, given that after the comment period closed, Microsoft announced that it would stop supporting the software program that unions use to track their financial data. See Pl. MSJ at 22–23. Yet, as Plaintiff itself admits, it has known about this decision since 2024, and Microsoft's support will not cease until the end of 2029. Id. It strains credulity for Plaintiff to suggest that a software change with a five-year runway is a material development.

The union also argues that it could have made arguments about how the Supreme Court's intervening decision in Americans for Prosperity Foundation v. Bonta, 594 U.S. 595 (2021), cast doubt on the permissibility of many of the new rule's sweeping disclosure requirements. See Pl. MSJ at 22. In Bonta, the Court clarified that First Amendment "challenges to compelled disclosure" are subject to at least "exacting scrutiny," which requires the disclosure rule to bear a "substantial relation" to a "sufficiently important governmental interest" and be "narrowly tailored" to that interest. Id. at 611 (opinion of Roberts, C.J., joined by Kavanaugh, J. and Barrett, J.); id. at 619 (Thomas, J., concurring) (contending that strict scrutiny should apply,

which also requires narrow tailoring); id. at 622 (Alito, J., concurring, joined by Gorsuch, J.) (explaining that he would defer for another day whether "a single standard" — exacting scrutiny versus strict scrutiny — "applies to all disclosure requirements").

Even before Bonta, however, both the Supreme Court and the D.C. Circuit made clear that compelled-disclosure laws like the one at issue here are subject to at least "exacting scrutiny" and require tailoring of the kind suggested in Bonta. See id. at 608 ("The need for narrow tailoring was set forth early in the Court's compelled disclosure cases."); id. (explaining that Court applied "exacting scrutiny" to "non-election cases"); Nat'l Ass'n of Mfrs. v. Taylor, 582 F.3d 1, 10 (D.C. Cir. 2009) (observing that "exacting scrutiny," at a minimum, applied to disclosure requirement); Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n, 333 F.3d 168, 175 (D.C. Cir. 2003) ("[T]he Commission failed to tailor its disclosure policy to avoid unnecessarily infringing upon First Amendment rights."). What is more, over forty years ago, two circuits evaluated a challenge to a different LMRDA provision and required the government to "show that the disclosure and reporting requirements are justified by a compelling government interest, and that the legislation is narrowly tailored to serve that interest." Master Printers of Am. v. Donovan, 751 F.2d 700, 705 (4th Cir. 1984); see also Humphreys, Hutcheson & Moseley v. Donovan, 755 F.2d 1211, 1221 (6th Cir. 1985) (adopting same standard).

The upshot? Although Bonta may have "clarified the contours" of the Supreme Court's First Amendment compelled-disclosure jurisprudence, Wyo. Gun Owners v. Gray, 83 F.4th 1224, 1243–44 (10th Cir. 2023), it was hardly a watershed that meaningfully changed the backdrop against which DOL was making rules. At bottom, then, although DOL's maneuvering may not have been best practice, it did not thwart the principles behind notice and comment. The agency

did not violate Section 553 of the APA in reviving the 2020 proposals without starting from square one on notice and comment.

B. Contrary to Law

The union next plucks a different arrow from its quiver. It contends that DOL ventured beyond its statutory remit by requiring Form LM-2 Long filers to itemize annual receipts for certain categories, such as dues, rents, and per-capita tax, including by reporting the name of the individual involved in the transaction. See Pl. MSJ at 25–33. The LMRDA authorizes the Secretary to require labor organizations to file an annual "financial report . . . in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year" — "all in such categories as the Secretary may prescribe." 29 U.S.C. § 431(b). In the AFL-CIO's view, that language means that the Secretary can mandate labor unions to report only information that would appear on a statement of "financial condition" and a statement of "operations" — *i.e.*, a corporate balance sheet and income statement. See Pl. MSJ at 26–30. In the union's eyes, the rule thus obliges Form LM-2 Long unions to divulge far more information than the statute permits. Id. at 32–33. There are numerous infirmities with that position.

1. *Chao III*

If Plaintiff's contention sounds familiar, that is because it is. As discussed above, the D.C. Circuit already considered and rejected this precise argument in Chao III. There, the AFL-CIO (plaintiff in that case, too) also asserted that the Secretary had exceeded her statutory authority when she promulgated a rule requiring LM-2 filers to "itemize receipts and disbursements of $5,000 or more, as well as receipts not reported elsewhere from, or disbursements to, a single entity that total $5,000 or more in the reporting year, in specified categories." 68 Fed. Reg. at 58374; see Chao III, 409 F.3d at 378. There, as here, the union

invoked the technical definitions of the terms "financial condition" and "operations," arguing that the statute did not permit the Secretary to require unions to report anything more than what would be found on statements of financial condition and operations. Chao III, 409 F.3d at 381–82. The Circuit rejected that position, concluding that the Secretary had acted permissibly when she required the more detailed reports. Id. at 386. The court found the union's textual arguments wanting, explaining that Congress did not in fact "adopt the precise terms of art — 'statement of financial condition' and 'statement of operations' that connote the typical corporate income statement and balance sheet." Id. at 381. The D.C. Circuit also found unpersuasive the union's arguments premised on legislative history and statutory structure. Id. at 382–84.

Plaintiff brushes off Chao III, contending that it has no precedential effect after Loper Bright, because Chao III relied on the framework from Chevron, which Loper Bright jettisoned. See Pl. MSJ at 32–33. That assertion rings hollow. True, Chao III's ultimate holding expressly relied on Chevron to uphold the regulation on the ground that the Secretary's interpretation of her authority was a reasonable construction of the statute. See 409 F.3d at 386. Despite rejecting Plaintiff's term-of-art argument, the court still thought that there was "ambiguity" regarding the precise "level of public financial reporting detail that the Secretary may require," prompting it to reach Chevron step two. Id. at 384, 386. Still, Loper Bright went out of its way to explain that it did "not call into question prior cases that relied on the Chevron framework." 603 U.S. at 412. Indeed, it went further, expressly warning that "[m]ere reliance on Chevron cannot" justify "overruling a statutory precedent." Id. The Supreme Court explained that disagreeing with the outcome because it rested on Chevron is simply the same as saying "that the precedent was wrongly decided" — which is emphatically not enough to justifying overturning such precedent. Id. (citation omitted). For that reason, numerous courts of appeals have concluded that "cases

relying on Chevron remain binding . . . insofar as they interpret the statutes at issue." U.S. Dep't of Lab. v. Americare Healthcare Servs., Inc., 171 F.4th 838, 848 (6th Cir. 2026); see also Garcia Pinach v. Bondi, 147 F.4th 117, 132 (2d Cir. 2025) (collecting cases).

Fighting that conclusion, Plaintiff insists that Loper Bright held only that "courts should generally refuse to revisit the lawfulness of 'specific agency actions' — particular agency rules or orders — that have already been upheld under the Chevron framework." ECF No. 32 (Pl. Reply) at 18. This Court does not interpret Loper Bright as so limiting its *stare decisis* proviso. Nor would such a limitation make sense, given that courts traditionally treat statutory precedent as saying something about the construction of a statute, not the propriety of a particular agency action. Chao III thus binds this Court's hands.

Even if it did not, that would not change Plaintiff's fate. Chao III explicitly rejected the AFL-CIO's position that the level of detail was dictated by the accounting terms "statement of financial conditions" and "statement of operations." Compare id. at 381 ("Congress did not adopt the precise terms of art . . . that connote the typical corporate income statement and balance sheet."), with Pl. Reply at 19 "([T]he D.C. Circuit did not hold that the AFL-CIO had misinterpreted the LMRDA."). That analysis hinged not on Chevron but on "traditional tools of statutory construction" and the court's effort to divine the statute's meaning before resorting to Chevron deference. Chao III, 409 F.3d at 381 (citation omitted).

Whether or not such statutory interpretation binds this Court, it was plainly correct. The best reading of the statute is that it vests the Secretary with "a degree of discretion" to determine what information, and at what level of detail, unions must disclose in their annual reports to accurately convey their "financial conditions and operations" — in other words, their operations and financial state. Loper Bright, 603 U.S. at 394 (citing Batterton v. Francis, 432 U.S. 416, 425

(1977)). That conclusion flows from two key aspects of the statutory language. First, the statute gives the Secretary "authority" to makes rules "prescribing the form and publication of" the financial reports and to "prescribe" the "categories" of information to be disclosed in those reports. See 29 U.S.C. §§ 431(b), 438. Second, the statute explains that the information to be disclosed must cover as much "detail as may be necessary" to capture the union's "financial conditions and operations." Id. § 431(b). One will note that, contrary to Plaintiff's depictions, that clause does not say that unions must annually report their "statement of financial conditions" and "statement of operations." Chao III, 408 F.3d at 381. Instead, the phrase "financial condition and operations" follows the word "information," which itself modifies the word "report," conveying that the statute requires a report containing enough information as is "necessary" to paint an "accurate[]" picture of the "financial conditions and operations" of each union. See 29 U.S.C. § 431(b).

Put together, the statute is thus an "express[] delegat[ion] to the Secretary [of] the power," Batterton, 432 U.S. at 425, to require unions to report certain information "in such categories" and "in such detail" as the Secretary determines in his judgment is "necessary" to fulfill the provision's aims. See 29 U.S.C. § 431(b). After all, the word "necessary" "clearly invites further definition by the Secretary" and "unavoidably calls for the exercise of the Secretary's judgment and expertise" as to the types of information and level of detail required. Chao III, 409 F.3d at 393 (Roberts, J., concurring in part and dissenting in part); see Fla. E. Coast Ry. LLC v. Fed. R.R. Admin., 186 F.4th 822, 836 (11th Cir. 2026) ("A broad consensus of our sister circuits has recognized 'as necessary' or 'necessary' as affording discretion.").

DOL's regulation is thus permissible under the statute, as it reflects "reasoned decisionmaking within [the statute's] boundaries." Loper Bright, 603 U.S. at 395 (quotation

marks and citation omitted). The Department determined that requiring unions to itemize receipts and disbursements of $5,000 or more "is vital to ensure that conflicts of interest can be identified and that the members of a labor organization have transparency into their union's dealings," which strikes at the heart of the LMRDA's purpose to ferret out corruption, as "aggregat[ion] makes it extremely difficult for a member to see potential problems." 91 Fed. Reg. at 32591. That is a "logical and rational" exercise of the Secretary's authority. Michigan v. EPA, 576 U.S. 743, 750 (2015) (citation omitted). The agency also determined that requiring unions to list members paying more than $5,000 would "enable[] members to identify potential conflicts of interest and to surface irregulates [*sic*]" in how unions are using dues, including any potential fraud or embezzlement. See 91 Fed. Reg. at 32590. As explained further below, that, too, survives the minimum standard of rationality.

2. *Plaintiff's Contrary Assertions*

The AFL-CIO does not quibble with the fact that the statute vests some discretion in the Secretary. See Pl. Reply at 24–25. Instead, it contends only that the terms "financial condition" and "operations" impose greater constraints on that discretion, given their specialized meanings. Id. at 25. Specifically, Plaintiff insists that it cannot be "pure coincidence" that Congress used "specific, technical terms" for the kinds of "basic financial reports" that were in use at the time the statute was enacted. Id. at 20.

That argument is more veneer than substance. Recall that the statute does not even use the word "statement" — let alone the phrases "statement of financial condition" and "statement of operations." The Supreme Court has declined to conclude that a statute adopts terms of art simply because it uses language similar to such terms. Bruesewitz v. Wyeth LLC, 562 U.S. 223, 234–35 (2011) (concluding that Congress did not invoke term of art "unavoidably unsafe

products" when statute referred to "side effects that were unavoidable," despite similarities). Indeed, Plaintiff's theory of the case works only if one plucks the words "financial conditions" and "operations" out of their statutory context, inserts words Congress did not use, and ignores the rest of what Congress said. That is not a good recipe for accurate statutory interpretation. See Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); Bates v. United States, 522 U.S. 23, 29 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face."); Williams v. Taylor, 529 U.S. 362, 404 (2000) ("It is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute.") (quotation marks and citation omitted).

If Congress had intended to require unions to publish their corporate balance sheets and income statements, or even to file reports consistent with generally accepted accounting principles, "Congress could easily have said so." Kucana v. Holder, 558 U.S. 233, 248 (2010). Elsewhere, the legislature has done just that. See, e.g., 12 U.S.C. § 1456(c)(2) (directing Federal Home Loan Mortgage Corporation to file "annual report" that "shall include . . . financial statements prepared in accordance with generally accepted accounting principles"); 29 U.S.C. § 3245(e)(1) (requiring local recipients of funds to "submit quarterly financial reports" containing "information identifying all program and activity costs by cost category in accordance with generally accepted accounting principles"). As such, Plaintiff's insistence that the statute covers only "statement[s] of financial condition" and "statement[s] of operations" does not make it so. See Pl. MSJ at 27–28 (quotation marks omitted).

The union punches back that if Congress had intended to give the Secretary authority to "cover a broader universe of financial details," it would have used words like "finances" or "financial information." Pl. Reply at 20. But Congress did use language that captures a broad array of financial information by insisting that the reports need to be as "detail[ed] as may be necessary to accurately" convey to the public and the union's members its "financial conditions and operations" and in giving the Secretary capacious authority to define the contents of those reports. See 29 U.S.C. §§ 431(b), 438.

Plaintiff also reaches for support from statutory structure. In describing the types of "information" that the financial reports should disclose, the statute lists six categories, in varying levels of detail. Id. § 431(b). For instance, it requires unions to report disbursement to "each" union employee who received more than $10,000 from the union. Id. § 431(b)(3). By contrast, for "assets and liabilities," "receipts," and "other disbursements," its instruction stops there; it offers no further detail. Id. § 431(b)(1), (2), (6). Seizing on that alleged distinction, the union argues that Congress "signaled that itemization was not required for financial information other than the enumerated categories." Pl. MSJ at 29.

The Court is not persuaded. Congress bookended the six items in the list with two clauses, which plainly demonstrates that the level of detail required for each category was set to fluctuate. First, before introducing the list, Congress specified that "the following information [must be reported] in such detail as may be necessary accurately to disclose" the union's financial status. See 29 U.S.C. § 431(b). It is a "routine aspect of expression" that "an introductory phrase" in a statute may "apply to, or modify, several terms coming after it, one by one by one." Pulsifer v. United States, 601 U.S. 124, 134 (2024). It is thus apparent that each item in the list must be reported in such detail as is necessary to achieve the provision's goal.

Second, after introducing the list, Congress specified that the items shall "all" be "in such categories as the Secretary may prescribe." 29 U.S.C. § 431(b). "[A] modifier at the end of the list 'normally applies to the entire series,'" and there is no reason to think that this ordinary grammar rule does not apply here. Facebook, Inc. v. Duguid, 592 U.S. 395, 402–03 (2021) (quoting with modification A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012)). Read in whole, then, the provision does not convey that detailed reporting is required only for certain aspects of the financial report but not disbursements, receipts, and assets and liabilities. Instead, the statute clearly contemplates that the level of detail across items in the list will vary as is "necessary." Structure is thus no savior here.

With the plain-text arguments lined up against it, Plaintiff responds by urging the Court to embrace its position anyway under the canon of constitutional avoidance. See Pl. MSJ at 30–31. That canon "is a tool for choosing between competing plausible interpretations" of an ambiguous provision, animated by the presumption that Congress would not legislate in a way that raises serious "constitutional doubts." Clark v. Martinez, 543 U.S. 371, 381 (2005). Plaintiff contends that there is a "serious question" whether requiring unions to itemize their financial transactions, as well as name the payors and payees involved in those transactions, violates its First Amendment right to freedom of association. See Pl. MSJ at 30, 32 (citing Bonta, 594 U.S. at 606, 608). So even if its reading does not represent the best interpretation of the statute, the union contends that the Court ought to adopt it nonetheless to avoid "serious constitutional concerns" raised by DOL's reading of the statute. Id. at 30–31.

The canon of constitutional avoidance, however, "comes into play" only when "ordinary textual analysis" reveals ambiguity in the statute's meaning. Clark, 543 U.S. at 385. "It has no application in the interpretation of an unambiguous statute." McFadden v. United States, 576

U.S. 186, 197 (2015) (quotation marks and citation omitted). That principle bars application of the canon here. Assuming *arguendo* that Chao III is no longer binding on this Court post-Loper Bright, this Court's independent statutory analysis demonstrates that the statute is sufficiently clear to preclude application of the constitutional-avoidance canon. See Warger v. Shauers, 574 U.S. 40, 50 (2014) (explaining that, where ordinary tools of statutory construction reveal text of statute is clear, "canon of constitutional avoidance has no role to play"). Because Plaintiffs do not bring a freestanding constitutional challenge to the rule, moreover, the Court need not grapple with its constitutional dimensions. In short, the Court cannot conclude that the 2026 final rule exceeds the Department's statutory authority.

C. Arbitrary and Capricious

Plaintiff next focuses its sights on a different target. The AFL-CIO contends that three aspects of the 2026 rule are arbitrary and capricious: (1) the changes to the functional-reporting requirement, (2) the requirement that Long Form LM-2 unions disclose the names of members who pay at least $5,000 in dues, and (3) the choice to make the rule effective 30 days after it was issued. The Court tackles each contention separately.

1. *Functional Reporting*

First up is the union's challenge to DOL's modification of the functional-reporting requirement to (1) expand the functional categories by breaking down two prior categories into four new ones, and (2) eliminate functional-time reporting. See Pl. MSJ at 33–38. An attentive reader will recall that functional reporting requires unions to report disbursements across certain functional categories, such as lobbying or overhead, while functional-time reporting requires unions to report a union's own labor costs across the same functional categories.

When an agency changes its position, it must do two things to survive arbitrary-and-capricious review. It must first "display awareness that it is changing position" — in other words, it may not "depart from a prior policy *sub silentio*." Fox Television Stations, 556 U.S. at 515. The agency also "must show that there are good reasons for the new policy," id., and must "supply a reasoned analysis for the change." Ark Initiative v. Tidwell, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting State Farm, 463 U.S. at 42).

It appears undisputed that Defendant fulfilled its initial obligation to acknowledge that it was making the two challenged alterations to its rules. The agency recognized that splitting "Representational Activities" into (1) "Contract Negotiation and Administration" and (2) "Organizing," as well as dividing "Political Activities and Lobbying" into (1) "Political Activities" and (2) "Lobbying," was a departure from the functional categories used in the 2003 rule. See 91 Fed. Reg. at 32589. It also acknowledged that the 2026 rule "eliminat[ed] . . . functional reporting of work time for both officers and employees" as required under the 2003 rule. Id. at 32586.

But were those two changes reasonable and well reasoned? The answer is plainly yes for the changes to the functional categories themselves, an issue upon which Plaintiff does not put up much of a fight. See Pl. MSJ at 37 (arguing issue on one page); Pl. Reply at 28–32 (not arguing issue at all). DOL made "clear the major policy issues at stake," responded to critical comments, and explained, "why it resolved [the issues] as it did." Brennan, 45 F.4th at 72. As for the decision to divide "Representational Activities" into "Contract Negotiation and Administration" and "Organizing," the agency explained that members would benefit from understanding "how their labor organization balances the recruiting of new members against advancing current members' interests through collective bargaining." 91 Fed. Reg. at 32589.

With respect to splitting "Political Activities and Lobbying" into two subcategories, the agency likewise reasoned that it would further "transparency for union members," as "political activities differ considerably from lobbying in terms of their purpose and their significance to union members," and members deserve to know what causes and issues their union is putting its efforts toward. Id.

The agency acknowledged comments critical of the proposal, including that "delineating transactions between the two categories is often unclear." Id.; see Pl. MSJ at 37 (raising this issue). The Department nonetheless concluded that delineating should not be "an overly difficult task." 91 Fed. Reg. at 32589. It reasoned that there is a clear distinction between funds spent on lobbying and those spent on political contributions and likewise a distinction between funds spent "preparing and negotiating" collective-bargaining agreements versus those spent "recruiting new members" and doing membership retention. Id. Even if the new reporting burdens were more onerous, the "transparency" benefits to members outweighed any administrative cost to the union. Id. at 32589–90. DOL thus carried its burden to offer reasoned explanation for its change and adequately respond to critical comments. The AFL-CIO's "dissatisfaction with the substance of the response . . . is no reason to invalidate the Rule." Brennan, 45 F.4th at 73.

The agency also offered a reasonable and sufficiently reasoned explanation for its decision to eliminate functional-time reporting while keeping the functional categories. Labor explained that "time estimates are difficult to ascertain and verify"; unions must often "ballpark" the amount of time allocated to each category, and neither the Department nor the union's members have a way of auditing those numbers to verify their accuracy. See 91 Fed. Reg. at 32587; see also id. at 32566. The agency thus determined that functional-time reporting did not

further "LMRDA's core purpose of ensuring reliable financial accountability" and giving union workers real "transparency in how the labor organization operates." Id. at 32587. The agency further explained that reporting disbursements across the functional categories, by contrast, does further those goals, as the disbursements are "concrete, auditable evidence of organizational spending priorities rather than unverifiable estimates." Id. Defendant thus clearly "examine[d] the relevant data" and offered a "rational connection between the facts found and the choice made." State Farm, 463 U.S. at 43. One cannot say that the agency's reasoning fails the minimum standard of rationality needed to survive arbitrary-and-capricious review.

Still, Plaintiff resists. It maintains that nixing functional-time reporting while keeping functional reporting was an inherently irrational choice, as it undermines the purpose of functional reporting altogether by giving members a misleading picture of how their union spends its resources across the categories. See Pl. MSJ at 34. That is because such a system will understate how much money a union is spending in categories where the largest cost to the union is labor — typically representational activities, such as collectively bargaining — while giving the erroneous impression that the union cares more about other categories where the work is typically outsourced to third parties — such as lobbying. Id. at 35. That cannot be squared with the original purpose of the functional-reporting system writ large, it argues, which was to help members "gauge whether the union is committing its resources in the sums and proportions they consider appropriate." Id. at 34 (quoting 68 Fed. Reg. at 58393).

It is true that an agency action is arbitrary and capricious if it "employ[s] means that actually undercut its own purported goals." Off. of Commc'n of United Church of Christ v. FCC, 779 F.2d 702, 707 (D.C. Cir. 1985). Still, the agency did not run afoul of that principle here. Labor simply reasoned that a type of expenditure reporting that could not be corroborated

by union members simply could not help them make an informed assessment about their unions' priorities or meaningfully compare different labor organizations. See 91 Fed. Reg. at 32587. The agency also anticipated the AFL-CIO's concern that axing functional-time reporting would give members an incomplete picture of their union's priorities. It reasoned that continuing to require unions to report actual dollar expenditures "itemized in the appropriate functional schedules" would "provid[e] more reliable evidence" of a union's "priorities than time estimates." Id. (emphasis added). True, that explanation is brief and perhaps not a "model of analytical precision." Van Hollen, Jr. v. Fed. Election Comm'n, 811 F.3d 486, 496 (D.C. Cir. 2016) (citation omitted). Yet a "reviewing court can reasonably discern the agency's analytical path," which is "enough" to clear Section 706's "low hurdle." Id. at 497. At bottom, Plaintiff may disagree that prioritizing verifiable disclosures — albeit trimmer ones that will not reflect all of a union's spending priorities — better advances the transparency aims behind the LMRDA. The Court cannot say, however, that the agency made an irrational or unexplained choice when it opted to strike the balance as it did between those competing concerns.

Plaintiff also suggests that the Department acted arbitrarily and capriciously by ignoring its own field investigators' views that reporting disbursements by functional categories was just as useless for investigative purposes as functional-time reporting. See Pl. MSJ at 36–37; Pl. Reply at 31–32. That argument does not stick either. For starters, the agency acknowledged that its "field staff saw benefits" to functional reporting "but also commented on its limitations." 91 Fed. Reg. at 32565. For instance, it explained that field staff reported that the categories sometimes "hinder investigations" by obscuring transactions, id. at 32565–66, since the "$5,000 threshold [for reporting] is applied by category rather than just by the amount of the transaction(s) alone." ECF No. 35 (A.R.) at ECF p. 190. But it also accurately reported that

others saw at least some benefit to it, as they had been able to "target audits based on unusual categorization patterns that ultimately indicated reporting or other potential LMRDA violations." 91 Fed. Reg. at 32565 (citation omitted); see A.R. at ECF p. 190; see also id. at 192 ("Disbursements in different categories are useful."). That mixed report contrasted sharply with the overwhelmingly negative comments on functional-time reporting. Indeed, every investigator to weigh in reflected that functional-time reporting had no benefit to them and was impossible to verify. See A.R. at ECF p. 190–94. The agency did not act arbitrarily and capriciously by opting to preserve one reporting requirement in which at least some investigators saw utility while jettisoning another that received exclusively negative feedback.

In any event, the Secretary is "by no means obliged to heed the advice of its expert staff." Mobil Pipe Line Co. v. FERC, 676 F.3d 1098, 1103 n.2 (D.C. Cir. 2012). The agency must consider the relevant evidence — which may include staff surveys of the kind in the record here — but the ultimate "choice between reasonable policy alternatives" remains the Secretary's to make. Dep't of Com. v. New York, 588 U.S. 752, 775 (2019). This Court cannot substitute its judgment for that of the agency simply because some of the Department's investigators may have wished to chart a different course. The agency's decision to eliminate functional-time reporting while preserving functional reporting of disbursements was not arbitrary and capricious.

2. *Dues Disclosure*

Plaintiff next contends that the Department acted arbitrarily and capriciously in requiring unions to list the "name, city, and state," as well as payment amount, for anyone who pays over $5,000 in dues, given that such information implicates sensitive privacy concerns. See Pl. MSJ at 38–39. The union insists that the agency did not "even acknowledge the substantial privacy interests" at stake, see Pl. Reply at 32, which were briefly raised in some of the comments. See,

e.g., A.R. at ECF pp. 217, 247. That is incorrect; the final rule contains a whole section entitled "Privacy Concerns." 91 Fed. Reg. at 32590. There, the agency explained that, in response to comments, it would allow unions to omit individuals' "full street address[es]," consistent with an "exception" that it had allowed for other itemized disclosures. Id. The agency also explained that it had crafted the rule to ensure that it would apply only to the nation's largest unions and, even then, only to those members who pay more than $5,000 annually — thus affecting only a narrow slice of the population. Id.

Plaintiff also argues that the Department offered no rational reason for the requirement. The agency, in fact, reasoned that such public accounting "is essential" to ensuring "an informed membership and the Department's corresponding enforcement responsibilities." Id. The rule explained that only if members can see an "exact" "match[]" between their information and the "transaction reported" will they be able to ensure union leaders do not embezzle dues — as investigations had revealed at least one union leader did. Id.; see also 85 Fed. Reg. at 64744 ("If there is no itemized receipt in new Schedule 22 — From Members for Disbursement on their Behalf for payments of $5,000 or more or the receipt is less than expected, then the member would know that the money was not properly reported and may pursue other avenues to determine what has happened to the funds.").

Plaintiff quarrels that any legitimate interest could be achieved through less-intrusive means. See Pl. MSJ at 39. Maybe so. A court, however, is "not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." FERC v. Elec. Power Supply Ass'n, 577 U.S. 260, 292 (2016). Agencies enjoy substantial leeway to make imperfect policy decisions. The only question is whether the agency examined the relevant considerations, reached a decision that bears a rational relationship to its stated goal, and

explained its decision. Id. That is not say that an agency may ignore "responsible alternatives to its chosen policy" or fail "to give a reasoned explanation for its rejection of such alternatives." Spirit Airlines, Inc. v. U.S. Dep't of Transp. & Fed. Aviation Admin., 997 F.3d 1247, 1255 (D.C. Cir. 2021). Here, however, the agency explained that it considered "relying on the Department's subpoena authority to obtain [information related to dues] after the fact," instead of requiring disclosure. See 91 Fed. Reg. at 32590. It concluded that subpoena authority on its own was insufficient, as the itemized disclosures themselves "often provide the initial basis for suspicion" of "potential conflicts or embezzlement" to "justify a subpoena in the first place." Id.

The AFL-CIO pushes back that a canceled check is all a member would need to confirm that her union — not its leaders — pocketed the cash. See Pl. MSJ at 39. A canceled check, however, shows who endorsed the check for deposit, not in which account the funds ultimately ended up. See 85 Fed. Reg. at 64744 ("Instead of depositing the checks into the union's bank account, the union treasurer endorsed the checks and deposited them into his own personal bank account under false pretenses."). In short, although the rule may be trigger happy or even unwise, the Court cannot conclude that it bears no rational connection to the agency's stated goal, lacks reasoning, or blatantly ignores obvious alternatives.

Plaintiff's real gripe appears to be that the disclosure requirement is not narrowly tailored to a substantial government interest — in other words, that the rule is unconstitutional. Yet, as the Court explained above, the AFL-CIO does not bring an independent challenge to the rule on constitutional grounds. The Court therefore has no basis to entertain such a claim.

3. *Effective Date*

The union aims its final salvo at the effective date, the sole basis upon which it moved for a preliminary injunction. Sonderling, 2026 WL 1906727, at *2. It contends that requiring

unions to come into compliance only 30 days after the rule's finalization — when unions thought the rule was shelved, no less — is arbitrary and capricious. The union's principal beef is that the rule is irrational and ill explained, as it will take months, not 30 days, for unions to update their accounting system to account for the new changes. See Pl. MSJ at 41.

That argument does not strike its target, however, as DOL "reasonably considered the relevant issues" and "reasonably explained" its choice of 30 days. Prometheus Radio Project, 592 U.S. at 423. Under the APA, rules have a presumptive 30-day effective date. See 5 U.S.C. § 553(d). That standard gives agencies "considerable discretion to choose an effective date." Recording Indus. Ass'n of Am. v. Copyright Royalty Tribunal, 662 F.2d 1, 14 (D.C. Cir. 1981); Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 543 (1978) ("[A]dministrative agencies should be free to fashion their own rules of procedure.") (quotation marks and citation omitted). In determining that 30 days was appropriate, Defendant acknowledged that unions would face technological hurdles in coming into compliance. It recognized that they "may require time to update accounting systems, internal controls, and reporting practices to comply with the revised forms and instructions," including by making "software" updates and training staff. See 91 Fed. Reg. at 32607. It also recognized that numerous labor organizations requested a much longer implementation period of 18 months given those logistical constraints. Id.

The agency explained, however, that it also received comments asking for just the opposite: an immediate effective date. Id. And it explained that unions would not need to file their first report in compliance with the new rules until a full year after the rule's announcement. Id. at 32606. As such, preparation for the filings would be forward looking, rather than "retroactive." Id. Weighing those factors, DOL settled on the default 30 days, concluding that it

"[a]ppropriately balance[d] the need for timely transparency enhancements with the practical realities of compliance and administrative transition." Id. at 32607; but see Pl. MSJ at 42 ("DOL also failed to explain why that short amount of lead time was beneficial.").

Plaintiff protests that the agency did not specifically acknowledge that the choice of date put unions with July 1 fiscal years in a pickle. See Pl. MSJ at 41. That is because they would need to move with alacrity to transition over to new software and train their staff on the new accounting procedures almost immediately. And if they found that enterprise infeasible? They would simply have to record their financial data pursuant to the old format until they could implement a new system, necessitating manual recoding down the line — an expensive and potentially error-prone exercise. See ECF No. 7- 2 (Declaration of Mary Margaret Prange), ¶¶ 29–30. But neither the AFL-CIO nor any other party raised this specific concern with the agency during the rulemaking process. See A.R. at ECF pp. 201–10 (AFL-CIO comments on proposed rule, which included 30-day effective date, not mentioning effective date); Nat'l Wildlife Fed'n v. EPA, 286 F.3d 554, 562 (D.C. Cir. 2002) ("It is well established that issues not raised in comments before the agency are waived and this Court will not consider them."). At most, the AFL-CIO points to comments explaining that the transition would be burdensome. See Pl. MSJ at 10 (collecting record citations); see, e.g., Nat'l Ass'n of Letter Carriers, Comment Letter at 8 (Dec. 10, 2020), https://www.regulations.gov/comment/LMSO-2020-0002-0096 (explaining that unions would need to "re-tool and make all the necessary changes which must be in place prior to the start of the reporting period [a]ffected by the new reporting rules"). But the agency expressly addressed those concerns when it acknowledged that unions would need to transition their technology and staff to the new requirements, see 91 Fed. Reg. at 32607, and that

the burden imposed on unions by the rule would be higher in the first year. Id. at 32608. DOL thus adequately addressed the feasibility and cost concerns raised during the rulemaking.

Plaintiff also maintains that the agency acted arbitrarily in not explaining why it was departing from its "past practice" of giving more runway when implementing major changes to the disclosure requirements. See Pl. MSJ at 42–43. It invokes examples from 1992, 2003, and 2009, where the Government offered a few months of lead time for reporting-requirement changes. Id. at 43–44. An agency need only explain when it departs from a prior policy. Fox Television Stations, 556 U.S. at 515. The Court doubts that the choice of an effective date is a "policy" within the meaning of Fox Television Stations. In any case, citing three past examples does not show that the agency had a prior "policy regarding" effective dates for financial-disclosure changes. Am. Wild Horse Pres. Campaign v. Perdue, 873 F.3d 914, 923 (D.C. Cir. 2017). That is especially so given the broad discretion agencies have to fashion effective dates consistent with the unique needs of each situation. For instance, in 1992, the Department flirted with — but ultimately withdrew — a proposal to implement the functional categories that DOL formally embraced in 2003. Labor Organization Annual Financial Reports, 57 Fed. Reg. 49282, 49282 (Oct. 30, 1992); see 68 Fed. Reg. at 58403 (recounting procedural history of proposal). It originally proposed a 30-day effective date, but after receiving comments about the difficulties of "revis[ing] . . . recordkeeping systems," the Department decided to "waiv[e] the customary . . . effective date of . . . 30 days" and instead give 18 months. Labor Organization Annual Financial Reports and Abbreviated Annual Financial Reports for Small Labor Organizations, 58 Fed. Reg. 28304, 28308 (May 12, 1993).

In 2003, moreover, the agency chose an effective date of about three months precisely because it was implementing the functional categories for the first time and thus knew that

unions would need time to "adapt their recordkeeping practices" to that entirely distinct system. See 68 Fed. Reg. at 58411. Plaintiff makes no convincing argument that, by picking these two dates, DOL somehow locked itself in perpetuity into extending the effective date for all changes to the reporting requirements — including for changes like those at issue here, which tweak the edges of an existing system, rather than creating an entirely new one. Cf. Chao II, 298 F. Supp. 2d at 126 (finding that couple months lead time under 2003 rule was arbitrary and capricious, as unions would need to "develop . . . new accounting systems" under new functional-category system).

The agency, moreover, directly acknowledged that there have been significant technological changes in recent years, making a union "more adaptable to changes in its annual financial reporting than in the past." 91 Fed. Reg. at 32607. Plaintiff protests that "DOL cited no evidence to support this conclusory assertion." Pl. MSJ at 42. But it is undisputed that today's technological landscape looks nothing like the 1990s, when screechy dial-up modems and floppy disks, rather than high-speed internet and cloud storage, were the technology *du jour*. It was reasonable for the agency to conclude that any technological modifications necessitated by the rule would be easier for the unions to implement than in the past.

To be sure, the union may be correct that "a later effective date might have been a preferable policy decision." Pennsylvania v. DeVos, 480 F. Supp. 3d 47, 66 (D.D.C. 2020). Yet it is not this Court's place to upset an imperfect policy choice or "to impose upon an agency its own notion of which procedures are best." Perez v. Mortgage Bankers Ass'n, 575 U.S. 92, 102

(2015) (cleaned up). The choice of effective date does not flunk the minimum standard of rationality.

## IV. Conclusion

For the foregoing reasons, the Court will grant the Government's Motion for Summary Judgment. An Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: November 13, 2026